### IN THE

# COURT OF APPEALS

### OF

# MARYLAND.

---

## JUNE TERM, 1832.

### The Chesapeake and Ohio Canal Company

### *vs.*

### The Baltimore and Ohio Rail Road Company.

In the month of June, 1828, *The Baltimore and Ohio Rail Road Company*, claiming under their charter, and in pursuance of locations, surveys and purchases of a route for a contemplated rail road, filed several bills in the Court of Chancery, against the *Chesapeake and Ohio Canal Company*. These bills suggested, that the defendants had obtained an injunction prohibiting the complainants from obtaining a title, or right of way, to their located route, and having thus stopped the progress of the complainants' undertaking, were proceeding in their turn, upon the assumption of a prior and paramount right of choice, to acquire title to the route surveyed and adopted by the complainants. The Chancellor upon this case granted an injunction. The defendants in their answers relied upon a prior right of choice to the route in controversy, and that it was impracticable for both companies to occupy it, for the purposes of their several charters. The Chancellor, upon final hearing, granted a perpetual injunction to the complainants, from which, an appeal was taken. It appeared, that the *Baltimore and Ohio Rail Road Company's* charter, was granted by this *State* on the 28th February, 1827. It declared that as soon as 10m. shares of the capital stock should be subscribed for, the subscribers should be incorporated; and it authorised the construction of a Rail Road from the city of *Baltimore* to some suitable point on the *Ohio* river, with as many tracks as the Directors might deem necessary, with power to enter upon, use, excavate, purchase, and condemn any land which may be wanted for the site of the road, and its necessary works. On the 23d April, 1827, this company was fully organized ; its surveys of, and contracts for the route, were made

VOL. IV.—1

in May and June, 1828. The charter of the *Canal Company* originated with the State of *Virginia*, and was passed upon the 27th January, 1824. It authorized the appointment of commissioners to receive subscriptions to its stock, so soon as *Maryland, Pennsylvania, Congress,* and the *Potomac Company,* should assent to its provisions, and declared that whenever one-fourth of the stock "shall have been subscribed for," then the subscribers, their heirs and assigns, should be incorporated ; it also provided for the *Canal Company* becoming the assignee and proprietor of the rights and property of the *Potomac Company,* which was chartered in 1784, to cut such canals, erect such locks, and perform such other works on both sides of the river *Potomac,* as it shall judge necessary, for opening, improving, and extending the navigation of that river, above tide water to the highest part of its north branch to which navigation can be extended, the stockholders of that company receiving an equivalent for the transfer, in the stock of the new company. This charter was accepted, assented to, and confirmed by this *State* upon the 31st January, 1825; and by *Congress* so far as to authorize a canal to be cut in the *District of Columbia,* upon the 3d March, 1825; by the *Potomac Company* upon the 16th May, 1825; and by *Pennsylvania,* conditionally, upon the 9th July, 1826. On the 14th November, 1827, the stock of the *Canal Company* was subscribed for, and on the 20th June, 1828, it was duly organized. On the 15th August following, the *Potomac Company* transferred its rights to the *Canal Company,* and this transfer was accepted upon the 17th September, 1828. The canal charter designated the valley of the *Potomac* for the route of the intended canal. It was in proof that between the *Point of Rocks* and *Cumberland,* in the valley of the *Potomac,* on the *Maryland* shore, (which embraced the route in controversy,) there were between 40 and 50 miles of narrow difficult passes, along which, the canal, if made without reference to the rail road, would have to be supported by embankments made in the bed of the river, many feet below the usual low water mark; that if the *Rail Road Company* has the choice of location, then the canal could either not be built at all, or at such an enormous cost as to render it impracticable. Held, that the *Chesapeake and Ohio Canal Company* has the priority of right in the choice, or selection of ground, for the route and site of the canal in the valley of the *Potomac,* that the injunction should be dissolved, and the bills dismissed with costs.

Upon the true construction of the charter of the *Potomac Company,* (act of 1784, *ch.* 33) the great object in view, was the extension of a water communication from the tide water of the river *Potomac,* up to the highest practicable point on the north branch of that river, and the means such, as might be considered by the corporation necessary, and proper, for the accomplishment of that object, whether by sluices, dams, locks, or by canal navigation. The company was not restricted to improvements in the navigation of the bed of the river, nor to an election between different modes of improvement.

Under this construction of that charter, the valley of the *Potomac,* from tide water to the highest practicable point of navigation on the north branch,

was specifically appropriated to the object contemplated ; and at the time the Company was formed, or became incorporated, it acquired a vested right (not the actual legal title to the land) to acquire land by purchase or condemnation along the shores of that river, to be exerted, wheresoever and whensoever, it should be thought necessary and proper, for the purposes of the charter.

The charter of the *Potomac Company* was a contract between the States of *Maryland*, and *Virginia*, and that Company, the obligations of which could not, without the assent of the corporation, be impaired by any act of the legislature of either of the States, nor by the concurrent acts of both, consistently with that section of the constitution of the *United States*, which declares that "no State shall pass any law impairing the obligation of contracts."

The charter of the *Baltimore and Ohio Rail Road Company* (1826, *ch.* 123,) could not diminish the prior and paramount right of the *Potomac Company* to select or appropriate, by purchase or condemnation, any lands in the valley of the *Potomac*, for the route and site of a canal or canals, wherever it should think proper along the borders of the river, either in terms, or by any construction of it, that would have authorised the *Rail Road Company*, without the assent of the *Potomac Company*, to occupy for the route and site of the road any place along the river, in such a manner, as either to exclude that Company from a priority in a choice of a site or sites, for the construction of the works authorised by its charter, or in any manner to restrict and circumscribe it in the exercise of its prior right of election.

The *Chesapeake and Ohio Canal Company*, as the assignee of the *Potomac Company*, stands in its place, is invested with its prior and paramount rights, by express legislation of this *State*, and transfer from the *Potomac Company*, and is entitled to all its privileges and exemptions.

Neither *Maryland*, nor *Virginia*, without the consent of the other, nor both of them without the consent of Congress, could have repealed the charter of the *Potomac Company*, nor have received or authorised the surrender of it, and its works, to another company. The canal was declared to be, when completed, a public highway through the territories of the sovereign powers which created the *Potomac Company*, in which the United States were interested.

The consent of Congress to the charter of the *Chesapeake and Ohio Canal Company* was not given as the legislature of the *District of Columbia*. Congress has no capacity to act as the local legislature of that, or any other particular district, and can only act in the capacity of legislature of the Union, in which capacity, it assented to that charter, and no State, after having entered into a solemn agreement with another, is competent to renounce the constitutional assent of Congress as the legislature of the Union.

The *Potomac Company* having surrendered its charter, and transferred all its rights and property to the *Chesapeake and Ohio Canal Company*, with the assent of *Congress*, *Virginia* and *Maryland*, in consideration of a stipulated equivalent in the stock of the Canal Company, the value of which depends upon the inviolate conservation of the chartered rights of the Canal Com-

pany, the State of *Maryland* could not by subsequent legislation, impair the rights of the new Company without the consent of the parties interested.

The charter of the *Chesapeake and Ohio Canal Company*, clearly and specifically designates the valley of the *Potomac*, for the intended route of the canal it was enacted to open, from tide water to *Savage Creek*.

In the construction of a statute, the whole law is to be examined together, and one part construed by another, with a view to give effect and operation to the whole, if it can be done.

It is laid down in some of the books, that in construing a statute, the title (being no part of it) is not to be regarded, but we have high authority in this country for a different rule of construction. The title, however, cannot control the express words of the enacting clauses.

The preamble of a statute is a key to its construction.

Where a corporation was created to effect a particular object, as to make a river navigable which was not so before, and no particular mode of accomplishing that result was pointed out in the charter, it will be intended, that the legislature designed that the river was to be made navigable, in any of the known modes, in which the navigation of a river may be improved.

A corporation may forfeit its charter by non-user or mis-user of its franchises; but it is well known, that such forfeiture can only be enforced by judicial proceedings, instituted for that purpose, at the instance of the government; and that no cause of forfeiture can be taken advantage of collaterally or incidentally; and the same principle applies, as well, to a question of forfeiture of a particular franchise, as of the whole.

It is not every non-user that will furnish a sufficient ground of forfeiture.

Where there are various alternative modes of exercising a franchise, authorised without limitation of time by a charter, subject each of them to be changed at the will of the corporation, no experimental trial of one of the modes, could work a forfeiture of the right to resort to either of the other modes, during the continuance of the charter.

There is no difference in principle, between a law that in terms impairs the obligation of a contract, and one that produces the same effect in the construction and practical execution of it; both are repugnant to the constitution of the United States, and void.

Where the grant of an estate in land is defeasible on the non-performance of a condition subsequent, it is not defeated upon the mere happening of the contingency upon which it is defeasible, but the law permits it to continue beyond the time when such contingency occurs, unless the grantor or his heirs take advantage of the breach of such condition.

The proceeding by the government for the breach of a condition subsequent, contained in a charter of incorporation, is by *scire facias*, or *quo warranto*.

A private corporation aggregate may be dissolved by the death of all its members: or by the loss of an integral part, whereby it is rendered unable to do any corporate act, or to restore itself by a new election; or by a surrender to the government of its franchises; or by an act of the legislature repeal-

ing the act of incorporation with the assent of the corporation; or by a forfeiture of its charter through abuse or neglect of its franchises, as for a condition broken, there being a tacit condition in every such grant, that the corporation shall act up to the end of its institution.

A forfeiture must be judicially inquired into, but a dissolution need not be.

Every law which is to wrest from an individual his property, without his consent, must be strictly construed.

All statutes *in pari materia* are construed as one law.

A State may contract with an individual, and it is equally certain, that two or more of the States may enter into a compact or agreement *inter se.*

A State may contract with an individual by an act of the Legislature, and two or more States may contract in that form, *inter se.*

No technical words are necessary to constitute a compact or contract, which are convertible terms, and neither need be used in the instrument creating it.

It is a mutual consent of the minds of the parties concerned, respecting some property or right that is the object of the stipulation, or something that is *to be done or forborne,* a transaction between two or more persons in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised or stipulated by the other, and any words manifesting that *congregatio mentium,* are sufficient to constitute a contract.

The terms "accept" and "assent to," are words of contract, and it was by virtue of such and similar terms in the constitution of the *United States,* that the Federal Government, when it received the sanction of the people, and the requisite number of States, became a compact between the parties to it and the Federal Government, and not a mere confederacy or league.

A charter being a grant, is an implied contract with the corporation not to reassert the rights it has granted.

The corporate right to select and acquire land for the authorised purposes of a corporation, is property. It is an incorporeal hereditament, not a legal title to the land itself, nor a mere capacity or faculty to acquire and hold land, such as every individual possesses. But in addition to such capacity, it is a right or privilege, a portion of the eminent domain, vested in the corporation to acquire the legal title to land, subjected by the grant to its will, and thus to convert the incorporeal right into a corporeal hereditament, and in the franchise to choose and condemn land for any particular public purpose, that portion of the eminent domain granted and subsisting in one corporation, cannot be bestowed upon another to the prejudice of the former grant—nor can any other legally acquire any such right of way, or title to land over which the franchise extends, as will hinder the former corporation in the exercise and enjoyment of its franchise.

In ordinary cases the *State* may repeal or modify at pleasure any act of incorporation granted by it, before it is accepted, and when no rights have been acquired under it. Until accepted it is not a grant, nor the public faith pledged not to impair it.

But in relation to the *Chesapeake and Ohio Canal Company*, although it was not actually incorporated, and had not accepted its charter before the *Baltimore and Ohio Rail Road Company* was chartered and organized, yet it is entitled to all the rights, benefits, and liberties, with which it would have been invested, if it had been organized before any antagonist corporation came into existence, on the ground of the compact and agreement of *Congress*, and the States of *Virginia* and *Maryland*, *inter se*, and between them and the *Potomac Company*, arising from the reciprocal and concurrent acts of the three former, and the assent of the latter, the consummation of which, was the consent of the *Potomac Company*, given anterior to the date of the *Rail Road Charter*, and under the Constitution of the *United States*, cannot be impaired by any thing contained in that charter.

An abridgement of the right of choice in selecting the route, impairs the obligation of the contract.

As between the holders of general or common land warrants, there is no priority of right to locate; this warrant, is a mere authority to the Surveyor or proper officer to make the survey, and the certificate is the inception of title, to which, the patent, when issued, relates. The title remains in the *State* until the warrant is located, and will pass under a junior warrant, if first executed.

But it is not so with an act of incorporation, which when accepted, amounts to a grant, and the right conferred, a vested franchise, existing independent of any act of location or survey, which the *State* cannot re-assert, nor grant to any other. It is a prior right to which all subsequent grants must yield.

A chartered company may lose its prior right by acquiescing in other works, inconsistent with such rights.

Statutes should be construed with a view to the original intent and meaning of the makers, and such construction should be put upon them, as best to answer that intention, which may be collected from the cause or necessity of making the statute, or from foreign circumstances, and when discovered ought to be followed, though such construction may seem to be contrary to the letter of the statute.

If laws and statutes seem contrary to one another, yet if by interpretation they may stand together, they shall stand; and when two laws only so far disagree or differ, as that by any other construction they may both stand together, the rule, that subsequent laws abrogate prior and contrariant laws, does not apply, and the last law is no repeal of the former.

Repeals of statutes by implication are things disfavored by law, and never allowed of, but when the inconsistency and repugnancy are plain and unavoidable.

When it is manifestly the intention of the Legislature that a subsequent act shall not control the provisions of a former act, the subsequent act shall not have such operation, even though the words of it, taken strictly and grammatically, would repeal the former act.

Upon the motion to dissolve an injunction, the Chancellor confines himself exclusively to the consideration of the case, or combination of facts set

forth in the bill, out of which the equity of the injunction arose, and to the answer of the defendant to those facts. PER BLAND, CHANCELLOR.

The best test of what are properly averments of facts in a bill or answer, is, whether they are such matters as a witness may be called upon to prove, or the truth of which must be established by *evidence*, to enable a court to act; if they are not, then such averments are either, mere principles of equity, or some of those public and established facts, of which, the court is bound to take judicial notice without any proof. IB.

As to all those facts and circumstances of which a court is bound to take notice, on a motion to dissolve an injunction the parties stand before it in the same situation, as that, in which a dissolution is asked for, on the ground that the facts set forth in the bill give rise to no equity, on which an injunction ought to be granted. IB.

If it appears that the facts as stated in a bill, looking to it only, give rise to no equity, it is very certain that the injunction would be dissolved, whether the defendant had answered or not, or however imperfectly he might have answered. IB.

No evidence can be required to prove the existence of a fact which must have happened according to the constant and invariable course of nature, or to prove any general law, or other public matter which the courts are bound to notice. IB.

It is not the duty of the courts to take judicial notice of the execution of a public statute. The various modes in which public statutes are carried into effect, by the executive officers of government are mere facts, and must be proved as facts. If relied upon to avoid an equity upon which an injunction was rightfully granted, upon the motion to dissolve, the court cannot notice them. IB.

APPEAL from the Court of Chancery.

A bill was filed by the appellees, against the appellants, and the *Potomac Company*, on the 23d of June, 1828, which stated—That by an act of the legislature of *Maryland*, passed at December session, 1826, entitled, "An act to incorporate *The Baltimore and Ohio Rail Road Company*, it was enacted, that as soon as ten thousand shares of the capital stock of said company should be subscribed, the subscribers thereof should be incorporated into a company by the name of *The Baltimore and Ohio Rail Road Company*, and should be clothed with all the powers necessary to the construction of a rail road from the city of *Baltimore* to the river *Ohio;* that the sum required in order to the incorporation and organization of said company having been previously obtained, the said company was duly or-

Bill.

ganized by the election of a president and directors to ma-
nage the affairs of the same; that the subscriptions to the
capital stock of said company having been augmented, so as
to amount in all to four millions of dollars, the said compa-
ny found itself, at once prepared to commence the construc-
tion of said road, and possessed of means at least sufficient
for its completion to the town of *Cumberland*, in *Alleghany*
county; and that with a view to the construction of said
road, the president and directors of said company caused
all the various routes for said road to be examined by skil-
ful engineers, in order to the determination of its general
direction, who ultimately recommended the adoption of the
southern route for the said road, to wit: from *Baltimore* to
the *Potomac* river by the waters of the *Patapsco* and the
*Monocacy*, striking the *Potomac* at the *Point of Rocks*, on
the north-eastern side of the gap, at which, the *Potomac*
passes through the *Catoctin* mountain, and thence to *Wil-
liamsport*, and thence with the *Potomac*, with inconsider-
able deviations, to *Cumberland*; that the route for said road
was finally adopted by the said president and directors, and
the said president was ordered, by a resolution of the said
board of directors, to proceed at once, to the construction of
said road, upon said route. Your Orator further sheweth,
that after said route for said road had been definitely ascer-
tained by said report, and a day for the commencement of
the operations of the company thereon assigned, the said
president and directors deputed engineers to pass along the
route thus adopted, and whenever the character of the
ground was such, as to leave but little choice as to the lo-
cation of said road, to make an actual location of the same
at once over such ground, so that the said actual locations
might serve as regulating points, for its location over the
intermediate sections, and secure the passage of said road;
and the said president and directors also deputed agents
and attorneys to accompany said engineers, who were di-
rected and required by the said president and directors to
take all necessary or proper steps, to procure a title to the
lands over which said actual locations were made, or to a

Bill.

right way over them. Your Orator further sheweth, that under and in conformity to the requisitions of the said president and directors, the said engineers proceeded at once to the actual location of said road, over such portions of the route from the *Point of Rocks* aforesaid, to the town of *Cumberland* aforesaid, of which specifications of said locations which have been adopted and confirmed by the said president and directors, and which extend from the *Point of Rocks* inclusive, through *Frederick, Washington*, and *Alleghany* counties, to and over the lands of *John Mitchell*, in *Alleghany* county, lying immediately above *Mitchell's* rocks, and above the lands of *John Folch*, are herewith exhibited marked A B C D, &c. &c. That all the said lo cations were made with a *bona fide* intention on the part of your Orator, of perfecting its incipient title to the lands included in said locations, or on the route of said road, by purchase, condemnation, or otherwise, and of proceeding as speedily as possible, to the construction of said road over the same. That acting with this intention, and designing to accomplish this object, the said president and directors therefor deputed agents and attorneys to procure a title to the same, or a grant of a right over the same, as aforesaid; and that the aforesaid agents and attorneys of the said company, in pursuance of the authority aforesaid, and to accomplish the objects aforesaid, have obtained from various persons (whose names were specified) relinquishments or agreements, under hand and seal, binding themselves, their heirs and assigns, to grant to your Orator, a right of way for the *Baltimore and Ohio Rail Road, either specifically according to the said actual locations, or generally, so as in either case, to bind all the lands lying within the said actual locations.* Your Orator further shows, that all its above mentioned acts in locating said road, and obtaining and securing a right of way for said road over the lands included in said locations, were done by your Orator in strict pursuance of the powers conferred upon it, by the above mentioned act of assembly, and with a view to the accom-

Bill.

plishment of the objects for which said company was incorporated, in the best possible manner, and not *merely* with the intent and design on the part of your Orator, to impede or obstruct the *Chesapeake and Ohio Canal or Potomac Companies,* hereafter mentioned, in the exercise of their respective powers; and that to carry into effect the agreements and relinquishments above mentioned, which are herewith exhibited marked 1 2 3 4 M M, and which your Orator prays may be taken as a part of this bill of complaint, the said agents and attorneys of the said president and directors were about to procure grants of said lands, or of rights of way over them, from said grantors, in conformity to their above exhibted agreements, by deed duly acknowledged for record, or to institute the necessary proceedings to enforce the specific performance of such agreements, where such grant was refused, and would have procured such grants, or have instituted such proceedings.  But now so it is, may it please your honor, that after the above mentioned acts had been done, by and under the direction of the said *president and directors of the said Baltimore and Ohio Rail Road Company;* after the above mentioned actual locations of said road had been made, and the above mentioned contracts or agreements with your Orator made or entered into, upon an application to *Washington* County Court, as a court of equity, made in the name and on the behalf of the *Chesapeake and Ohio Canal Company,* and *Potomac Company,* by bill of complaint, praying a writ of injunction against your Orator, its attorneys, agents, and all persons whatsoever acting under its authority, or on its behalf, to prevent them from obtaining a title by purchase, deed, or condemnation, or otherwise, to any of the lands lying within the actual locations aforesaid, or to a right of way over them, and otherwise, to restrain the lawful acts and proceedings of your Orator, an injunction as prayed for, was accordingly issued; all of which will more fully appear from a copy of the said bill of complaint, and the said writ of injunction,

Bill.

which are herewith exhibited, and which your Orator prays may be taken as part of this bill of complaint. Your Orator is advised, that neither the said *Potomac*, nor the *said Chesapeake and Ohio Canal Company, has any such unquestionable and absolute right of election and pre-emption for the route or site of said canal, as to all or any of the lands lying within the aforementioned actual locations of said Baltimore and Ohio Rail Road, as is set forth in said bill of complaint ;* that as your Orator is credibly informed and believes, neither of the said companies had obtained, at the time of issuing the said injunction, any title or right, by location, purchase, deed, condemnation, or otherwise, to the exclusive use and possession of any of said lands: that the *Potomac Company* has been organized for more than forty years, and during all that period has not exercised any franchise or right of election as to said lands, which it may have derived under its charter, so as to vest in it an exclusive title to the same, or to any part of them, and that at the time when all the above mentioned locations and agreements were made, the said *Chesapeake and Ohio Canal Company* was not, and never had been, sufficiently organized so as to be competent, under its charter, to do such acts, make such contracts, or accept such gifts, grants and relinquishments, as were, and are necessary to vest in the said company any pre-emption, election, or exclusive right, to any of the lands lying within the aforesaid actual locations; although as your Orator has reason to believe, from the allegations of said bill of complaint of said company, and from other information from credible persons, and verily does believe, the said *Chesapeake and Ohio Canal Company* is now sufficiently organized for said purposes by the election of a president and directors. And your Orator further alleges, that it has good reason to believe, and verily does believe, that whilst the said *Chesapeake and Ohio Canal and Potomac Companies* were professing, in their said bill of complaint, an entire reliance upon the pretended priority and right of election,

Bill.

as set forth in said bill, unaccompanied and unfortified by any location, purchase, condemnation, or other act, on their part, as necessary to secure and vest in them, such alleged priority and right of election, it was the principal, if not the sole object of the said companies, and their confederates, in obtaining said injunction, to obstruct and prevent your Orator, from enjoying the benefit of the above mentioned agreements and relinquishments, and from perfecting the same by deed or conveyance, so as to vest in your Orator, a complete legal title to the lands to which said agreements or relinquishments relate, or to a right of way over them, until the said *Chesapeake and Ohio Canal Company* was properly organized and prepared to appoint, and might appoint agents, adopt routes, make or cause to be made locations and contracts, and do and assent to all other acts which might be necessary or proper to vest in the said *Chesapeake and Ohio Canal Company* a title to the very lands, for which, or a right of way over which, the above agreements have been entered into with your Orator.   And your Orator has also good reason to believe, and verily does believe, that it was the intent and design of the said companies, and their confederates, in applying for and obtaining said injunction, to set up their pretended priority for the purpose of restraining your Orator from enjoying the benefit of the above agreements, and from acquiring a title to the lands affected by the same, until the said *Chesapeake and Ohio Canal Company* was competent and prepared to acquire, and could acquire, a title to the said lands, in the very mode in which your Orator was about to obtain, and would have obtained a title to the same, but for the interposition of the above mentioned injunction, and might thus be enabled, if their propriety and right of election, set forth and relied upon in their said bill of complaint, should fail them, to resort to a title acquired by purchase, deed or condemnation, and acquired only, by fraudulently restraining your Orator from availing itself of the equitable title which it derives under said agreements; and as further evidence of

such intention and design, your Orator alleges, that it has been credibly informed, and verily believes, that since the said locations and agreements have been made, and the said injunction obtained, and before, attempts have been made by one or more agents or persons, professing to act under the authority of the said companies, and on their behalf or for their benefit, to dissuade and prevent parties to the said agreements from performing their said contracts, and to procure from them, deeds for, or written agreements to convey the very lands affected by such agreements, or lying within the actual locations as aforesaid, and that one or more such deed or agreement has actually been obtained by a certain *Clement Cox*, or under his directions as the agent, or professing to act for the said companies; from all of which, and many other actings and doings of the said companies, and their attorneys, solicitors and agents, to obstruct and hinder your Orator in the enjoyment of its rights, your Orator has reason to believe, and verily believes, that the said companies, or their agents, combining and confederating for the wrongful purposes aforesaid, will endeavor to procure, and are endeavoring to procure, deeds for the said lands, from the very parties to the said agreements, and in violation of said agreements, or to value and condemn them, or have them valued or condemned for the use of the said *Chesapeake and Ohio Canal Company*, so as to hold them free, if possible, from any equitable interest in the same, which your Orator may have acquired under said agreements, and if not prevented, will procure, or value and condemn them, for their own use, and will endeavor to obtain, and will obtain, possession of the very lands affected by such agreements, and will prevent your Orator from taking possession of the same, and will otherwise obstruct and hinder your Orator in exercising its rights under said agreements over the same. And your Orator further showeth, that having a due respect for, and in all respects obeying the said injunction issued out of *Washington* County Court, it will, during the continuance of said injunction, be restrained

Bill.

from doing any act whatsoever, to protect the title which it derives under said agreements against said companies, and will, during that period, be left unprotected against the unjust and inequitable attempts of the said *Chesapeake and Ohio Canal and Potomac Companies*, to take advantage of their own wrong, by procuring titles by purchase, location or condemnation, so as to give a priority which they could not have obtained but for the said injunction; that the said injunction has been issued solely to protect an alleged priority or right of election in the said *Chesapeake and Ohio Canal and Potomac Companies*, as set forth in their bill, and not requiring any acts on the part of said companies, such as location, purchase or condemnation, to vest or originate the same, and as the said companies in their said bill of complaint allege, only in order to a speedy determination as to the existence of such priority of right, and that the purposes and objects of said injunction can be accomplished, and full justice done to your Orator, and to the said companies, in the premises, only by restraining the said *Chesapeake and Ohio Canal and Potomac Companies* from doing any act or acts whatsoever to deprive your Orator of the benefit of said agreements, until the question of priority or right as claimed by said companies, shall have been determined upon their said bill of complaint; so that, if said question should be determined against the said companies upon their said bill, your Orator may be remitted to all the rights which it possessed or enjoyed at the time of such injunction obtained, unaffected by any wrongful acts, in prejudice of the same, which the said companies may have done under color of said injunction, and in perversion or abuse of its objects, that thus all the alleged rights and priority of the said companies will be saved and reserved to them from their alleged nature, and by the aid of the above mentioned injunction, to which your Orator is ready to pay all due respect, and all the equities of your Orator will also be preserved and reserved to it, so that in the event of a decision in its favor upon the bill of complaint of the

Bill.

said companies, it will be remitted to the full enjoyment of them. Wherefore, and forasmuch as without such restriction imposed upon the said *Chesapeake and Ohio Canal and Potomac Companies,* and their agents, your Orator may be thus unjustly deprived of or injured in the possession of said equitable rights, and may thus suffer an injury which cannot be repaired by any decision in its favor upon the bill of complaint of the said companies, and forasmuch as a Court of Equity can alone give relief in the premises, and this honorable court having full jurisdiction co-extensive with the limits of the State, can alone give that speedy, extensive, and efficient relief which the nature and urgency of the case require. To the end therefore, that the said *Chesapeake and Ohio Canal Company* and the said *Potomac Company,* being companies incorporated and organized under acts of the legislature of *Maryland,* may under their respective corporate seals, full, true, and perfect answer make, to all the matters herein before set forth, and that in the mean time the said *Chesapeake and Ohio Canal Company and Potomac Company,* their agents or attorneys, and the agents or attorneys of either of them, and all persons acting or professing to act under their authority or on their behalf, or on behalf of either of them, may be strictly prohibited and enjoined, &c.

On the 24th of the same month, a second bill was filed by the same parties, alleging that, where, from the absence of the owners of the land, over which the road was located, or from other causes, they were unable to make such agreements or contracts as are spoken of in the preceding bill, they were causing warrants to be issued for the purpose of condemning the same, in the manner authorised by their charter, and they asked for and obtained an injunction, to protect them in the rights so acquired.

On the 25th of the same month, they exhibited a third bill, asking to be protected in the rights which they alleged themselves to have acquired, in virtue simply of actual locations for the route and site of the road, independent, either

Bill.

of contracts with the owners of the soil, or proceedings for its condemnation; and an injunction was accordingly granted and issued for that purpose.

On the 16th of May, 1829, *the Chesapeake and Ohio Canal Company* answered these bills, as consolidated in one suit. The answer stated, that in order more clearly to illustrate the antiquity of their right and title, and of the public recognitions of their right and title, in preference to all other projects of internal improvement, and to the claims and interests of all other corporations and individuals, particularly of the complainants, to appropriate to the construction of the *Chesapeake and Ohio Canal*, and of its incidental works and appendages, the most eligible, proper, and convenient site or route for the canal through the vale of the *Potomac*, from tide water to its highest sources, and especially that identical site and route along the vale and narrow passes of that river, from the *Point of Rocks* where the river passes through the *Kitocton* mountain in *Frederick* county, *Maryland*, to *Cumberland*, in *Alleghany* county, which the complainants have attempted, or now pretend in their said bills, a right to appropriate and occupy for the site and route of their intended rail road, they deem it expedient and proper to submit to the court, a historical deduction of their title, from the inception of the first scheme for improving the navigation of that river by means of a canal or otherwise, to its consummation in the charter, by which these respondents are incorporated, shewing the notoriety of the public and early dedication of the ground in question, to the ends and purposes of a canal supplied by the waters of the *Potomac* and its tributaries; the authentic and binding acts of public authority, and the implied as well as direct pledges of public faith, by which such dedication of the ground in question has been sanctioned and guarantied; and the conclusive, and plenary notice of the same, with which the complainants have advanced their adverse pretensions, and in so doing, have not only unconscionably infringed the chartered rights of these respondents, but have

Bill.

attempted to overreach, contravene and defeat the high objects and intents of public policy, as authentically declared and promulgated by the most solemn conventions of states, communities, and individuals, and irrevocably established by numerous legislative enactments.

That the improved navigation of the *Potomac*, by means of a canal or otherwise, from tide water to the sources of that river, or at least as high as *Cumberland*, was early considered, before the incorporation of the late *Potomac Company*, and both before and after the revolution, an object of public and national importance; and as such, engaged the active attention of the most eminent statesmen and patriots in *Virginia* and *Maryland;* that immediately after the peace of 1783, it was the first and leading object of public improvement, to which, those states and their principal citizens directed their attention; that the far-reaching views of the eminent citizens, conjointly employed by those states in devising and perfecting the plan of that great improvement, and among the most active and zealous of whom were found many of the most celebrated patriots and warriors of the revolution, contemplated it, even at that early period, as the great channel of commerce and intercourse, which was to connect the original states, with the vast and fertile regions beyond the *Alleghanies;* and that the charter of the late *Potomac Company* was the practical and direct result of those enlarged views and objects, is matter of history; and is more particularly illustrated by the papers and plans of *General George Washington*, by the delegation from the states of *Virginia and Maryland*, of that eminent citizen and other most distinguished public men of both states, as commissioners, to consider and report a plan of the work; by the public proceedings and report of those commissioners at *Annapolis*, in the year 1784; and by the concurrent laws of *Virginia* and *Maryland* establishing the late *Potomac Company*, followed up by various acts of the like concurrent legislation, from time to time, enlarging, modifying, or confirming the original charter of that compa-

Answer.

ny. For authentic copies of some of the preliminary documents and proceedings above referred to, and of all the laws relating to the said *Potomac Company*, these respondents pray leave to refer to the printed collections of the same, annexed to this answer, among the other public and authentic documents hereto annexed, and enumerated in a schedule hereto annexed; all of which they aver to be public and authentic documents, and pray that the same be received and referred to, as part and parcel of this their answer.

It was found, after an experience of between thirty and forty years, that the plan adopted by the late *Potomac Company* for rendering the river navigable, was essentially defective, and wholly inadequate to the great objects for which that company had been instituted; that all their large capital, and the long and arduous labors of so many years, had been expended without attaining the great end of an uninterrupted and safe navigation from the tide water to the source of that river; a failure not originating in any defect of zeal or perseverance, or general intelligence in the conduct of that company, but in the inadequacy of their pecuniary means at the time; in the imperfect state of the science of canalling, and in the general misconceptions of the facilities afforded by the river itself, for navigation, and of the comparative advantages of a continuous canal through the vale of the river, supplied by its own and its tributary waters, and of what is called sluice navigation; misconceptions, common to them, and to the whole *American* community, till the progressive lights of experience and science had subsequently demonstrated the superior advantages of the continuous canal. When this unfortunate result had become evident, the *Potomac Company*, as well as the community at large, began to consider, with an earnestness and solicitude due to the great and extensive interests dependent on the scheme, the means of repairing the original errors in its theory and details, and of reverting to the proper, and now demonstrated plan of a continuous canal all along through the vale of the river, using the waters of the

Answer.

river and *its* tributaries as feeders to the canal; a plan entirely within the scope of their chartered powers, and of the original, notorious, and declared ends and objects of their institution; and with this the company connected the ulterior plan to which their chartered limits did not then specifically extend, and the practicability of which, had but recently been thought deserving of further inquiry, (after the report of the *Secretary of the Treasury*, in the year 1808, assuming it to be impracticable for a canal to pass the summit of the *Alleghany*, for want of an adequate supply of water on the summit level,) of effecting a connected canal navigation between the head waters of the *Potomac and Ohio river*. With these views, the late *Potomac Company*, in the year 1819, applied to the Board of Public Works of *Virginia*, to institute, through their principal engineer, the proper examinations and surveys for determining the best mode of improving the navigation of the *Potomac*, and facilitating a communication by way of that river, with the western waters. In consequence of which application, the legislature of *Virginia* passed their resolution of the 8th of January, 1820, requesting the said Board of Public Works, to inquire into the expediency of directing their principal engineer, to examine the waters of the *Potomac*, and to explore the country between the *Potomac* and *Ohio*, &c. with a view to ascertain and report the practicability of effecting a communication by canals between those rivers; an authentic copy of which resolution is hereto annexed among the said scheduled documents. And the said Board of Public Works did accordingly cause the proper examinations and surveys to be made by their principal engineer, the late *Thomas Moore*, who, in the year 1820 made his official report of the same, which, with the said application from the *Potomac Company*, was officially printed and published in the annual reports of the said Board, and is hereto annexed among the said scheduled documents.

The examinations and surveys of the ground itself, by this practical and gifted engineer, gave results very differ-

Answer.

ent from those of the report of the *Secretary of the Treasury* above referred to, and which had proceeded upon the apprehension of conjectural difficulties, not brought to the test of professional examination and experiment, as will be evident from a comparison of the two reports.

This report of *Mr. Moore* gave a fresh impetus to public curiosity, and the long talked of plan of a connected navigation between the eastern and western waters, was agitated with renewed interest. Then followed the law of *Virginia*, and the concurring resolutions of the general assembly of *Maryland*, (also annexed among the said scheduled documents,) passed at the December sessions, 1821, of the legislatures of those states respectively, for the appointment of two commissioners on the part of each state, among other things to examine into and report the state of the navigation of the *Potomac*, and to advise and consult as to the measures most advisable to be recommended to, and conjointly adopted by, the said states, either for giving aid to the *Potomac Company* in the further prosecution of the work, or for the more effectual improvement of the navigation of the said river by other means, &c.

The commissioners appointed in pursuance of the said law and resolutions, proceeded in the summer and autumn of the year 1822, to execute their commission in its utmost latitude, with the assistance of the said *Thomas Moore*, the principal civil engineer attached to the Board of Public Works of *Virginia*, and other competent engineers and surveyors. Their joint report of their proceedings, with an appendix of explanatory documents, was duly returned to the respective governors of the two states, in December, 1822, and by the said governors officially communicated to the respective legislatures of those states at the December sessions, 1822, of the same, and were immediately printed and published at public expense, in both states, by the authority of each legislature; and a copy of the same report, &c. was in January, 1823, sent with an official and public communication from the governor of *Maryland* to the president of

Answer.

the senate of the *United States*, to be laid before the senate pursuant to a resolution of the general assembly of *Maryland*, and was, together with the governor's communication, then immediately re-printed and re-published by order of the senate, among its public documents; each of the printed copies, so printed and published by authority of the legislature of *Maryland*, and of the senate of the *United States*, is hereto annexed among the scheduled documents.

These respondents also refer to the original communication from the governor to the general assembly of *Maryland* at the December session, 1821, and the report of the committee of the house of delegates at that session thereon, as printed and published by authority of said house, and hereto also annexed among the said scheduled documents.

At the same sessions of the two legislatures of *Virginia* and *Maryland*, to which the report of the commissioners was communicated by their respective governors, applications were made to each legislature, by a number of individuals and corporations, acting in concert, for a charter to a new company, in place of the old *Potomac Company*, upon certain terms, for the surrender of the charter of the latter, approved by them. This new charter, connected with a provision for a considerable part of the stock to be taken by each state, was at that time earnestly solicited by the persons principally interested in the scheme; and especially by the three corporate cities in the *District of Columbia*, who deputed proper agents to solicit and advance the plan with the two legislatures. Such progress was made in this matter with the legislature of *Maryland*, that in January, 1823, a bill to establish the *Potomac Canal Company* was reported by a committee to the house of delegates; one of the copies of which, as printed by the authority of the said house, is hereto annexed among the said scheduled documents. But as this was accompanied by a proposition for a large pecuniary contribution from the state, which met with considerable objection and difficulty in the assembly, and without which the friends of the bill did not deem it material to

Answer.

press the enactment of the charter, that session passed over without any definitive enactment on the subject.

At the contemporary session of the *Virginia* legislature on the 22d February, 1823, an act incorporating the *Potomac Canal Company* did pass; an authentic copy of which is also here annexed among the said scheduled documents. The original bill had been presented to the *Virginia* legislature, and the enactment of it solicited in the same terms as that above mentioned in the *Maryland* legislature, and underwent in its progress, sundry changes and modifications, originating with, and suggested by particular members of the *Virginia* assembly.

About the time that these proceedings were going on in the two state legislatures, the subject was brought before *Congress*, in consequence of sundry memorials from the inhabitants of *Pennsylvania*, *Maryland*, and *Virginia*, and of resolutions moved in *Congress* on the suggestion of certain members of that body. For the progress of that body, in considering the subject and preparing measures for the advancement of the projected canal, in the winter of 1821-2, and the ensuing spring, these respondents refer to the printed and official reports and proceedings of the house of representatives of the *United States*, at the first session of the seventeenth *Congress*, mentioned in the annexed schedule.

Before the sessions of the two legislatures of *Virginia* and *Maryland*, for December, 1823, when the solicitations for the final enactment of the charter were intended to be renewed with unabated activity and zeal, the views of the numerous individuals and communities interested in the business, were considerably extended and improved in the scope and objects of the immediate plan of the canal. The great scheme of a canal, not confined to the *Potomac* region, but forming a connected navigation between the head waters of that river and the western waters, even to *Lake Erie*, had excited such general attention, and so intense an interest throughout the country, that the people of the states of *Virginia*, *Maryland*, *Pennsylvania*, and *Ohio*, and of the

Answer.

*District of Columbia,* solemnly appointed numerous delegates from among their most respectable and influential citizens, to meet in convention at the seat of the general government, and there consult and co-operate for the advancement of the common object; this convention held its first session at *Washington,* in November, 1823, and its second session at the same place in December, 1826; the debates and proceedings in both of which were public, and were respectively printed and published immediately after each session of the convention; and an authentic copy of all of which, collected in one pamphlet, containing a second printed edition of the proceedings of the first session, together with the proceedings of the second, printed and published immediately after its adjournment, is hereto annexed among the said scheduled documents.

From the time of the organization of this body, the whole management of the undertaking, the business of maturing its plan, of promoting and soliciting its general interests, and the grant of a charter and public patronage from the several legislatures and governments upon which it more particularly depended, and in fulfilment of the enlarged and beneficial views disclosed in the proceedings of the convention, devolved upon that body, and the several standing committees appointed by, and acting under its authority, as recorded in its proceedings; reinforced by the occasional representations and memorials of the corporate cities in the *District of Columbia,* and the commissioners appointed by the Executives of *Virginia* and *Maryland,* and the *President of the United States,* to open subscriptions for the capital stock of the company, pursuant to the charter finally obtained. The report of the central committee of the said convention, as printed in the aforesaid proceedings of its second session in December, 1826, correctly details the actings and doings of that and its associate committees, and the general objects and results of their labors during the recess of the convention; and these respondents refer to the same, among other of the recorded and published proceed-

Answer.

ings of the said convention, as part of this their answer. For the further proceedings of the said convention, and its committees, and of other parties interested in the public project of the *Chesapeake and Ohio Canal*, and for the action of the public authorities upon the subject, from the adjournment of the first session of the said convention in November, 1823, down to the passage of the act of Congress of the 24th of May, 1828, authorising a subscription to the stock of the *Chesapeake and Ohio Canal Company*, the respondents refer to all and singular the public proceedings and acts of the legislatures of *Virginia, Maryland*, and *Pennsylvania*, and of the Congress of the *United States*, and the several committees of those bodies, as recorded and published in their respective journals, reports, documents, and bodies of laws; the whole of which, in any manner relating to the subject of the *Chesapeake and Ohio Canal*, its plan, course, and construction, to its adoption by the public authorities as a work of national import, to the interest taken in it by the several States and the *United States*, to the incorporation of this company, and to all the preparatory legislative deliberations, measures, and proceedings, leading to that act, or consequent to it, these respondents pray may be referred to and taken by this court as part and parcel of this answer, and as public, authentic and notorious, in themselves.

From these documents the respondents deem it material, by way of illustration, here to recapitulate only the following facts, which are verified in detail by the said documents, and are true, and of public notoriety.

At the opening of the first session of the eighteenth *Congress*, in December, 1823, the *President of the United States*, in his message to *Congress*, having direct reference to the said convention, and its proceedings in the month of November preceding, mentioned, with decided approbation, the plan of the *Chesapeake and Ohio Canal*, as having been suggested by many patriotic and enlightened citizens, and recommended an adequate appropriation for the employ-

Answer.

ment of a suitable number of the officers of the corps of engineers, to examine the ground, and report their opinion thereon : and also to extend their examination, to the several routes through which the waters of the *Ohio* may be connected by canals, with those of *Lake Erie.* This, among other important objects of internal improvement, having been thus officially brought before *Congress*, the whole subject was referred to a committee of that body, called the committee on roads and canals, who, at the same session, reported a bill, which was passed on the 30th day of April, 1824, appropriating the sum of thirty thousand dollars, for the purpose of procuring the necessary surveys, plans, and estimates upon the subject of roads and canals.

In the month of May following, the *President of the United States* appointed, from among the corps of engineers and the topographical and civil engineers in the service of the *United States*, a board of internal improvement, with assistants to superintend the execution of the provisions of the said act ; and attached to the said board several officers of the corps of engineers and of the topographical engineers, with sundry civil engineers and surveyors in the service of the *United States*, to perform the practical operations in the field, under the direction of the board. The board was instructed "to make an immediate reconnoisance of the country, between the tide waters of the *Potomac* and the head of steam boat navigation of the *Ohio*, and between the *Ohio* and *Lake Erie*, for the purpose of ascertaining the practicability of a communication between those points, of designating the most suitable routes for the same, and of forming *plans and estimates* in detail of the expense of execution." The board was also instructed to use every possible exertion, to have their report, on this important line of communication, prepared in time to be submitted to *Congress* at their next session.

These examinations and surveys were prosecuted with the utmost vigor and diligence; and on the 14th of Febru-

Answer.

ary, 1825, the *President of the United States* communicated, in a special message, to both houses of *Congress*, the result of the labors of the board and their assistant corps, as far as they had then proceeded, which was immediately printed and published, by order of each house respectively. These operations were resumed and completed under the direction of the board, in the ensuing season, and a detailed report of the same made by the board to the chief engineer, on the 23d of October 1826, which was in like manner, communicated to both houses of *Congress* in a special message from the *President,* on the 7th of December, 1826, and in like manner immediately published and printed by order of each house.   These several reports were accompanied by detailed descriptions and surveys, and large maps and profiles, and exhibited with the utmost clearness and minuteness the whole route of the canal from *Georgetown* and the head of the tide water of the *Potomac* to *Cumberland,* and thence to its western termination, the plans and various sections of the canal, the geography and topography of the ground through which it passed, with detailed estimates of its cost, including the section of the canal from the head of tide water to *Cumberland,* and minutely exhibiting its course, and its various subdivisions, and sections, on the western and northern, or as expressed by the engineers, the left bank of the river between those points.   The printing of this last report having been expedited by the printers to *Congress* in anticipation of the *President's message,* and of the orders of the two houses, several copies of the same were laid before the said convention at its second session, by direction of the *Secretary of War;* and formed the ground work of the proceedings of that body and its committee, towards a corrected estimate of the cost of the canal; the high estimates of the cost, given by the board of internal improvement, being considered as founded on erroneous *data.*

During the same session of *Congress*, several members of the *House of Representatives*, considering the disagree-

ment between the estimates of the convention, and those of the board of internal improvement, and the necessity of the most exact preparatory estimates, as well for the success of the various applications to *Congress*, and to the States, for subscriptions to the stock of the canal and other aids, as for the general recommendation of the plan to the public, requested the *President* to submit these estimates to the revision of practical civil engineers, of long tried experience and skill. The *President* accordingly appointed *James Geddes* and *Nathan S. Roberts*, two eminent civil engineers, who, to great professional skill, added a long experience in the practical execution of other works of a similar description, to view and resurvey the route of the said canal, and revise the estimates of its cost. This duty was performed by these engineers with all diligence and despatch; and their detailed report of their surveys and estimates of the same, from *Cumberland*, or about one mile below *Cumberland*, to *Georgetown*, was duly returned to the engineer department, accompanied by detailed descriptions, surveys and maps of the route and site of the canal, between those points.

This last report and its results were largely quoted and commented on, in a report of the committee on roads and canals, in the *House of Representatives of the United States*, on the 11th of February, 1828, which report of the said committee was then immediately printed and published by order of the house, in the due course of its proceedings; and on the 26th of the same month, a resolution passed the house, calling upon the *Secretary at War* for the report at large of the said civil engineers; and the same was accordingly transmitted to the house on the 10th of March following; and then immediately printed and published by order of the house.

And these respondents, further answering, say, that upon the completion of their charter by the act of *Congress* passed on the 3d of March, 1825, assenting to and confirming the acts of *Virginia* and *Maryland*, commissioners were

Answer.

duly appointed by the *Executives of Virginia* and *Maryland*, and the government of the *United States*, pursuant to the directions of the charter, to open books for receiving subscriptions to the capital stock of the *Chesapeake and Ohio Canal Company;* and the said commissioners, in pursuance and execution of their appointment and authority, on the 20th of August, 1827, published due notice that such books would be opened at various places in the *United States*, on the 1st of October then next ensuing ; which notice was published weekly in various places, at, or as near as practicable, the respective places where the books were to be severally opened ; and among others in the city of *Baltimore*, a copy of that published in the *National Intelligencer*, at the city of *Washington*, is annexed ; and the others were in the like form, only designating other banks or agents, and other places for receiving the subscriptions in the different sets of books, all to be opened on the same day.   The opening of the books had been so long postponed at the request of the central committee of the said convention, in order to obtain, in the first instance, the most satisfactory estimates of the cost of the canal ; in the meantime the conflicting estimates of the board of internal improvement and of the said canal convention, were before the public ; and the engineers, *Geddes* and *Roberts*, were then engaged in their surveys of the route, and revision of the estimates, whose report, though not then completed, would, as was then well understood, confirm upon the most unquestionable *data* and calculations, the lowest estimates.

Pursuant to the said notice, the subscription books were duly opened on the said 1st of October, 1827, and subscriptions to a large amount were received ; a correct summary of the different amounts whereof, at different periods of the 14th day of November, 1827, till the 3d day of October, 1828, is hereto annexed.   The subscriptions on the part of the *United States* and of the State of *Maryland*, as authorised by their respective laws, have been duly fulfilled upon the conditions respectively prescribed by them, and were made

Answer.

at the respective dates mentioned in the said summary. Notwithstanding the subscriptions amounted, so much sooner, to the one-fourth of the capital stock required by the charter, to give immediate effect to the incorporation of the company, it was deemed advisable to postpone a call of the stockholders for the election of the president and directors, in the certain expectation, of an act at the then ensuing session of *Congress*, authorising a subscription on the part of the *United States*; and in order to give an opportunity to *Maryland* and the *United States*, on the completion of their respective subscriptions, to vote at the said election, and on other matters to be brought before the meeting. The said commissioners, accordingly, on the 5th day of March, 1828, called a meeting of the stockholders for the purpose of electing their president and directors on the 7th day of April then next ensuing; by which day it was expected the two subscriptions, just mentioned, would be completed, by means of a bill then pending in *Congress*. But some unexpected delays in the passage of this bill occurring, the call was postponed; and on the 26th day of May thereafter, (the said bill authorising the subscription of one million of dollars, on the part of *the United States*, having passed on the 24th of the same month,) the call was renewed, and the general meeting of the stockholders appointed for the 20th of June, 1828. These calls of the general meeting of the stockholders, and the intermediate postponement of the first, were duly published by the said commissioners in several public prints or newspapers, at various places in *the United States*, and among others at the city of *Baltimore*, pursuant to the directions of the charter; copies of which as published in the *National Intelligencer*, at the city of *Washington*, are hereto annexed. Pursuant to the last of the said calls, the stockholders assembled at the *City Hall*, in the city of *Washington*, on the 20th day of June, 1828, and duly elected their president and directors, who were immediately organized according to law; and have ever since been diligently

Answer.

engaged in prosecuting the execution of the canal, pursuant to their charter, with all practicable vigor and despatch.

The *Potomac Company*, by their several authentic and valid acts, in their corporate capacity, on the 16th of May, 1825, the 10th of July, 4th and 15th of August, 1828, duly declared their assent to the provisions of the said charter of the *Chesapeake and Ohio Canal Company*, in the manner prescribed by that charter; and duly surrendered their charter, and conveyed, in due form of law, to the *Chesapeake and Ohio Canal Company*, all the property, rights and privileges by them owned and possessed under their charter, which surrender and transfer were duly accepted by the *Chesapeake and Ohio Canal Company;* true copies of all which several acts of the two companies are hereto annexed as part of this answer.

The last named company, also at their said general meeting in June, 1828, and at several adjourned meetings of the same, in June and July of that year, adopted, and passed, among others, the several resolutions, by-laws, and regulations, printed copies of which are annexed among the said scheduled documents; and, among these, the annexed resolution adopting the route and site of the canal surveyed and laid down by *the United States' Engineers,* and by Messrs. Geddes and *Roberts,* &c.

Among the works done under the orders of the president and directors, since the organization of this company, they have caused detailed plans of their canal to be surveyed and laid down by their engineers in a practical form for contractors, upon the route before surveyed and laid down under the direction of the said Board of Internal Improvement, and by Messrs. *Geddes* and *Roberts* as aforesaid, from *Georgetown,* in the *District of Columbia,* to *Williamsport,* in *Washington* county, *Maryland;* and for the distance of about forty-eight miles from *Georgetown,* up to within about a half mile of the *Point of Rocks,* or foot of the *Kitoctin* mountain, the canal has been actually put under contract for execution upon these plans; and the work was

Answer.

actually commenced by the contractors in September last, has ever since been diligently and efficiently prosecuted by them, and such progress made in it, as leaves no rational doubt of its completion, upon the most enlarged scale and improved plan contemplated by its projectors, far within the time prescribed by the charter; and the said president and directors would, before now, have had at least so much more of the said canal, as the section from the *Point of Rocks* in *Frederick*, to *Williamsport* in *Washington*, under contract and in actual progress, but for the interruptions thrown in their way by the complainants, on the route from the former point to *Cumberland*. The respondents, by way of further illustrating the plan and route of their canal, refer to the annexed copies of the plans and surveys of the same from the said *Point of Rocks* to *Williamsport*, executed by their engineers; which they pray may be taken as part of this their answer.

As to the pretensions of the complainants to interpose and oust these respondents of their priority of selection, and their vested right in the route of their canal, and to intrude the rail road of the complainants upon the same, these respondents say, the legislature of *Maryland* never contemplated, by the charter granted to the complainants, any interference with the route selected for the canal, as if these be involved in the terms of that charter any covert or latent construction or operation in practice, authorising such interference, (which these respondents are well advised there is not,) and if the parties, who projected the said rail road, and actively promoted and solicited, and finally obtained, and now enjoy the charter for the same, originally intended that any such latent construction or operation in practice should be involved in its terms, with a premeditated design to press the advantage of such in their future operations under their charter, (which these respondents by no means charge, but, on the contrary, presume the said parties were at the time direct and sincere in their professed object and in the ostensible purpose and intent

Answer.

for which they solicited their charter,) then it would be manifest, that the legislature and people of *Maryland* were misled and deceived into the grant of a charter for the said rail road, contravening the well known views, and established policy, and interests of the state, long avowed and practically acted on by the legislature, and the solemn faith and compacts of the state, as well with her co-sovereigns *Virginia, Pennsylvania,* and the *United States,* as with the *Potomac Company,* with the *Chesapeake and Ohio Canal Company,* and with the public at large.    For not only was any intent, (if it existed) to supersede or interfere with the proper route and site of the canal, and occupy the same with the said rail road, kept out of view, and reserved and concealed in the minds of the parties who solicited and obtained the rail road charter, but it was studiously and elaborately masked, by their openly professing and setting up a different and shorter route for the rail road than any practicable route for the canal, and upon this very difference in the routes, they valued themselves, as having projected an improved mode of intercourse with the west, very superior to the canal.

The project of the said rail road was originated, and set in motion at a meeting of a number of the citizens of *Baltimore,* held at that city, on the 12th and 19th of February, 1827: the proceedings of that meeting, with a report of a committee unanimously approved by the meeting, were printed and published by its authority; the whole train of the elaborate reasonings of which, tends to establish two points; 1st. The intrinsic advantages, in point of expedition and convenience, of a rail road over a canal; 2dly.   The particular advantages of the projected rail road from *Baltimore* to the *Ohio,* over the *Chesapeake and Ohio Canal;* among the most decided of which was, that the former was to reach the western trade, by a different and shorter route. Upon this latter point the most minute calculations are made, of the differences, in distance and time, between the known route of the canal and the intended route of the rail road.

Answer.

The direct route, proposed for the Rail Road, as contrasted with the circuitous route chosen for the canal, was vauntingly printed in capitals, and its various advantages reiterated in every form calculated to illustrate the superiority of the rail road over the canal. The charter of the *Rail Road Company* was immediately solicited, and obtained of the legislature of *Maryland*, then in session, by the committee or some of them, named in the said printed proceedings; the pamphlet containing the said proceedings was circulated among the members of the legislature, and the same topics were enforced and illustrated by the committee, in the course of their solicitations. All the active and influential persons, composing the said meeting, and its committees, became members of the corporation, when the said *Rail Road Company* became incorporated, and the president and directors of that company were chosen from among the same description of persons, and so continued to the time of the filing of the complainants' said bills, and yet so continue, as these respondents are credibly and certainly informed, and do verily believe. One of the said pamphlets, so published by the said meeting, or by its committee, is hereto annexed among the scheduled documents; and to that, as well as to the representations and memorials of the said rail road committee to the legislature, and the proceedings of the legislature thereon, preparatory to the grant of the said rail road charter, these respondents pray that reference may be had, as part and parcel of this answer.

These respondents are further credibly and certainly informed, and verily believe, that not only was all idea of any interference with the site or route of the canal kept out of view, and masked by the *general* proposition of a different route for the rail road, studiously impressed on the legislature, and promulgated to the public, as one of the pre-eminent merits of the rail road project, but that the said parties, so engaged and interested in that project, and in the promotion of it as aforesaid, and now claiming the benefits of the charter for the same, did, both before and after the

Answer.

grant of that charter, and while the same was in a course of solicitation before the legislature, and down to a period considerably posterior to the subscription of the stock, and the formation of the company, even specify the difference between the two routes, both to the members of the legislature, and otherwise, to the public; that is, a direct route from *Baltimore* to the *Ohio;* cutting down the hills between *Baltimore* and the *Monocacy* 50 or 60 feet, by machinery, and forming an inclined plane to the *Monocacy*; and then crossing the mountains in the direct route to the *Ohio*, by a number of stationary steam-engines, computed at the number of a hundred; that afterwards, in the winter of 1827-8, when the complainants were soliciting of the legislature the law authorising a subscription on the part of the State to the rail road stock, the president of the said *Rail Road Company*, in behalf of the company, assured the members of the legislature, and especially the members from the western counties, that the rail road would pass by *Westminster*, through *Harman's* gap to *Williamsport,* and actually accepted the services of *Mr. James Johnson*, of *Frederick*, to explore the mountains on that route; that the said parties, on all these occasions, and continually, until they formed their sudden resolution, in May, 1828, to pounce upon the route and site chosen for the canal, publicly and distinctly disclaimed any rivalship or interference with the canal; and gave out that the comparative directness and shortness of the route of the rail road, and its other advantages, would place it above all competition from the canal. If on the other hand, the new route now proposed for the rail road, and the idea of ousting the *Chesapeake and Ohio Canal* of its chosen and proper route were after thoughts, originating with the complainants, or suggested to them, after their organization as a body corporate under their charter, then it is equally a perversion and abuse, in practice, of the original and genuine intent of their charter, and the privileges which that instrument was designed to confer on them. These respondents are not certainly or

Answer.

precisely informed at what time such change in their views was effected, or upon what ostensible grounds; but these respondents have good reason to think and believe, and do verily think and believe, that it was not until after the advertisements of the said commissioners, notifying a call of the stockholders of the *Chesapeake and Ohio Canal Company,* and the near prospect of large subscriptions to the stock of that company, from the State of *Maryland,* and the *United States,* gave sure promise of its speedy and efficient organization, and suggested to the complainants the policy of some bold and extraordinary measures to defeat it. The actual operations of the complainants, through their agents, in appropriating to themselves the route and site chosen for the canal, did not commence, as these respondents have good reason to believe, and do verily believe, and so far as they have been able to ascertain from the documents and exhibits of the complainants, or other evidence, till some time about the middle of May, 1828.

These respondents are further credibly and certainly informed, and do verily believe, that the real tendency and effect of those operations, as an adversary interference with the canal, were studiously masked and concealed by the complainants and their agents; and that they pushed them on with unusual and otherwise uncalled for hurry and precipitation, for the direct and concerted purpose of completely forestalling the chosen and well known route and site of the canal, before any of the persons materially interested in the conservation of its rights could have notice; and with such views and intents, that the agents who were employed by the complainants in making their locations of the rail road on the route of the canal, gave out to the people in the neighborhood who witnessed their proceedings, that they were merely making experiments, and intended no interference with the canal; and some of the persons with whom contracts were made for cessions of their lands, were also informed by such agents, that the only intent and effect of such contract, were to give permission to the sur-

veyors of the rail road to pass through. So much, however is certain, that it was not till about the 7th of June, 1828, that the persons principally concerned in the conservation, *ad interim*, of the rights and interest of the canal, (as the said central committee, the said commissioners appointed to open subscription books, and call the first meeting of the stockholders, the *Secretary of the Treasury* representing the interest of the *United States* in the stock of the company, and other principal stockholders,) received with the utmost surprise the first information that the agents of the complainants were proceeding with the utmost haste and secrecy in an attempt to forestall the chosen route and site of the canal, by making their surveys upon the most important and indispensable parts of it, and taking up the ground by contracts, with the adjacent propriotors. Measures were immediately taken at *Washington*, by the persons principally interested, and with the concurrence of the *Secretary of the Treasury*, to despatch proper agents, and counsel, to ascertain the true state of the case, and to take the proper measures for the protection of the rights of the *Canal Company*. The bill of injunction in the name of this company, and of the *Potomac Company*, against the now complainants, &c. in *Washington* County Court, and the injunction thereon grounded, on the 10th of June, 1828, to which the complainants have referred in their said bills, were the result of those measures. To that bill, a copy of which is hereto annexed, these respondents also refer, and pray that it may be taken as part of this answer, now here re-asserting the material facts therein stated, and all the rights and immunities therein claimed and asserted on behalf of this company; of all which, they pray that they may have the like benefit, as if ever so formally averred or pleaded in this answer.

These respondents further answering say, that at the *Point of Rocks* where the *Potomac* intersects the ridge of the *Kitoctin* Mountain, and where the pretended route of the said rail road is described by the complainants in their

Answer.

said bills, to strike the *Potomac* river, there is one of those narrow passes in the exact route and site of the canal as officially and definitively selected, surveyed, and laid down as aforesaid, which presents no choice of ground for the canal; but where for a considerable distance up the river along the foot of the mountain and its spurs, the canal is confined by the nature of the ground within certain primeval and unremovable barriers ; as is more particularly shewn and illustrated by the topographical descriptions, maps and profiles of the engineers, herewith exhibited, and above referred to. Through the whole of this pass, the space between the jutting and precipitous rocks on the one hand, and the river on the other, is so narrow, that in order to obtain the proper and necessary breadth for the canal and its towing path, a solid and wide wall must be constructed in the river ; and if the canal be intercepted and cut off by the rail road, or otherwise, from that single route through this pass, it must be completely intercepted, and cut off from the whole of its route above, and be either entirely stopped and defeated, or compelled to the precarious, dangerous, and enormously expensive, and every way inconvenient and burthensome expedient of crossing to the opposite side of the river on an aqueduct, and then in order to regain its route to its western terminus, of re-crossing the river on another such aqueduct, at such unknown and uncertain point above, certainly not lower than *Cumberland,* as where it may please the complainants to allow them verge and space enough. Through all the space between these two points on the southern and eastern bank of the river, these respondents will then have to explore a new route and site for their canal ; all the elaborate reconnoisances, surveys, maps, plans, &c. by which the present and appropriate route and site of the canal have been determined ; all the estimates already made of its cost, inseparable as are their *data* from the localities of the actual route and site of the canal so determined, and upon the faith of which, and of the already ascertained practicability of that route,

Answer.

the subscriptions to the stock of the canal have been made; all the labors and expenses of years consumed by the engineers of the *United States*, and of this company and their co-adjutors, in ascertaining these results, must then be utterly wasted and thrown away, and the whole progress be gone over again, on the opposite side of the river, at an immense increase of expense, and loss of time to the said *Canal Company*, and to the utter peril of the franchise bestowed on them by their charter, and every way to their inconvenience and oppression.   Besides, if it were possible (which it is not,) for the said *Canal Company*, after deserting their appropriate route as already specifically selected, surveyed and laid down, and conceding to the rail road the choice of the site next the river, at any labor or expense, within the reasonable compass of human means, and at all commensurate with the object, to lay off and conduct the canal out side of the rail road, by cutting down the sides of the mountains and rocky precipices, that bound their operations through the said pass, and through many other narrow and difficult passes of a like description, and presenting some of them equal, and others nearly equal difficulties on the route in controversy from the *Point of Rocks* to *Cumberland*, to the proper level, and of the proper breadth for the canal and its towing path, so as to keep the canal on the same side of the river, with the rail road interposed between it and the river, all the way between those points, still the inconveniencies and impediments to the proper construction, supply and use of the canal, would be immense and incalculable, if not insuperable, by its being cut off and intercepted in so great a portion of its route, from its cognate source and appendage, the river, and the numerous and necessary feeders and communications between it and the river, the frequent and continually recurring necessity of such communications throughout that route, being indespensable alike to the proper construction of the canal and its appendages, as to the purposes of its intercourse, commerce and navigation, for which alone, it was

Answer.

and is designed. The above mentioned pass at the *Point of Rocks*, and for some distance above the point so called, is not the only one of that description, and presenting the like narrow and difficult bounds to the canal, on the route in controversy, from that point to *Cumberland;* but there are numerous others on that route, where the *Potomac* breaks through the numerous ridges, mountains, and rocky precipices, where it is hemmed in by rocky and high banks, with a very narrow space between, and where in some instances equal, and in other instances nearly equal difficulty, labor and expense, to open and improve the site for the passage of the canal and its appendages, occur as at the *Point of Rocks*, as is more particularly shewn and illustrated by the documents above referred to, and cited for the topography of this last mentioned pass.

These respondents submit to the equity and discretion of this court, that even if originally, and by virtue of their prior grants and franchises, they had no priority of right to the choice and selection of the route and site of their canal, along the margin and bank of the *River Potomac;* if no authorised, determinate, and binding selection and designation of such route and site had been made, and if the complainants stood on a foot of perfect equality as to the date and origin of their franchise, still the preferable right of this company to conduct and construct their canal on the route and site in controversy, is just as absolutely determined by a concurrence of equitable and cogent circumstances, by the intrinsic qualities and faculties of these two works, and by their respective relations to the means, the objects, and the uses of their construction, and to the nature of the obstructions and public inconveniencies which they are designed to remove by artificial means. Because, according to the complainants' own shewing, and the facts are otherwise true and notorious, they have the choice of two, or more, practical routes for their rail road, without any interference with the canal, or connexion with, or even approximation to the river; the different routes only present-

Answer.

ing some differences in the comparative labor and expense of construction; and these compensated, if they occur with any considerable increase on the more northern route originally proposed for the rail road, by the advantages and savings from directness of course and shortness of distance, as the principal and leading personages, both among the original projectors, and promoters, and the present managers and proprietors of the rail road, have repeatedly averred, and publicly contended; the principle and the operation of the lifting power of stationary steam engines, by which the rail road overcomes ascents, and gains new levels, admit of an infinitely greater diversity and extent of application than that of the canal, circumscribed and limited as it is, by water levels, and are perfectly practicable and convenient, and within the ordinary compass of that power, either to overcome all the necessary ascents on the more northern and direct route first proposed for the said rail road; or if what the complainants designate the southern and circuitous route be preferred by them, to assume with ease and convenience, a higher level than the canal on that route, and leave the canal ample verge and room between the rail road and the river, there is no necessary or proper connexion or dependence between the rail road and the river, either intrinsically, as regards the construction, appendages, and uses of the rail road, or relatively as regards the purposes of intercourse, trade, and commerce, which the rail road was designed to subserve; whereas the river is, as it were, the life-blood of the canal; and continual access and frequent communication from the one to the other, are inseparable from the very idea of the canal; and lastly, the complainants, before they took any step towards a change of their original route, for the one now in controversy, or towards any claim or appropriation of the latter, or even contemplated any such change, claim or appropriation, had the most ample, direct and conclusive knowledge and notice of all the steps that had been taken to designate and appropriate this same route for the canal, they had the most cer-

Answer.

tain knowledge that every procedure, practicable in the nature of things, had been adopted to consummate and render effectual such designation and appropriation for the canal route and site, both before and after the consummation of the charter to the said *Canal Company* by the passage of the act of *Congress* confirming it, and before the charter to the *Rail Road Company* was either enacted or projected; and that such designation and appropriation of the route and site of the canal, its ascertained practicability and facilities of execution on that route, and the estimates of its capital and cost, which were founded on the local circumstances of that route, all entered into the considerations, motives, and terms of the charter, and more distinctly of the subcription to the capital stock created by it; and with the entire notice and consciousness of all these circumstances, the complainants, at the very moment when they perceived that the said *Canal Company*, then legally constituted a body corporate, were just coming into the actual fruition of the right thus claimed and secured to them, took advantage of their want of executive organization to forestall and oust them of that right, under the naked pretext that the proprietary right and title of the lands necessary to be purchased or condemned of individuals, had not been technically vested in the company. But these respondents are well advised by counsel, that they may lawfully and of right maintain before all courts of law or equity, and in all other places whatsoever, and they do now here maintain, that independent of any prior and specific location, survey, or appropriation, of any precise site or route of the canal, there was originally vested in and guarantied to the late *Potomac Company*, by virtue of their charter, the exclusive privilege, use and property, of the entire stream, bed and channel, of the river *Potomac*, with its branches and tributaries, and whatsoever as part, parcel, or appendage of the river, constituted any part of the public domain from tide water to the highest place practicable for navigation on the north branch of that river; and over and above these, the prior and exclusive

Answer.

election, pre-emption and appropriation, by the prescribed
modes of purchase or condemnation from all the adjacent
lands of the individual proprietors, all along the banks, cliffs
and low grounds contiguous to the river, and within the pro-
per sphere and compass of any of the authorised operations
of the company, of the proper ground for the route and site
of the canal or canals, and the auxiliary works and appen-
dages of the same, and of the materials for the same, con-
templated and authorised by that charter; that this exclu-
sive right and priority of election, pre-emption and appro-
priation, extended to all the lands of individuals and public
domains within the precincts of any of the actual or possible
operations of the said company, authorised by their said
charter; and that within those precincts no other corpora-
tion in present or future existence, nor any other descrip-
tion or body of men whatever, collectively or individually,
had or could acquire any right or title under any pretence
of a right of way, road or improvement whatsoever, public
or private, in any manner to restrict or confine the said
*Potomac Company*, or their authorised operations under
their charter, to any one among any possible number of lo-
cations or sites, or in any manner to diminish or circum-
scribe their free choice and election of the same; far less to
exclude them from priority in the choice and election of the
only, or of the most eligible, practicable, and convenient,
and still less of previously elected and designed locations
or sites, for the proper execution of the works authorised
by their charter.  That all these rights and privileges, in
all their integrity, force and efficacy, have been and are
duly and indefeasibly transferred to and vested in these re-
spondents, by virtue of their said charter, and of the surren-
der and transfer to them from the late *Potomac Company;*
with such extensions and modifications as the terms of this
new charter and the extended and improved scheme and
plan of the works thereby authorised, prescribe or require.
That independent of any proprietary rights or corporate
privileges and immunities specifically derived by these re-

spondents from the late *Potomac Company*, all the rights, privileges and immunities herein before described or mentioned, as vested in or guarantied to the *Potomac Company*, and all the analogous rights, privileges and immunities, enlarged and modified in conformity to the scheme and provisions of the new charter of these respondents, and to the more extended and comprehensive plan of the works and improvements thereby authorised, were and are indefeasibly vested in and guarantied to these respondents by the sole force and effect of their own charter. That the charter of the said *Rail Road Company* does not, and of right could not, in terms, abolish or take away, or in any manner diminish or alter, in the whole or in part, either of the prior charters to the said *Potomac Company*, and to these respondents, or any of the corporate rights, privileges or immunities expressly granted or necessarily inferred from the said prior charters or either of them; and that neither of the said charters, nor of the franchises thereby created, can be abolished, taken away, or in any manner altered or diminished by implication; even if the legislature of *Maryland* were competent, which it was not, when the charter to the *Rail Road Company* was granted, to pass any law or grant any charter, or any right, title, privilege or authority, to be exercised under such law or charter, abolishing, taking away, or materially diminishing the said prior charters, or either of them, or any of the rights, privileges or immunities by them, or either of them, communicated to and vested in these respondents. That the charter granted to these respondents, as well as that to the late *Potomac Company*, being in the nature not only of a contract between the sovereign parties to it on the one hand, and the members of the body corporate thereby created on the other, but of a solemn and binding compact between those sovereign parties themselves, was, and is, altogether irrepealable and indefeasible, in the whole, or in any part, by either of these parties, without the concurrence of all; or by all without the assent of the corporation in which the rights, privileges

Answer.

and immunities granted by such charter, are vested and reside. That the said charter of the complainants, and the authority exercised, or pretended to be exercised under it, in so far as the same purport, or are, or may be construed and executed in derogation of the corporate rights, privileges or immunities granted and vested by the said prior charters, or either of them, are repugnant to the constitution of the *United States,* and utterly inoperative and void; and lastly, that whatever the abstract right of prior choice and election claimed by these respondents in other possible routes or sites for their canal, and the incidental operations authorised by their charter, the ground designated for the route and site now in controversy, has been effectually elected and appropriated by these respondents to the exclusion of the complainants: of all which matters, these respondents crave all the benefit and advantage in this answer, that they might or could have had in any form of equity pleading whatever.

Of all the documents of title under which the complainants pretend a claim to the route and site in controversy for their rail road, and to the lands in controversy, as referred to, and it is presumed, filed with their said bills, these respondents or their counsel have only examined such, as were filed for enrollment in the clerk's office of *Washington* county, *Maryland,* as late as the 10th of June last, and the clerk's office of *Frederick* county, as late as the 11th of the same month; and the agreements with *Henry* and *Frederick Dellinger,* filed in this court with the complainants' bills against those persons, in the same month; the documents so examined, comprehend, as these respondents are credibly and certainly informed, and verily believe, the whole of the said pass at and above the *Point of Rocks,* and some other of the like narrow and difficult passes on the route in controversy, and the identical route and site elected, designated and surveyed for the canal as aforesaid; and as to all the other documents of title set up and pretended by the complainants in the said bills, and therein referred to, as exhibits,

such as deeds, agreements, locations, and specifications of locations, warrants for condemnation, &c. these respondents are not more particularly informed of their nature or authenticity, than what they collect from the allegations of the complainants in their said bills, and from careful inquiries in the country, into the nature and extent of the ground, covered by the claims of the complainants, in virtue of those documents, without any actual inspection of the documents themselves ; and therefore, for greater certainty, they refer to the said documents, and exhibits themselves, and the authentication of the same ; all of which, or office copies of such of the same as have been duly recorded, these respondents presume, are, or ought to be filed, as the exhibits referred to, by the complainants in their said bills. The ground, which these documents import, an intent to bargain or sell, or appropriate, or in any manner to affect by location or condemnation, and which the complainants now claim in virtue thereof, for the route and site of the said rail road, throughout the whole extent of that ground upon or towards the line of the river *Potomac*, includes the identical route and site selected, designated and surveyed for the said canal as aforesaid, and all the slight variations of the same in the several reconnoisances, surveys, and locations made of the same as aforesaid ; and every other practicable route and site for the canal and its appendages on the hither side of the river, from the *Point of Rocks* to *Cumberland;* or if there be any gap in those pretended appropriations of such ground for the rail road, where the ground designated for the route of the canal is not covered by that claimed under those documents, it would be rendered utterly useless and impracticable to these respondents, if the actual claims of the complainants were allowed, but whatever may be the local extent of the ground so claimed by the complainants in virtue of their said pretended locations, and appropriations of the same, the complainants, in their said bills, are understood to claim, as the fact is otherwise certain, that it comprehends the whole of the said pass at

Answer.

and above the *Point of Rocks*, and all the most difficult of the other narrow passes above described as on the route in controversy; and without the possession of which these respondents would be compelled to abandon the whole of the designated route of their canal, without having left to them any practicable route for the same on the hither side of the river.

The ground so claimed by the complainants in virtue of the several titles and documents referred to in their said bills, extends to the river *Potomac* itself, comprehending whatever of its margin and water may appertain to the lands, or rights of the individual proprietors; and in conducting the said rail road through several of the narrow and difficult passes above mentioned, the complainants would have to construct walls in the bed of the river, in order to get the proper breadth of their road, in like manner as these respondents would have to do for their canal, at the same places; and these respondents have no doubt it is the plan of the said rail road, as devised and specified by the engineers of the complainants to construct such river walls.

These respondents do not know, admit or believe, that the complainants, had caused any comparative or experimental examination of what, in their said bills, they have described as the southern route for their said rail road, that is, of the route in controversy from the *Point of Rocks* to *Cumberland*, or any part of it, to be made, or that there was any recommendation of that route, founded on any preliminary examination of the same by their engineers, when they determined upon the attempt, in direct and concerted hostility to, and derogation of, the rights of these respondents, to adopt and appropriate that route to themselves, and commenced their operations in May, 1828, for the location of their road on that route, and the appropriation of the ground constituting the route and site of the canal as aforesaid; but these respondents are credibly and certainly informed, and do verily believe, that without any previous examination of that route by their direction and authority,

Answer.

they suddenly despatched their agents, attorneys and engineers, sometime about or after the middle of May, 1828, (as to the precise time these respondents for greater certainty, refer to the documents of title, whether the deeds, agreements or warrants, exhibited with the said bills of the complainants,) to seize upon the said route by the means set forth in their said bills ; and that, without any previous survey, or examination whatever, of the route on their part or behalf, they made their pitch at once, and in the first instance, upon the narrow and difficult passes above described on that route, "and wherever the character of the ground was such (according to the description of it by the complainants in the said bills,) as to leave but little choice in the location of the said road," and of course, no choice in that of the canal ; that these measures were pursued with the most extraordinary and precipitant haste ; their agents riding about and ranging the country with ceaseless activity day and night, hunting up the proprietors of the ground on the route, and soliciting from them cessions for the rail road ; and with such anxious vigilance and activity, and celerity of movement, were all their operations for the location of the site of the rail road, and for taking up and forestalling the proprietary rights in the ground, conducted by the agents of the complainants, and the officers of the *United States* serving them as engineers, that the party more resembled a partizan corps meditating or guarding against surprise, on the flank of an enemy, than persons engaged in the ordinary business either of contract or of civil engineering.

The engineers who were employed by the complainants on that service, were enabled to perform such of the said operations as fell to their share, (and they were not confined, as these respondents are credibly informed and believe, to operations within the ordinary sphere of engineers, either civil or military, but extended to solicitations and negotiations with the individual proprietors, for cessions of their lands,) with so much the more ease and despatch, as most of them had before been attached to the said board of inter-

nal improvement, and actually engaged under the direction of that board in the reconnoisances and surveys of the route of the *Chesapeake and Ohio Canal*, and in making up the memoirs, topographical descriptions, drawings, maps, and profiles of the route and plan of the canal as above stated, of which or of the geographical and topographical details and information derived from which, they made free and frequent use (as these respondents are further credibly informed and verily believed,) in their locations of the said rail road upon the said route ; and these respondents have the strongest reason to think and believe, and do verily think and believe, that the complainants were urged to the instant commencement of these operations, and to the extraordinary haste and precipitancy with which they pursued them, entirely by the near prospect which they perceived of an organized board of president and directors for the efficient management of the affairs of the said *Canal Company*, and by a design to forestall, and defeat the expected operations of that board, to secure, by purchase or condemnation, the ground already designated and selected for the route and site of the canal.

In further confirmation of what these respondents have already averred, the full and detailed knowledge and notice of the long standing, authentic and notorious election and appropriation of the route and site in controversy, for the canal, and of all the steps that have been taken to mark it out, and set it apart for that purpose, and how completely it had been incorporated and identified with the whole scheme and plan of the canal ; with which knowledge and notice, the complainants, and their agents and engineers, commenced and carried on all their said operations to counteract and defeat these respondents, in the fulfilment of the great public and beneficial ends and objects of their institution ; and in order more clearly to illustrate the inequitable use and application made of such knowledge, which, instead of serving as a protection to rights, the existence of which is communicated, was laid hold of, and used to overreach, and

Answer.

defeat those rights; and how unscrupulously, in other respects, the very instruments and means dedicated to the advancement and execution of the scheme of the canal, have been converted into the instruments and means of the most deadly attempts against its vital interests, and the interests of the identical parties, who have provided those same instruments and means, and lent the aid of them to the complainants for a very different purpose; these respondents say, that of the nine delegates from *Baltimore* to the said *Canal Convention* in December, 1826, eight of them were prominent and active members of the said meeting at the city of *Baltimore,* when the project of the said rail road was set on foot, and of the committees appointed by that meeting; and six of those eight actually attended the said convention, and took part in its deliberations and proceedings, as will more particularly and at large appear, by a reference to the above mentioned proceedings of the said *Baltimore* meeting and *Canal Convention,* one of them was appointed the president of the said *Rail Road Company* at their first election, and has ever since continued so; and was also appointed by the executive of *Maryland,* one of the commissioners to open the subscription books for the capital stock of the said *Canal Company;* and others of the said delegates were, it is believed, appointed directors of the said *Rail Road Company;* that the board of engineers, officiating for the said *Rail Road Company,* was always, and yet is in part composed, and their corps of field engineers was always, and yet is entirely composed of officers belonging to the several corps of engineers, and of the army of the *United States,* and of the civil engineers in the service of the *United States;* all of whom were lent by the government of the *United States* to the complainants, to perform the scientific operations necessary to execute their then supposed plan of a rail road; and it is understood, the complainants enjoy the services of these engineers at public expense; that any idea of interference between the rail road and the canal, was then, and ever after, till the above

mentioned intelligence reached and surprised the *Secretary of the Treasury* in June last, the remotest imaginable from the mind of the government, and was necessarily known to the complainants to be so: that of the various descriptions of engineers, so borrowed by the complainants from the public service, six had been before employed and actively engaged, under the above mentioned board of internal improvement, in the identical reconnoisance, sur-veys, &c. &c., of the route of the *Chesapeake and Ohio Canal*, in the years 1824, 1825 and 1826, communicated by the *President* to *Congress*, and published as above mentioned; all which will more particularly and at large appear by reference to the already recited reports of the said board of internal improvement; and to the annexed document, certified from the *War Department* of the *United States*, containing the roll of the engineers detached from the public service, for the service of the complainants, with the orders from the chief engineer of the *United States* to the three principals among them; and also the roll of the various engineers in the service of the *United States*, constituting the said board of internal improvement, and its assistants, and the corps of engineers, of various classes actually employed, under the direction of that board in the various reconnoisances, surveys, &c., &c., of the route of the *Chesapeake and Ohio Canal.*

Now these respondents, as further advised by their counsel, and further answering, say, that by the pretensions set up by the complainants in their said bills, to oust and deprive these respondents of the route and site for their canal, here in controversy, and to intrude the said rail road upon the same, by the retrospective operations and effect of the rail road charter, or any other statute of *Maryland*, or of any other State, and in virtue of the pretended authority, which the complainants assert and exercise under the said State, and their charter from the same, as set up and asserted in their said bills, there is now here drawn in question, the construction of the constitution of the *United States*, and

Answer.

especially of that clause of the same, whereby it is ordain-
ed and established, that no State shall pass any *ex post fac-
to* law, or law impairing the obligation of contracts ; and
of the several statutes of the *United States*, to wit, the act
of *Congress*, passed on the 30th April, 1824, appropriating
thirty thousand dollars for the purpose of procuring the ne-
cessary surveys, maps, plans and estimates, upon the sub-
ject of roads and canals, &c.; the act of *Congress*, passed
on the 3d March, 1825, confirming an act of the legislature
of *Virginia*, incorporating the *Chesapeake and Ohio Canal
Company*, and an act of the State of *Maryland* confirming
the said act of *Virginia*, &c.; the act of *Congress* passed on
the 23d May, 1828, to amend and explain the two last men-
tioned acts of *Maryland* and *Virginia*, &c.; and the two acts
of *Congress* passed on the 24th May, 1828, the one author-
ising a subscription to the stock of the *Chesapeake and
Ohio Canal Company*, the other enlarging the powers of
the several corporations of the *District of Columbia*, and
for other purposes ; under which said clause of the consti-
tution of the *United States*, or under such other clause or
clauses, and provisions of the same, as apply to, and operate
on the case, and under which said statutes of the *United
States*, or under such of them, and such parts of them, as
apply to and operate on the case, these respondents, in vir-
tue of their aforesaid charter, and of the several statutes
and acts of *Virginia, Maryland*, and the *United States*, con-
stituting such charter, or altering or amending the same, or
anywise relating to the same, and in virtue of the rights
and interests thereby, and by the authority of the same,
vested in these respondents, do now here before this court,
set up and claim their prior and preferable title, right and
privilege, to construct their said canal, and its incidental
works and appendages, on the precise route a nd site de-
signated for them as aforesaid, and now in controversy ; and
to appropriate by the prescribed modes of purchase or con-
demnation, the lands and tenements in controversy, on, and
near that route and site, and through which the said canal

Answer.

is intended to be conducted, and the necessary materials found on such lands, for the construction of the said canal and its incidental works and appendages ; and these respondents do now here set up, and claim before this court, under the constitution and statutes of the *United States* aforesaid, and in virtue of the rights, interests and authority, by force of the said statutes, and of the other laws aforesaid, vested in these respondents, an exemption of such, their prior and preferable title, right and privileges, aforesaid, from the operation and effect of the charter granted to the complainants as aforesaid, and of the pretended authority set up, asserted, and exercised under the same as aforesaid ; and from all diminution and interference, under pretence of such charter or authority ; and there is in like manner, now here drawn in question, the validity of the statute of *Maryland* incorporating the *Baltimore* and *Ohio Rail Road Company*, and of the pretended authority so set up, asserted, and exercised by the complainants under that statute, in so far as that statute, or that authority has been, is, or may be held or construed, set up, asserted, or exercised to operate any revocation, diminution, alteration or interference of, or with the prior and preferable title, right and privilege so set up and claimed by these respondents as aforesaid, or in any manner to set up and assert any adversary title, right or privilege, or the pretence of such in the complainants ; the said statute and the said authority, so set up, asserted and exercised under the same by the complainants aforesaid, being so far, and to every such intent and purpose as aforesaid, repugnant to the constitution of the *United States ;* of all which matters these respondents crave all the benefit and advantages in this answer, that they might or could have had from any form of averment, or from any form or mode of equity pleading whatever.

The general replication was filed to the answer.

Answer.

BLAND, chancellor, afterwards, on the 21st of July, 1829, with the consent of parties, ordered, that the three bills be consolidated, and that the answer filed on the 16th of May last, be received as an answer to said three bills so consolidated, subject to all just exceptions.

And on the 24th of September, 1829, on the motion to dissolve the injunction, he passed the following order.

The motion for the dissolution of the injunction heretofore granted in this case, standing ready for hearing, the matter was opened, and the argument commenced by the solicitors of the parties, on the 21st of July last, and continued until the 6th of August following; when permission was given to add, by way of notes, some remarks upon such new matters as had not been presented in the opening, on the part of the plaintiffs. Whereupon a kind of supplemental argument in writing, was prepared on each side, which, with the pleadings and their exhibits, amounting, on the part of the defendants, to a very large mass, were submitted on the 19th of August last; since that time, I have read the proceedings, and maturely considered the whole case.

It appears that the plaintiffs, by their act of incorporation, were authorised, for the purpose of making the contemplated road, to enter upon, use and excavate, any land which might be wanted for the site of their road, or its necessary works; and to enable them to acquire a complete legal title to such land, upon making compensation for it, they were authorised to agree with the owner for the purchase of it; or if he were unwilling or incompetent to sell, or out of the county in which the property wanted, might lie, they were authorised to obtain a warrant for having it valued and condemned to them in the mode prescribed; under these powers, they proceeded to enter upon the lands along the route they have described, as the site of their road thus located; and to procure a complete legal title to those lands, they agreed with the owners of some parts, for a legal conveyance, and had sued out warrants for the purpose of obtaining a legal

Interlocutory order.

title to other parts thereof, in that way.   That neither the *Potomac Company*, (a body politic in existence at the time the plaintiffs filed their bill, and who were made defendants to it, but who have since been dissolved,) nor the present defendants, had ever, in any manner, acquired any title to the lands over which the plaintiffs had located their road; and that these defendants had, notwithstanding, attempted, and were about to obtain a legal title, in the modes authorised by their act of incorporation, for the identical same lands so entered upon, agreed for, or about to be condemned by the plaintiffs.   By which means they would be enabled to interfere, very injuriously, with the rights of the plaintiffs, and involve them in great difficulties.   To prevent which, the plaintiffs prayed an injunction, which was accordingly granted.

The equity arising out of these facts, may be expressed to this effect:  Where two or more are allowed, by law, to purchase and acquire a title to lands, upon certain conditions, and according to a prescribed mode of proceeding, he who does the *first* requisite act for that purpose, shall not be hindered in his further progress; because the law has thus held out a pledge, that no one else shall be permitted after that, so to interpose any obstacles, or to arm himself with a formal legal title, by means of which he may be, at least, enabled to litigate and embarrass, if not to overthrow, the right of him whose title had been thus, *first* begun.   To refuse an injunction, in such a case, against an impertinent and wrongful intruder upon an inchoate title, which at common law is altogether defenceless, would be to stand by, and openly tolerate a race for the means and weapons of litigation and strife.

But the principles upon which this injunction rests, must be familiar to every one, at all acquainted with the origin of land titles in *Maryland*.   A title to land may be obtained from the *State* through the land office, among other modes, either under a common, or a special warrant; but when the legal title has been perfected under either, it relates back

to the date of the special warrant, or the date of the certificate of survey, by which the particular parcel of land was designated, as that *first* act distinctly manifesting an intention to purchase that land so specified. After the taking of which *first* step toward a purchase, equity forbids any one else from interfering; and, if another person does attempt to intrude, he may be restrained in a summary way, by a *caveat* in the land office. The object of the *caveat*, as of the injunction, in this instance, is to prohibit the defendant from obtaining that to which he can have no just claim, and to prevent him from providing himself with the means of mischievous controversy. Upon these principles, I granted the injunction in this case; and I still feel satisfied that it was correctly granted.

The defendants, by their answer, have not denied, nor even questioned any of those facts upon which the plaintiffs' injunction reposes; those facts are all of them admitted, or not being denied, are now to be taken as true. But the defendants, taking an extensive range, have gathered together and condensed in their answer, a great mass of facts and circumstances, shwoing, as they say, the notoriety of the public and early dedication of the ground in question, to the purposes of a canal; and they allege that there are numerous passes between the tide and *Cumberland*, where the *Potomac* breaks through the numerous ridges, mountains, and rocky precipices, where it is hemmed in by rocky and high banks, with a very narrow space between; which narrow passes being wholly taken up by the rail road, leaves no room for the canal to be constructed on the same side of the river, but at enormous expense, and which, in fact, produces such difficulties as to endanger their whole project. These allegations, and their whole case, as they state, are deducible from a multitude of acts, proceedings, and papers, which they have exhibited as a part of their answer; and all of which they aver to be public and authentic documents. In this manner they introduce a case, **which, as they allege, is** so sustained, that the court must

Interlocutory order.

take judicial notice of the facts of which it is composed; and those facts being so noticed, they give rise to a countervailing equity, which avoids, displaces, and altogether overrules every equity upon which the plaintiffs can rely; and therefore they argue, that the court may with as much propriety, be called on now to dissolve the injunction in their case, so made out, as if they had shown a public act of the general assembly, the operation of which, displaced the equity, or was incompatible with the further continuance of this injunction.

There are some distinctions and principles which it will be useful to recall to our recollection, and constantly to bear in mind, in order to a more perfect understanding of this case.   When speaking of a court of common law, or of its proceedings and powers, a distinction is always made between *fact* and *law;* and much is said in the books which treat of their proceedings, of this distinction; and it is shown, that in some instances, *fact* and *law* are inseparably blended. The difficulties with which those courts have to contend, as to where, and how, the line should be drawn between *fact* and *law*, arises, for the most part, from the peculiarity of their constitution.   They are always constituted of two distinct branches, the judge, and the jury; to the judge alone belongs the right to decide on the *law;* and the jury is only charged with the duty of finding the *fact.*   All legal rules involve both law and fact; because the rule itself is either declared to be only applicable to a certain state of facts, or it is one which is assumed as always arising out of some particular fact.   Every *law* is then nothing more than the *incident,* or *consequence,* annexed to a particular combination of facts, *ex facto oritur jus*—1 *Stark. Ev.* 406. 3 *Atk.* 36.   In speaking of the proceedings in a Court of Chancery, the same distinction is made, and exists precisely in the same way, and to the same extent in all respects. The phrase is changed, and nothing more; we do not here speak of the distinction between *fact* and *law;* but of that between *fact* and *equity;* excepting only so far as a refer-

Interlocutory order.

ence is made to the different constitution of the tribunals, the sense and meaning of the two expressions are exactly the same, to all intents and purposes. And if the chancellor were to have associated with him, a jury for the purpose of finding the *facts*, leaving him only to decide upon the *equity*, the same kind of difficulties would arise, and as often, in this court, as to the proper distinction between *fact* and *equity*, as between *fact* and *law*, in a court of common law.

In the case of *Salmon vs. Clagget*, I endeavored to explain the principles by which this court had been, and would continue to be governed in relation to motions for dissolving injunctions. I stated that there was, or in many cases might be, a very clear distinction drawn between the *facts* composing the case on which the injunction rested, and those making up the whole case of the bill on which the relief was prayed; and the case presented by the answer, including as well the facts set forth in avoidance of, as those which are responsive to the bill. In a word, that as the equity arising out of each combination of facts, as its incident, must vary as the combination of facts essentially varied, it became necessary to determine what was that combination of facts to which the court must confine itself, on a motion to dissolve the injunction; and I then declared, that it must confine itself exclusively to the case, or combination of facts set forth in the bill, out of which the equity of the injunction arose, and to the answer of the defendants to those facts. Through the whole of the explanation of this subject in that case, I took it for granted, that the distinction between *fact* and *equity* was perfectly understood, and constantly attended to; because it was a common, substantial, and elementary one. I was the more particular in the explanation of the peculiar, and often circumscribed nature of the case on which the injunction rested, because, as I there showed, the loose and general expressions of the *English* books upon this subject, however well adapted to the course of proceeding in that country, by no means con-

Interlocutory order.

veyed a correct notion of the principles by which this court was governed; and because I perceived that although the *New York* adjudications, which are highly respected here, had in some cases, laid down the rule as it prevails here, and had declared it to be according to the reason of the thing; 1 *Hopk.* 276, 4 *John. C. Rep.* 499; yet they had in other cases, apparently deviated from it; 7 *John. C. Rep.* 323; and also because, the no less highly respectable decisions of *Virginia*, had sanctioned a course of proceedings in that State, which was wholly unlike ours, and as it seemed to me, unsuitable to the constitution of this court.   1 *Hen. and Mun.* 8.

In this case much has been said about the injunction granted by the County Court of *Washington*.   That case, as I have repeatedly declared, has no sort of necessary connexion with this.   The wrong complained of here, is the fact of the defendants endeavoring to purchase certain land which the plaintiffs were about to purchase, and to which they had previously begun to acquire a legal title.   Now, I have not perceived from the pleadings in the case, or been able to gather from the arguments, that this matter of controversy is in any way involved in that suit, or that any judgment I can pronounce in this case, can in any manner bring this court in collision with the *Washington* County Court.   There was, in truth, no necessity to have made the slightest allusion to the suit in that county court; but since that suit has been fully and specially referred to in this bill, I will here take occasion to remark, that this case has been thus made, to afford an example of the distinction, I endeavored to illustrate in the case of *Salmon vs. Clagget*, between the case on which the injunction rests, and the whole case of the bill upon which it prays relief.   Here the plaintiffs state themselves to be purchasers, who had taken the first requisite step towards completing their purchase, and were going on to do so, when these defendants stepped in, and were attempting to take the bargain from them, or to put themselves in a condition to contest their

Interlocutory order.

complete title when it should be obtained. So far the facts
were necessary to this injunction. The plaintiffs then in-
troduce all the circumstances of the county court injunc-
tion and suit. Now, those facts could be of no service to
them, as a basis for the injunction asked for here; but at the
final hearing they might have been of use, as a reply to a
charge of laches in not going on, with due diligence, to per-
fect the legal title they had begun, had it been alleged in the
answer that they were unworthy of relief, because of any
such negligence, since that county court injunction would
have sufficiently accounted for the delay, and prevented its
being thence inferred, that the plaintiffs had tacitly abandon-
ed their incipient title. For that purpose, and as showing
why the plaintiffs should be restored to those advantages,
which they ought to have been allowed to derive from their
first step toward a complete title, when that injunction, if
at all, shall have been withdrawn, so as to allow them to
proceed, are the only modes in which any thing that is said
about the county court suit can have any bearing upon this
case; and in this way, it furnishes an example in this suit,
of the difference between the case of the injunction and that
case, every part of which might have been necessary to
give a sufficient foundation for the relief prayed.

In the consideration of a motion to dissolve an injunction,
on the coming in of the answer, it is essentially necessary
that these distinctions should be constantly borne in mind;
and that we should be every way careful, not to confound
the equity and merits of the case with that combination of
facts of which the case is composed, and which gives rise
to the equity upon which the injunction reposes. These
distinctions are our chief or only guides through the mazes
of the numerous and various allegations, averments, and ar-
guments, which each one of the parties may introduce into
the pleadings by which he exhibits his case to the court.
In a court of common law, as regards the rights of the judge
and jury, there may often be much difficulty in distinguish-
ing between *fact* and *law;* but here, and in cases of this

Interlocutory order.

kind, the distinction between *fact* and *equity* being de-
duced from the pleading, is much more easily drawn.    The
allegations of the pleadings, so far as regards *facts*, are of-
fered as by a witness giving testimony.    The averments of
fact in an injunction bill are sworn to, as by a witness, to
cause the court to believe in their truth; and so believing
in them, to perceive the incident equity arising therefrom,
which will authorise the granting of an injunction.    And
a defendant is bound, and may be forced to make answer,
on oath, to all the facts so stated in the bill; he responds, in
many respects, as a witness; and his answer is evidence of
*facts*, not of equity; consequently, if the pleadings in chan-
cery are taken, as they certainly may be to this purpose, as
the declarations of witnesses testifying to facts, the distinc-
tion between what must be regarded as *facts*, and what as
*equity*, in a bill or answer, will be seen in a clear and stri-
king point of view.    A party speaking only as a witness,
cannot be said to alter, or cause belief· in any principles of
equity, by making oath to their existence, since they are
annexed to, and made incidents beyond his control, of cer-
tain combinations of *facts*; and the court is bound, in the
most emphatic sense, to take notice of all such principles
without proof.    Therefore, on a motion to dissolve an in-
junction, the best test of what are properly averments of
fact, in a bill or answer, is, whether they are such matters
as a witness might be called on to prove, or the truth of
which must be established by evidence, to enable the court
to act; if they are not, then they are either sheer principles
of equity, or some of those public and established facts,
such as the constitutionally appointed day of the meeting of
the general assembly, or the like, of which the court is
bound to take judicial notice without any proof whatever.

The defendants, in support of the position, that their case
is substantially made up, only of such matters of which the
court is bound to take notice, relied·upon 1 *Stark. Ev.* 166.
But the subject there treated of, can have no manner of re-
lation to this case, as it now stands upon this motion.    Here

Interlocutory order.

the position taken is, that no proof of any kind can be required; there, the inquiry is, concerning the public written instruments of evidence; the forms with which they must be clothed to entitle them to be received as such, and of the nature of the matter, of which, they may be deemed sufficient proof. No one will question the soundness of the general principle there laid down. It amounts to no more than this, that the acts of the whole government, or any one of its departments, may be shown by giving in evidence those papers and documents which are the usual and established forms by which it exercises or manifests the powers belonging to it. In *England,* the king alone declares war; and therefore, a royal proclamation to that effect, is there held to be sufficient evidence of a state of war ; in this country, *Congress* alone can declare war, and hence ,here no instrument short of an act of *Congress,* can be deemed sufficient evidence of the *United States* having placed themselves in a state of war. This principle of evidence may, perhaps, be considered as alike applicable to all countries. But the showing that certain papers and proceedings may be used as evidence, for any purpose, by no means sustains the position, that the court is bound to take notice of them as public and authentic documents. 2 *Camp.* 44.

The general principle, as illustrated by the authority relied on, applies only to the inquiry, what is proper and sufficient evidence of certain facts? The question here is, not as to the nature or the instruments of evidence, but whether the case, or the facts are such, of which no proof whatever is required; because of their belonging to that class of matters of which the court is bound to take notice. The position taken by the defendants, repudiates all proof; they aver, that their case is made up of that, which gives them a full dispensation from the necessity to produce proof of any description; and therefore, they invite the court so to look upon it, to sanction the truth of every part of it, and to act accordingly.

Interlocutory order.

I take it to be clear, that as to all those facts and circumstances of which the court is bound to take notice, on a motion to dissolve an injunction, the parties stand before it in the same situation, as that in which, a dissolution is asked for, on the ground that the facts set forth by the bill, give rise to no equity upon which an injunction ought to be granted. It is a well established principle in equity, as well as at law, that a plaintiff can only obtain relief upon the strength of his own claim, and not upon the weakness of that of his adversary ; and therefore, if it should appear that the facts as stated in the bill, looking to it alone, gave rise to no equity, it is very certain, that the injunction would be dissolved, whether the defendants had answered or not, or however imperfectly they might have answered. Let it then be supposed, that an injunction had been granted to restrain the making of a canal, or the doing of any other act, under an impression, that the defendant had been clothed with no authority to do the act complained of, and it should be afterwards shown to the chancellor, that a public act of the general assembly, of which he was bound to take notice, had fully authorised that very act, it is certain, that he would, in such case, immediately dissolve the injunction, even without an answer, or without regard to the imperfections of the answer; consequently, if the exhibits of these defendants be in truth, as they have alleged, such public and authentic documents as the court is bound to notice, they might, by merely reading them to, or reminding the court of them, have obtained all the benefit from them which they could have had in any other way. If taken altogether or separately, they give rise to such an equity as is incompatible with that on which the injunction rests, it must be dissolved. This might have been done by the defendants, without making any answer ; but a defendant may, in general, insist on any matter, by way of answer, which he may take advantage of, by plea or demurrer ; here the answer relies expressly upon that countervailing equity arising out of the combination of facts which it has set forth, in avoid-

Interlocutory order.

ance of the plaintiff's case; and therefore, if those facts are such as the court is bound to notice, their being couched in the form of an answer, cannot release the court from that obligation; nor can they be thus rendered, in any manner, less acceptable to the court, or less available to the plaintiffs, than if they had been shown in any other way.

It is laid down as clear law, that no evidence can be required to prove the existence of a fact, which must have happened according to the constant and invariable course of nature, or to prove any general law, or other public matter, of which the courts are bound to take judicial notice. An act of assembly relating to a public highway, is a public act of which they will take notice; but of private acts they take no notice. 1 *Stark. Ev.* 163, 400. They take notice of the order and course of proceedings in each of the two houses of the general assembly. 1 *Saund.* 131; but not of their journals, or votes and proceedings; 1. *Ld. Raym.* 15; nor are those journals, when proved, evidence of any facts stated in the resolutions or reports of committees, which are not a part of the proceedings of the house : 1 *Stark. Ev.* 167. The courts of justice of the several States must take notice of all public acts of *Congress*, even including, (as may be admitted in this case,) those which relate exclusively to the municipal affairs of the *District of Columbia;* but they are not bound to notice any foreign law, or law of any other State of the Union. The acts of the other States of the Union to be admitted even as evidence, must be authenticated according to the act of *Congress*. The courts of justice are also bound to take notice of the civil geography of the State, as of the counties, districts, and cities, established by the State government; and also of the districts and ports which are the divisions made of it by the federal government; but they do not notice the local situation of plains within particular counties, or the distance of counties from each other. 4 *Bar. & Ald.* 243. And although they will notice the extent of ports, 1 *Stra.* 469; yet the straightening of a port, by building too far into the water, where

Interlocutory order.

ships or vessels might have formerly ridden, is a matter of which they cannot take notice, but it is a question of *fact* to be determined by a jury upon evidence. *Harg. Tr.* 85. As regards the subject now under consideration, the obligation of the courts of justice to take notice of various matters and things, extends thus far, and no further. It only remains to inquire, therefore, whether those matters which the defendants have condensed into the form of an answer, and proffered to the consideration of the court, are some of those of which it is bound to take judicial notice.

The line of road to be formed by the plaintiffs, and the canal to be constructed by the defendants, are both of them, declared to be public highways ; and therefore, the several acts by which they have been incorporated, are public laws of which the court is bound to take notice. The acts of *Congress*, and of the other States of the Union, in relation to these two public highways, may also be noticed, on the ground, that they have been called for, recognized, or adopted by public laws of this State, which have actually taken effect ; but no private act of this State, nor any legislative enactment of any other State, which has not been thus expressly invoked, and in a manner, introduced into the body of our public statute law, can be noticed by this court ; and therefore, none of the acts of the legislature of *Virginia*, or of any other State, passed prior to, or which have not been adopted by those acts of ours, of 1826, *ch.* 123, and 1824, *ch.* 79, by which the plaintiffs and defendants had been incorporated, can be now noticed. It is also certain, that all the journals, reports of committees, and every thing else, found among the proceedings of any legislative body, must, upon the present occasion, be laid aside as matters which the court cannot now notice. As to the multitude of private papers referred to in the answer, such as proceedings of sundry meetings of respectable people, who gave themselves the name of conventions, private letters and the like, as it has not been very seriously contended, that they should be noticed, and considered, as public and

Interlocutory order.

authentic documents, in any respect so as to affect the rights of property any where, or to any extent, I may, without scruple or hesitation, throw aside the whole mass of papers of that description, at least for the present, as utterly unworthy of being judicially noticed without proof, for any purpose whatever. But the defendants in their answer, say, "that at the *Point of Rocks,* where the *Potomac* intersects the ridge of the *Catoctin* mountain, and where the pretended route of the said rail road is described by the complainants, in their said bills, to strike the *Potomac* river—there is one of those narrow passes in the actual route and site of the canal, as *officially* and definitively selected, surveyed, and laid down as aforesaid, which presents no choice of ground for the canal ; but where for a considerable distance up the river, along the foot of the mountain and its spurs, the canal is confined by the nature of the ground, within certain primeval and immoveable barriers ; *as is more particularly shewn and illustrated by the topographical descriptions, maps and profiles of the engineers, herewith exhibited, and above referred to.* Through the whole of this pass, the space between the jutting and precipitous rocks on the one hand, and the river on the other, is so narrow, that in order to obtain the proper and necessary breadth for the canal and its towing path, a solid and wide wall must be constructed in the river ; and if the canal be intercepted and cut off by the rail road, or otherwise, from that single route through this pass, it must be completely intercepted and cut off from the whole of its route above ; and be either entirely stopped and defeated, or compelled to the precarious, dangerous, and enormously expensive, and every way inconvenient and burthensome expedient, of crossing to the opposite side of the river on an aqueduct; and then, in order to regain its route to its western *terminus,* of recrossing the river on another such aqueduct, at such unknown and uncertain point above, certainly not lower than *Cumberland,* as where it may please the complainants to allow them verge and space enough." From this the defendants argue,

Interlocutory order.

that by an act of *Congress*, which the courts of justice
are all bound to notice, the president was authorised to
order surveys to be made of the most suitable routes for
roads and canals; that therefore, this court must take
notice that the president did execute that law by ordering
surveys to be made; that one of those surveys was made
expressly for this canal, as a location of its route, and
as a first step towards an absolute appropriation of the
land along that route, to its use; that the maps and pro-
files now shown are those made to exhibit the result of
that survey; and that those maps and profiles clearly
show, that the canal has been either altogether inter-
cepted and cut off, or most illegally and ruinously turned
aside, from its rightful and destined route by the rail road.
This is drawing consequence from consequence, and piling
notice upon notice, to a great extent and height indeed.
The act of *Congress*, as a public law, it is true, must be
noticed; and because the law presumes, that every officer
has properly performed his duty, until the contrary appears,
it must be admitted that the president did order *some* sur-
veys to be made, as required by that public law. But there
is no adjudged case, or principle of law, which declares it
to be the duty of the courts, to take judicial notice of the
execution of any public statute whatever. If they wer-
bound to take notice of the manner in which this public act
of *Congress* had been executed, then, upon the same princi-
ple, they would be bound to notice the manner in which
every public statute was executed. There are many pub-
lic statutes requiring acts to be performed by justices of
the peace and constables; but to take judicial notice of the
manner in which such officers had executed a public sta-
tute, and so to admit their *ex parte* proceedings to affect
the rights of property, would be absurd and mischievous.
The various modes in which the public statutes are carried
into effect by the executive officers of government, are, in
principle and in law, all proceedings of the same character;
they are mere *facts*, and are not some among those public

Interlocutory order.

proceedings, of which, the courts of justice are bound to take notice; consequently, when, where, and how, those surveys were made, as authorised by the act of *Congress*, and the topographical maps and profiles exhibiting the results of any of them, are all matters of fact to be shown and established by proof; and even when they shall have been so established, it will remain a question how far they can be received, even as evidence, to affect the interests of any one who was not a party to their being made, or who had not, in any way admitted their verity and correctness Abstracting then, every thing from the case of the defendants, of which the court cannot take notice, and there remains nothing left to them with which they can assail the equity of the plaintiffs, except their several acts of incorporation; but with these alone they have attempted to maintain their ground.

I have read the act incorporating the plaintiffs, and also that incorporating the defendants, and compared them with each other. These two bodies politic are entirely distinct in all respects; there is not one single sentence in the acts, by which either has been incorporated, which has the most remote allusion to the other ; nor does the sense of any expression contained in either of their acts of incorporation, in the slightest degree, indicate that there probably may, or possibly can arise, any jarring between their respective franchises, or collision of their several interests, in any way whatever. From all or any thing apparent upon the face of those legislative enactments, there is no room to infer, that each one of these two corporations may not proceed in all their operations, without the least interference with the other. If then, upon the face, and according to every fair reading of these several acts of incorporation, all is harmonious between them, the discord can only have arisen from the manner of executing the one or the other, or both of those laws, and in no other way; and that this controversy between these parties has only originated in that way, appears to be admitted by the defendants themselves. In

their answer they say, that "according to the complainants' own showing, and the facts are otherwise true and notorious, they have the choice of two or more practicable routes for their rail road, without any interference with the canal, or connexion with, or even approximation to the river; the different routes only presenting some differences in the comparative labor and expense of construction; and these compensated, if they occur, with any considerable increase, on the more northern route originally proposed for the rail road, by the advantages and savings, from directness of course, and shortness of distance, as the principal and leading personages, both among the original projectors and promoters, and the present managers and proprietors of the rail road, have repeatedly averred and publicly contended, the principle, and the operation of the lifting power of stationary steam engineers, by which the rail road overcomes ascents, and gains new levels, admit of an infinitely greater diversity and extent of application than that of the canal, circumscribed and limited as it is by water levels; and are perfectly practicable and convenient, and within the ordinary compass of that power, either to overcome all the necessary ascents on the more northern and direct route first proposed for the rail road, or if, what the complainants designate the southern and circuitous route be preferred by them, to assume, with ease and convenience, a higher level than the canal, on that route, and leave the canal ample verge and room between the rail road and the river; there is no necessary and proper connexion or dependence, between the rail road and the river; either intrinsically, as regards the construction, appendages and uses of the rail road, or relatively, as regards the purposes of intercourse, trade, and commerce, which the rail road was designed to subserve; whereas the river is, as it were, the life-blood of the canal; and continual access and frequent communication, from one to the other, are inseparable, from the very idea of the canal." Here, it is distinctly alleged by the defendants, that the injury they complain of, has arisen altogether from the location

Interlocutory order.

which the plaintiffs have given to their road, under their act of incorporation ; that is, not from the law itself, but from the execution of the law.

The defendants insist, that by virtue of their grants and franchises, they have a priority of right to the choice and selection of the route and site of their canal, along the margin and bank of the river *Potomac.* They mainly, and in every way, rest upon this priority of right to a choice of routes. If it exists at all, it must be founded upon the various facts and circumstances, as shown by them, when taken in connexion with the acts of the general assembly, by which they have been incorporated ; or it must be based upon those acts of assembly alone. But if, as in the first supposition, its foundation is composed of those facts taken with the law ; then it certainly cannot avail them, upon the present motion, because, as has been shown, those *facts* are none of them, of that character of which the *court* can now take notice and act upon. Take the other supposition; and let their alleged right be admitted to have been expressly given by a public law, of which the court must take notice ; even then they cannot avail themselves of it upon the present motion ; because they have been deprived of it, as they themselves state, not by the act itself by which these plaintiffs have been incorporated, but by the manner in which that law has been executed ; which *mode* of executing the law, is clearly a matter of *fact* of which this court cannot now take notice.

I do not understand, that the defendants contend for an arbitrary and whimsical right of choice, which, without regard to their own real interests, may be capriciously turned against the plaintiffs, or any others, merely for the purpose of intercepting their line of operations. They certainly cannot claim such a right, with any design to use it, for the very same evil purposes of which they themselves now complain ; it must be, therefore, that the right of choice for which they contend, is one, which, in its exercise, is to be governed by fairness, justice, and equity. If this be the

Interlocutory order.

kind of right for which they contend, and none other could be sanctioned by a Court of Equity, then it is evident, that the court has not, as yet been furnished with the means of forming any fair and correct judgment upon the subject. It has heard, so far, only the allegations of one side, and that that too, without any proof in support of those allegations which it can allow itself to notice, and act upon. The bill and all the allegations of the plaintiffs are perfectly silent in respect to this right of choice, as now claimed by the defendants. The claim, and every fact relating to it, make their appearance, for the first time, in the answer of the defendants. The plaintiffs could not be, nor were they expected to come prepared for a vindication of their rights, so far as they are implicated by this claim ;—their case, as shown by their bill, either as necessary to an injunction or to relief, called for no such disclosures as the defendants have set forth respecting this claim of a right of choice ; and consequently, every thing relating to it, is entirely new matter, advanced in avoidance of the plaintiffs case, and concerning which they have yet had no opportunity to show any thing, on their part. Justice and equity, therefore, do most manifestly require, that the injunction heretofore granted, upon an equity which the defendants have been unable, otherwise, to controvert, should be continued until the validity and extent of the claim of the defendants can be examined, and ascertained upon surveys and evidence, which each party may be allowed to make and produce ; and from which the court may be furnished with the means of determining, whether or not, these two apparently harmonious acts of incorporation, have, in reality, by the improper execution of one of them, been brought into ruinous conflict with each other.

If, upon an order of survey, authorising these parties to lay down their respective pretensions, in the usual manner, and on the return of such topographical maps and profiles as may be specially directed, if required, the fact appears, that the location of the rail road does deprive the canal of

Interlocutory order.

its most suitable and advantageous route, then the question will fairly arise, and be correctly presented to the court; whether the defendants have a priority of right, to the choice and selection of the route of their canal, or not. The extent of the interference and the nature of the collision between these two bodies politic, will then, and in that way, be clearly and properly presented, according to the showing and proofs of both parties.

Commissions to take evidence were issued, the last of which was returned on the 27th May, 1831. It is not deemed necessary to recite any part of the proof, as those portions, that bear on the question decided by this court, are adverted to, by the judge who delivered the opinion of the majority of this court.

BLAND, Chancellor, (September term, 1831.)

This case standing ready for hearing, and the solicitors of the parties having been attentively heard, the proceedings were read, and maturely considered. Whereupon it is adjudged, ordered, and decreed, that the injunction heretofore granted in this case, be, and the same is hereby confirmed, and made perpetual. And it is further adjudged, ordered, and decreed, that the defendants, *The Chesapeake and Ohio Canal Company*, pay unto the said plaintiffs, *The Baltimore and Ohio Rail Road Company*, all their costs expended by them in this suit, including all the expenses of the survey, to be taxed by the register.

From this decree the defendants appealed to the Court of Appeals.

The cause came on to be argued before BUCHANAN, Ch. J., EARLE, STEPHEN, ARCHER, and DORSEY, J.

*Walter Jones*, and *A. C. Magruder*, for the appellants.

*Daniel Webster*, and *Reverdy Johnson*, for the appellees.

BUCHANAN, Ch. J., delivered the opinion of the court.

The charter of the *Potomac Company*, was created by the mutual and concurrent legislative acts of *Maryland* and *Virginia*, in the year 1784, to which there are many supplements.

The act for incorporating the *Chesapeake and Ohio Canal Company*, was passed by the legislature of *Virginia* on the 27th of January, 1824. The 1st section of which has this provision, "that so soon as the legislatures of *Maryland* and *Pennsylvania*, and the *Congress* of the *United States*, shall assent to the provisions of this act, and the *Potomac Company* shall have signified their assent to the same, by their corporate act, a copy whereof shall be delivered to the executives of the several *States* aforesaid, and to the *Secretary of the Treasury* of the *United States*, there shall be appointed by the said executives, and *President* of the *United States*, three commissioners on the part of each *State*, and the government of the *United States*," for the purpose among other things, of causing books to be opened under the management of "persons to be by them appointed for receiving subscriptions to the capital stock of the company," &c. And by the 22d section it is enacted, "that this act or so much thereof as respects the canal and works designed to be constructed in the *District of Columbia*, and the states of *Virginia* and *Maryland*, shall take effect, with such necessary modification in the construction thereof, as shall fit it for such limited application or use, upon the assent of the *Congress* of the *United States*, and the legislature of *Maryland* being given thereto; and upon its receiving the further assent of the legislature of *Pennsylvania*, the whole and every section, and part thereof, shall be valid and in full force and operation."

In an act of the legislature of the state of *Maryland*, passed on the 31st day of January, 1825, at the December session, 1824, entitled, "an act to confirm an act of the general assembly of the state of *Virginia*," entitled, "an act incorporating the *Chesapeake and Ohio Canal Company*," after

reciting that act, the assent of the legislature is given to it in these words, "that the said act of the general assembly of *Virginia* be, and the same is hereby accepted, assented to, and confirmed."

In an act of the *Congress* of the *United States*, passed on the 3d of March, 1825, entitled, "an act confirming an act of the legislature of *Virginia*," entitled, "an act incorporating the *Chesapeake and Ohio Canal Company*," and an act of the State of *Maryland* confirming the same, the assent of *Congress* is given in these words, "that the act of the legislature of the State of *Virginia*, entitled, 'an act incorporating the *Chesapeake and Ohio Canal Company*,' be, and the same is hereby ratified and confirmed, so far as may be necessary for the purpose of enabling any company, that may hereafter be formed by the authority of the said act of incorporation, to carry into effect the provisions thereof, in the *District of Columbia*, within the exclusive jurisdiction of the *United States*, and no further." And on 16th of May, 1825, the full and unqualified *assent* of the *Potomac Company* was declared and signified by a corporate act, in the manner required; with authority to the president and directors of that company, to surrender its charter, and convey all the property, rights and privileges, owned, possessed, and enjoyed under it, to the *Chesapeake and Ohio Canal Company*, agreeably to the provisions of the 13th section of the act incorporating the latter company; which surrender and transfer, the same section empowers the *Chesapeake and Ohio Canal Company* to accept. So that on the 16th of May, 1825, the act incorporating the *Chesapeake and Ohio Canal Company*, or so much thereof, as respects the canal and works designed to be constructed in the *District of Columbia*, and the States of *Virginia* and *Maryland*, in the language of the 22d section of that act *"took effect,"* the assent of the *Congress* of the *United States*, and of the legislature of *Maryland* having been before given to it; and the assent of the legislature of *Pennsylvania* being by the same section dispensed with, so far as respects those portions

of the contemplated canal, and only required in relation to the part proposed to be made in that State. Still the assent of the legislature of *Pennsylvania*, on certain conditions not material in the examination of this case, which relate only to a portion of the canal designed to be constructed in this State, was given by an act of the 7th of February, 1826—and commissioners were appointed as authorised by the charter, by the President of the *United States*, and the executives of *Virginia* and *Maryland*, for receiving subscriptions to the capital stock of the company, &c.

On the 3d of December, 1823, the President of the *United States*, adverting in his message to *Congress*, to the proceedings of a convention, called the *Chesapeake and Ohio Canal Convention*, (which had sat at the city of *Washington* in the preceding month of November,) in relation to the scheme of the *Chesapeake and Ohio Canal*, recommended the authorising by an adequate appropriation, the employment of a suitable number of the officers of the corps of engineers, to examine the ground, and report their opinion thereon. On the 30th of April, 1824, an act of *Congress* was passed in pursuance thereof, appropriating $30,000 for the purpose of procuring the necessary surveys, plans and estimates, upon the subject of roads and canals. In the month of May, 1824, the President appointed a board of internal improvement, who were, on the 31st of the same month, instructed to "proceed to make an immediate reconnoisance of the country between the tide waters of the river *Potomac*, and the head of steam boat navigation of the *Ohio*, &c." "for the purpose of ascertaining the practicability of a communication between those points, of designating the most suitable route for the same, and of forming plans and estimates in detail, of the expense of execution, and to use every possible exertion to have their report prepared in time, to be submitted to *Congress* at their next session. On the 2d of February, 1825, the board of engineers for internal improvement, made a report of their proceedings,

accompanied by surveys, maps and profiles, but without any estimate of the probable cost of the projected work, which was communicated to *Congress* by the President, on the 14th of the same month. At this time, neither the assent of *Congress*, nor of the *Potomac Company*, had been given to the act of incorporation. That report which was immediately printed and published, by order of *Congress*, asserts the entire practicability of a communication between the tide waters of the river *Potomac*, and the head of steam boat navigation of the *Ohio*, by a continuous canal, which, in the report, surveys and maps, is called the *Chesapeake and Ohio Canal;* and that portion of it extending from the tide waters of the *Potomac*, to the mouth of *Savage* river, on the north branch of the *Potomac*, is designated as the eastern section, which, in the report is described in these words; "this section ascends the valley of the *Potomac*, as · the several ridges which that river traverses and breaks through, oblige to follow its course without any deviation, the side on which it should ascend *along* the river, is the only choice left to the engineer."

The route of that section throughout its whole course, as surveyed and laid down by the board of engineers for internal improvement, is in the valley of the *Potomac*, along the shores of the river; particular places being marked, as suitable points for crossing the river from shore to shore, should it be found necessary, but a preference being given to the north or left side. Thus, they say in one part of the report, "this short analysis is sufficient to show, that the *northern* side of the valley offers the best ground for receiving the bed of the canal." And after describing the valley, they say, "such are the local features of the valley through which this section of the canal, *east* of the *Alleghany must* be directed."

On the 6th March, 1826, the legislature of *Maryland* passed a law for the promotion of internal improvement, incorporating a company to be called, "*The Maryland Canal Company*," to make a canal "from *some convenient point*

*on the Potomac River*, intersecting or continuing *The Chesapeake and Ohio Canal* to the city of *Baltimore;*" authorising a subscription by the treasurer, for the stock of the *Chesapeake and Ohio Canal Company*, to the whole amount of the stock of the *Potomac Company* owned by the State, and of the debt due to the State by that company; and also authorising the treasurer to subscribe for 5000 shares of the stock of the *Chesapeake and Ohio Canal Company*, on condition among other things, that the *Congress* of the *United States* should by law, authorise a subscription for not less than ten thousand shares of the capital stock of the *eastern section* of that canal, with a proviso, that the executive of the State, " shall previously be satisfied, that the residue of the sum of money estimated by the *United States'* board of engineers, to be adequate to the completion of the *eastern* section of the *Chesapeake and Ohio Canal*, after deducting the amount of the subscriptions of the State of *Maryland* and of the *United States*, therein provided to be made, hath been actually subscribed by *bona fide* and competent subscribers." Thus recognizing the board of engineers for internal improvement, and sanctioning the survey and location, they had made of the route of the *eastern* section of the *Chesapeake and Ohio Canal*, through the valley and along the shore of the river *Potomac*, which was the basis of the estimate to be made by them of the amount necessary to the completion of the canal. On the 8th March, 1826, permission was given to the State of *Pennsylvania*, by an act of the legislature of *Maryland*, to make any canal or rail way, " to connect with the *Chesapeake and Ohio Canal*."

On the 23d October, 1826, the board of engineers for internal improvement made a report exhibiting a plan, and estimate of the cost of constructing the canal ; which report was communicated to *Congress* on the 7th December, 1826, and printed and published by order of *Congress*. The estimated cost of the *eastern* section from *Cumberland* to *Georgetown*, 186 miles, is $8,177,081 05, which estimate is

made upon the basis of the survey, before made and reported by them on the 2d February, 1825, confining the route of that section to the valley of the *Potomac;* and upon the construction of the canal, upon, and along the *Maryland* shore throughout. The engineers in their report, say, " after due investigations upon this subject, we remain convinced, that it is more expedient, less expensive, and liable to less accidents, to keep without deviation, on the same side of the valley ; and the *Maryland* side has received the preference, for the following reasons, &c." Their estimate of the cost of the whole canal to the *Ohio* is $22,375,427 69.

These estimates not being satisfactory, and differing essentially from estimates made by the *Chesapeake and Ohio Canal Convention,* and no aid being given by *Congress* during that session, to the *Chesapeake and Ohio Canal Company;* on the 3d March, 1827, a number of the members of *Congress,* requested of the President, that they might be submitted during the recess, to the revision of practical civil engineers, and *James Geddes* and *Nathan S. Roberts* were appointed to re-examine the route of the canal, as it had been surveyed and laid down by the board of engineers for internal improvement, and to report on the expense of constructing it.

On the 5th February, 1827, at the December session, 1826, the legislature of *Maryland* passed a law to amend the " act incorporating the *Chesapeake and Ohio Canal Company;*" the first section of which in terms requires, " that it shall receive the assent of the necessary parties thereto," and the last section provides, " that it shall commence and be in force, as soon as it shall have received the assent of the legislature of *Virginia,* of the *Congress* of the *United States,* and of the *Potomac Company.*" This act authorises the termination of " the *eastern* section of the canal, *at or near* the town of *Cumberland, on the river Potomac,*" and the substitution of inclined planes and rail ways in crossing the ridge, which separates the *eastern* from the *western* waters ; and provides "that the company

shall have the power to extend a branch of the canal to the coal banks, at or above the mouth of *Savage*," in the event, that, the *western* section *shall leave the* valley *of the Potomac river*, at any point below the coal banks." This act received the assent of the legislature of *Virginia* on the 26th February, 1827, of the *Congress* of the *United States* on the 23d May, 1828, and of the *Potomac Company* on the 10th July, 1828.

At the December session, 1826, on the 10th March, 1827 the legislature of *Maryland* passed a supplement to the act for the promotion of internal improvement, repealing certain provisos in the act to which it is a supplement, upon which, a subscription for five thousand shares of the stock of the *Chesapeake and Ohio Canal Company* was made to depend; and also repealing, so much of the act to incorporate the *Susquehanna and Patapsco Canal Company*, as should be found to be inconsistent with the provisions of the act, to incorporate the *Pennsylvania and Maryland Canal Company*.

On the 20th August, 1827, due notice was given by the commissioners, that books would be opened on the 1st October following, for receiving subscriptions to the stock of the company; the books were opened accordingly, and on the 14th November, 1827, the amount of stock subscribed for unconditionally, exceeded $1,500,000, exclusive of subscriptions payable in the stock and debts of the *Potomac Company*.

At the December session, 1827, on the 2d January, 1828, the legislature of *Maryland* passed an act further to amend the act incorporating the *Chesapeake and Ohio Canal Company;* by which the stock is declared to be personal property, and aliens are authorised to subscribe for, and hold it; to commence and be in force, as soon as it should receive the assent of *Congress*, the legislature of *Virginia*, the *Potomac Company*, and the stockholders of the *Chesapeake and Ohio Canal Company*. To which, the legislature of *Virginia* assented on the 26th February, 1828, the *Congress* of

the *United States* on the 23d May, 1828, *The Chesapeake and Ohio Canal Company* on the 3d July, 1828, and the *Potomac Company* on the 10th July, 1828.

At the same session, on the 3d March, 1828, the legislature of *Maryland* passed a further supplement to the act for the promotion of internal improvement, reciting one of the conditions, upon which the treasurer of the State, had, by a former act been authorised to subscribe for five thousand shares of the stock of the *Chesapeake and Ohio Canal Company;* and the importance it was of, to the State, that the grant already made by her to that company, should be made dependent upon such other conditions and restrictions, as would effectually secure the completion of the *work,* if ever commenced, &c. ; and authorising the treasurer to subscribe for the said five thousand shares, on the condition of stock to the amount of $2,500,000 being subscribed for, by *bona fide* purchasers, with sufficient security to ensure a faithful compliance on the part of such subscribers ; with other conditions requiring the agreement thereto of the president and directors of the company, and repealing any act or acts, repugnant to, or inconsistent therewith, the conditions of which act, were assented to by the company on the 23d June, 1828.

On the 5th March, 1828, the commissioners for receiving subscriptions to the stock, called a meeting of the stockholders on the 7th April following, for the purpose of electing a president and directors.

On the 10th March, 1828, the *Secretary of War,* transmitted to *Congress,* in obedience to a resolution of the house of representatives of the 26th of the preceding month, the report of *James Geddes* and *Nathan S. Roberts,* (the civil engineers appointed for that purpose,) of the survey and location made by them of the route of the *eastern* section of the *Chesapeake and Ohio Canal,* from a little below *Cumberland,* through the valley of the *Potomac* to the tide water at *Georgetown,* and along the *Maryland* shore of the

river; accompanied by estimates of the cost of construction, amounting for a sixty feet canal, to $4,479,346 93.

On the 4th of April, 1828, the meeting of the stockholders which had been called on the 5th of March preceding, was deferred, for the reasons assigned by the commissioners in their publication of the postponement, that the government of the *United States*, and the State of *Maryland*, might participate in the organization of the company, when *Congress* should have definitively acted on the memorials of the district corporations, and of the central committee of the *Chesapeake* and *Ohio* convention, and the commissioners; which were for a subscription to the stock of the company, and for which a bill was then depending in *Congress*.

The act of *Congress* of the 23d of May, 1828, among other things recognizes the assent given by the *United States*, to the charter of the *Chesapeake and Ohio Canal Company*, by the act of 3d of March, 1825.    By an act of *Congress* of the 24th of May, 1828, the *Secretary of the Treasury* is authorised to subscribe for ten thousand shares of the stock of the *Chesapeake and Ohio Canal Company*, the report, survey and estimate, of *Geddes* and *Roberts*, having then been received and acted upon.    And by another act of the same day, authority was given to the corporations of *Washington*, *Georgetown*, and *Alexandria*, to subscribe for stock, and the subscriptions before made by them, were declared to be valid and binding.

On the 26th of May, 1828, *Congress* having then authorised a subscription for ten thousand shares of stock, and declared the subscriptions before made by the district corporations, to be valid and binding, a meeting of the stockholders on the 20th of June, 1828, was regularly called by the commissioners, where president and directors were elected, and the company duly organized.

On the 26th of June, 1828, the route and site surveyed by the *United States'* board of engineers, for internal improvement, and by *Messrs. Geddes* and *Roberts*, and com-

municated to *Congress*, were adopted (so far as they corresponded,) by the president and directors, as the line of the *Chesapeake and Ohio Canal* below *Cumberland*.

On the 10th of July, 1828, the *Potomac Company* assented to all the acts of *Congress*, and of the legislatures of *Virginia* and *Maryland*, affecting the charter of the *Chesapeake and Ohio Canal Company*, so far as such assent might be deemed necessary to their validity.

On the 4th of August, 1828, the *Potomac Company* instructed the president and directors, forthwith to surrender their charter, and convey all their rights and interests to the *Chesapeake and Ohio Canal Company*. On the 15th of the same month, the surrender and conveyance were made, and on the 17th of September following, accepted by the *Chesapeake and Ohio Canal Company*.

Whilst these legislative and other proceedings were in progress, meetings were held in *Baltimore*, by a number of citizens of that place, on the 12th and 19th February, 1827, in whose printed proceedings, the advantages likely to accrue to *Baltimore*, from connecting her trade with the western states, by intersecting the contemplated *Chesapeake and Ohio Canal* within the *District of Columbia*, according to the route surveyed and reported by the board of engineers for internal improvement, and by a direct rail road from *Baltimore* to some eligible point on the *Ohio* river, are contrasted, and the saving of distance by such a direct road, stated to be 140 miles; which proceedings formed the basis of an application (or memorial) which was preferred to the legislature, for an act to incorporate the *Baltimore and Ohio Rail Road Company*, by a committee appointed for that purpose. And on the 28th of the same month, February, 1827, the charter was passed. On the 8th of March, 1827, a law was passed by the legislature of *Virginia*, giving permission to the *Rail Road Company*, to extend their road through that State, but prohibiting its striking the *Ohio*, at a point lower than the mouth of the *Little Kenawha*, on the *Ohio*; and on the 2d day of March, 1831, permission was

given them by an act of *Congress*, to extend a lateral road
into, and within the *District of Columbia.*

On the 31st of March, 1827, the whole of the rail road
stock was subscribed; and on the 23d of April, 1827, the
company was organized by the election of its officers.

On the 20th of June, 1827, a reconnoissance of the coun-
try between *Baltimore* and the *Ohio* river, was commenced
by engineers in the service of the *Rail Road Company*, with
a view to the location of the road.

On the 28th of February, 1828, the legislature of *Penn-
sylvania* passed a law, authorising the *Rail Road Company*,
to extend their road through that State, to the *Ohio* river.

On the 3d of March, 1828, the legislature of *Maryland*, in
a supplement to the act for the promotion of internal im-
provement, authorised a subscription for five thousand
shares of the stock of the *Rail Road Company*, on condition
that the company should agree to locate it, so as that it
should go to, or strike the *Potomac* river at some point
between the mouth of the *Monocacy* river, and the town of
*Cumberland*, and that it should go into *Frederick, Wash-
ington*, and *Alleghany* counties.

On the 5th of April, 1828, the engineers who had com-
menced their reconnoissances on the 20th of June, 1827,
made a report recommending a route for the road from *Bal-
timore* by the *Point of Rocks*, and up the valley of the *Po-
tomac.* Being the very route by the *Point of Rocks*, which
had before been surveyed with a view to the location of the
canal, by the *United States'* board of engineers for internal
improvement; and again by *Messrs. Geddes* and *Roberts*,
civil engineers, appointed by the general government for
that purpose, whose report and estimates of the 7th of Feb-
ruary, 1828, had then been made public.

The board of engineers in the service of the *Rail Road
Company*, after examining the ground on horse-back, and
without instruments, approved the report of the engineers
of the 5th April, 1828, and their decision in favor of a
route for the rail road by the *Point of Rocks*, and through

the valley of the *Potomac* to *Williamsport*, in a report of the 5th May, 1828; upon which report, the route by the *Point of Rocks*, and the valley of the *Potomac* was adopted by the company. Up to that time, no survey had been made in the valley of the *Potomac*, above and from the *Point of Rocks*, at the instance, or for the use of the *Rail Road Company;* and a bill was then depending in *Congress* for an appropriation to the *Chesapeake and Ohio Canal*, by a subscription to the stock of the company.

On the 12th of May, 1828, engineers were deputed by the president and directors of the *Rail Road Company*, to pass along the route thus adopted from the *Point of Rocks* to *Cumberland;* and wherever the character of the ground was such, as to leave but little choice as to the location of the road, or to present but one passage, to make an actual location of the same at once over such ground ; in order that the actual locations so made, might serve as regulating points, for its subsequent locations over the intermediate sections, and secure the passage of the road. And at the same time, agents were deputed to take all necessary steps to procure title to, or a right of way over, the lands upon which such actual locations should be made. In pursuance of which instructions, the engineers proceeded to make surveys for the site of the road, at the places indicated, and as actual, partial, locations of it, from the *Point of Rocks* along the *Maryland* shore of the *Potomac* to *Cumberland*. And the agents employed for that purpose, entered into contracts with some of the proprietors, for the title to, or right of way over, their lands so surveyed, and commenced process of condemnation of other parcels of land, actually surveyed for the site of the road, with the owners of which, they were unable to make contracts for the title to, or right of way over.

In this state of things, the *Chesapeake and Ohio Canal Company* claiming to be then duly incorporated, and the *Potomac Company* (not having at that time surrendered its charter and transferred its interest to the *Canal Compa-*

*ny,*) filed a bill on the equity side of the *Washington* County Court, on the 10th June, 1828, against the *Baltimore and Ohio Rail Road Company,* denying the right of that company to construct its road on the route it had adopted, and just caused to be partially surveyed, and laid down in the valley of the *Potomac* from the *Point of Rocks* to *Cumberland,* upon the *Maryland* shore; and asserting a prior and paramount right to the choice of a route for the canal, in and along the valley of the *Potomac*—and obtained an injunction, granted by one of the associate judges of that court, prohibiting and enjoining the *Rail Road Company,* its agents and attorneys, and all persons acting by its authority, from making any contracts or agreements with, or receiving any deed or conveyance from any person or persons whatsoever, for any lands or tenements lying within the bounds already so marked out, and surveyed for the said road ; and also the justices of the peace, and sheriffs of the counties of *Frederick, Washington,* and *Alleghany,* from issuing or executing any warrants, for the condemnation of any such lands, until a reasonable time should have been allowed the *Canal Company,* for completing the actual surveys and definitive locations of the canal, and the further order of the court.

That bill was not answered, but on the 23d June, 1828, the *Rail Road Company* filed a bill in chancery, against the *Canal* and *Potomac Companies,* referring to it, and praying an injunction, prohibiting those companies and each of them, and all persons acting under their authority, or the authority of either of them, from making any contract or agreement with, or receiving any deed, or conveyance, from any of the parties to the contracts before made with the agent of the *Rail Road Company,* for any lands, or any interest in any lands, owned by them, or either of them, and lying within the limits of the actual location of the rail road, as surveyed and marked out by the engineers in the service of that company ; and also prohibiting the justices of the peace, and sheriffs of *Frederick, Wash-*

*ington,* and *Alleghany* counties, from issuing or executing any warrant or warrants for the condemnation of any such land, for the use of the *Canal* and *Potomac* *Companies,* until the claim of those companies to a priority and right of election as set forth in their bill, filed in the *Washington* County Court, should have been finally heard and determined upon, or until the further order of the Court of Chancery.

On the 24th June, 1828, a second bill was filed by the *Rail Road Company,* for an injunction to protect rights, that it was supposed to have acquired under the proceedings that had been instituted by its agents, for the condemnation of such portions of the land surveyed for the site of the road, as they had been unable to make contracts with the owners for ; and on the 25th of the same month, a third bill was filed by the same company, for an injunction to protect rights claimed to have been acquired to lands, by actual locations for the site of the rail road, but in relation to which, no contracts had been made, or proceedings for condemation instituted—upon each of which bills an injunction, was issued, according to the prayer of it.

The complainant in neither of those bills of complaint, sets up any paramount right of election or pre-emption for the route or site of the road; but founds its claim to a right to construct the road in the valley of the *Potomac,* along the *Maryland* shore, from the *Point of Rocks* to *Cumberland,* upon the actual surveys it had caused to be made on that route, as partial locations of the road; upon the contracts made by its agents, with the owners of portions of the land so surveyed, for the title to, or right of way over them, and upon the proceedings instituted by its agents for the condemnation of other portions, in relation to which, they were unable to make any contracts with the owners. The three bills were afterwards consolidated, and on the 8th of May, 1829, the *Canal Company* having then received from the *Potomac Company* a surrender of its charter, and a transfer of all its rights and interests, put in

its answer re-asserting a prior and paramount right to the choice of a route and site for the canal, in the valley of the *Potomac*, as claimed in the bill filed in the *Washington* County Court, to which there was a general replication. At the September term, 1825, after a previous argument, on a motion to dissolve the injunction, the injunction was continued by order of the chancellor, until final hearing; and on the final hearing at the September term, 1831, it was, by a decree of the chancellor, made perpetual. From which decree the case was brought by appeal to this court.

It appears that there are, between the *Point of Rocks* and *Cumberland*, in the valley of the *Potomac*, on the *Maryland* shore, between forty and fifty miles of narrow, difficult passes, along which the canal, if made independently, and without reference to a rail road, will, from the character of the difficulties presented, have to be supported by embankments, constructed in the bed of the river, many feet beyond the usual low water mark; that should the *Rail Road Company* prevail in establishing a choice of location on that route, if it would not be impossible to construct the canal along those passes, after the most eligible ground had been occupied by the rail road, it could only be done with such difficulty, and at such an expense, as that no practical engineer would recommend it, and that the expense of constructing the canal, if taken out of the valley of the *Potomac*, would be so enormous, as in the language of one of the engineers, to render such an untertaking, "a *canal impracticability.*"

The question then presented for the consideration of this court is, whether the *Chesapeake and Ohio Canal Company*, has a priority of right, in the choice or selection of ground for the route and site of the canal in the valley of the *Potomac*. The decision of which question is approached, with a due sense of the extent, diversity, and magnitude of the interests involved, (reaching far beyond the confines of this State,) and the possible consequences both to the immediate parties and the community at large. Should the decision of this cause, have the effect to arrest the progress

of the great work, commenced by the party against whose claim it is pronounced, it will be a matter of regret. But it is the business of a judge to endeavor in every case that is brought before him, to arrive at a correct conclusion; and that done, to the conviction at least of his own mind, his duty, though sometimes an unpleasant, is a very plain one, and admits of no hesitating in the discharge of it.

Proceeding then to the discharge of an obvious duty, as this case mainly depends upon the construction proper to be given to the several charters, under which, the rights asserted by the respective parties are claimed; and as the *Canal Company* claims to be entitled to all the rights and privileges originally granted to, and vested in the *Potomac Company*, it is necessary to inquire into the character and object of the charter of that company, and to ascertain what the rights and privileges granted were, (so far as concerns this controversy,) and how, and for what cause to be divested, and that charter being also the first in order in point of date, it will be first examined; a correct understanding of which, will essentially aid in the construction of the charter of the *Canal Company*. One construction given to the charter of the *Potomac Company*, by the counsel for the *Rail Road Company*, and insisted on in argument, is, that the *Potomac Company* was not authorised to make a continuous canal, but was restricted to the improvement of the navigation of the *bed* of the river, with no power to make canals, except at the *Great* and *Little Falls;* and for that construction, the phraseology of the title, and of the 9th, 10th, and 17th sections, is principally relied upon. But that construction, it is believed cannot prevail, if the whole of the charter is examined together, and one part construed by another, (as every statute should be,) with a view to give effect and operation to the whole, if it can be done. In pursuance of which principle of construction, it is proposed to collate the title, with the preamble and the different provisions of the charter, having any relation to this point.

The charter itself is, "an act for establishing a company *for opening and extending the navigation of the river Potomac*," and the preamble states, "that the *extension of the navigation of the Potomac river*, from tide water to the highest place practicable on the north branch, will be of great public utility;" and that "it may be necessary to *cut canals, and erect locks,* and *other works*, on both sides of the river."

The 4th section authorises the president and directors "to agree with any person or persons, on behalf of the company, to *cut such canals*, and *erect such locks*, and perform *such other works* as they *shall judge necessary* for *opening, improving* and *extending* the *navigation of the said river* above tide water, to the highest part of the north branch to which navigation can be extended, and *carrying on the same, from place to place*, and from *time to time*, and upon *such terms*, and in *such manner*, as they shall *think fit*."

The 9th section provides, that "in consideration of the expenses the said proprietors will be at, not only in *cutting the said canals, erecting locks*, and *other works for opening the different falls of the said river*, and *in improving and extending the navigation thereof*, but in maintaining and keeping the same in repair," &c., the president and directors shall have a right, "*at all times* forever," to *demand and receive tolls* at the nearest convenient place below the mouth of the south branch, and at or near *Payne's* falls, and at or above the *Great Falls* of the river, &c.

The 10th section declares, "that the river and the works to be erected thereon, when completed, shall forever thereafter be esteemed and taken to be navigable, as a public highway."

The 17th section is in these words, "that the tolls herein before allowed to be demanded and received at the nearest convenient place below the mouth of the *south branch*, are granted, and shall be paid on condition only, that the said *Potomac Company* shall make the river well capable of being navigated in dry seasons, by vessels drawing one foot

water, from the place on the north branch, &c., to and *through* the place which may be fixed on below the mouth of the south branch, for receipt of the tolls aforesaid; but if the said river is only made navigable as aforesaid, from *Fort Cumberland,* to and *through* the said place below the mouth of the south branch, then only two-thirds of the said tolls shall be there received; that the tolls herein before allowed to be demanded, and received at or near *Payne's* falls, are granted, and shall be payable, on condition only, that the said *Potomac Company* shall make the river well capable of being navigated in dry seasons, by vessels drawing one foot water, from the said place of collection near the mouth of the south branch, to and *through Payne's* falls aforesaid; that the tolls herein before allowed to be demanded and received at the *Great Falls,* are granted, and shall be payable on condition only, that the said *Potomac Company* shall make the river well capable of being navigated in dry seasons, from *Payne's* falls *to* the *Great Falls,* by vessels drawing one foot water, and from the *Great Falls* to tide water; and shall, at or near the *Great Falls,* make or cut a canal, twenty-five feet wide, and four feet deep, with sufficient locks if necessary, each of eighty feet in length, sixteen feet in breadth, and capable of conveying vessels or rafts, drawing four feet water at the least; and shall make, at or near the *Little Falls,* such canal, and locks if necessary, as will be sufficient and proper, to let vessels and rafts aforesaid into tide water, or render the said river navigable in the natural course."

And by the 18th section it is enacted, "that, in case the said company shall not begin the said work within one year after the company shall be formed, or if the *navigation* shall not be *made* and *improved* between the *Great Falls* and *Cumberland, in the manner herein before mentioned,* within *three years* after the said company shall be formed, then the said company *shall not be entitled to any benefit, privilege or advantage under this act;* and in case the said company shall not *complete* the navigation *through* and from

the *Great Falls* to tide water *as aforesaid*, within *ten years* after the company shall be formed, then shall *all the interest* of the said company, and *all preference in their favor, as to the navigation and tolls, through* and from the *Great Falls* to tide water, be forfeited and cease."

It is very certain, that there is nothing in this charter, *requiring* of the company to make a continuous canal, nor is it insisted upon here, that any such duty was imposed. All that is contended for, is, that no specific mode of improvement was designed by the legislatures from which the charter emanated, and that, the sphere of the operations of the company was not restricted to the bed of the river, and to the canals required at the *Great* and *Little Falls;* but that, authority to effect the proposed extension of the navigation, either by means of a continuous canal, or by improvements in the bed of the river, with such occasional canals, and at such places, as might be deemed proper, and necessary to the accomplishment of the end contemplated.

The right to improve the navigation in the bed of the river, was clearly comprehended in the powers delegated to the corporation; and that seems to have been considered as the mode of improvement, which would probably be pursued. Upon which hypothesis, it may be inferred, the *obligation* (to be found in the 17th section,) to make canals at the *Great* and *Little Falls* was imposed, where it was believed, that no safe and adequate improvements could be made in the bed of the river. But the question is not, what it was supposed, would be the mode of improvement resorted to, but whether the operations of the corporation were limited to the bed of the river, or whether it had a right, in the practical exertion of its powers, to adopt any other plan, as it became instructed by experience, and aided by the light of science.

It is laid down in some of the books, that in construing a statute, the title (being no part of it,) is not to be regarded, but we have high authority in this country for a different rule of construction—the opinions of the judges of the

Supreme Court, as expressed in the *United States vs. Fisher*, *2d Cranch*, 358. It is no where pretended, that the title can control the express words of the enacting clauses. Without stopping, therefore, to inquire how far the title of a statute may be regarded in the construction of it, but yielding to the title in this case, all the influence that can be claimed for it, it will be found not sufficient to sustain the construction of the charter contended for by the counsel for the *Rail Road Company.*

It is described in the title, to be an act "for opening and extending the navigation of the river *Potomac*," and whatever might be the ordinary understanding of the terms, "the navigation of the river *Potomac*," if considered independently and alone, the preamble which more fully discloses the object contemplated, and which is deemed to occupy so important an office in a statute, as to be called a key to its construction, explains the sense in which these terms were intended to be used, by the recital "that it may be necessary to cut canals, and erect locks and other works on both sides of the river," and clearly shows, that the navigation proposed to be opened and extended was not intended to be restricted to the channel or bed of the river; but that by "the navigation of the river *Potomac*," was meant a communication by the waters of the river, whether in the natural course, or by means of occasional canals, or both, as it might be found necessary—since the canals spoken of on both sides of the river, could only be necessary for the purposes of navigation out of the bed of the river ; and are specified as works, that might become necessary, not for the purposes of *canal* navigation, as distinguished from the navigation of *the river*, but as necessary for *opening* and *extending* the navigation of *the river itself.*

It was no doubt expected, that improvements in the bed of the river, would be resorted to; but it was also apprehended, if not foreseen, that the object could not be effected throughout, in that way ; and canals were suggested, as means that might become necessary, to the accomplishment of the

scheme of opening and extending the navigation of the river.

If then the construction of the charter rested upon the title and preamble alone, with no other guide to the intention of the makers, there would be no difficulty in ascertaining what that intention was, if there were ambiguous expressions in the enacting clauses, requiring the aid of the preamble to explain them. Not only, however, does the *preamble* sufficiently explain the sense, in which the words "the navigation of the river *Potomac*," were intended to be used; but the 4th section conferred the express and unlimited power, "to cut such canals, and erect such locks, and perform such other works," as should be judged necessary by the corporation, "for opening, improving, and extending the navigation of the river," from tide water to the highest practicable point on the north branch, and "carrying on the same, from *place to place*, and from *time to time*, and upon such terms, and *in such manner*, as they should think fit."

Here then was distinctly granted the power to make canals, &c., for the purpose of "opening, improving, and extending the navigation of the river"—with no restriction, either as to the number, or kind of canals, locks, or other works, authorised to be made and performed, but such as might be prescribed by the judgment of the corporation, and the places, times, and manner of conducting the improvement were committed to its will, "for carrying on the same, from place to place, and from time to time, in such manner as they shall think fit." Thus manifestly showing, that to make the *water* of the river navigable by means of a *canal, or canals*, would be to make the *river* navigable, in the sense in which the words were used—and showing also, that the *manner* of effecting that object, was referred to the judgment and discretion of the corporation.

The makers of the charter very well knew, that there were various modes of improving the navigation of a river, and that canalling was one ; but not being possessed of the means of determining which of the different modes was

best adapted to the situation and character of the *Potomac*, prudently forbore to describe any specific mode, but committed the whole subject to the judgment of the corporation, regardless of the mode, provided the object was accomplished.

Under the authority thus conferred, looking to the 4th section alone, or in connexion with the preamble, can it be doubted, that the corporation might have adopted any plan of improvement, which in its judgment, was best adapted to the end proposed ? The language of that section is as broad as it could well have been ; without a word to restrict the operations of the corporation to the bed of the river, or to confine it to any particular mode of improvement. It might have resorted to improvements of the navigation in the bed of the river by sluices ; or to dams and locks. Both of which kinds of improvements, are comprehended in the terms "such other works." Or it might have adopted the plan of opening the bed of the river, with occasional canals, under the authority to "cut canals, &c." and having the power to "cut such canals as it might judge necessary" for improving the navigation of the river, and to carry on the improvement "from place to place, and from time to time, and is such manner as it should think fit," why might not a continuous canal have been made ? If at one time, it had made a canal to a particular point, and afterwards had "thought fit" to make another, from that point to another point, joining the two together, in other words, elongating the first ; and so on, from time to time, and from place to place, as it had "judged necessary" or "thought fit," throughout the whole geographical extent of the charter, it would have been a continuous canal.

And could such a work have been deemed to be unwarranted by the charter ? It would have been an improvement within the letter of it : such as the corporation "judged necessary," and "carried on from place to place, and from time to time," in the "manner it thought fit." Or suppose the corporation, "judging it necessary, and thinking fit" to

do so, had made a number of canals at different places, between the two *termini* of the proposed extension of the navigation; and afterwards from experience, "judging it necessary" to make other canals in the intermediate spaces, have " thought fit " to do so, and to unite them with those that were before made, it would have been a continuous canal, and what would there have been opposed to the legality of it. The corporation had an unlimited discretion as to the number of canals, and the time, places and manner of making them; no number was specified, no time was limited, no place or places designated, nor manner directed, and having the right to make as many as it should "judge necessary," and at such places as it should "think fit," the having made some at some places, did not prevent its making others, at other places, and at other times; one place being as much within its discretion as another, and the making them from one to another of those that had been before made, being the making of them "from place to place : " and the joining them together being within the authority to make them in " *such manner as it should think fit;*" there being not one word denying the right to do so ; and surely, there can be no difference in principle between the right to make a continuous canal, by constructing one piece at one time, and another at another time, and in different places, as the necessity for it is discovered, and in such a manner, as ultimately to unite all the different parts, and to adopt at once, the plan of a continuous canal. They are in effect the same, each being referred to, and made dependent upon the judgment and will of the corporation, by the unlimited terms in which its powers are expressed.

It is not enough to say, that the state of knowledge on the subject of canals, was not such at the date of the charter, as to justify the supposition that a continuous canal was thought of at the time, and therefore as has been suggested, that the respective legislatures could not have intended to confer the power to make such a canal. The state of knowledge certainly was not then, what it is now; experience and the

advance of science have shed much additional light upon the subject. But continuous canals were not unknown ; they were in practical operation elsewhere, and had been long before, though the extent of their superiority over other modes of improving the navigation of rivers, was not probably well understood ; which was perhaps the very reason why such a canal was not *expressly* designated ; and may account for the unlimited discretion given by the charter ; the makers and procurers of it, being unwilling for want of better information than was then generally possessed, to confine the corporation to any specific mode of improvement. Nor can any inference against a grant of power to make a continuous canal, be drawn from the limited amount of the capital, provided by the second section, as is supposed, since the sixteenth section authorises an indefinite extension of it, at the discretion of the corporation.

The 9th section contains nothing, adverse to the power to make a continuous canal. The right to demand and receive tolls was given, in consideration of the expenses the corporation would be at, "in cutting the said canals, &c." What said canals? Not at the *Great* or *Little Falls*, or any other particular falls, but the canals before authorised by the 4th section, without reference to any falls; such as the corporation "should judge necessary for opening and improving the navigation of the river," to be made and "carried on from place to place, and from time to time, and in such manner as it should think fit." That is one of the enumerated probable subjects of expense, in consideration of which the tolls were allowed ; and the *"erecting locks* and *other works*, for opening the different falls of the river," are others. Showing indeed that it was *supposed*, that *different* modes of improvement might be resorted to; but precluding neither, and excluding the idea, that the improvements were to be confined to the bed of the river ; and entitling the corporation to tolls, on the accomplishment of the object, the extension and completion of the navigation of the

river, in either of the known modes, or by a combination of any of them.

The 10th section, in making "the river, and the works to be erected thereon, when completed, a public highway," proceeds upon the same idea, that the *navigation of the river*, might be opened by a resort to different modes of improvement, and provides for the event of its being done in the bed, and by occasional works out of the river, by declaring both the river and such works, to be a public highway, which would equally cover the case, of its being done in either of the different modes.   If it had been effected by improvements confined to the bed of the river, the *river*, under that provision, would have become a public highway, though there were no works on the out side of it ; and so, if it had been accomplished by a canal, altogether out of the river, with no improvements in the bed, that *canal* would have been a public highway.   It could not have been intended, that to constitute the proposed channel of communication a public highway, there should be improvements both in the *bed of the river*, and upon the margin; and if either exclusively, would have been sufficient, so would the other.   It was the channel of communication when completed, that was to be a public highway, no matter by which of the different modes.

But it is supposed, there is something in the 17th section, indicating the intention to have been, to restrict the corporation in its improvements, to the bed of the river, with the exception only of the points at the *Great* and *Little Falls*.   There is no such express restriction to be found in that section.   The most that could be gathered from it, is by a remote inference from general and ambiguous words construed alone ; which would be a departure from the acknowledged rule, that in construing a statute, all the parts should be taken together.

The words of the 17th section which are relied upon, as proving the intention to have been to confine the improvements to the bed of the river, are, "that the tolls, &c. are

granted, and shall be paid on condition only, that the saidf *Potomac Company* shall make the river well capable o being navigated in dry seasons, by vessels drawing one foot water, "from *Cumberland*, to and through a place below the mouth of the south branch, from thence to and through *Payne's Falls*, from thence to the *Great Falls*, and from the *Great Falls* to tide water; the expressions, "shall make the river well capable of being navigated," being considered as meaning, according to the ordinary acceptation of the terms, that the river should be made navigable in its bed or natural course. But would that be the ordinary acceptation of the terms?

When we speak of *navigating* a river, without reference to the state or condition of it, ordinarily the navigating it, in its natural course is meant. But when the *making* a river navigable, (which was not so before,) is spoken of in general terms, without a designation of any particular mode of doing it, no particular mode is understood to be intended; the making it navigable in its natural course, no more than the making it navigable in any other way, there being various modes of making a river navigable; and indeed, to say that such a river is *made* navigable, or may be *made* navigable by means of a canal, is a common mode of expression. It is therefore by no means clear, that the words of the 17th section, if standing alone, with nothing to explain the sense, in which they were used, should be understood, as requiring the river to be made navigable in its bed or natural course; but when taken in connexion with the whole context, it seems to be very plain, that they were used in no such restricted sense; and that by requiring the *river to be made navigable*, was meant the *making it navigable*, in any of the known modes, in which the navigation of a river may be improved, and not exclusively in its bed or natural channel. It is stated in the preamble, that *"it may be necessary to cut canals, and erect locks, and other works,"* for *extending* the navigation of *Potomac* river; which shows the understanding of the respective legislatures to have been, that the

*extension* of the navigation might be effected by making canals.

By the 4th section, the corporation was invested with power "*to cut such canals, and erect such locks, &c.*" as it should judge necessary, for *opening, improving,* and *extending the navigation of the river,* "*from place to place,* and *in such manner as it should think fit;*" and by the 11th section, authority was given to purchase or condemn lands, for the purpose of making such canals, &c. Here then is an express authority to *open, improve,* and *extend* the *navigation of the river,* by means of *canals, locks,* and *other works;* embracing the variety of modes, in which rivers are capable of being made navigable, and exclusively confined to neither.

With this explicit legislative exposition of the sense, in which the terms *opening, improving,* and *extending, the navigation of the river,* were used, fixing the meaning imparted to that language, by the makers of the charter, to have been, that *to make a navigable canal* fed by the waters of the *Potomac,* would be *to make the river navigable;* how can it be said, that the 17th section in requiring the river "*to be made capable of being navigated,*" meant exclusively that the *bed* of the river should be made navigable? Besides, under the 4th section, the corporation had an unlimited discretion, co-extensive with the geographical limits of the charter, to make canals, "from place to place," for *opening, improving, and extending the navigation* of the river; there was not a spot from one *terminus* to the other, to which the exercise of that discretion was confined, nor from which it was excluded. But it had an express right to make canals, wherever it should think fit, and "from place to place," along the whole route; which is utterly at war with the construction claimed to be put upon the 17th section, and both cannot stand. For it will be observed, that the terms of the 17th section, cover the entire space between *Cumberland* and tide water; and if the construction contended for, of that section, could be sustained, if by requiring that "*the river*

*should be made capable of being navigated,*" was meant that the *bed* of the river alone should be made navigable, to the exclusion of every other mode of improvement, except at the *Great* and *Little Falls*, where canals are *required* to be made, there would not be a spot left to the corporation throughout that whole distance, for the exercise of its discretionary power, to *make such canals*, &c. as it might judge necessary for *opening*, *extending*, and *improving the navigation of the river*," and "from place to place, as it should think fit"—which would be a virtual repeal of so much of the 4th section. It would be to alter and narrow down the positive and express enumeration of powers contained in that section, by mere implication from ambiguous expressions to be found in the 17th. But when the two sections are examined together, and the language of the 17th, taken in the sense in which the 4th shows it to have been used, construing one by the other, as must be done, the intention is plainly seen to have been, that the river should be made capable of being navigated in any of the modes authorised by the 4th section. By which construction both will stand, and full effect and operation be given to every word of each. But without the aid of the 4th section, the conclusion of the 17th clearly explains the sense in which the preceding expressions were used. The words are these, "and shall make at or near the *Little Falls, such canal, and locks*, if necessary, as will be sufficient and proper to let vessels and rafts aforesaid into tide water, or *render* the said *river navigable* in the *natural course*," one or the other. Thus presenting the alternative of making the *river* navigable by a *canal*, or of making it navigable in its natural course—and distinctly indicating, that to make navigable canals fed by the water of the river, would be, to make *the river navigable*, in the sense of the charter. And the language of the 18th section *is*, that "in case the said company shall not *complete the navigation, through* and from the *Great Falls* to tide water as aforesaid, then, &c." What was here intended? Was it, that the *river* should

be made navigable *in its natural course, through,* and *over* the *Great Falls?* Certainly not; but that the *navigation of the river* should be *completed* by *means of a canal,* at or near the *Great Falls,"* as directed by the 17th section—otherwise the 18th section would have had the effect to abrogate so much of the 17th, as provides for the improvement of the *navigation of the river* at the *Great Falls,* by a canal out of the natural course.    The same may be said of expressions contained in some of the supplements, which have been called in aid of a different construction; such, for instance, as the proviso in the 6th section of the act of this State of 1790 *ch* 35, relative to the application of the tolls, &c. to the improvement of the navigation of the branches of the river; "that no such application shall be made, until *the main river from tide water, is cleared to Fort Cumberland."* The main river, how cleared? certainly not exclusively in its bed or natural course; because the 17th section of the original charter, expressly provides for the clearing or improving of the navigation, by *canals* at the *Great* and *Little Falls*—and the 4th section as explicitly authorises the doing so, *from place to place* throughout the whole distance from one *terminus* to the other.    But *cleared,* in the sense of the original charter, that is, in either of the modes therein recognized, for the improvement and extension of the navigation ; and in reference to which, those expressions must be understood as having been used.    And so of similar expressions contained in other supplements, all of which must be construed with reference to the original act.    Nor can any adverse argument be drawn from the preamble to the act of 1802, *ch.* 84, reciting, that the object of the charter had been accomplished; notwithstanding it appears, that no continuous canal had, at that time, been made.    It does not profess to state, that the corporation was restricted to any specific mode of accomplishing it, or in what way it had been done; and whether effected by means of a canal or canals, or by improvements in the bed of the river, the object would equally have been accomplished.

But the act of November session 1811, *ch.* 208, which gave to the corporation *"the same power"* to *make canals* on the *branches* of the river, that was given by *the 4th section* of the original act, *to make canals* on *the river itself*, plainly shows the understanding of the legislature of this State to have been, not that the corporation was confined in its improvements to the bed of the river, or that its power to make canals was limited to the points of the *Great* and *Little Falls*, as has been supposed in argument, but that it had a right to make them wherever it *"should think fit,"* without restriction. Otherwise the grant of power, to make canals on the branches of the river, was perfectly nugatory; since if the power given by the 4th section of the original act, was limited to the making canals at the *Great and Little Falls*, which are points of difficulty in the *main river*, *"the same power"* could not be exercised on the branches.

So that the legislature, in giving to the corporation by the act of 1811, "the same power" to make canals in relation to the branches, that was given by the 4th section of the original act, in relation to the river itself, must have intended the same power "as expressed in that section ;" that is, the power to make canals, wherever it should be deemed necessary. Considering the power there *expressed*, to be the power *given*, according to the unrestricted sense of the language used; and not altered or diminished by the 17th section, so as to reduce it to the power of making canals at the *Great* and *Little Falls* only.

Taking the charter then altogether, and construing one part by another, if there had been a canal or canals made along the shore of the *Potomac*, fed by the waters of the river, and capable of being navigated in dry seasons, by vessels drawing one foot water, the *river* would have been made navigable for vessels of that description, in the obvious sense, in which the language adopted by the respective legislatures was used ; although not a drop of water was left to flow in the natural channel, not being required to be

kept there. The great object in view was, the extension of
a water communication from the tide water of the river *Po-
tomac*, up to the highest practicable point on the north
branch ; and the means, such as might be considered by the
corporation, necessary, and proper for the accomplishment
of that object, whether by sluices, by dams and locks, or by
canal navigation, which is apparent in the preamble, and
is carried out into the enacting clauses.   There is nothing
in the charter, to restrict the operations of the corporation
to the bed of the river, and thus to alter or narrow the pow-
ers, expressly enumerated and granted in the 4th section ;
but the whole matter was committed to its judgment; and
so that the end was accomplished, it was immaterial, by
which of the *means* that were subject to its discretion.   If
this is the true construction of the charter, the *Valley of
the Potomac*, from tide water to the highest practicable
point of navigation in the north branch, was specifically ap-
propriated, to the object contemplated,—and at the time the
company was formed, or became incorporated, it acquired a
vested right, (not the actual legal title to the land,) but a
vested right to acquire land by purchase or condemnation,
along the shores of the river, to be exerted wheresoever
and whensoever it should be thought necessary and proper
for the purposes of the charter.  The object being an exten-
sion of the navigation of the river, by such means as should
be found best suited to the purpose, corresponding powers
were given to the corporation.

It is apparent throughout the charter, that it was *suppos-
ed* the *bed* of the river would, or might be occasionally ad-
hered to ;  and it was as clearly *intended*, that any *canal*
or *canals*, that it might be thought necessary and proper to
resort to, should be made along the shore or shores of the
river—thus plainly designating the *Valley of the Potomac*,
for the route of the contemplated improvement, and dedi-
cating the river and its shores to that object.  This is mani-
fested by the preamble reciting that, " *the extension of the*

*navigation of the Potomac river* will be of great public utility," and that "*it may be necessary to cut canals, &c. on both sides of the river*," which could only be done in connexion with the river, by making the canals in the valley; by the 4th section, giving the power to make *canals* and *any other improvements* (in, or out of the bed of the river,) wherever it should be thought necessary and proper, for *opening* and *extending* the *navigation*, from tide water to the highest practicable point on the north branch. Thus by confining each end of the proposed extension of the navigation, to a point upon the river, one at tide water, and the other on the north branch, requiring, that in whatever way effected, it should begin and terminate upon the river; and pointing to the valley of the river, from one extremity to the other of the intended improvement, for the location of the canals authorised to be made; as the river itself, if any where resorted to for the purpose of being navigated in its natural course, could not in the nature of things, be used in connexion with any canal or canals, not constructed upon its borders, or within the valley.

By the 9th section, which in consideration of the expense of cutting canals, erecting locks, and other works " for "*opening the different falls of the river*," and of improving and extending the navigation thereof, vests such canals and works in the proprietors of stock and their heirs, and entitles the corporation "to demand and receive tolls at the nearest convenient place below the mouth of the south branch, and at or near *Paynes' Falls*, and at or above the great falls of the river *Potomac* for all commodities transported through either of these places;" thereby plainly indicating the valley of the river, for the construction of the canals and others works—works *for opening the falls of the river*, being evidently works to be erected in the valley of the river; and the places designated for the demand and receipt of tolls upon commodities passing through them, being points upon the river.

By the 10th section, declaring "that the said river, and the works to be *erected thereon*, when completed, shall forever thereafter, be esteemed, and taken to be navigable as a public highway." The works to be *erected upon the river*, and on the supposition, that the bed of the river would be occasionally used, the *river* and *the works* to be one continual highway; which could not be, unless the works were to be constructed in the valley, so as to admit of a connected navigation with the river.

By the 12th section, giving authority to the corporation to acquire land by purchase or condemnation, at the different places before designated *on the river*, for the demand and receipt of tolls, for the purpose of erecting toll houses; the very purpose and object of which, would require them to be built on the line of the projected extension of the navigation; and the authorising them to be built at certain points upon the river, indicating the valley as the route of that line, whether accomplished by improvements in the bed of the river, or by canals, &c. along the river, or by both; and by the 17th and 18th sections, the former requiring as a condition precedent to the right, to demand and receive tolls, that the river should be made navigable from the upper *terminus, to and through* a place below the mouth of the south branch, thence *to and through Payne's Falls,* thence *to the Great Falls,* (the several places on the river before designated for the receipt of tolls, and the erection of toll houses,) and from the *Great Falls* to tide water, the other *terminus;* and requiring a canal to be made at the *Great Falls,* and also a canal at the *Little Falls,* or the river to be rendered navigable in the natural course; and the latter providing that, if not done within the respective periods therein prescribed, in the manner, and from and to the places specified in the 17th section, the corporation "*should not be entitled* to any *benefit, privilege or advantage under the charter,* and that "all its interests, &c." should "be forfeited and cease." Thus, by requiring the proposed improvement, (by whatever means accomplished,) to be

made throughout its whole course, from one point upon the river to another, and requiring also canals to be made at specified points *upon the river*, *(the Great and Little Falls,)* distinctly confining it to the valley of the *Potomac*, and designating and appropriating *that* region, as its route. The 13th and 19th sections might also (if necessary,) be resorted to, for the purpose of showing the intention, that any canal or canals, which it might be thought necessary to make, should be constructed *along the river*, and of course in the valley. And the supplemental act of this State, passed at the November session, 1785, speaking of the canals to be made *at the Great and Little Falls*, *"supplied by the current of the river,"* and *"communicating again with the river by locks, if necessary,"* and the further supplementary act, passed at the November session, 1811, giving to the corporation, the same powers to acquire and condemn lands, for the purpose of making canals, *upon the branches of the river Potomac*, as those conferred by the 4th, 11th, and 13th sections of the original act, for "making canals *on that river*," explicitly show, what was the understanding of the legislature of *Maryland*, in relation to the location of the contemplated works.

The valley of the *Potomac* being thus marked out for the sphere of the operations of the *Potomac Company*, without restriction to any particular mode of improvement, the corporation had a right to select in the first instance, either of the various modes of improving the navigation of the river, and if that failed, or proved insufficient, to resort to another, and so on, until the object of its incorporation was effected. It was not not *put to an election* between the different modes of improvement; nor concluded by any selection it might make, from having recourse to another, if that should fail. Such a construction of the charter would be too narrow for the great object in view. It cannot be believed, that the respective legislatures intended to limit the powers of the corporation, to any experiment it might make, in the prosecution of a work of such great and acknowledged public

utility, the means of accomplishing which, were then but little understood in this country; and to deny to it, the right of completing it in any other way, if such experiment should fail; and thus to defeat the whole project, after heavy expenses had been incurred, in an honest, but unsuccessful effort to accomplish it, and at a time too, when a knowledge of the best and most effectual mode of doing it, could only have been acquired from lessons of experience; the scheme itself being but an experiment, and that a hazardous one to the undertakers.

It is believed, that no company could have been found, with such an understanding of the charter, and that there is nothing to be found in it, to sustain such a construction. But on the contrary, that the whole subject was committed to the judgment, discretion, and experience of the corporation; with power to execute the work, in such of the various modes, as might in its progress be found to be most expedient; and that this is fully proved by the express provisions of the 4th section, authorising the corporation to "cut such canals, and erect such locks, and perform such other works, as it should judge necessary for opening, improving, and extending the navigation," "from *place to place*, and *from time to time*," "and in such manner *as it should think fit.*" Thereby embracing all the different modes of improvement, and empowering the corporation, not merely to elect one particular mode, but to resort to any of the various modes, at such places, and at such times, as from experience, aided by the advance of science, as should be found necessary in the prosecution of the work, though begun on a different plan.

More than forty years having elapsed from the date of the charter of the *Potomac Company*, to the time of its surrender to the *Chesapeake and Ohio Canal Company*, it has been suggested, but not seriously pressed in argument, (as it could not well have been) that, if the *Potomac Company* had originally the right to make a continuous canal, and to procure the condemnation of lands for that purpose, that

right, as well as any other right to condemn lands, and make canals, which was never exercised, had become lost and forfeited by non-user for so long a period. A corporation may *forfeit* its charter by non-user or mis-user of its franchises; but it is well known, that such *forfeiture* can only be enforced by judicial proceedings instituted for that purpose, at the instance of the government, and that no cause of *forfeiture* can be taken advantage of, collaterally or incidentally; and the same principle applies, as well to a question of forfeiture of a particular franchise, as of the whole. Nor is it every non-user, that will furnish a sufficient ground for a judgment of forfeiture. Here, there is no pretence for the assertion of such a cause. The right to improve and extend the navigation of the river, was a franchise granted; the manner of doing it, a mode of exercising that franchise. And there being various alternative modes authorised by the charter, subject, each of them, to be changed at the will of the corporation, no experimental trial of one of those modes, could work a forfeiture of the right to resort to either of the others, during the continuance of the charter. So long as the charter remained in force, there could be no *forfeiture* of the right to exert the franchise, in either of the authorised modes, which still remained to be tried; but all the rights and powers it conferred, continued in like manner, and so far from there being any ground for a forfeiture of the *charter*, by *non-user*, the very employment of *some* of the authorised modes of improvement, was a practical exercise of the franchise. But considering the right to make a canal or canals, and to condemn lands for that purpose, as a *particular* franchise, and not a means only of executing the general power to improve the navigation of the river; the not having resorted to that mode of improvement, did not amount to a cause of forfeiture on the ground of *non-user*, the power given to the corporation by the 4th section of the charter, to make canals," from place to place, and from time to time, and in such manner as it should think fit," being altogether indefinite both as to place and time,

and leaving it expressly and entirely in the discretion of the corporation, to make such canal or canals as it should *judge necessary, wheresoever* and *whensoever* it should think proper.    And the fact, that other expedients were in the first instance resorted to, and for a long time persevered in, cannot be tortured into an abandonment, or any thing equivalent to a surrender of the right to make a canal or canals, whenever such expedients should be found inadequate to the purpose intended, and a canal or canals should be thought necessary to the accomplishment of the object.

If then, the powers originally imparted to the *Potomac Company* by the 4th section of the charter remained unimpaired, that corporation, under the authority "to make such canals as it should judge necessary from place to place, and from time to time," had a right, at any time it should think proper, during the continuance of its charter, to make a canal or canals along any, or all of the difficult passes upon the river, which form the subject of this litigation ; or at any other place or places in the valley, and to purchase or condemn lands for that purpose.    And its charter, according to the decision of the Supreme Court in the case of the *Trustees of Dartmouth College vs. Woodward, 4th Wheaton* 518, being a *contract* between the states of *Maryland, Virginia,* and the *Potomac Company,* the obligation of which could not, without the assent of the corporation, be impaired by any act of the legislature of either of the States, nor the concurrent acts of both, consistently with the constitution of the *United States,* declaring that, no State shall pass any "law impairing the obligation of contracts ;" the charter of the *Rail Road Company,* could not, without impairing the obligation of that contract, abolish, take away, or diminish the prior and paramount right of the *Potomac Company,* to select and appropriate by purchase or condemnation, any lands in the valley of the *Potomac,* for the route and site of a canal or canals, wherever it should think proper, along the borders of the river, either in terms, or by any construction of it, that would have authorised the *Rail*

*Road Company,* without the assent of the *Potomac Company,* to occupy any of the difficult passes, or other places along the river, for the route and site of the road, in such a manner, as either to exclude that company from a priority in the choice of a site or sites for the construction of the works authorised by its charter, or in any manner to restrict and circumscribe it, in the exercise of its prior right of election. But such an occupation by the *Rail Road Company* of the valley of the *Potomac,* would have been a violation of the vested corporate rights and privileges of *the Potomac Company,* and the charter of the *Rail Road Company,* in so far as it purports to be, or may be construed in derogation of those rights and privileges, is repugnant to the constitution of the *United States,* and void; there being no difference in principle, between a law, that in terms impairs the obligation of a contract, and one that produces the same effect, in the construction and practical execution of it. And the *Canal Company,* as the assignee of the *Potomac Company,* stands in its place, and is invested with the same prior and paramount right, that was originally granted, and vested in the *Potomac Company;* the 13th section of the charter of the *Canal Company,* authorising a surrender by the *Potomac Company* of its charter, and a transfer to the *Canal Company* of all its property, rights, and privileges, &c. expressly providing, that "thereupon (that is upon such surrender and transfer, and acceptance by the *Canal Company,)* the charter of the *Potomac Company* shall be, and the same is hereby vacated and annulled, and *all the rights and powers thereby granted* to the *Potomac Company shall be vested* in the company hereby incorporated," of which it can no more be divested by any operation or construction of the *rail road charter,* than could the *Potomac Company* have been at the time of the surrender and transfer; but it took them, and holds them, in all their integrity and force, as they were held by the *Potomac Company,* unimpaired by the *rail road charter.* Which upon the hypothesis, that the rights and powers

specified in the 4th section of the charter of the *Potomac Company*, had not been altered or restricted, nor lost by that company, is not understood as being denied.

But it is contended, that if the *Potomac Company* did originally possess the power to construct a continuous canal, it had lost that power, and had no right to make any canal or canals, or to acquire any lands for that purpose, by purchase, agreement, or condemnation, at the time of the surrender of its charter, by the deed to the *Canal Company* of the 15th August, 1828, or at the date of the rail road charter ; and therefore, that the *Rail Road Company*, either as concerns the *Potomac Company*, or the *Canal Company*, in its character of assignee of the *Potomac Company*, has a right according to the true construction of its charter, to occupy the ground in controversy for the route of the road. Which is asserted upon the assumption, either that the whole of the work authorised to be done, must be taken to have been accomplished, within the times limited by the 18th section of the charter, and extended by the several supplementary laws of *Maryland* to the 1st January, 1813, and of *Virginia* to the 1st January, 1820, and the *power* to have been thereby fully executed and at an end ; or that, if it was not accomplished within the times limited, the franchise of the *Potomac Company* to make canals, and to acquire lands by condemnation for that purpose was forfeited, or had expired by lapse of time—and being gone from the *Potomac Company*, could not, upon the surrender of its charter, vest in the *Canal Company*, which is very plausible, and would be a full answer to the claim of the *Canal Company*, in the character of assignee of the *Potomac Company*, if the whole of the work authorised to be done, was in fact accomplished: for then, it must be conceded, the power would have been fully executed and at an end, or if the *Potomac Company* was, by lapse of time alone, and without the intervention of judicial proceedings, divested of the power to make canals, and to condemn lands for that purpose.

But was there, or could there have been such a divestiture consistently with the principles applicable to questions relating to vested corporate rights? Or was the whole of the work in fact completed, that was authorised to be done, and the entire object of the charter accompished?

The provisions relied upon in the 18th section, are, that "if the navigation shall not be made and improved between the *Great Falls* and *Fort Cumberland*, in the manner herein before mentioned, (that is for vessels drawing one foot water in dry seasons, as specified in the 17th section,) within three years after the said company shall be formed, then the said company *shall not be entitled to any benefit, privilege* or *advantage* under this act ; and in case the said company shall not complete the navigation through, and from the great falls, to tide water as aforesaid, within ten years after the said company shall be formed, then shall *all the interest of the said company, and all preference in their favor, as to the navigation and tolls*, at, through, and from the great falls, to tide water, be *forfeited* and cease."

And it is supposed, that the object of the charter was limited to the improvement of the navigation of the river, (whether by canals or otherwise,) only so far as to render it capable of being navigated in dry seasons, by vessels drawing one foot water ; that the powers of the company were restricted to that *degree* of improvement, and that, whenever *that* object should be accomplished, the powers of the company would be spent—which is a proposition that must be maintained on the part of the *Rail Road Company*, to support the argument, that the powers of the *Potomac Company* had been exhausted, by a compliance with the condition contained in the 18th section, by reference to the 17th section, which is, " that the river shall be made well capable of being navigated in dry seasons, by vessels draw-one foot water," within the times specified—otherwise supposing that object to have been effected, or condition complied with, within the time limited, there still remained in that company under the 4th section, a discretionary power

to extend the improvement of the navigation by a canal or canals.

But is that the true construction of the charter? The extension of the navigation of the river *Potomac*, is asserted in the preamble, to be a work of *great public utility*, and the legislatures of *Virginia* and *Maryland*, are declared to be *impressed with the importance of the object*, and to be *desirous of encouraging* so *useful* an undertaking. The grand object, was a connexion between the *Atlantic* States, and the country west of the *Allegany* mountains, to be effected in part, by an extension of the navigation of the *Potomac* river; a work not merely of local, but of great national importance, and one which, from its character, and supposed magnitude, drew into exertion the combined action of the states of *Maryland* and *Virginia*. With such an object in view, is it to be supposed, that the legislatures of those states, intended to restrict the powers of the company they were incorporating, to the making the river navigable for vessels drawing one foot water only, an improvement so entirely inadequate to the end contemplated? Was that the *encouragement* proposed to be given to so useful an undertaking? It cannot be believed, and it is but to propound the question, to find the answer. There was no motive, no imaginable necessity for such a restriction, and if intended to be imposed, those legislatures must have been but slightly *impressed with the importance of the object.* Construing the 18th section alone, without regard to any other part of the charter, and construing it most rigidly, it might possibly be tortured into such a meaning. But though the *Potomac Company* was a private corporation, the charter was a public act, granted professedly *pro bono publico*, and should be construed in such a manner, as to attain, as far as possible, the end proposed. *Pierce vs. Hopper, Strange,* 253, 258. *New River Company vs. Graves, 2 Vern.* 431. It would not be doing justice to the makers of the charter, in searching for their intentions, to look to the 18th section alone, for the narrowest possible construction of it; but that

section must be construed together with the 4th, by which the general power of improvement was given, in order to arrive at the intention of the makers, and that both may stand, if consistently they can.

Looking then to the unqualified terms of the 4th section, that the president and directors shall have power, &c. " to cut such canals, and erect such locks, and perform such other works, as they shall judge necessary, for opening, improving, and extending the navigation, and carrying on the same from place to place, and from time to time, and in such manner, as they shall think fit," it is clearly seen, that the right was expressly given to the corporation, by that section standing alone, to improve the navigation by any means, and to any extent in its power, that the river and the region through which it passes would admit of, without limitation either as to manner, extent or time.    With that unrestricted power, it might have contented itself, with making the river navigable in its *natural course*, or by means of a canal, or canals, for *vessels drawing one foot water ;* or if from experience, that was found to be inadequate to the demands of an increasing commerce, it might have deepened the bed of the river, or any canal or canals that had been made; or if none were originally made, it might have extended the improvement, by a resort to canals, from place to place, and from time to time, as in its judgment, occasion should require, which would seem to have been the very object of the power, to make canals "from place to place, and from time to time;" or it might in the first instance, have resorted to the temporary expedient of making the river navigable in its natural course, for the immediate public accommodation, by vessels of small draft, and at the same time, have adopted the more extended plan of improvement, by a canal or canals; all which it is believed must be conceded, looking to the 4th section alone—and it is not perceived, that there is any thing in the provisions of the 18th section, declaring, that if the river was not made navigable within the respective periods therein mentioned, *for*

*vessels drawing one foot water, between the Great Falls and Fort Cumberland, and from the Great Falls to tide water, the corporation should not be entitled to any benefit, privilege, or advantage under the act, and that all the interest, &c. of the corporation should be forfeited and cease,* which so abridged the general power specified in the 4th section, *to make such canals as the corporation should judge necessary,* and *at such places and times as it should think fit,* as to reduce and limit it to the mere power to make the river navigable for vessels drawing one foot water, and to terminate whenever that should be effected, without any express words of restriction; instead of the more extended power to make such canals, as might be found better suited to the purposes of useful and efficient navigation; and at such times, as the progressive improvement of the country, and consequent increase of internal commerce and intercourse between the two great sections of the *United States,* which it was the object of the charter to bind more closely together in interest and affection, might indicate a necessity for further improvements, and aid in supplying the means of carrying them on. If that was the effect of the 18th section, it took away by implication, the whole of the discretionary and more beneficial power given by the 4th, and virtually annulled that section. Such a construction and effect, could only be given to the 18th section, by rejecting the 4th from consideration, in violation of the rule, that every statute should be so construed, that no clause, sentence or word, shall be superfluous, void, or insignificant, if it can be prevented; which is too well known and established, to render any reference to authorities in support of it, necessary.

Nor is there any necessity for such a rejection of the 4th section, in order to give effect to the 18th section, but both may well stand. The requiring that to be done, which the corporation had before the undoubted right and power to do, *the making the river navigable for vessels drawing one foot water,* was by no means inconsistent with, or repugnant to the power to make further and more important im-

provements. It was only saying, that, that at least should be done, leaving the corporation in possession of the power given it by the 4th section, to do as much more as it pleased, but not less : and accommodating the navigation afterwards, to vessels of greater draft, (by whatever means effected,) would not have rendered it *less* "capable of being navigated by vessels drawing *one* foot water." If it could have done so by deepening the bed of the river, or canals already made, (which cannot be doubted,) it might also have done it by making additional canals, where none had been made, there being no restriction perceived in the law itself, of one mode more than the other, but the general power, extending equally and without distinction to all; and for us to make such a distinction, would be to legislate, and not to expound the law as it is given to us. The idea advanced, that to draw off the water from the river, after it was made navigable for vessels drawing one foot water, into a canal of greater depth, would have been a violation of the charter, rests upon the supposition, that the operations of the corporation, except at the *Great* and *Little Falls*, were restricted to the bed of the river, and that it was bound, to entitle it to tolls, to make and keep the river navigable in its natural course alone: which we have already endeavored to show, is not consistent with the proper construction of the charter, but that the corporation had a right to make the river navigable, by means of a canal or canals, and to demand and receive tolls, although no water should be left to flow in the natural course.

Taking then the 4th and 18th sections together, it appears to be very plain, that the intention was not, by the provisions of the 18th section, to abridge the general power, explicitly given in the 4th, to improve the navigation to the utmost extent within the means of the corporation, and in any mode, and at any time, and to limit it to the right only *to make the river navigable for vessels drawing one foot water;* but merely to enjoin as a positive duty, under pain of forfeiture, and to insure an early use of the river, though

upon a limited scale, that it should at least be made naviga-
ble to the extent therein required, within the respective
times specified; leaving the general discretionary power of
further improvement unimpaired, in regard both to extent
and mode, and to be executed at any time; or in the lan-
guage of the 4th section, "from time to time, as the corpo-
ration should think fit;" aided by the tolls permitted to be
received, and by the 4th section expressly authorised to be
applied to that purpose, in these words, "and out of the
money arising from the subscriptions, and the tolls, &c., to
pay for the same, and to repair and keep in order the said
canals, locks, and other works necessary thereto, and to de-
fray all incidental charges." Which of itself, abundantly
shows the intention that the canals, locks, and other works
so authorised, might be made and carried on, after *the river
should be rendered navigable from Cumberland to tide wa-
ter, for vessels drawing one foot water;* since that was, by
the 17th section, expressly made a condition precedent, to
the right to demand or receive any tolls; the canals, locks,
and other works, and incidental charges, that were intend-
ed "to be paid for, and defrayed," in part, "out of the
money arising from the tolls," could only have been such, as
should be made, and occur after tolls were authorised to be
charged, which was not until after the river had been made
navigable *for vessels drawing one foot water.* To say it
was intended, that the whole of the work authorised should
be first completed, and afterwards paid for, with all the in-
cidental charges, out of such tolls as might possibly be re-
ceived, without a word in the law to that effect, would be a
most strained construction. It could not have been known
that a sufficient amount of tolls with the subscriptions,
would ever be received to discharge the principal and in-
terest of the sum expended upon the work, or that the cor-
poration would be able to borrow money for carrying it on,
about which, nothing is said in the charter. It is not there-
fore to be supposed, that any such speculation was indulged
in; but the evident intention was, that the corporation

might carry on the canals and other works *from time to time*, as it should be deemed necessary, and as its pecuniary means, arising from the subscriptions, and the *receipt of* the *tolls*, should enable it to do so.

The great and general ultimate object was the improvement of the navigation of the river, to the utmost extent commensurate with the means of the corporation, as they should accrue, and to which it should at any time choose to push it ; with no motive for limiting the degree of improvement, which could not have been too extensive for the purposes contemplated. The special, and more immediate object, was a partial improvement, not committed to the discretion of the corporation ; but required under pain of forfeiture, to be completed as a *positive duty* within the times specified, upon the execution of which alone, without doing any thing more, the corporation was to be entitled to demand and receive tolls, and to all the benefits, privileges and advantages, proffered by the charter. If the river was not made navigable for vessels drawing one foot water, the corporation was to have no "benefit, privilege or advantage, under the charter;" in other words, the charter was to be forfeited; but if that was done within the time limited, then the whole of the charter was to remain in full force; none of the franchises were to be forfeited, and the corporation was to have the benefit of demanding and receiving tolls; and the privilege, if it chose to exercise it, of making any further improvements in its power, according to any mode, and at any time it should think proper.

In this view of the subject, there was no inconsistency, or repugnancy, between the 4th and 18th section; no *clause, sentence or word of either, was superfluous, void, or insignificant*, but each section had its full effect and operation. Under the 18th section, the corporation was *bound* to make the river navigable from *Cumberland* to tide water, *for vessels drawing one foot water at least*, within the times limited, and it might have contented itself, with the discharge of that duty ; and under the 4th section, it was not *bound*,

but had *authority* to make *any further* improvements, in any mode or *plan*, and at *any time*, it might have executed that *authority*. But according to the interpretation of the charter on the part of the *Rail Road Company*, the 4th section, in regard to all discretionary power of improvement, whether in relation to, extent, mode, or time, was abrogated by the 18th section, when both might well have stood together, which is not sanctioned by any acknowleged rule of construction.

It is said to be "inconceivable, that the legislature could have intended to give to the company the power, after the navigation was *completed* in one way according to the *requisitions* of the charter, to complete it in another." That might have been *unnecessary* legislation, if the *charter is to be so understood*, though not for that reason *void*. But it was not the meaning of the charter, that the navigation would then be *complete*, when the river should be made navigable for vessels drawing one foot water only, as it clearly would not. The intention of the makers was, to secure to the public the benefit of a partial use of the river in a reasonable time, by *requiring* under pain of forfeiture, an *improvement* to that *limited* extent at least, within the prescribed periods; leaving it to the corporation, and clothing it with sufficient power and authority for that purpose, to make at any time, what further improvements it could; the more extensive and *complete* the better; but not exacting as a duty, to entitle it to tolls, what it might be unable to accomplish, and what subsequent events have proved, it was not able to effect.— Nor is there any thing very astonishing, or calculated to excite surprise in this. It was exactly what a wise and prudent legislature would have done, not to restrict the powers of the corporation, to the smallest possible improvement suited to any useful purpose, which would have been inconsistent with the great end in view; nor to jeopard the whole enterprize, by *requiring* the work to be *completed* under pain of forfeiture, on the most approved plan,

and to the utmost extent, within a period that might prove too limited, for the means and capacity of the corporation; nor to leave too much in the discretion of the corporation, by omitting to require any thing to be done within a time limited; which discretion might have been abused by the corporation to the prejudice of the public. And, borrowed as it would seem, from that charter, the same policy of securing to the public, the benefit of a limited use of the river for the purposes of navigation, during the progress of a more extended plan of improvement, has been carried into the charter of the *Chesapeake and Ohio Canal Company;* the 13th section of which has this provision, "and it shall be the duty of the said last mentioned company, (the *Canal Company*) until every section of the contemplated canal shall be completed, so as to be used and enjoyed for the purposes of navigation, to keep the corresponding part of the river, in a proper state for navigation, and in good order as the same now is; and in default thereof, they shall be in all things responsible, in the same manner, as the *Potomac Company* is now responsible."

The different supplementary acts of this *State* and *Virginia,* to the charter of the *Potomac Company*, giving further time to that company, could only have been intended, (and cannot be otherwise construed,) to extend the time for completing *that,* which by the 18th section of the original act, was *required* to be done within the respective times therein limited. And that was, the making "the river well capable of being navigated in dry seasons, by vessels drawing one foot water, from *Cumberland* to tide water," and nothing more. There was no limitation of time for the exertion of the powers given by the charter, except that prescribed by the 18th section; of necessity therefore, the supplements extending the time, had reference to that section, and to the particular work expressly required by it, to be done within the times limited.

The preamble of the act of this State, of 1802, *ch.* 84, reciting "that the object contemplated by the act of assembly

for establishing a company for opening and extending the navigation of the river *Potomac,* has been accomplished," has been much relied on, to show the understanding of the legislature of *Maryland* to have been, that the *object* for which the *Potomac Company* was originally incorporated, was the making the river navigable in its natural course, for vessels drawing one foot water, except where canals were expressly required ; no continuous canal having then been made.    But, however that preamble might have been understood, taken alone, it is perfectly clear, when construed with the enacting clause, that, that was not the meaning of the legislature.    The language of the enacting clause, immediately following the preamble is, "that the proprietors of shares in the said *Potomac Company,* their heirs and assigns, shall, and may demand, take, and receive tolls, at the several and respective places heretofore fixed by law, for the payment, and receipt thereof ;" thus manifestly showing, that by the *object* stated in the preamble to have been accomplished, was merely meant, the performance of the condition imposed by the 17th section of the original act, precedent to the right to demand and receive tolls ; that is, the making the river navigable for vessels drawing one foot water.    And the *particular object, required* by the 18th section to be accomplished within the times specified, on pain of forfeiture of all *"benefit, privilege* and *advantage* under the act ;" with no reference whatever, to the *general authority to make canals,* &c. given by the 4th section, without any limitation of time.    And the conclusion of the same enacting clause of the act of 1802, *ch.* 84, is in these words, "and that *all* and *every* of the *rights, interests, privileges* and *immunities* heretofore granted to, or vested in, the said proprietors and *Potomac Company,* are hereby confirmed and established to them, their heirs, &c." including the right and privilege to make a canal or canals, at any time; thus asserting and confirming the existence of that right, upon the assumption that the river had been made navigable *for vessels drawing one foot water.*

The charter was not limited in its duration, but expressly made perpetual by its terms, defeasible only, on failure by the corporation, to accomplish within the time limited, what was required to be done by the 18th section. Which was a *condition subsequent* engrafted upon it, in defeasance of a vested franchise, on breach of which, if in point of fact, there was any act of forfeiture committed by the corporation, it might have been avoided, or forfeited, by *scire facias*, or a *quo warranto*, if the states that granted it, had chosen to take advantage of the non-performance of the condition. But not having done so, the franchise endured, notwithstanding the breach of the condition. And it is like the grant of an estate in land, defeasible on the non-performance of a condition subsequent, strictly speaking, as if an estate be granted expressly upon condition to be void on the happening of a certain event. In such case, it is perfectly clear, that the estate is not defeated by the mere happening of the event, but that the law permits it to continue, beyond the time when such contingency happens, unless the grantor or his heirs, take advantage of the breach of the condition by entry, &c. which cannot be done by a stranger. The proceeding by the government (the grantor,) for the breach of a condition subsequent, contained in a charter of incorporation, is by *scire facias*, or *quo warranto*; by an individual grantor (or his heirs,) of land, by entry.

A private corporation aggregate may be *dissolved*, by the death of all its members, or by the loss of an integral part, whereby it is rendered unable to do any corporate act, or to restore itself by a new election; or a corporation may be *dissolved* by a surrender to the government of its franchise, or by an act of the legislature repealing the act of incorporation, with the assent of the corporation; or it may be dissolved by a forfeiture of its charter, through abuse or neglect of its franchises, as for condition broken; there being a tacit condition in every such grant, that the corporation shall act up to the end of its institution.

But such forfeiture must be judicially ascertained and declared, upon direct proceedings against the corporation for that purpose, in order that it might not be condemned unheard, for an imputed delinquency.   Where there is no corporate body in existence, as where it has been *dissolved* by the loss of an integral part, or by surrender, &c. it would be not only useless, but absurd, to go into a court of law, to obtain a judgment of dissolution.   But where there is an existing corporation capable of acting, but which has been guilty of an abuse, or neglect of its franchises, or the powers committed to its trust, amounting to a cause of forfeiture, such cause of forfeiture can only be enforced by *scire facias*, or a *quo warranto*, issued at the instance of the government creating the corporation, and cannot be taken advantage of incidentally, or in any other way, or by any individual; since the government, with which alone the contract arising out of the charter is made, may waive the breach of any condition of that contract, and cannot be made to enforce the forfeiture, whether it will or no, and when it may have sufficient reason for not choosing to do so.   Until it does, and that by judicial action, and not by legislation, no individual or other corporation, can treat it as a forfeited franchise.   This is the doctrine taught by the authorities—among which are, *The King vs. Amery,* 2 *Term. Rep.* 515.   *The King vs. Pasmore,* 3 *Term. Rep.* 199. *Terret vs. Taylor,* 9 *Cranch,* 43.   *Dartmouth College vs. Woodward, Wheat. Rep.* 518.   *Slee vs. Bloom,* 5 *John. Ch. Rep.* 366. *Same vs. Same,* 19 *John. Rep.* 456.   *The Trustees of Vernon Society vs. Hill,* 6 *Cowan's Rep.* 23. *McLaren vs. Pennington,* 1 *Paige's Rep.* 102, *and Angell and Ames on Corporations.*

The opinion of that distinguished jurist *Judge Marshall,* which was used in argument, would be entitled to, and would receive the highest consideration, if the question upon which it was given, arose in this cause.   The substance of it is, that as the 11th section of the charter only author-

ised the condemnation of land, through which a canal was *intended* to pass, the condemnation must of course be before the canal was made; and therefore, that if *after* the canal had actually *been made*, and the making of it no longer rested in intention, there could be no condemnation of land on the sides of it; upon the principle asserted, that every law, which is to wrest from an individual his property without his consent, must be strictly construed. The utmost extent to which that opinion could be used, would be to show, that wherever the power of the company to make a canal, had been exerted, it was expended and gone, and could not again be exercised by a further condemnation of land, at the same place. But the question presented here, is not whether the power of the *Potomac Company* to make canals, had, by being exerted, been executed, and was at an end; but whether that corporation retained the power to condemn land, and make canals, where none had before been made.

The penalty annexed to the breach of the condition in the first clause of the 18th section, was, that "the company should not be entitled to *any benefit, privilege,* or *advantage* under the act;" and in the last, that "all the interest, &c. of the company should be *forfeited* and cease." Now, to lose all *benefit, privilege,* and *advantage;* or for all *interest* to be *forfeited and cease,* would be to lose the charter itself. To take away every thing a charter gives, is to take away the charter— and to have taken away all *benefit, privilege, advantage, and interest,* would have been, to take away every thing that this charter gave. A forfeiture therefore of the entire charter, together with the particular franchise to condemn lands and make canals, was the penalty prescribed.

The analogy between this, and the case cited of *Agnew vs. The Bank of Gettysburg,* 2 *Harr. and Gill* 478, is not perceived. That was the case of a bank charter, of limited duration, which had expired by its own limitation, and with it, the *corporation ipso facto dissolved;* it wholly ceased to exist for any purpose; no corporate powers remained,

no originally vested franchise to be divested, for none were given beyond the term of duration; and no act was necessary to be done, in order to avoid the charter, or *dissolve* the corporation. But this was a corporation in full life, with vested franchises, unlimited in their duration, and liable only to be divested, through failure to *exert* them to a limited extent, within a specified time—and although by matter in *pais*, it might perhaps *stricti juris*, have had no right to exert them; yet none could have questioned the right, but the States that granted the franchises, and with which the contract was made, and which alone could have resumed them, for breach of the condition, on a judgment of seizure—until which was done, the *corporation* continuing to exist, the power to exert the franchises granted, remained.

Suppose for any cause, the rail road, or canal, should not be completed within the time prescribed by its charter; would it be contended that the charter was *ipso facto* forfeited, and the corporation dissolved without any judicial proceedings being instituted for that purpose, and that the State could thereupon grant the same franchises to another company? It is however conceded, that at the date of the surrender and transfer to the *Canal Company*, *this* was a *subsisting corporation*, with *corporate rights*, and the *power* to exercise them; and it is said, it must now be taken, that the river had then been made navigable for vessels drawing one foot water. If so, every *benefit, privilege, and advantage*, under the act, remained; and among them, the privilege of condemning *land*, and making a canal or canals, at any time; which the corporation was free to exert, where and when, and how it "should think fit," within the designated region. The expressions, *benefit, privilege, advantage* and *interest*, used in the 18th section, applied as well to the right to demand and receive tolls, and to make the river navigable in the natural course, as to the right to condemn lands for a canal or canals. The terms equally embraced

all the rights and powers of the corporation; if one was to be forfeited, all were to be forfeited; if a term was prescribed for the duration of one, the same term was prescribed for the duration of each. There was no distinction, no exception of one, more than another from the operation of that section. And evidence of their understanding of the 18th section, is furnished by the acts of the legislatures that granted the charter; which show, that they did not consider the franchise as one that was to expire by its own limitation, but viewed and treated it, as a question of forfeiture altogether. Not as a grant of the right or franchise for a *limited time*, to condemn lands and make canals, but as a grant of the franchise for an *indefinite time*, subject to a defeasance, and that the object of the different acts passed for the extension of the time limited by the 18th section, was to guard the corporation against the liability to a *forfeiture* for a breach of the condition.

The 2d section of the act of *Virginia*, passed in November, 1793, for extending the time limited by the 18th section of the charter, has this provision, "and that no *privilege* or *advantage* granted by law, shall be *forfeited* or lost, in case the navigation aforesaid shall be finished within the time hereby limited." The 3d section of the act of this State, passed at the November session, 1794, *ch.* 29, for the like purpose, has the same provision, and the provision of the 4th section of the act of this State, passed at the November session, 1797, *ch.* 93, is in the same words.

The act of 1814 of this State, *ch.* 75, giving to the company the power to acquire land, by *purchase, compromise,* or *exchange* only, which is relied on to show, that the power before granted to acquire land for constructing canals, was considered by the legislature as gone, and extinguished, does not seem to have been correctly attended to. It declares that the company "shall be, and they are hereby authorised and empowered, to use and dispose of the land and water rights, now held by the said company, or which they may hereafter acquire in this State, in the erection of

mills," &c., "and shall be authorised and empowered to ac-
quire lands and other property, *contiguous to the land, ca-
nals, and locks on said river, by purchase, compromise, or
exchange,* &c.    No authority had before been given to the
corporation to acquire land in any way, except for the pur-
pose of constructing canals and building toll houses; and
the authority given by this last act to acquire land, was not
for the purpose either of constructing canals, or building toll
houses; but it was an authority to acquire lands *contigu-
ous to the canals and locks on the river,* for the purposes, as
it would seem, of the mills, or other water works, which
the same act authorised the corporation to erect.    It was
therefore an entirely new power, not given, because the
power before imparted had departed from the corporation;
but for a purpose, foreign from that, for which the power to
condemn land had before been given.    It was therefore a
necessary power, for the purpose for which it was conferred,
though the former power to acquire land by purchase or
condemation remained in full force; since under that for-
mer power, no lands could have been condemned *contigu-
ous to canals already made,* for the purposes of mills or
other water works; and it affords no inference that the for-
mer power, was considered as having ceased.    But as it
speaks of water rights thereafter to be acquired, it would
seem to imply, that the right to make canals still existed,
which was a means of acquiring water rights, and that, af-
ter the expiration of the time last limited by the acts of this
State.

On the 29th of January, 1821, the legislature of *Virginia*
passed an act authorising the appointment of commissioners,
to ascertain among other things, whether the *terms and con-
ditions* of the charter had been complied with; and if not,
to advise and consult with commissioners to be appointed
on the part of this State, as to the measures best to be re-
commended to, and conjointly adopted by the two States,
either *for giving aid* to the company *in the further prose-
cution* of the work, or for the *institution of a proseculion*

against it, for the purpose of *annulling* and *vacating the charter*—and in the course of the same session, the legislature of *Maryland* passed a resolution for the appointment of commissioners to make the same joint inquiry ; substituting only, for the measure of instituting a prosecution, the alternative of adopting measures for the more effectual improvement of the navigation by some other means. Thus we have the sense of the States that granted the charter, clearly expressed by the concurrent acts of their respective legislatures, after the expiration of the last extension of the time limited by the 18th section, that if the *condition* (calling it and treating it as a *condition*, and not a *limitation*,) had not been complied with, not that the franchises had therefore expired, and that the corporation was dissolved, but that it continued to exist, in the possession of the corporate powers originally given to it, and that until it was dissolved by judicial action, it might, with sufficient pecuniary *aid*, go on to do the work originally authorised ; with the opinion of the legislature of *Virginia* plainly indicated, that the breach of the *condition* could only be taken advantage of by *direct* proceedings at law, instituted for that purpose, and the unwillingness of *Maryland* to adopt so harsh a measure.

And finally, the two States upon whose pleasure alone, the continuance of the corporation, and of its franchises depended, (both of them interested as stockholders, and *Maryland* largely as a creditor,) and which had a right to waive the breach, by any non-feasance or mal-feasance of any *implied* or *expressed* condition contained in the charter, having virtually waived the breach of the condition by the corporation in failing to exert its franchises, by the act to incorporate the *Canal Company* conclusively remitted to the *Potomac Company* any abuse, or neglect of its franchises, or any of them; and recognized and treated it as a subsisting corporation, in the full possession of all its original powers, in requiring its *assent* to the charter of the *Canal Company*, in

order to give it validity; and by declaring in the 13th section of that charter, that upon the surrender and transfer by the *Potomac Company* to the *Canal Company* of its charter, *all the rights and powers thereby granted* to the *Potomac Company*, should be vested in the *Canal Company*, which included the right and power to condemn land for canals. Not the rights and powers, *then held* by the *Potomac Company*, but *all* that *had been granted*, and which must have been considered as *then subsisting*, otherwise they could not so pass and vest. Which shows the intention and meaning of the 18th section; and it is not denied, (as it cannot be,) that in construing a statute, a subsequent law upon the same subject, may be resorted to, for the purpose of ascertaining the intention, which when discovered, must prevail; all statutes in *pari materia* being construed as one law. But whether this view of the subject is correct or not, and independent of any corporate rights and privileges derived from the *Potomac Company*, a priority of right in the choice of a route for the canal in the valley of the *Potomac*, is claimed on the part of the *Canal Company*, by the force and effect of its own charter, viewed as a compact between the States of *Virginia* and *Maryland*, and the *Congress* of the *United States*, and between those sovereign parties and the *Potomac Company*. Which leads to an inquiry into the character and effect of that instrument.

A State may contract with an individual; and it is equally certain, that two or more of the States, may enter into a compact or agreement *inter se;* and the only question upon that subject is, whether that has been done in this case—which involves the further question, (if a question it can be at this day,) whether a State can contract by an act of its legislature. That it can so contract with an individual, is settled beyond all controversy by the decisions of the Supreme Court, in *Fletcher vs. Peck*, 6 *Cranch.* 87. *The State of New Jersey vs. Wilson*, 7 *Cranch.* 164. *Terrett vs. Taylor*, 9 *Cranch.* 43. *The Town of Pawlet vs. Clark and others*, 9 *Cranch.* 292; *and Dartmouth College vs.*

*Woodward,* 4 *Wheat.* 518; and that two or more of the States may contract in that form *inter se,* is settled by the same court in *Green vs. Biddle,* 8 *Wheat.* 1, which was the case of a law of *Virginia,* relating to the separation of the district of *Kentucky* from *Virginia,* and the erecting that district into a separate State, containing this clause, "that all private rights, and interests of lands within the said district, (*Kentucky*) derived from the laws of *Virginia* prior to such a separation, shall remain valid and secure under the laws of the proposed State, and shall be determined by the laws now existing in this State." Which being afterwards ratified by a convention of the people of *Kentucky,* and made an article of the constitution of that State, it was held to be a compact between those States, the obligation of which, *Kentucky* could pass no law to impair. How then does this case stand? *Virginia,* impressed with the importance of that subject, but knowing that the object could not be accomplished by any act of its own legislature alone, nor by its sole authority, passed the act for the incorporation of the *Canal Company,* in January, 1824, requiring in terms, the assent of the legislature of *Maryland,* of the *Congress* of the *United States,* and of the *Potomac Company,* to its provisions, to give it effect and validity so far as concerns the eastern section of it, to which only, this suit relates. *Maryland,* treating it as a proposal offered for acceptance, assent, and confirmation, by an act of its legislature, passed on the 31st January, 1825, declared it to be "accepted, assented to, and confirmed." The *Congress* of the *United States,* by the act of the 3d March, 1825, declared it to be "ratified and confirmed," and on the 16th May, 1825, the *Potomac Company,* by a corporate act, signified and declared its "assent" to it, and to all its provisions.

There are no technical words necessary to constitute a *compact,* or *contract,* which are convertible terms; and neither need be used, and seldom is, in the instrument creating it. It is a mutual consent of the minds of the par-

ties concerned, respecting some property or right, that is the object of the stipulation, or something that is to be done or forborne; "a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised or stipulated by the other," and any words manifesting that *congregatio mentium*, are sufficient to constitute a contract.   Here we have the very language of contract, in the terms "accept," and "assent to."   It is the language used by the parties to a compact of the most solemn and imposing character. .  The 7th article of the constitution of the *United States*, provides, that "the ratification of the conventions of *nine States*, shall be sufficient for the establishment of the constitution *between the States so ratifying the same;* and the language used by the conventions in their acts of ratification, is, " assent to and ratify," " assent to, ratify, and adopt," " agree to, ratify, and confirm," " approve, assent to, ratify and confirm," and the amendments proposed by *Congress* in 1789, were ratified by acts of the legislatures of the respective States, using the language, "ratify," "assent to, and ratify," " confirm and ratify," " assent to, ratify, and confirm," &c.

· The constitution to which validity and effect, to which vitality was imparted, by those expressions of assent, became not a mere confederacy, or league, but a compact, in the language of the constitution, *"between the States so ratifying the same,"* as soon as it was so ratified by the number required by the 7th article ; by which, they were reciprocally bound, that there should be such a government of the Union for the benefit of the whole, with the assent of the people, and proceeding from them, as that, provided by the constitution.   And when the federal government was organized and brought into existence, which is a creature of the constitution, possessed of the rights and powers it confers, and subject to the duties it prescribes and enjoins, it became also a compact between the parties to it, and the federal government.

In this case, there were mutual interests in the subject matter of the reciprocal acts of the two States and of *Congress*, with an acknowledged authority to contract; and the legislature of neither of the States, could have performed by any separate act of legislation, what was proposed to be accomplished by the concurrent acts of all. One *terminus* of the canal is proposed to be in the *District of Columbia*, and the other in the State of *Maryland;* and *Virginia* could not of its own authority, by any separate act, authorise a canal to be made through *Maryland*, nor could *Maryland* authorise a canal to be made through *Virginia*, without its consent, nor could either or both of them, authorise one to be made in the *District of Columbia*, without the consent of *Congres; Maryland* and *Virginia* were interested in the *Potomac Company;* both, as stockholders, and *Maryland* largely as creditor, and both of them, and also the *United States* were interested in the river, and the works erected by the *Potomac Company*, as a public highway. Neither of the States therefore, without the consent of the other, nor both of them without the consent of *Congress*, could have repealed the charter of that company, nor have received, or authorised the surrender of it, and of the works, to another company. Neither State could have authorised the condemnation of land, nor the imposition and collection of tolls within the territory of the other, without the consent of that other ; nor could either or both of them, have authorised either to be done within the *District of Columbia* without the consent of *Congress.* The 14th section, declares " that the said canal, and the works to be erected thereon in virtue of this act, when completed, shall forever thereafter be esteemed and taken to be navigable as a public highway." Not, that the part in *Virginia*, shall be a highway there, nor the part in *Maryland*, a highway in *Maryland;* but the entire canal shall be one continued connected highway, through the respective territories of the three sovereigns ; and neither of the two States could have made a public highway through the territory of the other, without the consent

of the other ; nor neither or both of them, through the *District of Columbia*, without the consent of *Congress.* Yet all this, wearing the features of a conventional arrangement, has been done by the reciprocal and concurrent acts of the three sovereigns ; with other stipulations and reservations of rights, impressing upon those acts the qualities of a compact.

The 9th section declares, that the canal and other works " shall be forever exempt from the payment of any tax, imposition, or assessment whatsoever." Now ordinarily, *Congress* and each State has a right to impose taxes within its own jurisdiction, and neither has the power to deny it to the other. What then, is that renunciation of the right to impose taxes, but a stipulation or agreement between them, that neither will exercise that right? And the 14th section provides, that no other toll or tax for the use of the canal and works, except those authorised by that act, " shall at any time be imposed, but by consent of the said States, and of the *United States.*" Is not that an agreement or stipulation, that neither will authorise the imposition of any further toll or tax, even within its own territory for the use of the canal, without the consent of the others? There is a stipulation in the first section, that *Congress* and each of the States shall appoint commissioners for taking subscriptions to the stock, and carrying the act into operation. Not to act separately, as if it were a separate law of *Congress*, and of each of the States ; but to act conjointly for carrying it into effect, as the united act of all—and the stipulation for the appointment of commissioners, could only have been an agreement between themselves, as the corporation was not then in existence, and was only to be brought into existence by the agency of their joint commissioners, as a creature of their joint creation. In the 20th section, there is a provision for reserving to each State, the right to charter another company, in case the western section of the canal, should not be completed within the time limited. And in the 21st section, there is a reservation to each of the States, of the

right to make lateral canals, to be fed by the waters of the *Potomac;* and to the government of the *United States*, to extend the principal canal through the *District of Columbia*, with a provision that before the act should take effect, *Congress* should authorise the two States, or either of them, to take and continue a canal from any point of the principal canal, through the *District of Columbia*, &c. (which was done by *Congress* in the act of March, 1825, and the unnecessary explanatory section of the act of 23d May, 1828.) There is also in the 21st section the further provision, "that in taking or extending such lateral canal or canals through the *District of Columbia*, by either of the States, no impediment or injury be done to the navigation of the *Chesapeake and Ohio Canal*." And are not those reservations and provisions, mutual stipulations or agreements, that each shall have and enjoy the rights and powers reserved and conceded, and that neither of the States, shall make any lateral canal or canals to the prejudice of the navigation of the principal canal? We have moreover the understanding of the parties themselves, of the character of this act of incorporation.

The 1st section of the act of December session, 1826, which is an act for the amendment of the act of incorporation, after reciting, that it had received the assent of *Maryland*, *Congress*, and the *Potomac Company*, declares that it shall be amended, &c. "on condition that this act receive *in like manner*, the assent of the necessary parties thereto." And the 4th section, "that this act shall commence and be in force, as soon as it shall have received the assent of the legislature of *Virginia*, of the *Congress* of the *United States*, and of the *Potomac Company*," showing them to be the parties alluded to as the necessary parties. It did receive their assent, and became a part of the charter. It does not in terms call that act, or the original act, a contract, but it uses equivalent expressions, "*receive in like manner, the assent of the necessary parties;*" parties to what? not to that act, as a separate, and independent act of

the legislature of *Maryland:* that could not be; neither of them could be a party to it, as a mere law of *Maryland.* It was only in the character of a compact, that they could become *parties to it;* and being parties to the original charter, which that act proposed to amend, they were necessary parties to that act, and the assent to that act, by all the parties named, was a recognition of the necessity for their concurrence as parties to it; in order to give it the effect to alter, or in any manner modify the original act—and the same may be said of the act of the December session, 1827.

There were mutual interests, advantages, and rights, reciprocally conceded and compensated, by the concurrent acts of *Virginia, Maryland,* and *Congress,* constituting the original charter, which by any fair test that can be applied, is believed to be a compact between the two States and *Congress,* a reciprocal pledge of public faith, that there should be a corporation, the creature of that compact; created, not merely for its own benefit and advantage, but to effect a great national object, in which all were concerned, for the common benefit and advantage of all, and for the public good ; and that whenever the corporation should be brought into existence, it should be invested with all the privileges, rights and powers, provided by the charter, for the accomplishment of the end contemplated, without any diminution or alteration of the franchises as therein expressed. There is no acknowledged necessity, for any stronger, or more technical terms, to constitute a compact between two or more states, than between a state and an individual ; and the terms here used, would be quite sufficient to constitute a contract between a state and an individual. Indeed this very charter being a grant, is an implied contract with the corporation, not to re-assert the rights it has granted.

It has been intimated, rather than seriously argued, that under the provision of the constitution, "that no state shall, without the consent of *Congress,* enter into any agreement or compact with any other state," this charter is inoperative

as a compact between the two states, for want of the constitutional assent of *Congress.*

The assent of *Congress* to the provisions of the charter, is required by the 23d section, to be given "as the legislature of the *District of Columbia.*" The consent of *Congress* could not have been given as the legislature of the *District of Columbia.* It has no capacity to act as the local legislature of that, or any other particular district, and can only act in the capacity of the legislature of the Union, (in which capacity its assent was given to this charter,) and no state, after having entered into a solemn agreement with another, is competent to renounce the constitutional assent of *Congress* to it, as the legislature of the Union.

There is no particular form, in which the assent of *Congress* is required to be given, and it is not material in what form it is given, provided it is done. Here is an act, proposing to create a corporation, with all the necessary rights and faculties for making a canal, to terminate in the *District of Columbia*, to which the assent of *Congress*, a party in interest is required to give it validity, and *Congress ratifies* and *confirms* it, so far as may be necessary, for enabling any company *formed by the authority of that act of incorporation*, to carry into effect its provisions, in the *District of Columbia;* and is not an assent to the provisions of the act being carried into effect in the *District of Columbia, by a company to be formed under the authority* of the act, an acknowledgment of its authority, an assent to the act itself, and to the creation of a company, with all the powers proposed to be given to that company, for executing its provisions? The act does not provide for the making a separate canal in the *District of Columbia*, nor did *Congress* intend so to restrict the company ; but to authorise an *extension* into the district of the canal indicated by the provisions of the act, and by the means the act prescribes ; and the assent to the *extension* of the canal into the district, was a recognition of, and an assent to the whole scheme of the canal itself, and of the provisions for making it. And thus *Con-*

*gress*, by the very act of becoming a party to the whole scheme of the canal, in acceding to it, to the extent of its territorial interest, gave to the compact or agreement, such an assent as was sufficient to gratify the constitution.   But it is unnecessary to dwell longer on this part of the case.   In *Green vs. Biddle* it was decided, that no particular form, for the assent of *Congress* to a compact between states, was required, and it was held that the consent of *Congress* in terms, "to the erecting the district of *Kentucky* into a separate and independent state, and its reception into the Union," upon a certain day, was a sufficient consent under the constitution, to the compact in detail between *Virginia* and *Kentucky*, for that purpose; though no part of the compact, except that which related to the erection of *Kentucky* into a separate state, was adverted to in the act giving the consent of *Congress*; and the act of *Congress* of 23d May, 1828, assenting to the acts of this State, for changing the route of canal above *Cumberland*, and substituting rail ways, &c. for a canal through the *Alleghany* mountains, declares "that the assent *already given* by the *United States* to the *charter* of the *Chesapeake and Ohio Canal Company*, shall not be impaired by any such change, &c." which plainly shows that *Congress* understood the assent before given, to extend to the whole charter a compact, and all its provisions—otherwise, the provision that a change in the route of the canal *above Cumberland*, should not impair that assent, would have been unnecessary, as no change of the route *above Cumberland*, could in any way affect that assent, unless it extended to that part of the route.   Besides, it speaks of the assent before given to the *charter*, in terms which embraces all its provisions.

The *Potomac Company*, which was also the creature of a compact between this State and the State of *Virginia*, was at the time the original act was passed for incorporating the *Canal Company*, a subsisting corporation, and its charter could not have been repealed or annulled, nor any of its corporate rights diminished or infringed, without its con-

currence. Its assent therefore, to the scheme of a new corporation in its place being necessary, it was expressly made a condition *precedent* to the consummation of the canal charter, and to the vesting of any rights under it; to be signified by its corporate act registered among the archives of the two States, and of the *United States,* which was regularly done.

Upon its assent so given in consideration of a stipulated equivalent, the canal charter was to take effect, and not otherwise. It was not to be evidenced, as has been supposed, by a surrender of its charter, and transfer of its property and rights to the *Canal Company;* which was only authorised to be done by the 13th section, after its *assent* had been declared, as required by the 1st section, and after the *Canal Company* had been formed; and could not have been done before the company was formed, and in a condition to receive such surrender—and it was only after the *assent* that the company could be formed, as without it, there would have been no authority for its formation, no act of incorporation.

What the *Potomac Company* was required to yield, was its charter, with all its rights and property held under it— and the proposed equivalent, was the benefit to that company, of the privilege of stock in another company, possessed of all the rights and advantages proposed to be granted to the *Canal Company,* being paid for in the debts of the *Potomac Company,* and in certificates of its stock at the par or nominal value.

It was plainly a proposal made to the *Potomac Company,* for its acceptance, in the form of legislative enactments, to this effect; if you will consent to the provisions of this act, for incorporating the *Chesapeake and Ohio Canal Company* in your place, you shall, on the formation of that company, be authorised to surrender and transfer to it, your charter, with all your corporate rights and privileges; as an equivalent for which, and in consideration of your assent, the *Chesapeake and Ohio Canal Company* shall be invested

with all the rights and privileges that the provisions of the act impart, and subscriptions for stock in that company shall be payable in claims against you, and in certificates of your stock at par ; such a transaction between individuals, in relation to any matter about which they were competent to contract, would clearly be a contract, the obligation of which the State could pass no law to impair.    And it is conceded that, that legislative proposal, agreed to by the solemn corporate act of the *Potomac Company*, amounted to a contract between the two States and *Congress* on one side, and the *Potomac Company* on the other, to the same extent, and of the same obligatory force and effect, as the compact of *Congress* and the two States *inter se*.    Not awaiting the formation of the *Canal Company*, nor the surrender and transfer to it by the *Potomac Company*, of its charter and property ; but *eo instanti* that the assent of the *Potomac Company* was given, it became a *compact*, and by virtue and force of that very compact, *a law;* the concurrence of the parties to the compact being a condition precedent to its becoming a law, which compact and law, it was not competent to the *Potomac Company* afterwards to defeat or annul, nor by any act to rescind its assent.

And it is a mistake to suppose, that its becoming a compact, depended upon the coming into existence of the *Canal Company*, and its acceptance of the offered terms as a necessary party.    The coming into existence of the *Canal Company*, depended upon the prior formation of the compact, of which it was to be the creature, and without which it could have had no existence.    When the *Canal Company* did come into existence, and accept the charter, in the only way it could, by the very act of coming into existence, the subscriptoins to the stock, the charter became a grant, from which, there then resulted a contract between the two States and *Congress*, and the *Canal Company;* but distinct from the compacts of the two States and *Congress inter se*, and between them and the *Potomac Company*.    They were contracts, that there should

be such a corporation, with all the rights and privileges provided by the charter. The contract of the two States and *Congress* with the *Canal Company* is, that they will not re-assert the rights they have granted.

Upon the faith of the canal charter, the *Potomac Company* surrendered and transferred its charter, and all the rights and property it enjoyed and held under it, in consideration of a stipulated equivalent; the value of which depends upon the inviolate conservation of the chartered rights of the *Canal Company.* For of what value would the privilege of paying for stock of the *Canal Company*, in the debts, and certificates of stock of the *Potomac Company* be, if the stock of the *Canal Company* should be made worthless by an act of the legislature? and would not the faith of the States be violated by impairing that equivalent in any way, without the consent of the *Potomac Company?*

But if there is any ambiguity in the original act for incorporating the *Canal Company*, or doubt arising upon that act alone, as to the intention of the respective legislatures, the understanding of *Congress*, and of the two States, that it was a compact, to which they and the *Potomac Company* were parties, and could not therefore be in any manner altered or modified, without the consent of that company as a *necessary party* to such alteration; and that they acted upon that understanding, is demonstrated by the act of this State, of the December session, 1826, assented to by *Virginia* and by *Congress*, for amending the charter; which requires as a condition precedent to its becoming a law, that it shall receive the assent of *Virginia, Congress*, and the *Potomac Company*, as *necessary parties* thereto, *in like manner as they had assented* to the original act—and also by the act of the December session, 1827, for further amending the charter, which required and received the same assent. And these acts are particularly worthy of notice, as showing the presence of a contract to which the *Potomac Company* was a party in interest; since, if it had no interest in the conservation of the canal charter, and of the rights

and privileges it professes to confer, there was no necessity for requiring its assent to any change in the route of the canal. But the recital in the preamble, that "it is represented to this general assembly, that the *Potomac Company* are willing and desirous that a charter shall be granted to a new company, upon the terms and conditions hereinafter expressed, and that the charter of the present company shall cease and determine," furnishes evidence of a conventional arrangement with that company, and would seem to be conclusive of the question of contract.

As to the sphere of the operations of the proposed corporation, looking to the various documents accompanying the answer, there would be no difficulty in ascertaining through what region it was intended the canal should pass; but it is unnecessary to resort to those documents generally, or to inquire how far recourse may be had to them for that, or any other purpose; the charter itself sufficiently and clearly designates the valley of the *Potomac* for the intended route of the canal.

The preamble states the object to be the construction of "a navigable canal from the tide water of the river *Potomac*, in the *District of Columbia*, to the mouth of *Savage Creek*," &c. "to be *fed through its course* on the east side of the mountain, by the river *Potomac* and the streams which empty therein." Here then, is a canal to begin, and end upon the river, and to be *fed throughout its course*, by the *waters of the river*, from one *terminus* to the other. Could there have been a clearer manifestation of the intention of the makers, that the canal should pursue the course of the river? The right to make a canal, necessarily drawing to it, (if there was nothing more to indicate the valley as the intended route,) the right to make it where it could be supplied with the water, the vital stream by which it was intended to be fed.

The two *termini* being thus fixed, the laws of nature point to the course of the river, as the route of the canal.— The recital too in the preamble, that the *Potomac Company*

were willing and desirous that a charter should be granted to a *new company*, upon the *terms* and *conditions* thereafter expressed, shows it was intended as a substitution of the *Canal Company* for the *Potomac Company*, and to take its place in all things, and it has been seen, that the operations of the *Potomac Company* were confined to the valley of the *Potomac*.

The enacting clauses are in perfect accordance with the preamble, and provide for carrying it into effect. The 4th section authorises and empowers the corporation to cut canals, erect dams, open feeders, construct locks, and perform such other works, as it shall judge necessary or expedient for completing the canal *before mentioned and described;* that is, the canal described in the preamble, to be made from tide water to the mouth of *Savage Creek*, and fed by the *Potomac*.

The 15th section, after reciting that, "it is necessary for the making of *the said canal*, &c. that a provision should be made for condemning a quantity of land for the purpose," authorises the acquisition by condemnation, of *any land through which the said canal is intended to pass*, (still referring to the canal described in the preamble,) and declares, that on the payment of the valuation of the land so condemned, the title shall vest in the corporation; and the 19th section authorises the corporation, during the pendency of any proceedings, to subject any land, to the purposes of the act, to enter upon the land and go on with the work. The 20th section declares, "that the *eastern* section of the canal shall begin at the *District of Columbia* on tide water, and terminate at or near the bank of *Savage* river or creek, which enters into the north branch of the *Potomac*, at the base of the *Alleghany* mountains," and the 13th provides, for the establishing a rate of tolls, on the different parts of the canal, as they shall be finished, "until the eastern section shall be finished, up to the mouth of *Savage* river or creek." The 11th directs the appropriation of the surplus tolls, "to the accommodation of the inhabitants of the shores

of the river *Potomac,* by affording to them, in the best prac-
ticable mode, a safe and easy access to the canal, from the
surface of the main river." Now, how are the inhabitants
of the shores of the river to be accommodated with a safe
and easy access to the canal from the surface of the river,
unless the canal is constructed upon the shore, or in the
valley of the river? The 13th section makes it the duty of
the corporation, when any part of the canal shall not be
finished, "to keep the *corresponding part* of the river in a
proper state for navigation." What *corresponding part* of
the river can there be, if the canal is not made along the
river? And the same section annuls the charter of the
*Potomac Company,* upon its surrender and transfer to the
*Canal Company,* and grants to the *Canal Company* all the
rights and powers, that had been granted to the *Potomac
Company;* which included the original power of the *Poto-
mac Company* to make canals along the borders of the river.
The 2d section of the act of December session, 1826, for
amending the charter, assented to by *Congress, Virginia,*
and the *Potomac Company,* authorises the termination of
the *eastern* section of the canal, "at or near the town of
*Cumberland* on the river *Potomac,*" (which is situated on
the *Maryland* side of the river,) instead of the mouth of
*Savage* creek and the commencement of the *western* sec-
tion at that point, and has also this provision, "and in the
event, that the *western* section of the *Chesapeake and Ohio
Canal shall leave the valley of the Potomac* river, at any
point below the coal banks, at or near the mouth of *Savage,*
&c." showing the intention of all the parties, that the route
of the *eastern* section of the canal should be in the valley
of the *Potomac,* and designating the town of *Cumberland*
as a point in the valley of the *Potomac,* on the left or
*Maryland* shore of the river to which it should go. The
board of engineers for internal improvement, acting under
the authority of the general government, in their report,
made before either *Congress* or the *Potomac Company* had
assented to the act of incorporation, explicitly state, that the

*eastern* section of the canal must pass through the valley of the *Potomac*, and follow the course of the river without any deviation, and that the side on which it should go, is the only choice left, but giving a-preference to the left or *Maryland* side—and they base their estimate of the cost upon a construction of it on the *Maryland* shore—which survey and report were recognized and adopted, as designating the route of the canal, by the legislature of *Maryland*, in the act of the 6th March, 1826, for the promotion of internal improvement, in the proviso to the subscription to the stock of the *Canal Company*, that the executive should be satisfied that the residue of the sum estimated by the *United States'* board of engineers to be adequate to the completion of the *eastern* section of the canal, had been subscribed by *bona fide* and competent subscribers; which act also provides for a canal to be made by the *Maryland Canal Company*, "from some convenient point on the *Potomac* river, *continuing* the *Chesapeake and Ohio Canal* to the city of *Baltimore*"—and the assent of *Congress* and of the *Potomac Company* having been given to the original charter, after that survey and report were made, they may be considered as having received their sanction also—and the survey and estimate of the cost of the same route, by the civil engineers, *Geddes* and *Roberts*, may likewise be considered as the basis of the subscription by *Congress*, of a million of dollars (which was made afterwards,) to the stock of the *Canal Company*.

With all this before us, is it not perfectly manifest, can it for a moment be doubted, that the valley of the *Potomac* was intended, and specifically designated for the route of the contemplated canal? If indeed the sanction given by this State to the proceedings of the board of engineers for internal improvement, by making their survey the basis of a subscription of half a million of dollars, to the stock of the *Canal Company;* and the assent of *Congress*, and of the *Potomac Company* to the original act, after that survey had been made ; and the subscription by *Congress* of a mil-

lion of dollars, consequent upon the survey, and estimate of cost of the same route by the civil engineers, *Geddes* and *Roberts* appointed for that purpose, may not be taken as an actual appropriation of the land surveyed for the route and site of the canal.   If the *Canal Company* had come into existence immediately, and before the rail road charter was granted, it would have taken a *vested right* to *choose a route* for the site of the canal, in the valley of the *Potomac*, along either bank of the river, except at the upper *terminus*, which, whether at the mouth of *Savage* creek according to the original charter, or at *Cumberland* according to the amendatory act of the December session, 1826, is confined to the *Maryland* shore, both of those places being on that shore, and specifically designated for the upper termination of the *eastern* section of the canal, a right created by the charter, and existing independent of any survey, or act of location or of condemnation, which would be but an exertion of that right.   And if the *Rail Road Company* had afterwards been chartered and organized, before any exercise of that vested right by the *Canal Company*, it could not, by any act of location or appropriation, have defeated or overreached it.   The prior grant that gave, would have preserved the prior right.   It would have been a corporate right, a vested franchise, to select the most suitable ground for the construction of the canal within the assigned sphere of action, which neither of the sovereign grantors alone, nor all together, could by any direct legislative act, have taken away or repealed ; and much less could it be taken away, or disturbed by the act of any other corporation. This franchise, this corporate right, to select and acquire land for the authorised purposes of a corporation, is property ; it is an incorporeal hereditament, not a legal title to the land itself, not a *mere capacity* or *faculty* to acquire and hold land, such as every individual possesses ; but in addition to such capacity, it is a right or privilege, a portion of the eminent domain vested in the corporation, to acquire the legal title to land subjected by the grant to its will, and

thus to convert the incorporeal into a corporeal hereditament, and after the franchise to choose and condemn land for any particular public purpose, that portion of the eminent domain granted and subsisting in one corporation, cannot be bestowed upon another, to the prejudice of the former grant; nor can any other legally acquire, any such right of way or title to the land over which the franchise extends, as will hinder the former corporation in the exercise and enjoyment of its franchise. And although the *Canal Company* was not actually incorporated, and had not accepted the charter, before the *Rail Road Company* was chartered and organized, yet it is entitled to all the rights, benefits, and liberties, with which it would have been invested, if it had been organized before any antagonist corporation came into existence. It is not like the common case of an act of incorporation, passed by an individual State, which ordinarily, the State may repeal or modify at pleasure, at any time before it is accepted, and when no rights are acquired under it, and if it is accepted after any alterations are made, the corporation takes it subject to such modification; because, until accepted, it is not a grant, and there is no contract between the State and the corporation, no pledge of public faith, to be violated by any alteration of the charter. And is it not on the ground of an original contract with the *Canal Company*, by *Congress* and the two States, at the date of this charter, that on this point of the case, the corporation is considered as having taken the charter, and holding it according to the then state of things with all its provisions inviolate; for it is admitted, that the three sovereign grantors, with the consent of the *Potomac Company*, might have repealed, or modified the charter, (as they did in more instances than one,) or have granted the same franchises to any other company, at any time before acceptance by the *Canal Company*, or any act done, or right acquired under it; as until then, it had not assumed the character of a contract with that company, and therefore might have been altered or annulled by the united action of the parties, from

whose concurrence it derived its existence. Though neither, acting alone and independently of the others, had the ability to do it, according to their own understanding of its charter and obligations; as is conclusively shown by the several amendatory acts of this State, of the December sessions 1826 and 1827, expressly requiring, and receiving the concurrence of all, in order to give them validity; and the former in terms styling them *necessary parties*. But it is on the ground of the compact and agreement of *Congress* and the two States *inter se,* and between them and the *Potomac Company,* arising from the reciprocal and concurrent acts of the three former, and the assent of the latter; the consummation of which, was on the 16th May, 1825, the day on which the assent of the *Potomac Company* was given, anterior to the date of the rail road charter; and under the protection of the constitution of the *United States,* cannot be impaired or affected by any thing contained in that charter.

It is conclusively settled by the Supreme Court of the *United States,* in *Fletcher vs. Peck, Terrett vs. Taylor, The Town of Pawlett vs. Clark, Dartmouth College vs. Woodward,* and in *Green vs. Biddle,* that contracts between States and individuals, and also contracts between two or more States, are within the protection of the provision of the constitution, " that no State shall pass any law impairing the obligation of contracts," and that no State can constitutionally pass any law, impairing the obligation of its own contract, whether with an individual, or with another State. The contract here was, that there should be a corporation, which, whenever it should be organized, should, by virtue of the charter, have the right to make a canal from the tide water of the river *Potomac,* in the *District of Columbia,* through the valley, and pursuing the course of the river, to the mouth of *Savage* creek, (a point on the left or *Maryland* side of the *Potomac,*) with permission afterwards given, to stop at the town of *Cumberland,* upon the river, (also a point designated on the *Maryland* side,) with

power to acquire by purchase or condemnation, any land that should be found necessary for that purpose; which of necessity included the right to choose the route of the canal within the designated region, as the mere right to condemn land would have been of no value, and the canal could never have been made, without the additional right to select such land for condemnation, as should be thought best suited to the purpose; no specific part of the valley being appropriated. That right of choice then, in addition to the right to condemn, which is dependent upon the exercise of the right to choose, is a franchise, a portion of the eminent domain, which the sovereign grantors contracted should vest in the *Canal Company*, whenever it should be formed. It was a right residing in those sovereigns respectively, distinct from the exercise of it, which they had the power to exercise themselves, or to contract for the exercise of, by a company to come into future existence, and that, they did; not that the company should, on being incorporated, have the legal title to any lands held by individuals, but the franchise only to choose the route of the canal, and to acquire by purchase or condemnation, the legal title to the land selected for its site. It was to have also, all the rights and privileges that had been granted to the *Potomac Company.* That contract has not been rescinded; was in full force at the time the rail road charter was granted, and has been constantly recognized, by all the contracting parties, and the charter treated as subsisting in all its integrity, capable only of being altered, by the consent of all the parties, even for the purpose of enlarging the authority of the company. By *Maryland*, in its various acts, both before and after the date of the rail road charter, relative to large subscriptions to the stock, and authorising the intersection of it by other similar works, according to its provisions; by *Congress*, in subscribing to its stock; and by all the parties in the amendatory acts of 1826, and 1827, the 3d section of the first of which, (passed at the same session that the rail road char-

ter was passed,) provides, that nothing in that act shall discharge the company from a compliance with each and every of the conditions of the original act, except as therein altered. The contract is, that the canal company shall take and hold the charter, with all its provisions, all the rights and privileges it professes to impart. The right to make the canal in the valley of the *Potomac*, is not more distinctly stipulated, than the right to choose or select the route of the canal within that valley: and one stipulation can no more be violated, than the other. To exclude the canal from the valley of the *Potomac* altogether, would be no more a violation of the contract, than to obstruct or restrict the exercise of the right, to choose the most eligible ground for the construction of it. The right to choose the route, is not restricted by the contract, to either side of the river, except at the points designated for the termination of the eastern section; but is submitted to the judgment of the company, as it should have been. It is, by the contract, to have a choice between the two shores; authorise another company to occupy one of the shores, and that choice, that alternative is gone; it must take the other or none; and the contract, that it should have the right of choice, is violated. Besides, if *Maryland* has a right to authorise the occupation of the shore on the *Maryland* side of the river by another company, *Virginia* has the same right, and between them, though only two of the contracting parties, the power to make the canal at all, might be destroyed, and the charter virtually annulled. Let it be pronounced that the *Rail Road Company* has the right to take possession of the *Maryland* side of the river, and what is there to prevent it from the taking like possession of the *Virginia* shore, wherever it may be found convenient? In which event the charter of the *Canal Company* would become as blank paper; for if it would have the right to go out of the valley with the canal, it would want the physical power, the proof being in the language of one of the witnesses, (an engineer,) that to make it out of the valley, would be a canal impracticability—and the

further proof is, that if the claim of the *Rail Road Company* should be established, the canal could only be made on the *Maryland* shore, with such difficulty, and at such an expense, that no practical engineer would recommend it.   In which case, the canal, if it went on at all, would have to cross the river, where it might be met by the same, or another company; for if to infringe the right of choice in this State, would not be to impair the obligation of the contract by the sovereign contractors *inter se,* neither would a similar infringement in *Virginia,* impair the obligation of the contract between the grantors and the *Canal Company.* The same law equally applies to both contracts.   But if it were otherwise, the fact that both companies have chosen the same shore, and the same route, is sufficient to show that, that is the best route; and the occupation of it by the *Rail Road Company,* even if there should be another, would equally impair the obligation of the contract, since it would obstruct the exercise of the right of choice; and the nature or degree of the hindrance, the extent to which the obligation of a contract is impaired, be it great or small, is not material in the view of the constitution.   If therefore, under the proper construction of the rail road charter, or the practical application of it, that company would be enabled so to locate and construct the road, as to interfere with, and restrict the action of the *Canal Company* in the choice of the route of the canal in the valley of the *Potomac,* or in the exercise of any of the rights and privileges granted to the *Potomac Company,* in so far, it is contrary to the constitution of the *United States* and void; and no rights to land, or of way, acquired by the *Rail Road Company,* can be set up against the paramount rights and privileges of the *Canal Company,* which stand as if the rail road charter had not been granted.   The analogy insisted on in argument between this, and the case of two general or common land warrants, is not admitted; as between the holders of general warrants, there is no priority of right to locate.   The warrant is in truth, nothing more than a mere authority to

the surveyor or proper officer, to make the survey, and the certificate is the inception of title, to which the patent when issued, relates.    The State may issue as many general land warrants as it pleases; the issuing of one, does not preclude its issuing another or more; and he who can get his warrant first executed, though the *junior* warrant secures the land, notwithstanding all may be laid upon the same land, because the warrant confers no right, and it is from the act of location alone, that the right arises, and the title to the land remaining in the State, may, until the warrant is located, be granted to any other.    But not so with an act of incorporation, which when accepted, amounts to a grant, and the right conferred, a vested franchise, existing independent of any act of location or survey, which the State cannot re-assert, nor grant to any other; it is therefore a prior right, to which all subsequent grants must yield.    Here there was a consummated contract or pledge of public faith, anterior to the rail road charter, against the effect and operation of which, it is protected by the constitution of the *United States*, and to the prior right of choice so secured by that contract or pledge, the rail road charter must give place. If there is any analogy, it is to a special land warrant, arising from the peculiar and special designation of the valley of the *Potomac*, for the route of the canal.

If there was any thing unwise, in not having limited a time for the formation of the *Canal Company* under the charter, that was a question for the sovereign grantors themselves, and cannot affect the rights of those claiming under it.    But there is no want of wisdom perceived: it was a subject of great difficulty, and some doubt as to the practicability of the scheme; one company had already been in operation more than forty years, without being able to effect the desired object, and it could not well have been supposed, that others would embark their funds in such an enterprise, very hastily, and without having first taken proper measures to ascertain the probable cost of accomplishing it, if upon examination it was found to be practicable—and if

there had been any unreasonable delay in forming the company, (as there was not,) they who made the charter could easily have revoked it, before any rights were acquired; and if, after being formed, it had lain by, and suffered the rail road to be made, without interposing any claim to the route on which the road was constructed, such acquiescence would have amounted to a waiver of its rights, which it would not afterwards be permitted to resume, to the destruction of the road.   No argument therefore can be drawn *ab inconvenienti*, against the right claimed by the *Canal Company*.

To the objection rather suggested than urged, that the *Canal Company* was not a party to the contract between the two States and *Congress*, it is enough to say, that it is the creature of that compact; was brought into existence by it, and claims, and holds all its rights under it; as well those which had been granted to the *Potomac Company*, (in place of which it is substituted,) as others more extended; the whole of which depend upon the inviolate conservation of that compact or pledge of public faith.   In *Green vs. Biddle*, 8 *Wheat*. 1, the suit was not between parties to the compact. The compact was between the States of *Virginia* and *Kentucky;* and the suit was between individuals, one party claiming under a law of *Kentucky*, and the other setting up the compact, to show the law to be unconstitutional and void, and succeeded in doing so.   But if the canal charter could be treated as the separate and independent act of *Maryland* alone, and which the legislature had therefore the power to repeal at any time before it was accepted, or any rights acquired under it; should the rail road charter be so construed, as to deny to the *Canal Company* the prior right to choose a route for the canal in the valley of the *Potomac*, and to give to the *Rail Road Company* the right asserted in the bill, to construct the road in the same valley, before the *Canal Company* shall have selected the route of the canal?

Statutes should be construed with a view to the original intent and meaning of the makers, and such construction should be put upon them, as best to answer that intention, which may be collected from the cause or necessity of making the act, or from foreign circumstances; and when discovered, ought to be followed, although such construction may seem to be contrary to the letter of the statute.— *Plow.* 205, 232. 11*th Coke Rep.* 73. 19*th Vin. Abr.* 519. 6*th Bac. Abr.* 384. That, therefore, which is within the letter of a statute, is sometimes not within the statute, not being within the intention of the makers. "If laws and statutes seem contrary to one another, yet if by interpretation they may stand together, they shall stand;" and where two laws only so far disagree, or differ, as that by any other construction they may both stand together, the rule that *Leges posteriores, priores contrarias abrogant,* does not apply, and the latter is no repeal of the former. *Roll. Rep.* 90, 91. 2*d Co. Rep.* 5, 6. 11*th Coke Rep.* 63, 64. 19*th Vin. Abr.* 519, 525. It is laid down as an established rule, in 19 *Vin. Abr.* 525 *Pl.* 132, that "repeals by implication are things disfavored by law, and never allowed of, but when the inconsistency and repugnancy are plain and unavoidable; for these repeals carry along with them, a tacit reflection upon the legislators, that they should ignorantly, and without knowing it, make one act repugnant to and inconsistent with another; and such repeals have ever been interpreted, so as to repeal as little of the preceding law as is possible;" and in 6*th Bac. Abr.* 385, 385, that "where it is manifestly the intention of the legislature, that a subsequent act of parliament shall not control the provisions of a former act, the subsequent act shall not have such operation, even though the words of it taken strictly and grammatically, would repeal the former act." These principles have been recognized and adopted by courts, from the time of *Roll, Plowden,* and *Coke,* to the present day. In *Williams vs. Pritchard, 4th Term Rep.* 2, where the question was, whether a house built on land

recovered from the river *Thames*, which by the *Statute 7th, Geo.* 3, was exempted "from all taxes and assessments whatever," was liable to be assessed to the general land tax, imposed by the 27 *Geo.* 3. *Lord Kenyon* in delivering the opinion of the court of *King's Bench*, said it could not be contended, that a subsequent act of parliament would not control the provisions of a prior statute, if it were intended to have that operation. But decided in that case, that though the words of the general land tax act of the 27*th Geo.* 3, were sufficiently large to subject the land to the payment of the tax in question, yet that the statute of 7*th Geo.* 3, exempting it from taxes, was not thereby repealed, on the ground, that it was not considered to have been the intention of the legislature to repeal it.

In *Preston vs. Browden*, 1 *Wheat.* 115. The Supreme Court of the *United States*, in construing an act of assembly of *North Carolina*, had recourse to the history and situation of the State, and treaties made by that State with the *Indians*, in order to ascertain the intention of the legislature, and thereby to arrive at the meaning of the act, and decided, that it did not embrace the land in question, though the words of it were sufficiently broad and extensive; on the ground, that it did not appear to have been the intention of the legislature; and in *McCartee vs. the Orphan Asylum Society*, 9*th Cowen*, 437, it was decided, that although the word *purchase* comprehends the acquisition of an estate, as well by *devise*, as by the *party's own act*, yet that the act of the legislature of *New York*, incorporating the *Orphans' Asylum Society*, which enacts that, that institution, "shall be capable in law of purchasing, holding and conveying any estate, real or personal, for the use of the said corporation," did not so far operate as a repeal of the statute of wills, of that State, which prohibits a *devise* of real estate to bodies *politic and corporate.* Thus limiting and restricting by construction, the acknowledged legal import of the term *purchase*, and confining it to such other modes of acquiring real estates, as do not include a devise, on the ground,

that it was only the intention of the legislature, to grant to that corporation the right to *purchase,* subject to other existing statutes, and not to confer a right to purchase without restraint, and therefore, that the term *purchase,* ought not to be construed in its most comprehensive sense, since by doing so, it would have the effect to repeal the express words of a prior statute; but in a more restricted sense, so as to leave the former act unimpaired, and that both might stand together.  Keeping in view the principles before stated, and upon which the decisions referred to were made, with many others quite as strong that might be mentioned, let us for a moment examine, whether it was the intention of the legislature of *Maryland,* when granting the rail road charter, in any manner to limit or restrict the provisions of the act to incorporate the *Canal Company,* or to alter or abridge any of the rights or powers originally intended to be given by that act, or to repeal any part of it; and if not, whether the rail road charter must be so construed as to operate that effect.   It has been seen, that the valley of the *Potomac* is specially and clearly designated by the charter, for the route of the canal from one *terminus* to the other, the upper *terminus* being required to be at a point on the *Maryland* shore of the river ; and that it was considered as a work of great national, as well as local importance.   And it is undeniable, that independent of any interference by the rail road charter, the *Canal Company* would be entitled to select a route for the canal, in that designated region.   On the other hand, the rail road charter is general and affirmative in its terms, with no route prescribed, no particular region or district of country designated for the location of the road, nor any thing relative in its character, requiring it to be constructed, (as in the case of the canal,) in the valley of the *Potomac.*  A general power only being given to the company to *enter upon, use, and excavate, and to acquire by purchase or condemnation, any land which may be wanted for the site and construction of the road.*  There is no reference to the canal charter,

(which is not mentioned) nor to any of its provisions, or the particular region within which the canal is required to pass, and must be made, if at all ; but upon the face of it, it is perfectly compatible with the canal charter, and it is only by the practical application of it, under the construction contended for, that any interference is produced.

On the 16th of May, 1825, the day on which the *Potomac Company* gave its assent to it, the act to incorporate the *Canal Company* became a public law of the State, though not at that time operating as a grant, not being then accepted. The act of the 6th March, 1826, *ch.* 180, for the promotion of internal improvement, in which a company called *The Maryland Canal Company* is incorporated, to make a canal "from some convenient point on the *Potomac* river, intersecting or continuing the *Chesapeake and Ohio Canal* to the city of *Baltimore*," gives authority to the treasurer, to subscribe for the stock of the *Chesapeake and Ohio Canal Company*, to the whole amount of the stock of the *Potomac Company* held by the State, and of the debt due to the State by that company, and of half a million of dollars besides.

Thus recognizing the act to incorporate that company as a subsisting law in all its integrity, vesting her capital to a large amount in its stock, and treating it as part of a more extended scheme of internal improvement—and by the provision for a canal to be made by the *Maryland Canal Company*, "from some convenient point on the *Potomac* river, *intersecting*, or *continuing* the *Chesapeake and Ohio Canal* to the city of *Baltimore*," plainly indicating the understanding and intention, that the *Chesapeake and Ohio Canal* should be made on the *Maryland* side of the river : otherwise it could not be intersected or continued to *Baltimore*, by the *Maryland* canal. The act of the 8th of March, 1826, *ch.* 200, giving permission to the State of *Pennsylvania*, to connect a canal or rail way with the *Chesapeake and Ohio Canal*, again recognizes it, as a subsisting law. The act of the 5th of February, 1827, *ch.* 78, to amend the act, to incorporate the *Canal Company*, requiring by the 4th sec-

tion, in order to give it validity, that it should receive the assent of the legislature of *Virginia*, of the *Congress* of the *United States*, and of the *Potomac Company*, styling them in the first section necessary parties; and declaring in the 3d section, *that nothing in that act, shall be held to discharge the company from a compliance with each and every of the conditions of the original act, except so far as they are expressly altered by the provisions of that act*, which only relates to a part of the canal above *Cumberland*, not only treats it as a law in full force, but as a favorite measure of the State, and exacts from the company whenever it should come into existence, a rigid compliance with all its provisions; and on the 28th of February, 1827, the rail road charter was passed.    Now is it to be believed, that on the 28th of February, 1827, the legislature intended by the rail road charter, to repeal any part of the canal law, which had been up to that time, so recognized and fostered by the State, and to the stock of which, considerably more than half a million of the State's capital funds had been authorised to be subscribed; or in any manner to abrogate, alter, limit, or restrict, or to authorise any interference with any of its provisions? On the contrary, is it not manifest, that the legislature had no such intention ? Can it be, not only that the legislature, but the same body of individuals, who, on the 5th of February, 1827, had, in the act to *amend* the canal law, declared that it could not be done without the assent of the legislature of *Virginia*, of the *Congress of the United States*, and of the *Potomac Company*, as necessary parties, even for the purpose of enlarging the powers of the contemplated company, and had also required a strict and full compliance with all the provisions of the law except as therein altered, intended on the 28th of the same month, only twenty-three days afterwards, and at the same session, by its own separate and independent act, *proprio jure*, to repeal any part of that law, or to limit or restrict any of its provisions, or authorise any obstruction to the exercise of any of the rights or powers originally intended to be conferred by it, whereby the ca-

nal might either be arrested altogether in its progress, or
driven from the State : which, so far as *Maryland* is con-
cerned, would amount to a virtual repeal of the law ; and
that too, in favor of an institution, the relative value of
which, was not then well understood? If the question
could now be put to the members of the legislature who
passed the rail road charter, whether they had, or not, any
such intention, it cannot be doubted what the answer would
be ; and that, is not an unapt test of the intention.    It was
certainly not the interest of the State, to do any thing to ob-
struct the canal in its progress, or to force it from the State;
nor does it appear that any interference with it, was in the
contemplation at the time, of the projectors of the rail road.
But there are other subsequent legislative acts upon the
subject, showing the understanding and intention of the
legislature.

On the 10th March, 1827, at the same session, and only
ten days after the rail road charter was passed, the canal
law, with all its provisions, was again recognized by the
legislature, in the supplement to the act for the promotion
of internal improvement, *chap.* 211, modifying, by the first
section of it, the condition on which half a million of dollars
had before been authorised to be subscribed to its stock, and
continuing the authority to subscribe that amount; which
would hardly have been done, if the legislature had under-
stood that only ten days before, they had by the rail road
charter, authorised such an interference with the location
of the canal, as might have the effect to force it from the
*State of Maryland,* or destroy it altogether.    The act of
the 2d January, 1828, further to amend the canal law, re-
quiring the assent of *Congress,* of the legislature of *Vir-*
*ginia,* &c. was not only a further recognition and affirmance
of all its provisions, except as thereby intended to be alter-
ed; but by requiring the concurrence of *Virginia, Con-*
*gress,* &c. whenever it was intended directly to alter the
law in any particular, furnishes strong evidence, that they
did not intend when passing the rail road charter, indirect-

ly to alter or repeal any part of the canal law. On the 3d March, 1828, by a supplement to the act for the promotion of internal improvement, *ch.* 104, authority was given to the treasurer, to subscribe for five thousand shares of stock in the *Baltimore and Ohio Rail Road Company;* and on the same day, and immediately following, authority was given to the treasurer, by a further supplement to the same act, *chap.* 105, to subscribe for the same number of shares of the stock of the *Canal Company,* reciting the importance it was of to the State, *effectually to secure the completion of the work,* if ever commenced. What work? Surely the canal, as provided for by the terms of the law. Thus, two supplements passed on the same day, treating the two contemplated works, as branches of the same general system for the promotion of internal imnprovement, and giving a preference to neither; but extending the same aid to each, by subscribing equally, to the stock of both. Those various, precedent, concomitant, and subsequent acts, demonstrate the intention of the legislature to have been, not that the rail road charter should repeal the canal law, or any part of it, or that the rail road should displace the canal; but that the law to incorporate the *Canal Company,* and all its provisions should remain in full force. With this manifest intention of the legislature, in the absence of any express, or necessarily implied repeal of the express provisions of a prior law, and with no plain and unavoidable repugnancy between the two laws, the rail road charter ought to be so construed if it can be done, as that both may stand, and the intention of the legislature be gratified—and not so, as by the practical application of it, to defeat the intention of the legislature, if by a reasonable construction it can be avoided. A construction of the rail road charter, that would have the effect to obstruct the route of the canal along the valley of the *Potomac,* on the *Maryland* side of the river, would be a virtual repeal of the *Maryland* law; since if it cannot be enforced here, it can be enforced nowhere—which was clearly not intended by the legislature, but would be the effect of con-

struing the words *any land,* used in the rail road charter, according to their most comprehensive and extended sense, as contended for on the part of the *Rail Road Company;* as *any land,* would embrace any land in the State, whether in the valley of the *Potomac* or elsewhere, and under any circumstances. But if construed in a more limited sense, and so as to entitle the *Rail Road Company* to occupy with the road, any land not required for the practical operation of the prior law, both may stand according to the intention of the legislature, made evident by the general and uninterrupted course of legislation, in relation to them, at every session from the date of the canal charter, to the time of the institution of this suit; and especially, in their avoiding to make any *amendment* of the canal charter, without the assent of *Congress,* the legislature of *Virginia,* &c. (and much less therefore, would they have intentionally repealed it,) and in authorising subscriptions for an equal amount of stock in both, and constituting them independent branches of a great system of internal improvement. And that construction should be given to the rail road charter, the construction of the *road* in the valley of the *Potomac,* not appearing to be necessary, to the full execution of the charter; and the *road* not being *required* by the charter to be made in that region—whereas the *canal* is not only required to be made in the valley of the *Potomac,* but according to the proof in the cause, can be made nowhere else, and if not made on the *Maryland* side of the valley, cannot be made at all under the *Maryland* law, viewed as a mere separate and independent charter of this State, without reference to the law of *Virginia:* which as such, could not authorise the construction of it, any where but in *Maryland.* And as the validity of the *Virginia* law, is made by its terms to depend upon the concurrence of *Maryland,* if the canal charter, as a law of *Maryland,* was repealed by the rail road charter, and the assent of the State to the *Virginia* law thus withdrawn, the whole charter thereby became inoperative and void. But by construing the words of the rail road charter,

in the sense suggested, full effect will be given to both charters, and the faith of the State preserved unimpaired, which it was never the intention of the legislature to violate ; and if no other construction could be put upon the words of the rail·road charter, than that contended for on the part of that company, the use of those terms, would clearly have been a mistake on the part of the legislature.

It would be doing injustice to the legislature, to suppose that they intended to start those two great companies on a race, for the, ground best suited to their respective purposes, with a stake of half a million of dollars on each, by which the State might lose a large amount; in the event of one, being obstructed in its progress by the other, with no prospect of gain, instead of sending them forth, each to pursue its own independent course, without any interference or conflict with the other.    It has been urged in argument, that the proviso in the supplement to the act for the promotion of internal improvement, to the subscription authorised to be made to the stock of the *Rail Road Company*, that the company "shall agree so to locate said road, that it shall go to, or strike the *Potomac* river, at some point between the mouth of the *Monocacy* river, and the town of *Cumberland,* and that it shall go into *Frederick, Washington,* and *Alleghany* counties," shows the intention of the legislature to to have been, to authorise the *Rail Road Company* to make the road in the valley of the *Potomac*, notwithstanding the provisions of the canal charter, if they could first appropriate ground in that region for the route of the road.    But it will be remarked, that, that proviso is no part of the charter of the *Rail Road Company*, and was only a condition, upon which the stock of that company was authorised to be subscribed for, on behalf of the State, and whatever might have been the object of the legislature, in annexing that condition, it cannot have the effect to show, what was the original intention of the legislature at the time of passing the rail road charter, and to overthrow all the legislative evidence, that is exhibited, of a different intention.    Nor ought a

mere condition, on which the legislature thought fit to sub-
scribe for stock of the *Rail Road Company*, with nothing
more, to have the effect to repeal the canal charter. And
the requiring as a part of the condition, that the road should
"go into *Frederick*, *Washington*, and *Alleghany* counties,"
was not to require that it should pursue the course of the
river : since it might go into all those counties, without
pursuing the course of the river, even after going to it; and
with more advantage to those counties, (which it would
seem to have been the intention of the legislature to bene-
fit by the condition,) as a road passing through their inte-
rior, would necessarily diffuse more general benefit and
convenience, than one, merely running along their borders.
It is possible, that the legislature did entertain doubts
whether the canal would ever be commenced ; no company
having then been formed ; and that under the influence of
such doubts, they annexed to the subscription to the stock
of the *Rail Road Company*, the condition that the road
should go *to the river;* not for the benefit of that company,
but in order to diffuse as widely as might be, the advanta-
ges to the community of that institution. But with no in-
tention to prevent either the commencement, or completion
of the canal, by requiring the road to be constructed along
the borders of the river, to the exclusion of the canal. And
that is not the meaning of the condition, as is sufficiently
shown, by the recital in the immediately following supple-
ment to the same act, of the importance to the State, of
"*effectually securing the completion of the canal, if ever
commenced;*" which conclusively evinces the determina-
tion of the legislature, that the canal, if ever commenced,
should be completed according to the provisions of the
charter, without hinderance by any other institution.
Moreover, exclusive of subscriptions, payable in the stock
and debts of the *Potomac Company*, there had been on the
14th November, 1827, more than a million and a half of
dollars subscribed to the stock of the *Canal Company*, by
individuals and the district corporations, and the amount re-

quired by the charter, paid on each share at the time of
subscription, whereby extensive interests and incipient
titles had been acquired, and the public faith pledged, that
each subscriber should hold and enjoy his stock upon the
terms and conditions expressed in the charter, and on which
he had subscribed and paid his money,—after which, it was
too late, consistently with good faith, to alter the terms and
conditions of subscription; or in any manner to lessen the
value of the stock, or vary the condition or interest of the
subscribers, without their knowledge or consent. Under
such circumstances, with the subscription books still open,
and an invitation held out to all the world, under the au-
thority of the State, and by the charter, to come in and sub-
scribe for stock according to its provisions as they then stood;
and there being also, then pending in *Congress*, a bill for a
subscription to the amount of a million of dollars to the ca-
nal stock, it is not, and cannot be believed, that the legisla-
ture intended on the 3d March, 1828, by the proviso annex-
ed to the subscription to the rail road stock, to authorise
and require that company, so to locate, and construct the
road to the *Potomac* river, and along the valley, as either
to arrest altogether the progress of the canal, or force it out
of this State into *Virginia;* or in any way to limit and
restrict the provisions of the canal charter; or do more,
than to provide as far as it could be done, for the event of
the failure of the canal scheme, which might have been ap-
prehended; but which, the *same* legislature, immediately
afterwards on the *same day*, and by a further supplement
to the *same act*, which together, are to be taken and con-
strued as one law, manifested a determination to prevent, by
authorising a subscription of half a million of dollars to the
canal stock, on such conditions, (in their own language,) "as
would effectually secure the *completion* of the work, if
*ever* commenced," which is wholly at war with any inten-
tion to repeal the canal charter, or to abrogate or restrict any
of its provisions; or to *require* or *authorise* the *Rail Road
Company* to *obstruct* or displace the canal, by being *the first*

to acquire title, by purchase or condemnation, &c. to any land in the valley of the *Potomac,* deemed necessary for its route and construction.

The acts of the legislature of *Maryland,* passed on the 22d Feb. 1831, and of *Congress,* on the 2d March of the same year, have been pressed in the argument on the part of the *Rail Road Company,* but do not seem to have any bearing upon the question involved. The former being "an act to promote internal improvement, by the construction of a rail road from *Baltimore* to the city of *Washington,*" and only authorising the construction by the *Baltimore and Ohio Rail Road Company,* of a rail road from some convenient point on that part of the *Baltimore and Ohio Rail Road,* which had then been constructed, and was in use, not exceeding eight miles from the city of *Baltimore,* to the line of the State, adjoining the *District of Columbia,* in a direction towards the city of *Washington.* With no relation whatever, to a location of the *Baltimore and Ohio Rail Road* in the valley of the *Potomac,* which is in a different direction, and far beyond the point on that road, from which the proposed road from *Baltimore* to the city of *Washington,* is authorised to be constructed, and not in the remotest manner tending to sanction such a location of the *Baltimore and Ohio Rail Road,* or to show the original intention of the legislature to have been, to repeal any part of the canal charter, or to authorise the *Rail Road Company* so to locate that road, as to obstruct, or in any manner interfere with the passage of the canal, along the valley of the *Potomac,* upon the *Maryland* side of the river. The making the contemplated road from *Baltimore* to the city of *Washington,* not being dependent upon, and having nothing to do with the question, whether the *Rail Road Company* has or not, a right to construct the *Baltimore and Ohio Rail Road* in the valley of the *Potomac,* but may be made whether that right exists or not, and without any reference to it; and even, although the rail road never should be completed to the valley of the *Potomac.* Just as well may

any law, which may hereafter be passed, for making branches from any part of the rail road that is completed, be said to show the intention of the legislature to have been, to confer upon the *Rail Road Company* by its charter, the right to exclude the canal from the valley of the *Potomac*, by first occupying the ground, as can the act of this State, of the 22d February, 1831. And the act of *Congress*, of the 2d March, 1831, does no more than merely to authorise an extension "into and within" the *District of Columbia*, of the road proposed to be made by that act; without any reference whatever, to the chartered rights of either the *Rail Road* or *Canal Company*, in relation to the occupation of the valley of the *Potomac*, or to any sanction, express or implied, of the claim set up by the *Rail Road Company*.

There were several minor questions discussed at the bar, which in the view that has been taken of the subject, it is not deemed necessary to examine. It may however, here be proper to remark, that had our minds been in a state of equipoise, the decree of the Chancellor, whose argument we regret not having seen, would have been affirmed; there being no appeal from a decree of reversal. But not entertaining that degree of doubt, which would alone justify a decree of affirmance, we should be unworthy of the trust reposed in us, if we were to shrink from the faithful discharge of our duty, only to commit the decision of the the cause to another tribunal. These observations are elicited, by our having been reminded in the course of the argument, that in the event of a decision against the claim of the *Rail Road Company*, there could be no appeal; which we regret, but cannot honestly avoid the consequence.

The decree of the Chancellor is reversed, and the bill dismissed with costs.

EARLE, and STEPHEN, J. concurred.


ARCHER, J., dissented, and delivered the following opinion:

A collision having arisen between the *Rail Road* and *Canal Companies*, in the designation of a route for their improvements, a removal of the difficulty is sought in the judgment of this court, in the exercise of its appellate, equitable jurisdiction.

The solution of these difficulties will be found in the determination of the legal priority, which one company may have over the other, and in the examination of their respective equities.

The canal claims priority over its rival company upon the ground, first, of her *derivative* rights arising by assignment from the *Potomac Company*, and secondly, from her *original* rights springing from the law which created her. These pretensions shall be severally examined. In their investigation, the comparative rights of the *Rail Road Company* will be necessarily reviewed.

1st. The *derivative* rights of the *Canal Company* will be first examined.

Without any particular reference to the laws in relation to the canal, it may be generally stated, that these gave to the *Canal Company*, the right of receiving from the *Potomac Company*, the surrender of its charter, and an assignment of all its rights and privileges, and the right to hold, use, possess, and occupy the same, to the same extent as the *Potomac Company* at the time of the surrender held them. The *Potomac Company* did accordingly, on the 15th August, 1828, execute its deed of surrender of the charter and rights above referred to.

This charter of the *Potomac Company* was granted in the year 1784, long anterior to the *Rail Road Company*, and if it was possessed of rights and privileges, which were interfered with by the rail road charter, its assignee, the *Canal Company*, must be protected in their enjoyment, as it would not be competent for the legislature, to disturb by her subsequent action, rights vested in pursuance of her anterior grant.

An attentive examination of the charter of the *Potomac Company* then becomes necessary, for the purpose of ascertaining her powers, rights and privileges. If this company had originally no power of making a continuous canal, or in consequence of lapse of time, had lost the power of acquiring land on the river, to make her improvements, no rights which she possessed, or property which she enjoyed, are at all interfered with; the *Rail Road Company* not seeking to disturb its works heretofore erected, or to interfere with the navigation of the river, by its locations, but desiring only to pursue its unoccupied margin.

If it were legitimate to look beyond the laws creating this corporation, to discover the designs of the legislative body, in its creation, they would be observed in a light too glaring to escape the dimmest vision. Previous to December, 22, 1784, commissioners had been appointed by the States of *Maryland* and *Virginia*, to confer together on the subject *of opening* and *improving the navigation of the Potomac river*, and, on that day, they proceeded to consider the subject referred to them, and came to a variety of resolutions recommendatory to their respective principals. Some of these will be adverted to.

"That it is the opinion of this conference, that the *removing the obstructions in the river Potomac, and the making the same capable of navigation*, from tide water, as far up the north branch as practicable, will increase the commerce of *Virginia* and *Maryland*."

"That it is the opinion of the conference, that *the proposal to establish a company* for opening the river *Potomac*, merits the approbation of the two States."

"That it is a general opinion that *the navigation on the Potomac may be extended* to the mouth of *Stony Run*."

"That the States appoint skilful persons *to view, and accurately examine and survey Potomac*, from *Fort Cumberland* to the mouth of *Stony* river, and the river *Cheat*, from about the *Dunker* bottom to the present navigable part thereof, and if they judge *the navigation can be extended*

*to a convenient distance above Fort Cumberland,* that they may from thence survey, lay off, and mark a road to *Cheat* river, or continue the same to the navigation, as they may think will most effectually establish the communication, between the said eastern and western waters."

The object and intent of this conference was manifestly not to *canal* the river, but to render *its bed* navigable, for it speaks constantly of making the *river navigable*—how ? by canalling ? no, but by *removing obstructions* in it. The great object was, to produce a communication with the western country, not by a canal, but by the conjoint means of the *river itself,* whose navigation was to be made passable by clearing its obstructions, and by roads across the ridges of the *Alleghanies,* to certain designated navigable waters of the west. Out of the results of this joint commission, grew the charters granted by the respective States to the *Potomac Company,* passed immediately after the labors of the commission had closed, and it is remarkable how closely the States pursued the recommendation of their commissioners. The great agent which each created, for effecting this object, so strongly recommended, of improving the *navigation of the river,* was the *Potomac Company.*

But if we cannot look at the anterior proceedings of the States, to fix their designs in the creation of the charter of the *Potomac Company,* even where the charter is not inconsistent with the intent thus indicated, and it may be well assumed, that the charter is the only legitimate index of the legislative intent—then, it is just as clear, that the design of the charter, is identical with the designs as expressed previously by the commissioners, with this exception, that the States foresaw, that there existed impracticabilities in the removal of obstructions, in particular places or passes of the river, arising from *falls,* which might render occasional canalling necessary.

Let us examine, with some minuteness, the provisions of this grant, that we may be enabled, the more clearly to discern its character.

Both the charters of *Maryland* and *Virginia,* as regards this question are identical.

The title explains the whole scope and object of the law. What is it? "An act *for opening and extending the navigation of the Potomac river.*"

Now let us refer to the recital—"Whereas *the extension of the navigation of Potomac river* from tide water to the highest point practicable on the *north branch,* will be of great public utility, and many persons are willing to subscribe large sums of money to effect so laudable and beneficial a work ; and it is just and proper that they, their heirs and assigns, should be empowered to receive reasonable tolls, forever, in satisfaction for the money advanced by them in *carrying the work into execution,* and the risk they run."

Thus we perceive, that the *preamble,* like the *title,* looks constantly *to the river,* whose navigation is to be improved— and the *opening of its navigation, as the work which is to be accomplished.* But the preamble proceeds : "And whereas *it may be necessary* to cut canals and erect locks" (*not a continuous canal, but canals*) and other works on both sides of the river, and the States, impressed with the *importance of the object,* are desirous of encouraging so *useful an undertaking :* Therefore, &c." Now, what undertaking is here referred to? Is it not that which had been previously referred to—*the opening of the navigation of the river?* and can the word canals be tortured to mean one continual canal? On the contrary, does it not obviously pre-suppose that the river, in some places, may be innavigable even by art, and that hence, in such places there may exist a necessity, in order to preserve a continuity of navigation, that such barriers should be avoided by canals, otherwise the great work of *opening and improving the navigation of the river* might have been defeated.

The 9th section more clearly specifies this power of *cutting canals,* and in *express* terms defines and declares the object of such a grant. The following is the language,

"That for and in consideration of the expenses the proprietors will be at, not only, in cutting the said canals *for opening* the *different falls of the said river*, and in improving and extending the navigation thereof, the canals and profits are vested in the proprietors in fee, it is deemed real estate exempt from taxation, and they declared to be entitled to tolls." Thus the canals authorised to be cut, are declared "*to be canals round the falls of the river,*" and the legislature here distinctly recognise two objects within the grant. 1. *The cutting of canals round the falls;* and 2dly, the *improving and extending the navigation of the river itself.* For this section, as we have seen, says the company will be at expense in cutting canals round the falls, and in improving and extending the navigation of that river : thus all idea of one continuous canal is not only impliedly repudiated, but is without the express terms of the grant—for a river navigation is looked to where not impeded by falls, and where falls interfere, canals.

The 10th, 17th, and 19th sections, are in furtherance of the same construction, and will justify no other.

The 10th section enacts, "*that the said river,* and the works to be erected thereon, in virtue of this act, when completed, shall forever thereafter be esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities or produce whatsoever, *on payment of the tolls imposed by this act.*" Now, if it was designed, that the *Potomac Company* should make one continuous canal, and abandon the improvement of the bed of the river, it is inconceivable that the company should have been permitted to retain the right of collecting tolls, for the transportation of produce down *the channel of the river.* Because, instead of improving its navigation, so as justly to render those who passed down it liable to a toll, it had abandoned the river, by making a continuous canal, and had, by abstracting thereby so large a quantity of water from its current, in all probability lessened the value of the stream itself to the public, as a navigable river. Instead of a continuous canal

having been in contemplation, this section clearly shows, that the improvement of the river and canals as before, were contemplated, because tolls are imposed on produce passing down *the river and the works thereon,* and the *river and the works thereon* are declared to be a public highway.

The 17th section is also perfectly explicit, where it declares, that *"the Potomac Company* shall make *the river well capable of being navigated in dry seasons, by vessels drawing one foot water."* Now a continuous canal would have a tendency, by *lessening* the quantity of water in the river, to defeat this express requisition—that of making the *river* navigable in dry seasons. And the 19th, pursues the same object, and is illustrative of the same design. "Be it enacted, that all the commodities which may be transported on the canals and river, may be landed and sold, subject only to such impositions as the like goods are liable to, in the state where landed." Here the transportation of goods *down the river* is spoken of, and also through the canals. What canals? Why the canals spoken of in the 9th section; *"the canals round the falls."*

Thus the title, preamble, the whole scope and object of the grant, all the sections adverted to, refer distinctly and explicitly to the improvement of the bed of the river, unless where that is rendered impracticable by falls, and then, they were to canal. Thus their powers are clearly limited and defined, and they would have possessed no power to make a continuous canal, and consequently were destitute of all power to condemn land for any such purpose.

All the sections of the charter having any reference to this branch of the subject, have been adverted to, except the *fourth* section, and having thus ascertained the general scope and object of the legislature, and what it is, that this company was incorporated for, I shall advert to that section. "The company shall have power and authority to agree with any person, or persons, to cut such canals, and erect such locks, and perform such other works, as they shall judge necessary, for opening, improving, and extend-

ing the navigation of the said river above tide water, to the highest part of the north branch to which navigation can be extended, and carrying on the same from place to place, and from time to time, and upon such terms, and in such manner as they shall think fit." It is upon this section, that the *Canal Company* insists, that powers were imparted to the *Potomac Company*, to make a continuous canal. Now, whatever power this provision might, if it stood alone, be supposed to grant, it must be admitted, that its phraseology is capable of being controlled by the scope and object of the law, to be deduced from its provisions generally. Thus, when it is said, they may perform these works *from time to time*, this would seem to give them an unlimited range. But the words from time to time must be controlled, and governed, by the limitation assigned in their charter, for the completion of their work. Again, when it is said, these canals, locks, and other works, are to be done *in such manner as the company shall think fit*; this generality of expression must be restricted to canals and locks, of such size and dimensions, as might be prescribed in other sections of the law; and so when the general power is given to make such canals as they may deem necessary, it means such canals as are spoken of in the 9th section, *"canals for opening the falls of the river."* It is not my intention to assert, that they were confined in their power to make canals, to the *Great* and *Little Falls*, but had a general power to make a canal around any falls of the river, which impeded its navigation. But in the exercise of their judgment, of what canals were necessary, they were restricted to the making of them only where falls existed; and it would have been a perversion and evasion of the law, to have *made either* a continuous canal, or a canal where no falls existed, or no impediment existed in the navigation of the river *by its natural course.* It is no answer to this, to say, that a continuous canal would better have subserved the public interests, and better have gratified the wishes of the legislature, by giving certainty and safety to the transportation of

produce from the north branch to tide water; for the legislature have not chosen to say so, they desire alternate river and canal navigation; they desire the river to be opened and improved, and the difficulties interposed by falls, surmounted by canals. And having intelligibly impressed these dispositions on their grant, a court of justice should give it efficacy as they find it; and has no power to do any thing else. They must expound the grant, and not frame one, because they might perchance think, that a grant thus judicially framed, would better subserve the public welfare.

The same construction which is above given to the *Potomac* charter, has from its very organization, been given to it by the parties interested, by the States of *Virginia, Maryland,* and the *Potomac Company* herself. At November session, 1797, that company stated, that they had *removed most of the obstructions in the Potomac river, from Savage river to tide water,* that they had erected locks at the *Little Falls,* and made a canal at the *Great Falls,* but had not completed the locks thereat; whereupon the legislature authorised that company to receive tolls, conceiving that their great scheme of improvement, as contemplated by the charter, had been so far advanced, as to justify the grant of liberty to take tolls. And the legislatures of the two States, go on from time to time, *Maryland,* for the period of twenty-nine years, in extending time to the *Potomac Company* to complete the navigation of the *Potomac* river; thereby recognising the mode of improvement pursued, as the proper mode, and the construction put upon the law as the true one; and *Virginia* has even gone farther, and has extended the time for thirty-six years, from the passage of the law. And as if to give greater efficacy to what has been done, and to confirm, if it wanted confirmation, that the construction was strictly according to the charter, *Maryland,* by her law of 1802, *ch.* 84, declared "that *the object contemplated by the act of Assembly, for establishing a company for opening and extending the navigation of the*

*river Potomac, had been accomplished.*" Again, in the act of 1786, extending the time to the company, for completing the navigation, the legislature declare that their reason for the enactment of the law was, " that the two last summers had been so unfavorable to the work of making and improving the navigation above the *Great Falls*, in the *Potomac river.*" We may easily imagine, how much the occurrence of freshets in the river, would interfere with the works of a company which had to make the river navigable in dry seasons, by clearing out obstructions; but if their business and duty had been to make a continuous canal, there must have been the occurrence of two very unusual and extraordinary summers, to have been pronounced by legislature so very unfavorable to the digging and construction of a canal. The act of 1790, *ch.* 35, which authorised the company to apply the tolls, received for the improvement of the branches of the river above *Seneca*, contains this provision, "Provided that no such application shall be made *until the main river, from tide water, is cleared to Fort Cumberland.*" Here the main river is spoken of. It is to be made navigable not by a continuous canal, but by *being itself cleared.* And by an act passed in the year 1814, being a supplement to the charter, power was given to the *Potomac Company* to acquire lands, contiguous to the canals and locks on the river, by purchase, compromise, and exchange, but with the proviso, "*that the said company shall not, at any time, hold more than one thousand acres of land in this State.*" Notwithstanding the general power to purchase land contiguous to their canals, all the land they are to hold, both that which is occupied by their canals, and such as they should purchase contiguous to them, was not to exceed one thousand acres. With this express limitation, who will or can say, that it ever was intended to grant any power, to make a continuous canal from *tide* water to the highest practicable point on the north branch, a distance of from one hundred and twenty to one hundred and fifty miles, and considerably more,

following the sinuosities of the river. A moment's calculation will show, that instead of being able to purchase any land contiguous to their canals and locks, one thousand acres, the extent of their power to hold, would have been exhausted, before they could have reached half the distance from tide water westwardly, with a continuous canal.

Thus, whether we look to the charter itself, or to the practice, acts, and understandings of the parties under it, its exposition is freed from all doubt; and clearly, there was at no time power to make a continuous canal, and it was never so thought, or understood, by the parties or either of them.

The right of the *Potomac Company* to condemn lands, has long since ceased, not by any forfeiture of its charter, but by limitation of time. In speaking of this limitation, it is only meant to refer to the right of condemnation, along the disputed and contested territory. It may still possess the right to condemn land, from the town of *Cumberland* to the highest place to which navigation is practicable, on the north branch of the river, unless the company accepted some of the amendments of the charter; for between those two designated points, there seems to have been no limitation of time in the original law, with regard to its powers in this respect. But from the town of *Cumberland* to tide water, *Maryland* had bound her to complete her works by the 1st January, 1813, from *Great Falls* to the town of *Cumberland*, under the following penalty, "that it should not be entitled to any benefit, *privilege*, or advantage under her charter, and from the *Great Falls* to tide water, under the penalty of a forfeiture of all her rights to tolls, and all her preferences to a navigation of the river." And it was under the same obligations, and liable to the same penalties under the *Virginia* charter, except that, by that, and its supplements, it had the time extended until the 1st January, 1820. Now it so happens, that the very portion of the river, and its contiguous country, now in litigation, from the town of *Cumberland* to the *Great Falls*, is the subject of this limitation. Whether the right to condemnation still continued

in the company, higher up than *Fort Cumberland*, we are consequently not concerned to inquire.

The continuation of the company, notwithstanding the limitation of time, for the exercise of its ordinary franchises, even if it had not completed its object, there never having been any process in a legal tribunal for vacating its charter, is not the question presented for consideration ; but the question is this, could that company, after the time limited, exercise its *extraordinary power of condemning land*, whether its works were or not completed.

The power of condemning land, and appropriating it for the use of the company, was a high attribute of sovereignty, was in derogation of the rights of the citizens, and ought to be construed rigidly, and made subject, in the strictest degree, to all the limitations imposed upon it by the sovereign power; and denying to it this power, when the question comes collaterally, or incidentally into litigation, in a court of justice, in no manner affects the common and ordinary franchises of the corporation, but leaves them all subsisting, to be exercised in their accustomed mode, until there shall be a regular judicial forfeiture, while at the same time, every citizen has it in his power to guard himself against the illegal seizure and appropriation of his land, and is not called upon to solicit the intervention of the sovereign power to establish the fact of a forfeiture of franchises, before he could hope for a vindication of his rights.

We accordingly see the parties to this grant, constantly acting upon this principle. The *Potomac Company* never seeking the passage of laws denying the right to have their charter forfeited, but asking time to extend their works in the mode pointed out by the laws, and neither the company, nor the legislature, ever looking back to periods *of* time which had elapsed, not covered by any of the laws extending the time, but always forward to the exercise of those powers conferred by their charter, which would be necessary to enable them to complete the work they had undertaken.

If the company failed to complete her works from the *Great Falls* to *Cumberland*, in the language of the 17th section, she was no longer entitled to her *privileges*, one of which was, the purchase and condemnation of land within those limits; and a title, either by the one mode or the other, would have been just as unavailable, as it would have been, had the charter declared, that the title acquired at such a time, and under such circumstances, should be void, and the company might at all times have been restrained by a court of equitable jurisdiction, from the acquisition of title by such means, after the time limited by the law, had elapsed.

And if she had on the contrary, completed all the objects in the contemplation of the legislature by that charter, within those designated points, it cannot be contested, with success, that they nevertheless still retained the power of condemning lands.

That these works had been completed in view of all parties, is not to be disputed against a clear, legislative, declaration to that effect. The original charter only author-ised the exaction of tolls, upon their completing the extension of the navigation from *Cumberland* to the *Great Falls*, and from those falls to tide water. In 1802, *ch.* 84, the legislature of *Maryland* passed a law with the following preamble:—"whereas the object contemplated by the act of assembly, for establishing a company for opening and extending the navigation of the *river Potomac*, has been accomplished,"—and then enacted, that she should take the tolls as originally prescribed, thereby recognizing in the fullest and clearest manner, the entire completion of the work, at least within the designated points. To fulfil its engagements then to the public, the *Potomac Company* had nothing further to do, for she had the declaration of the highest functionaries of the State, that she had performed them. The act of 1809, further extending the time, furnishes no argument against this view, because, although the company had completed her work, she may have desired the re-establishment of her former powers, which are by this law

admitted to have expired, for the purpose of rendering more perfect her works, for her own profit and advantage.

If then, she had completed all the works assigned her by the charter to perform, for what purpose should the law repose in her, for an indefinite period, the power to condemn lands, or why should she retain those powers for a moment beyond the period assigned?

For what purpose was the power to condemn, granted? The 11th section informs us—"And whereas it is necessary for the making the said canals, locks, and other works, that a provision should be made for condemning a quantity of land for the purpose"—therefore the power is given.

Now, if all the canals, locks, and other works, are made and completed, and we have the legislative declaration that this was done, where the necessity for the existence of the power, and did it not, by the terms of the grant expire with the accomplishment of that, which it was intended to effect? Argument cannot make this proposition plainer, or carry greater conviction to the mind of its truth, than its mere statement.

But it is said, the company had a right to adopt one mode of improvement, then abandon it, and commence, and prosecute another. That she might make canals where none were made before—let this be admitted. Still she must execute all these powers within the limited time prescribed by the charter, otherwise, she is transcending the powers granted.

It therefore appears, that the *Potomac Company*, having no powers at the date of her assignment, to make a continuous canal, or to condemn land, could confer no rights or privileges to the *Canal Company*, its assignee, which could give it a priority over the rail road, or any right against that company, which only takes the unoccupied margin of the river.

The *Canal Company*, possessing no derivative rights to priority over the *Rail Road Company*, as we have seen,

plants herself upon her own original charter, and claims, that it gives her a precedence.

This brings us to the consideration of *the original rights of the company*.

This claim, it is said, is fully supported, whether the *Canal Company* be considered as obtaining her grant from the State of *Maryland* alone, or from the *United States, Virginia,* and *Maryland*.

These claims will be separately examined.

Let us first suppose the grant to be from *Maryland* alone, unaffected by any compact with other States.

At what time did the law of *Maryland* go into operation? At what time was the *Canal Company* incorporated? To what period had it relation?

After having severally examined these questions, for the purpose of fixing a day, on which the rights of the *Canal Company* came into being, it is proposed, to examine the course of *Maryland* legislation, anterior to the date which shall be thus ascertained, and to determine its character and validity, as affecting the rights and interests of the parties.

1. At what time did the law of *Maryland* go into operation?

The State of *Virginia,* in her first law, by its 21st section, had reserved to the States, the right within their respective territories, of tapping the canal by any canal they might think proper to construct; and had made her whole act to depend upon the following proviso: "Provided that before this act shall take effect, the *Congress* of the *United States,* shall authorise the States of *Maryland* and *Virginia,* or either of them, to take and continue a canal from any point of the above named canal, or the termination thereof, through the territory of the *District of Columbia,* or any part thereof, to the territory of the said States, or either of them, in any direction they may *deem* proper, upon the same terms and conditions, and with all the rights, privileges, and powers of every kind whatsoever, that the company have, to make the *Chesapeake and Ohio Canal,*" with

this additional proviso: "that in taking or extending such lateral canals through the *District of Columbia*, no impediment or injury should be done to the navigation of the *Chesapeake and Ohio Canal;*" and the State of *Maryland*, in conforming and assenting to the act of the State of *Virginia*, added this *express condition* to her law, "that the act of *Congress*, contemplated by the 21st section of the *Virginia* act, shall provide some safe and practicable mode, whereby, such lateral canals may be secured to the State of *Maryland*, and whereby, also, it may be determined whether such lateral canals will injure the said *Chesapeake and Ohio Canal*, within the meaning and intention of the 21st section of the *Virginia* act." On the 3d of March, 1828, *Congress* assented to the act of *Virginia*, and enacted as follows: "should the State of *Maryland* or *Virginia* desire, at any time, to avail itself of the right secured to it by the 21st section of the act aforesaid, to take and continue a canal from any point of the *Chesapeake and Ohio Canal*, to any other point within the territory of the *District of Columbia*, or through the same, on application to the *President of the United States* by the executive of the State, the *President* is authorised, and empowered, to depute three skilful commissioners of the *United States'* corps of engineers, to survey and examine so much of the route of such canal as may affect, in any manner, the navigation of the *Chesapeake and Ohio Canal*. The said commissioners shall ascertain, as far as practicable, whether the canal proposed to be constructed, will injure or impede the navigation of the *Chesapeake and Ohio Canal*, and report to the *President*, the *facts* and reasons upon which they may ground their judgment thereupon, which report shall be submitted to *Congress* at the session next ensuing the date thereof, *for their decision thereon;* and *if Congress shall be of opinion, that the said Canal may be cut in the manner proposed, as aforesaid, without impeding or injuring the navigation of the Chesapeake and Ohio Canal, the same shall be conclusive thereon.*"

It is perfectly apparent, that the condition above required by *Maryland*, was not fulfilled by this act of *Congress*, for, although, she had generally, given her assent to the law of *Virginia*, she had coupled that assent with a provision, which, at all times, left it in the power of either branch of *Congress*, or the *executive*, to prevent either *Maryland*, or *Virginia*, from conducting a canal through the *District of Columbia*; for whether it was at any time to be made, was to depend upon the fact, whether in the *judgment of Congress* the contemplated canal would injure or impede the navigation of the main canal; which, in other words, was an entire reservation to herself, of granting, or refusing, at any future time, the liberty demanded by the States of *Maryland* and *Virginia*, which, instead of being a compliance with the condition demanded by *Maryland*, that the right to make this lateral canal through the *District*, should be secured to her, was a direct negation of it. For, how could that right be said, in any manner, *to be secured*, which was to depend upon the judgment of one of the parties. *Maryland*, certainly never meant to submit her right, to tap the canal in the *District*, to either branch of the government, but *expressly* desired that *Congress* should *secure it*. How secure it? Why place it beyond the power of any one branch of the *United States'* government to impede, obstruct, or prevent her right? It is apparent, that *Maryland* did not consider the act of March, 1825, passed by *Congress*, as a fulfilment of her prescribed condition, for upwards of a year after the act of *Congress* was passed, that State incorporated a company by the name of the *Maryland Canal Company*, with powers to make a canal through the *District*, from the *Chesapeake and Ohio Canal* to *Baltimore*, and by the same law, authorized the subscription of 5,000 shares in the *Chesapeake and Ohio Canal Company*, but she made that subscription dependent upon the following condition: "that *Congress* should enact a law *expressly securing* to the State of *Maryland*, and to any company incorporated

by her, the right to take and continue a canal from any point of the *Chesapeake and Ohio Canal*, through the territory of *Columbia*, or any other part thereof;" thereby declaring in express terms, that *Congress* had never theretofore complied with the condition, which she had demanded, of *securing to her*, the fulfillment of the condition upon which her assent to the act of *Virginia* had been given; (act of 1826, *ch.* 211, *sec.* 21, an act for internal improvement) and insisting on *an express recognition of it* before her subscription to the *Canal Company* should be valid.    It is true, that at the same session, December, 1826, at which the above demand was made by *Maryland*, she passed a supplement to the canal charter, which in its first section, recited that the act of *Virginia*, had been *assented to by Maryland, and by Congress*.    And it is attempted to be shown from this, that *Maryland* had recognized the fulfilment, by *Congress*, of all the requisitions of her charter.    But *it is* impossible *to give* such a construction to the words *"has been assented to by Congress*," when we look at the character of the condition which *Maryland* prescribed ; at the character of its *attempted fulfilment* by *Congress ;* and the explicit declaration made by *Maryland* at the same session, that she demanded an express fulfilment of her condition.    The words above adverted to, have no reference, by any just construction, to the fulfilment of the condition, but only refer to the general assent given by *Congress* to the act of *Virginia*, without in any manner alluding to the compliance of *Congress*, with the conditions which she had prescribed.    And in confirmation of this idea, we find that *Congress*, looking to the demand made by *Maryland*, on the 23d day of May, 1828, and not until then, passed a law expressly securing to *Maryland*, the right which she had demanded, and complying with the condition which *Maryland* had imposed on the validity of her charter.    Neither the condition prescribed by *Maryland*, nor *Virginia*, had been complied with until that period, for both States required more than the consent of *Congress* to their acts; they required action on the part of that

body; *Virginia* demanded that she should be *authorised by that body to make a canal through the District, possessing all the powers and privileges of the Chesapeake and Ohio Canal Company;* and *Maryland* not only demanded this, but insisted, as an *express condition of her law, that Congress should secure the right.* Yet instead of doing this, although she had in general terms assented to the law of *Virginia,* her consent became qualified, and remained qualified until 24th May, 1828, with such stipulations in regard to the exercise of the right as to confer no authority, except one, dependent upon the judgment and opinion of a future *Congress,* and absolutely secured nothing to *Maryland.*

The general assent given by the act of *Congress,* of 3d March, 1825, by no means gratified the conditions of *Virginia.* She desired a law to be passed by *Congress,* to enable her to make a lateral canal, from the main canal, through the *District,* to her limits. Was this done? Let the first section of the law of *Congress* answer this question. "Be it enacted, that the act of *Virginia* entitled, an act incorporating the *Chesapeake and Ohio Canal Company,* be, and the same is hereby ratified, and confirmed, *so far as may be necessary for the purpose of enabling any company, that may hereafter be formed, by the authority of the said act of incorporation, to carry into effect the provisions hereof, in the District of Columbia, within the exclusive jurisdiction of the United States, and no farther.*" Now, this assent is expressly limited to the right of the *Chesapeake and Ohio Canal Company,* to construct a canal. Not a word is said or intimated as to the right of *Virginia,* to make a lateral canal through the *District.* Indeed this section was not intended by *Congress,* at all, to have any reference to the proposed lateral canal, but the second section exclusively referred to it, and we have seen, that it was no law authorising a lateral canal, but a law pointing out a mode by which some future *Congress, possibly* mght see fit to authorise it.

The conditions then prescribed by the States of *Virginia* and *Maryland*, upon which they had chosen to make their legislation dependent, were never complied with on the part of the *United States*, until the 23d May, 1828, and consequently, on that day, her law had validity for the first time.

2. At what time was the *Canal Company* incorporated?

The 3d section of the charter declares, "that whenever one-fourth, or a gearter part of the capital stock of 6,000,000 of dollars, shall have been subscribed, then the subscribers, their heirs and assigns, shall be, and are hereby incorporated into a company, by the name of the *Chesapeake and Ohio Canal Company.*"

It becomes then important, for the purpose of fixing the date of the incorporation, to ascertain at what period $1,500,000 of the capital stock was subscribed, for it could not, by the express terms of the grant, until that time, have any life and being, for any purpose whatever. On the 14th November, 1827, on the supposition, that the conditions prescribed by *Virginia* and *Maryland* had been complied with by the *United States*, and that the law of *Maryland*, had consequently gone into operation, books were opened by commissioners, and the sum of $416,900, was only obtained of *valid subscriptions;* and upon the 24th day of May, 1828, only $562,700, were subscribed by persons, or corporate bodies, having any authority whatever, to subscribe. It is true, that in addition to those sums, the corporations of *Washington, Alexandria,* and *Georgetown,* had subscribed $1,500,000, but those subscriptions were entirely invalid, not having been authorised by either of their charters, and within the meaning of the act, which certainly looks solely to an effective subscription, were, until some curative law was passed, absolute nullities. Such a law was passed by *Congress,* but not until the 24th day of May, 1828, at which period of time, and not before, the amount of subscribed stock, necessary within the charter, to bring the company into being, was obtained. The 24th day of May, 1828, con-

stitutes the day, then, of the actual incorporation.  If it be said, that the act of *Congress*, of that day, had a retro-active operation, and gave validity to the subscriptions, from the 14th November, 1827, the day on which they were made, so as to give a being to the corporation on that day, the answer is obvious, and is of a two-fold character.  1st.  There could be no subscriptions which could give life to a corporation, until the law existed creating the corporation, and we have just seen, that no law existed on the 14th November, 1827, nor at any period before the 23d May, 1828, for it was on that day, that the *Maryland* and *Virginia* acts went into operation.  *Congress* then, for the first time, having complied with the conditions, upon which those States had thought proper to make their laws dependent.  And 2dly.  If the law of *Maryland*, on the 14th November, 1827, had been an effective law, the act of *Congress* validating the subscriptions, could have no other retro-active operation, than as against the municipal corporations, which it would bind from that day; but it could not operate retro-actively, against the rights of third persons, or bodies corporate, which had come into existence, and been vested, in the intermediate time, between the date of the subscription, and the date of its validation, which we shall hereafter see, would be the effect of such retrospective action, upon the interests and vested rights of the *Rail Road Company*, and its effect upon the legislative power of *Maryland*, would of itself, conclusively show that such a doctrine could not exist.  The charter of *Maryland*, may be considered as a mere offer to incorporate, and until the offer is accepted, according to her intent in making the offer, she may recall or repeal her offer.  Thus, she offers to incorporate, if a sufficient prescribed number of subscribers accept.  No valid subscribers within the intent of the law do accept; she then retains the power to recall the offered grant.  Would it be within the power of *Congress*, by validating those invalid subscriptions, to render null and void all intermediate acts of *Maryland*?  By what provision of her law, has she

thus stripped herself of power? It is to be found no where, and to give a retro-active operation to the law of *Congress*, would clearly defeat the intent of *Maryland*, in the enactment of her law. If this validation is to have this effect, it must be sanctioned by *Maryland* law. A foreign legislative body can give no efficacy, to that, which the domestic law condemns. If this is thought to be correct, and it is not believed to be susceptible of a successful denial, the *Canal Company* had no corporate existence until the 24th day of May, 1828.

3d. To what period had the charter of the *Canal Company* relation?

Does it date its right and powers from the 23d May, 1828, the day on which, we have seen the charter was enacted? from the day on which the stock was subscribed, according to the requirements of the charter? or from the date of the *Maryland* act?

The course of *Maryland* legislation, from the period of the passage of her law, on the 31st January, 1825, until the *Canal Company* became incorporated by the required subscriptions, and by the entire fulfilment of the conditions upon which she had made her laws dependent, are not meant particularly to be adverted to here. They will be particularized, and commented on, hereafter. It will be sufficient, to bear in mind that *Maryland* had incorporated the *Rail Road Company*, and that the company had, anterior to the 23d May, 1828, adopted the contested route, and appropriated considerable portions of it, by actual surveys and locations.

The legislature of *Maryland*, upon the passage of her law, did not profess to give, or grant any thing. She merely declared, that she would grant a charter to make a canal, on certain conditions, whenever they should be complied with, and not before. It was a mere offer then, on her part, to the public, which only became obligatory when it should be accepted, and nothing more.

VOL. IV.—24

*Relation,* in its legal application to deeds, stands on intelligible principles, and is meant to carry into effect the intention of parties, by giving efficacy to such instruments, when they would be, otherwise, without the intended operation.   Apply it here, and quite a different result is produced; the intention of the parties is perverted; what was only intended as an offer, is converted into a contract; that which was intended, and by express terms, to take effect at some distant period, when the terms of the act should be complied with, is made to operate against intention, immediately upon the passage of the law.   The doctrine of relation, it is believed, has never been held to subserve such a purpose.   It is founded always on a principle of equity, and is a fiction of law, introduced for the attainment of justice, and to prevent circuity of action.   Courts of law have applied it to uphold an equitable claim, against a subsequent legal litle.   As in the case of certificates, and payment of composition money, the grant is made to relate back to the date of the certificate, and dates the transmission of the legal estate from its birth, so as to override, and defeat all intermediate grants.   In this, there is the greatest justice and reason, for what could be more unjust or unreasonable, than to permit the highest and clearest equity—an equity arising from the payment of the purchase money, to be defeated by a subsequent grant, merely because it happened to be clothed with legal solemnities.   But in the case before the court, no equity grew up with the enactment of the law, to be proteced by relation.   No effective act was done under the statute, until the *Rail Road Company* had obtained a legal existence, and had given to itself a locality.   Not only was no effective act done, until this event took place, but nothing of any kind was done by any one, through which he could, by any possibility, sustain any injury.   For what purpose then, it may be emphatically asked, should the doctrine of relation be called in?   If its aid is sought, it would here subvert all the rules upon which that salutary fiction of law has been established; it would defeat le-

gal rights, not for the purpose of supporting an anterior equity, but to give a subsequent legal right the preference.

It would be difficult, nay impossible, if the doctrine of relation does exist, and is applicable in the case of *offered* corporations, to say what would be the limitation to it. Twenty years could be no bar, for although that furnishes the ordinary presumption against a right, yet in the case of an *offered* corporation, there are no persons in *esse*, against whom the presumption could operate. The right only begins to exist, when a sufficient quantum of stock is subscribed, and that may be for an indefinite period. In short, the only possible limitation which could exist, would be the arrival of a period, when the inexecution of the law might give rise to the idea, that it had become obsolete, which would in truth extend it to an indefinite period; for courts of justice, it is believed, would hesitate in pronouncing, that from lapse of time alone, a law existing in the statute book, though dormant, and unexecuted through the whole period, had become a dead letter.

In this view of the subject, what would be the result of the application of the doctrine of relation to a subject of the character now before the court? An example will illustrate its evil consequences. A law passes, authorising the formation of an incorporated company, to make a canal from the sources of the *Potomac* to its mouth. It is to date its charter from the time its capital is subscribed, and it has imparted to it the eminent domain of the States of *Virginia, Maryland,* and the *United States,* over the whole country watered by it, or its tributary streams—a district, of at least two hundred and fifty miles square, extending from the *Chesapeake* to the *Alleghany,* and from the highest sources of the *Shenandoah* to the head of the *Monocacy.* Nothing is done to bring this corporation into existence for half a century. Then it unexpectedly springs into life. What are to be the results? Is it to overreach and defeat all intermediately formed canals, rail roads, and turnpikes; or are all these improvements to be absolutely terminated, and this entire region thus

condemned, to forego the advantages of the useful progress of legislation, enlightened by the advancement of science—and for what purpose? to gratify this notion of relation, which was never, even in the dreams of its framers, considered as applying, or at all referring to such a subject. Besides, its deleterious consequences to a whole region of country, its effects upon legislative action, would be novel and extraordinary.

It would deny to the legislature, in the absence too of all contract, its ordinary power, that of enacting and repealing laws, and under the same circumstances, would confide to one legislative body, the power of binding its successors to abstain from all beneficial and wholesome legislation. No principle which could operate this result, can be tenable.

In order to carry back the rights of the *Canal Company* to the date of the law, without regard to the time when the subscriptions were obtained, resort is had to *abeyance*, differing from relation, not in its consequences, but in the mode only of effecting them.

This doctrine of abeyance, like relation, is a fiction of law instituted to subserve the purposes of justice, and to carry into effect the wishes and intentions of the grantor; and has hitherto, only been applied to estates of inheritance, for the purpose of passing over the reversion or remainder to the person designed to take it; as in the case of a grant to A, remainder to the heirs of B, B being still living—or of preventing the falling in of such an estate, and its re-investment in the crown; as in the case of the grant of a dignity, when by death of the crown's beneficiary, there exists no representative, capable, by the grant, of taking it; the right is held in abeyance, until some one is in *esse*, capable of taking it by succession, according to the terms of the original grant. Wherever it has been applied, it has been of necessity. It is said in 3 *Cruise Dig.* 232, to be a doctrine which the law abhors, and a very distinguished writer on real law, as regards such estates, argues against its existence or necessity, altogether. *Fearne*, 361. Ad-

mitting its existence, it is said, in 1 *Cru. Dig.* 71, that in modern times, abeyance is not favored, because *it is in* restraint of alienation ; and in the case of *Perin and Blake,* it was declared, that abeyance ought not to be extended, because, *it* prejudices the public, it ties up property, and leads to perpetuity. *Harg. Law Tracts.*

The application of the doctrine in this case, would be within none of the principles which gave rise to it. It must be remembered, that it is applied only in cases of necessity. Where a donor selects, as the object of his bounty, a person not in *esse,* having parted with his estate, there exists a necessity, that it should exist, to vest in the donee, when he comes into being to receive it; there, without either supposing the fee to remain in the donor to gratify his objects, which would be against the grant, or that it is *in nubibus,* the intentions of the donor must be defeated, and the donee could never take. But here the sovereign power is the grantor, which can impress upon the grant any powers of operation which it pleases: and can mould and modify it against all technical rules, whenever she shall please to do so. She might have pronounced, that the franchise should bear date from the law, without soliciting the aid of judicial fictions, to establish and give efficacy to her intentions.

We have seen that abeyance was introduced to give efficacy to estates, according to the intent of the grantor ; this characteristic demonstrates its inapplicability here. The State never thought she had parted with any thing. Unlike the grantor or donor, who, by the words of the grant or gift, manifests a *present intention* to part with his estate, the State grants nothing, and means at the *instant of her grant,* to pass no right. She merely declares, that on the happening of some contingency in future, she will grant. She holds her law up, *as an offer merely,* and declares, that when any portion of her people shall accept that offer, they shall have certain powers imparted to them, and meant to place herself in no different condition, than an individual would

be placed in, who would offer to contract with another, and who, without any reservation of right, possesses at all times before acceptance, the right and power to withdraw *the offer.* 4 *Wheat.* 228. Now, if the doctrine of abeyance is applied, the State is held *to her offer* against her clear intent; a different rule is meted out to her, from that which would be applied to individual contracts, or offers to contract, and there would thus be an utter perversion of the whole doctrine.

This fiction, like all other legal fictions, originated in that watchful anxiety which the law always manifests to establish justice. Yet it would be made to accomplish injustice, if it could bind the legislature against its clear intent, by giving efficacy to its law, as a grant from its first offer, when according to its express terms, it was only to take place in *futuro*, and that on a possible contingency.

We have seen, that the doctrine of abeyance has, even in its appropriate sphere, met with the disfavor of courts of justice in modern times, as *tending to perpetuities*, and as *prejudicing the public.* If in its application to estates of inheritance, it has this obnoxious tendency, how much greater would be its evils, when applied to legislative power? The indelible, constitutional land-mark of legislative power, is, that it shall pass no law impairing the obligation of contracts. Yet this doctrine of abeyance breaks up these constitutional land-marks, by contracting them within much narrower limits. And it says, although you make no contract, yet if you *offer to contract*, you shall make no law rescinding the offer. Can a technical principle of law, work this change in the fundamental law?

We have seen, that abeyance is a doctrine not favored, and which ought not to be extended, as it prejudices the public. Shall we apply it to a class of cases new in their character? To cases of *offered* corporations, when its consequences are such, that it would, manifestly, greatly impair the public interests. The manner in which this injury may be thus inflicted, we have seen in examining the

effects of *relation*, and shall not again advert to them, except to remark, that its establishment in such cases, must infallibly lead to a change in the legislative course which has been adopted since the revolution. The public interest would demand it. For offers of incorporation, although never accepted, would be a negative on the power of making any future, actual grant, in relation to, or interfering with, the offer made.

But it is supposed, that judge *Story*, in the case of the *Dartmouth College vs. Woodward*, 4 *Wheat*. 691, has recognised this doctrine of abeyance, with all its incidents and appendages, as applicable to corporations, such as the one under consideration, and the following language of that learned judge is relied upon for this purpose : "When the corporation is to be brought into existence by some future act of the corporators, the franchises remain in abeyance until such acts are done, and when the corporation is brought into life, the franchises instantly attach to it." If the word *abeyance*, in the above extract, was used in its *technical sense*, it must be admitted, that the authority of the *dictum* goes to the whole extent for which it has been cited ; but it is apparent from all the reasoning of that officer, that he used the word "*abeyance*," not in its technical, but in its popular sense, and as synonimous with "*suspension*." Taken in this sense, it is entirely legitimate, and consistent with reason and authority, and that he does mean so to use it, will appear by what follows in the same paragraph of his opinion. He was endeavoring to establish the principle, "that there might be future springing contracts in respect to persons not now in *esse*," or in other words, that the legislature might offer to contract, and that at some future time, when the offer was accepted, it would become an indissoluble contract, clothed with constitutional inviolability : His reasoning, which goes to illustrate his meaning, is as follows : "If the legislature were voluntarily to grant land in fee, to the first child of A, to be born thereafter ; as soon as such child should be born, the estate would vest in it.

Would it be contended that such grant, *when it took effect, was revocable,* and not an executed contract upon the *acceptance of the estate?* ' Take the case of a bank incorporated for a limited period, upon the express condition, that it shall pay out of its corporate funds, a certain sum as the consideration of the charter, and *after the corporation is organized, a payment is duly made of the sum out of the corporate funds; will it be contended, that there is not a subsisting contract between the government and the corporation, by the matters thus arising ex post facto, that the charter shall not be revoked during the stipulated period?* Suppose an act, declaring that all persons who should thereafter pay into the public treasury a stipulated sum, should be tenant in common of certain lands belonging to the State, in certain proportions.   If a person afterwards born, *pays the stipulated sum into the treasury, is it less a contract with him, than it would be with a person in esse at the time the act passed?*"   Now from this quotation from the opinion of the learned judge, it will be perceived, that in every case by him cited, he impliedly admits the legislative power to modify or repeal the proposed grant, or contract, until some right has vested under it, or until something has been done, manifesting the grantee's consent, and he selects such a period, as the one which places what the legislature have done, beyond recall.   This he could not have done, if he meant any thing else by the use of the word *"abeyance,"* than suspension; for had he used it in its technical sense, he could not have so explicitly admitted, that they were liable to recall before they were vested or accepted. Indeed, if he had used the term abeyance in its technical sense, they would have been liable to recall or repeal at no time after the enactment; but the offer would have been invested with all the sanctity of an actual grant.

That in the case of grants *to pious uses, or of grants in the nature of a dedication to public uses,* the doctrine of abeyance is permitted, does not aid the case of the *Canal Company.*   The grant is neither for the one purpose nor

the other. But is a *mere offer to grant* to a joint *stock company*, when it shall be formed, certain privileges, with the right to take tolls, as a source of emolument to the company. Who enjoy the profits of this company ? Its emoluments are to be forever secured to the stockholders. But the canal when completed, is declared to be a public highway, it is still, however, subject to the right of exacting tolls for the benefit of the individual corporators, which strips it of the character ascribed to it, that of a dedication to public uses. The preamble of the charter cannot *relieve* it from the difficulty. "Whereas the completion of the work will be of great advantage to the people of this, and the neighboring States, may tend to produce a connected navigation between the eastern and western waters, may extend internal commerce and personal intercourse, between the two great sections of the Union, and may tend to consolidate and perpetuate the vital principles of the Union." These are certainly public objects of great importance. But individuals in the pursuit of private emolument and gain, may accomplish works of great benefit to the public; yet it would be scarcely allowable to say, that they had, therefore, dedicated their services to the public. The same thing may be effected by corporations, and from the same motives, and yet where they are stimulated by tolls to accomplish these results, who would say, that therefore, their franchises were granted as a dedication to public uses? In the year 1810, a bank was incorporated in the town of *Elkton*, with the following preamble : "Whereas it is the opinion of this general assembly, that the agricultural, commercial and manufacturing interests of this State, will be promoted by the establishment of a bank, &c." Now here are great public objects developed, and yet, will it be pretended that the bank thus established, was a dedication to public uses? Yet if the preamble operates this result in the canal charter, it must also do it in the case of the bank. But reasoning upon this subject, is unnecessary. The canal charter is no grant, it is a mere *offer;* and if a case can be found any

where, where rights were decided to be held in abeyance, upon a mere offer, then it will be time enough to enter into a more minute examination of this alleged dedication to public uses.

The case of the *Town of Pawlet vs. Clark,* 9 *Cranch,* 322, was no offer to grant, but a grant which professed upon the face of it, *to pass from the crown six miles square of land, and all its right and title thereto;* and in *Lade vs. Shepherd,* 2 *Strange,* 1049, the street was actually laid out and dedicated as a public highway, and in all the cases, where this fiction of abeyance has been applied, the grantor has clearly manifested his intention, to part with his interest in the thing granted.   He had not merely *proposed,* or *offered to do so,* but had actually, by apt terms granted it, and the grant would have been prevented from its intended operation, but for the interposition of this principle.

But apart from all the above considerations, this fiction is incapable, in the nature of things, of application to the franchises of a corporation, not in existence.   By the franchises of a corporation are meant, those rights which are inseparably incident to it when created, or such rights of eminent domain as the sovereign power may impart to it. The corporation is the *principal,* the franchises are *incidents.*   The one is the substance, the other the shadow; the latter cannot be without the former.   As well might it be said, that a *court baron* could exist without a *manor.* The corporation, in the case of the *Canal Company* was not to come into existence until a fourth of its stock was subscribed, nor until all the conditions of the charter should have been complied with; as it was not in being, it could have no incident; there could not be any incidents to be in abeyance, when there was no principal.   Existing rights may, by law, be placed in abeyance, but non-entities cannot be in that condition.   It would require the famed omnipotence of an *English Parliament* to give life to incidents or franchises, and put them in abeyance, before the principal or corporation was created—when the inheritance is in

abeyance, although intangible, it exists. When dignities are in abeyance, the right has in legal contemplation an existence. The doctrine would be perfectly comprehensible, if it could be maintained, that the corporation was itself in abeyance, for then its incidents might also be in the same condition ; but when the law passes, it is admitted, that it is not in existence, so that it could be put in abeyance; but it is to spring into life after the law, not by the law itself, but by the conjoint effect of the law, and of acts, *aliunde.* To avoid this difficulty, it is supposed, that after the franchises vest *de facto* by the creation of the corporation, by a kind of legal magic, or subtle metaphysics, there is a coalescence of the legislative act, which creates the corporation and its franchises, with the corporate act, which produces a party capable of taking the benefit of the grant; and that the franchise relates back to the original grant. But it cannot be perceived, that in order to give efficacy to this grant, it is necessary to resort to this ingenious system of reasoning. It must be conceded, that there may be future springing contracts with persons or bodies not in *esse*—is it necessary to give them validity, to say, that they must relate to the first proposition, or offer for the date of their creation ? By no means. They take their date from the time of their acceptance ; because, until then, it is no contract. 4 *Wheat.* 228. This is the case in ordinary contracts, and must be so in corporations; for charters are compacts between the government and those who assume to act under them. Nor is it necessary to resort to this ingenious refinement, to account for the *modus operandi* of the offered grant. The offer takes date from its acceptance, and the franchises remain in the grantor until such acceptance, at which period of time they are divested by the offered terms of the law, and vested in the corporate body; and thus remaining in the grantor, at all times before the offer is accepted, they are liable to be actually granted to others.

If there be any truth in the above reasoning, neither the doctrines of relation or abeyance, apply to this grant, and

consequently, it must look for the first existence of its pow-
ers to the date of its incorporation, which period is to be
ascertained, in the words of the law, "when one-fourth of
its capital shall have been subscribed," which we have seen
never did take place, until the 24th day of May, 1828.

3. It is now proposed to examine the course of *Maryland*
legislation, in matters which may affect this company, from
the date of her first law in relation to it; and to determine
its character and validity, as affecting the rights and interests
of the parties to this controversy. In doing this, it may
become necessary occasionally to advert to some proceed-
ings under these laws.

On the 28th February, 1827, a charter was offered to the
*Rail Road Company*. On the 31st March, 1827, it became
incorporated; the quantity of stock demanded by the char-
ter, as preliminary to her incorporation, having been sub-
scribed.   Thus, the *Rail Road Company* was an actual in-
corporated body, nearly eight months before even an effort
was made by the *Canal Company* to become incorporated,
by obtaining subscribers to one-fourth of her capital; for it
was not until the 14th November, 1827, that the latter com-
pany made any attempt to give existence to her charter,
and then we have seen, that the attempt was unavailing, the
subscribers to the extent demanded by the law, having no
authority to subscribe.   And a period of nearly fourteen
months elapsed, from the time of the incorporation of the
rail road, before the *Canal Company* was incorporated;
which never took place, as we have seen, until the 24th of
May, 1828.   Anterior to this period, the *Rail Road Com-
pany* was not only incorporated, but had selected the very
route in controversy, and had appropriated the greater part
of it, by obtaining conveyances for some portions, and agree-
ments for the transfers of other parts, and actually causing
locations and surveys to be made.   On the 3d of March,
1828, *Maryland*, by a supplement to the act for the promo-
tion of internal improvement, passed the following enact-
ment: "Be it enacted that the treasurer of the *Western*

*Shore*, be, and he is hereby authorised and directed to sub-scribe for, and on behalf of the State of *Maryland*, for five thousand shares of stock," with the following proviso: "*Pro-vided, that the said company shall agree so to locate said road, that it shall go to, or strike the Potomac river, at some point between the mouth of Monocacy river and the town of Cumberland, in Alleghany, and that it shall go into Washington, Frederick, and Alleghany counties.*" Which provision we have heretofore seen, the *Rail Road Company* adopted, by causing her route to strike the river *Potomac*, at the *Point of Rocks* above the mouth of the *Monocacy*, and designating her route towards the town of *Cumberland*, on the margin of the *Potomac* river, through the counties of *Washington, Frederick*, and *Alleghany*.   All these laws were enacted, and these proceedings had, before the *Canal Company* was incorpoporated ; and when it was not known, and could not be known, whether she ever would be incorporated. For then it was uncertain, whether the necessary quantity of stock would be taken by valid subscribers, and whether the act of *Maryland* would ever go into operation, by a compliance by the *United States*, with the conditions upon which *Maryland* had made her act dependent, that is authorising *Maryland* to make a lateral canal through the *District of Columbia*, and directing some safe mode by which the right should be secured to her.

Now, if the view already taken be correct, that the company was not incorporated until the 24th May, 1828, and that the *Maryland* law by its express conditions, never became an operative law until the 23d May, 1828; it is undeniably certain, that the grant to the *Rail Road Company*, not only in its general terms, was a valid grant, but would have been equally valid, had the general assembly of *Maryland*, in the charter of the *Rail Road Company* itself, designated the very route in controversy, and that all the acts of the *Rail Road Company* designating and selecting this contested ground, are entitled to protection, as prior vested rights under her grant, which in this view would be ante-

rior to the rights of the *Canal Company*, and therefore entitled to priority and protection.   These positions are asserted on the hypothesis, that until the grant of the *Canal Company* was perfected by acceptance, it was always within the competency of the legislature, to repeal or modify her offered charter, or to grant rights and franchises inconsistent with the offered grants, remaining unaccepted, or which may become so in their ordinary and legitimate exercise.

All grants *offered* merely to existing or non-existing bodies, or to persons in *esse* or not *esse*, are liable to be resumed at the will of the *power* or sovereign offering the grant, at any time before acceptance, and to be re granted to other and different individuals.   I do not, it is perceived, here speak of those cases where there exists a present intention to grant, and where the instrument purports on its face to be a grant to pious or public uses; and where such instruments are upheld against the general rule of law, that there must be a grantee, as well as a grantor, or a *corpus* to be granted, and which are held an extinguishment of the grantor's right in the thing granted, and constitute exceptions to the general rule, but as will be perceived, of mere *offers to grant*—such offers (and all charters like the canal charter are offers merely,) are not contracts which cannot be violated or impaired by any kind of legislation.   Any body of men, therefore, who shall become corporations under such offer, take and accept it, subject to the known power of the legislature, by any act anterior to such acceptance, to modify it, and can only hold it subject to such modification; or if the offer have been repealed, the acceptance is a nullity, and confers no rights.   Such is the settled and undoubted law in private contracts, and the reasons which demands its application to grants from the public, are of a much more weighty and imperious character, as we have heretofore seen.   That there may be future springing contracts, which do not take effect *instanter*, but grow up, and become binding upon the happening of

some future event or contingency, is not attempted to be denied, or the principle at all impaired. But until that event or contingency does happen, (I speak of cases where no interest has or could vest,) it is insisted, that the proffered contract is liable to a partial or total recall. It could not, for example, be denied, that a grant to the unborn son of A, might at any time before the grant had vested by the birth of the grantee, be entirely abrogated. Nor could it be doubted, that the grant of lands by the legislature to any citizens of the State, who should do certain acts, could be resumed before any citizen had actually entered into a contract with the State, by the performance of the act. It is equally clear, that all the rights proposed to be granted by the canal charter, were liable to the like resumption, at any time before that charter went into legal operation according to its terms. And these rights were all resumed and re-granted by the State; or at least rights and franchises were granted by the State to the *Rail Road Company* of so general and comprehensive a character,—the power to construct a road in any direction, from *Baltimore* to the *Ohio*, that in their rightful exercise they became inconsistent with the offered rights, proposed to be granted to the *Canal Company*. And these rights had actually vested by grant and selection, before the *Canal Company* had come into being, nor would the principle be at all altered, by so construing the offered grant to the *Canal Company*, as to give it a special and designat-· ed location along the valley of the *Potomac*, or to make it still stronger, along the left bank of the *Potomac;* for the grant is still, but an offered, unaccepted grant, and the anterior accepted grant to the rail road, being general, broad, and comprehensive, without exception, or limitation, to make a road any where between the designated points mentioned in her charter, clothes her with the right to take any route, not before *actually granted.*

The intention of the legislature, to make this grant to the rail road, without any limitation or reservation of any rights offered to be granted to the *Canal Company*, is not sus-

ceptible of successful contestation. The terms are as comprehensive as our language could make them; the grant is without any express reservation or exception, and without any words from which might be implied, any intention to make any exception. The construction then, admits of no amibguity, and becomes imperative. We can nowhere look for legislative intention out of the grant, but must confine ourselves in the ascertainment of intention, to the terms used by the contracting parties, in the instrument or charter by which they stipulate. Are we to construe this grant, general in its terms, as if it had contained an express exception of the offered rights, to the *Canal Company?* If it were capable of a double construction, one limited, and the other general, it may be conceded, that we should take that which would be limited, for the purpose of upholding the anterior law. But we cannot give it a construction to produce this effect, because its phraseology is unambiguous, and should, by so doing, limit that which is unlimited, and meant to be so, if language is any just interpreter of intention.

But the legislative intention is manifested if possible, in more direct and specific terms, by the law of 3d March, 1828. By the charter of the *Rail Road Company*, in 1827, she had contracted, as we have seen, in general terms. By her subsequent law, she enters into a new contract with the *Rail Road Company*. She agreed to subscribe for $500,000 worth of the stock of that company, on condition that the *Rail Road Company* would locate her route, so as to strike the river *Potomac*, above the mouth of the *Monocacy*, and afterwards go through the counties of *Washington*, *Frederick*, and *Alleghany*. This proposition is acceded to; the rail road receives the money; the State becomes stockholders; and the company lay down their road, so as to *go to*, or *strike* the *Potomac*, and in pursuance of their contract, locate their road onward, through the counties of *Washington*, *Frederick*, and *Alleghany*, by the margin of the river. Here is a contract, as explicit and as binding as the

original charter, and is in truth a modification, by a subsequent agreement of the original contract; for the grant in the orginal charter gave an umlimited and undefined range, at the will of the company, to select her route where she pleased; but this new contract restricted her to one designated and particular route ; she *must strike* the *Potomac,* and go through *Washington, Frederick,* and *Alleghany.* Now, if the *Canal Company* had no route designated in her law, it must be admitted, that so far as this law fixes the route of the rail road, the *Canal Company's* right, however general before the selection, would be gone as to this particular course; and if it was actually located by the law to follow the valley of the *Potomac,* on its left margin, so far as this route interfered with that, it would *pro tanto* be a repeal of the law creating the *Canal Company.* And what was the route to which she was confined by this new contract with the *Rail Road Company?* The rail road must *"strike the Potomac."* Now if this must be done, in the point of contact with the river, there is a direct and unequivocal interference with the route of the canal, and an equally clear interference throughout the whole controverted ground. Can it be believed that the legislature, through mere caprice and frivolity, would order this company to *strike the river,* and then go through the counties of *Washington, Frederick,* and *Alleghany,* without meaning that they should then take the margin? For what purpose are they brought to the river, and made to strike it? Was it merely that they might have their hopes of the most eligible route up the margin of the river defeated? Did they mean to invite them there merely to look at the route, then the more cruelly to frustrate their excited expectations; order them to retrace their steps; pass with immense cost and difficulty the elevated ridges of the *Catoctin* mountain, and its parallel ranges in their progress to the western country? Such an imputation, would I am sure, be doing great injustice to the intention of the legislature. Indeed the intention that they should take the margin, is apparent from

the history of the proceedings of the *Rail Road Company,* in evidence in this cause. Engineers had been appointed 20th June, 1827, who preceeded to examine the routes proper for the rail road, and all the routes had been examined (among the rest, this,) before the passage of the law compelling the company to strike the river; for the engineers report, in a month afterwards, this route by the *Potomac.* It is fair to presume, that it was as well known to the legislature, as to the company, that two or more routes were in contemplation. The one by the margin of the river, and the other in a different direction through the three counties. Knowing this, the legislature invite them to the *Potomac;* they must strike it, and go through the counties of *Washington, Frederick,* and *Alleghany.* The legislature were anxious that they should not cross the river, but that they should keep on the *Maryland* side the whole way—they must go through the three *Maryland* counties. It is therefore conceived, that the canal charter was modified to the whole extent of the route designated by the *Rail Road Company,* in consequence of the contract made by this law with it. The subscription of $500,000, by *Maryland* to the *Canal Company,* furnishes no argument against the views which have been taken of the intention of the legislature. If indeed it was contended, that the rail road charter had actually repealed the whole charter of the *Canal Company,* this subscription might well be resorted to, for the purpose of showing, that the State never meant to annihilate it, and of demonstrating her intention, not only, that it should continue to have life and being, but that it should go on and prosper. But no repeal is attempted to be shown; a modification and limitation of its range of choice, is all that is urged, as growing out of the rail road laws. Notwithstanding the limitation thus imposed, she had a right under her charter from *Maryland* and *Virginia,* to have taken the *Virginia* shore of the *Potomac,* from the mouth of *Savage* river to tide, and under the operation of the combined charters from *Maryland* and *Virginia,* she might have pur-

sued the *Virginia* shores, until she arrived at a point opposite the *Monocacy*, or opposite any point which the *Rail Road Company* might select on the *Potomac*, as the point at which she would strike the river, then cross, and take the *Maryland* shore the whole distance to tide water. There is nothing unreasonable in the supposition, that *Maryland* thus intended to limit the *Canal Company*, to the one or the other of these routes, either of which, would have left the company in the possession of her chartered rights, subject to no other limitation, except what had been carved out and granted to the *Rail Road Company*. The canal practicability of either of the above routes is not capable of denial. The *Maryland* side *throughout* may have been more advantageous, but this will not in the least advance the argument on the other side; the practicability of other routes was foreseen; and all the State says, by her agreement with the *Rail Road Company*, is this, we choose to constitute you a favorite company, by giving you this route; we insist on your striking the *Potomac;* the *Canal Company* has other routes, let her pursue one of them. *Maryland* may have even thought it probable, that she might not materially interfere with the *Canal Company*, and she would not, if that company had fallen upon either of the other routes spoken of. *Pennsylvania* in her act of 9th of February, 1826, looked to this probability, when she demands the consent of *Virginia* to certain provisions of her act, provided the *Chesapeake and Ohio Canal should be located on the south side of the Potomac*. *Maryland* may have done the same; but whether she did or did not, it was sufficient for her to know, that it was perfectly practicable for the canal, to take one of her other routes, and it is apparent by thus interfering with her offered grant to that company, she did mean to throw the *Canal Company* upon such routes.

The assent of the *Potomac Company* did not at all interfere with *Maryland* legislation. Her assent was asked, because the *Maryland* offer of a charter would be in vain, unless she consented to the offer. If she professed a wil-

lingness to waive her rights, then, and not until then, could it have been of any utility to have opened the subscription. But her assent subjected her to no inconvenience, nor bound her to any legal consequence. She could have withdrawn it at any time she pleased, anterior to the vesting of any legal rights. The whole charter was *in fieri* until the conditions which the law demanded, were complied with. And she could, and had a right at any moment before the 23d May, 1828, to have rescinded her assent, for it was not until that period of time, that the charter became valid. The anterior subscriptions on the 14th of November, 1827, were of no consequence, for they were not justified by the charter. It had not become a law, and not being such, they were null and void, and bound no one. The *Potomac Company* was, therefore, in every respect, in *statu quo*, as long as the grants of *Maryland* and *Virginia* stood as offers, and had not become binding, operative grants. She was precisely in the situation of either of these Staets; she could rescind her assent, as they could repeal their laws. It strikes me, that it would be a proposition entirely untenable, to say, that her assent placed her in the same attitude, as if she had actually surrendered her charter. The States had made no contract with the company. She had made none with them, for they had not even a potential existence—nor had she entered into any contract any where, incurred any obligation, forfeited any rights, or done any act, which by possibility could affect her, unless it was her subscription, and that we have seen, was utterly void.

The legislature then, had the power to modify her offered grant to the *Canal Company*, has so modified it, and spoken her intention in this respect, in language too intelligible to be misunderstood, and by such modification and partial resumption, and re-granting of a portion of her eminent domain, has given a perfect right and priority to the *Rail Road Company* in what she demands.

We have been hitherto examining the foundation of the claims of the *Canal Company*, standing alone, on the basis

of *Maryland* law.   But the same conclusions result, and the rights of the parties, as ascertained, remain fixed and undisturbed, even although a compact existed between the various grantors of the canal charter.   If a compact exists, it is certainly only binding and effectual from the period when such compact was consummated.   It cannot ante-date its power to the time when negotiations between the parties commenced, and so derive a capacity to avoid and annul all acts done by the parties, or either of them, in the intermediate time between the first offer by either, and the acceptance of it by all.   Each party was bound to know, that neither, by her mere offer, was stripped of her constitutional powers of legislation, and if she accepted such offer after legislative interferences, she must necessarily make her acceptance subject to all resulting consequences, and all intermediate grants.   If this be true, (and it is not perceived how it can be denied,) and if it be also true, as has been attempted to be shown, that the conditions imposed by *Virginia* and *Maryland*, were never, in their letter or spirit complied with until the 23d of May, 1828, then it follows, *ex consequenti*, that the compact, if any, was never until that day formed by the contracting parties; and *Maryland* having in the mean time, granted certain rights and franchises to the rail road, which had become vested and valid contracts, such compact, when formed, was necessarily subject to the due and legal operation of such grant and contract; and became obligatory in every other respect according to its terms.

Whether *Maryland*, in this intermediate grant, acted in perfect good faith, might not perhaps be the subject of judicial inquiry.   But in this, as in all other portions of her political history, her character stands unblemished, and is susceptible of entire vindication, even considering the grant in the light of a compact, and her first offer as intended to bring about mutual and binding stipulations.   Her first law was passed on the 31st January, 1825, and her conditions were never complied with, until 23d May, 1828,—a period

of three years and four months.    In the mean time we find her complaining of the inefficient character of the first act of *Congress*, and in effect demanding the just and entire fulfilment of her conditions, by her law of 6th March, 1826, entitled, an act for the promotion of internal improvements ; and even after this, upwards of two years are suffered to expire, before the *United States* complies.    In the mean time, all efforts to organize the company, legitimately, had failed, and she herself had, by her law of December session, 1827, entitled, "a further supplement to the act entitled, an act for the promotion of internal improvement," expressed her doubts, whether the work would ever commence. Indeed it must be admitted, that the whole work was entirely contingent on the possible subscription by the *United States* of $1,000,000.    And when the uncertainty of such an event was looked to, it must have been doubted by all, even the most sanguine, whether it ever could progress.    Under such discouraging circumstances, from the combined causes above adverted to, can it be said that there could be any breach of faith in the State undertaking to make her grants to the *Rail Road Company*, as she has done, and of interfering with her previous offer to the extent which she did do by that grant?    How long was she to wait for the fulfilment of her conditions?    She had in effect twice reiterated to *Congress*, the necessity of complying with her conditions by the act of 1826, above adverted to, and by a further supplement to the same law, passed the next year ; a deaf ear was turned to these solicitations, and the case of the *Canal Company* was utterly hopeless.    She was not bound to wait for ever, and a just respect for the rights and interests' of her people, demanded of her, that she should not longer be restrained in the march of improvement.    She had waited as long as reason and propriety demanded, and nothing further could be sought by the most scrupulous adherent of good faith.

If it be urged, that the relations of *Maryland* with the *Potomac Company* should have prevented her modifying

the canal charter, the answer is in substance found in the previous part of these views. Her complaint against *Maryland* would probably be, that she had assented, and that she had become a subscriber to the stock of this company, and that she ought to have been in good faith consulted. But such a complaint would obviously have no just foundation. She assented to the law, as *Maryland* made her *offer*. Her assent was not binding; it could at any time have been withdrawn, and such being the law, it will be intended that the parties so understood these transactions. There was nothing therefore, to prevent her, after the enactment of the rail road charter, from withdrawing her approbation; and not having done so, *it is fair to consider her as yielding* to any modification which *Maryland* had made in the canal charter; at all events, after the modification her assent, became subject to it. As to the subscriptions of the *Potomac Company*, they were utterly void, there being at that time no law to justify them, and of course the *Potomac Company* was under no obligations.

The above views of the whole case would entirely relieve me from the necessity of examining the question, whether any compact did, at all, exist between the State of *Virginia*, *Maryland*, the *United States*, and the *Potomac Company*, in relation to the *Canal Company*. But I will proceed to present my views upon that subject.

1. Was there any compact between the States of *Maryland* and *Virginia*, in relation to the *Potomac Company*.

2. Was there any compact between the *United States*, *Virginia*, *Maryland*, and the *Potomac Company*, in the formation of the charter of the *Canal Company*.

In the exposition of grants, as we have seen, the grant itself is the only index of the thing granted, and that matters *aliunde* cannot be resorted to, for the purpose of limiting or enlarging the express terms of the grant. But where the enactment of two States is resorted to, for the purpose, not of showing an express compact, but of raising one by implication, a resort to some matters *aliunde*, may be gov-

erned by different considerations.   In such case, the suppos-
ed compact rests only on inference and intendment, and the
acts,  usage and practice of the States, it may  not be unfair
to bring into review, to show the character which the par-
ties meant to impress upon their laws.  With these remarks
the above questions will be separately examined.

1.  Was there any compact between the States of *Mary-
land* and *Virginia*, in relation to the *Potomac Company*.

Anterior to the passage of the laws by which the *Poto-
mac Company* was chartered, conferees, as we have hereto-
fore seen, were appointed by the legislatures of the respec-
tive States, for the purpose of inquiring into the proper
mode of improving the navigation of the *Potomac* river.
This conference resulted, *not in any compact*, nor in any
recommendations *that any compact should be formed* by the
States, but merely in recommendations that a *similar law
should be passed by each State* to establish a company for
opening the river, and similar laws of incorporation were
passed by each State, chartering the *Potomac Company*, for
the purpose of promoting an object no doubt greatly benefi-
cial to both.   The law of *Virginia* does not appear to have
been of a dependent character, but the charter of *Maryland*
rested on the condition, not that *Virginia* should enter into
any agreement with her in relation thereto, but that she
would pass a similar law, granting the same company the
like privileges, and authorised a subscription for fifty shares
of its stock, on condition that *Virginia* would subscribe the
same.   With these exceptions the charters of the two States
were identical.

Besides the provision above adverted to, as contained in
the *Maryland* law, each charter contained the two follow-
ing sections, which are the only ones which have any rela-
tion to this subject:

"Sec. 10, *And be it enacted,* That the said river, and the
works to be erected thereon in virtue of this act, when com-
pleted, shall forever thereafter be esteemed and taken to be
navigable as a public highway, free for the transportation of

all goods, commodities or produce whatsoever, on payment of the tolls imposed by this act; and no other toll or tax whatsoever, for the use of the water of the said river, and the works thereon erected, shall at any time hereafter, be imposed by both, or either of the said States; subject, nevertheless, to such regulations as the legislatures of the said States may concur in, to prevent the importation of prohibited goods, or to prevent fraud in evading the payment of duties imposed in both, or either of the said States, on goods imported into either of them.

"Sec. 19. *And be it enacted,* That all commodities of the produce of either of the said States, or of the western country, which may be carried or transported through the said locks, canals, and river, may be landed, sold, or otherwise disposed of, free from any other duties, impositions, regulations, or restrictions of any kind, than the like commodities of the produce of the State in which the same may happen to be so landed, sold, shipped, or disposed of."

By these references to the charters, it is insisted by the appellant, that a compact grows out of one, or all of the following circumstances.

1. The dependent character of the *Maryland* charter.

2. That the river and canals were declared highways.

3. The prohibition on both States to impose the tolls.

4. The concurrent character of all laws to be passed, to prevent the evasion of the revenue laws of the respective States.

5. The exemption of all produce from any tax, other than what is imposed on the like produce, by the State where it shall be sold or shipped.

1. From the dependent character of the *Maryland* law, it must be obvious, that no idea of a compact can arise. A State may affix any condition to her law, which she may think proper, however arbitrary, or seemingly destitute of reason it may be, as to make any law affecting the rights of her citizens, dependent upon a law of a similar character being passed by a foreign State, operating upon her citizens,

as a trespass law—a law regulating replevins, or any other law; yet who could say that if such foreign State complied with the condition, that there would exist an irrevocable, or any other contract between the two States, neither to repeal their law without the consent of the other? Whether the condition arises from caprice, or from high motives of interest or state policy, cannot alter the question.

*Maryland* had in truth high objects to gratify, by her enactment that her law should be inoperative, till *Virginia* passed a similar law. The *Potomac* river was a border stream; each State had great interest in the improvement of its navigation. She proposed to establish a company, and also to aid it with her funds; but why should she do this unless *Virginia* would do the same? Why should she exhaust her resources, if *Virginia* would not lend a helping hand. She therefore chose to make her charter dependent. Her objects by doing so were, as she anticipated, all accomplished. *Virginia* was by this dependent system of legislation, stimulated to grant a charter, and also to subscribe her funds. These were the sole motives and objects of the legislature, in pursuing this peculiar course and manner of legislation.

Before proceeding to the examination of the other clauses in the charter, which have been relied upon, as creating a compact, it may be assumed, that a court of justice would in no case be justified in deducing inferentially, a contract, or compact, between sovereign States, from their mutual enactments, unless the existence of such compact would be necessary to give efficacy to their laws, and this assumption is founded on a reason so obvious, as that it need only be stated, to receive assent. By making concurrent laws, compacts, the sovereign power of the States would, most generally, be restrained in their accustomed power of legislation, over the subject matter of such laws, for in every case, each would be obliged to seek the assent of the other, to make valid any repeal or amendments. Such consequences ought therefore only to flow from clear expressions, and

unequivocal indications of intention. Now when we are able distinctly to ascertain, that no motive could exist for a compact producing such results, and that the whole object which each State had in view, was effectually brought about without supposing such a compact, by a separate course of legislation, unfettered by any State agreement, there is no ground left for the inference of an intention to make an agreement. With these views, let us ascertain whether those clauses, which are considered as compacts, are not as effectually secured to the States without, as with a compact, and by the separate laws which they have enacted.

2, 3, 5. *The charters declare that the river and canals shall be highways.* The object of this provision was effectually established by the creation of a charter to the company in each State, and could never thereafter be violated, either by the company, or by the company and one of the States combined, or by both States acting together, without the consent of the company, or by either State acting separately, and alone. The company could not violate it, because such a course would violate her charter. Neither State acting separately, nor both acting together, could violate it, because it would be in breach of their respective grants to the company; nor could one of the States, acting with the assent of the company, repeal this provision of the charter, because it would be in direct violation of the charter granted by the other to the company, and would work a forfeiture of the grant in that State; and such a consequence, from the very character of the work, would utterly destroy the value of the subsisting charter; and would just as effectually guard one of the States, against such an injurious combination between the other State and the company, as any compact could possibly do. The same course of reasoning applies to the prohibition on each State, to impose other tolls, and to the clause exempting all produce from any tax other than what is imposed on the like produce, by the State where it shall be sold or shipped.

4. No deduction favorable to the idea of a compact, can justifiably be drawn from that clause, in each charter, which demands concurrent legislation, in all laws passed to prevent the evasion of the revenue laws of the respective States. Each State agrees with the company, that it will pass no such law by force of its own legislation, but that it shall at all times, be contingent upon the concurrence of the other. This is the contract with the company, for its security. And can it be doubted but that she has a perfect capacity to make such a contract, and that she never could violate it, if there was no compact?

A fact in the history of these States will be adverted to, for the purpose of showing the entire improbability, that in the grants to this company, any compact was ever contemplated by the States to be made with each other. At the very sessions of the legislatures of *Maryland* and *Virginia*, at which these charters were passed, commissioners of these States were holding their sessions at *Mount Vernon*, *negotiating a compact in relation to the navigation of this river.* It was concluded in March, 1785, and in March, 1786, it was formally ratified as an irrevocable compact between the two States. Two of the articles are, that the river should forever be a highway for the commerce of the two States, and that all laws creating any obstructions, in, or to, the navigation of the river, were prohibited to each State, without the consent of the other. No clause in it, is found having relation to the *Potomac Company*, or to any previous compact having ever existed between them in relation to this subject, although they were engaged in making agreements in relation to the very subject to which the *Potomac Company* applied. If the charters were compacts, it is astonishing they should not have been adverted to in any way; and if they were compacts, it is not to be credited, that they would in the short space of three months, have again negotiated about the subject of making the river a highway, and should have shortly after ratified that compact, when they had but just previously made one in relation to the very

subject. The truth is, the States never dreamed that in chartering the *Potomac Company*, they had made any compact. This idea has been a modern discovery by the appellants.

This is clearly proved by their practice. Emendation after emendation has been made by the respective States, in the charter of this company, in great and important particulars, without asking the consent of the other. Is it probable this would have been done, had the assemblies of the States, or the company, believed, or thought, that any agreement had been made between the States, in relation to the subject?

2. Has any compact been formed between the *United States*, the States of *Virginia* and *Maryland*, and the *Potomac Company*? This compact between the States is supposed to grow out of the following provisions.

1. The extra-territorial character of the legislation.

2. Its dependent character.

3. That the canal shall be a highway, &c.

4. That water rights are reserved to the respective States.

5. That each State has reserved the right to make a lateral canal in the *District of Columbia*.

1. The extra-territorial character of the laws. This can have no bearing on the question. *Virginia* could not legislate for *Maryland* or its territory, and certainly did not mean to do so, even with the consent of *Maryland*. She must have contemplated the entire re-enactment of her law in *Maryland*, to give it efficacy, and her wishes, in this respect, were carried into effect. It was foreseen, that the object to be created by her law, might at one time occupy her own territory, and again the territory of her neighbor, and would lie along the borders of each, hence this law assumed this character. She too, passed the first law, and it properly assumed the shape of one perfect and entire grant, as a fundamental law for the company, which, when by a re-enactment in the several States, it became a valid

law, all might appeal to it where it could be seen at one view, instead of being obliged to look for disjointed fragments of the grant, in the statute books of four States.

2. *The dependent character of the laws chartering the Canal Company.*   Most of the reasons urged for the shape which the *Potomac* charter assumed, in this respect, will apply to the one now under consideration.   But in addition to the fact of the canal running into both States, and so requiring legislation on the part of *Maryland,* to give full efficacy to all the objects and views of *Virginia,* neither *Virginia, Maryland,* nor the *United States,* could have acted in this matter for their own peculiar territories, without obtaining the assent of the other.   Their anterior history shows, they had lost all absolute powers of legislation in relation to the river, and could only again resume them, with the consent of the other.   A reference to the compact between *Virginia* and *Maryland,* agreed upon in 1785, and finally settled in 1786, will show that it had been stipulated, that the river was forever to be a common highway for the citizens of those States, that neither State could obstruct, in any manner its navigation, and that all laws to be enacted by either, upon this subject, were to be invalid, unless assented to by the other. This ancient compact, satisfactorily accounts for *Virginia* demanding the assent of the two other powers, even if her law had been entirely in its form extra-territorial.   For she was enacting a law, the consequence of which, in abstracting so large a quantity of water from the bed of the river, might in dry, nay in ordinary seasons, have had a tendency, by rendering the river less navigable, to have materially interfered with its value, as a public highway for the commerce of the two States, and interfered with the spirit of that agreement, which prohibited either State from obstructing the navigation of the river.   The same considerations which induced the demand of the assent of *Maryland,* occasioned the same requisition on the *United States,* and the *Potomac Company.*   The former had, by the session of the *District,* succeeded to all the rights of *Maryland* on the left

bank of the river, so far as the same was within her terri-
tory, whether those rights grew out of the territorial sove-
reignty of *Maryland*, or by treaties, or compacts with other
States: and the *Potomac Company's* assent was also neces-
sary to be asked, before the *Virginia* law could be opera-
tive, for the grant to her gave her rights over the river, and
preferences in its navigation, which the new law materially
interfered with. The demand of this "assent" on the part
of *Virginia*, is then put upon the sound and proper princi-
ples, when it is placed on the combined facts, that the canal
might be extra-territorial, and that consent to any legisla-
tion was a direct compliance with anterior stipulations;
*Maryland* and the *United States* yield their consent. The
form in which this has been done, has been seized upon by
the solicitors for the appellant, as indicating a contract by ap-
propriate terms. *Marlyand* spreads on her statute book, the
whole *Virginia* charter, and then declares that it is *"accept-
ed, ratified, and confirmed."* The *United States* refer to
the act, and say *"it is ratified and confirmed so far as to
enable the company to make their canal in the District."*
Now if it has been shown, that *Virginia*, by her proposition
never meant to make the offer of a contract, but merely to
ask consent, as she was bound to do, to give efficacy to her
law; then it is immaterial what were the intentions of
*Maryland*, and the *United States;* they could not by any
terms, make that a contract, which was never, by the State
offering, intended to be such. There must, in every con-
tract, be an *aggregatio mentium*—both must agree to con-
tract, or there can be no contract; and here I might permit
this branch of the subject to rest; but neither *Maryland* nor
the *United States* believed they were entering into any
compact, instead of re-enacting the whole *Virginia* law,
section by section, and causing it to appear as an ordinary
statute, as was done by the States in the organization of the
*Potomac Company*, they ratify, confirm and accept the
*Virginia* law, as their law. A difference is only created in
the mode of legislation, none in its consequences. It is

still a *Maryland* law; and as far as the *United States* and *Virginia*, or the *Potomac Company* were concerned, was liable like all her other statutes, to repeal, or modification, until the grant proposed to be made, had actually sprung into a contract, by the organization and acceptance of the company proposed to be created.

3. *That the canal to be constructed shall be a common highway, and no other toll shall be imposed, &c.* This branch of the subject has been fully examined, when inquiring into the character of the grant to the *Potomac Company*, and having shown that it constituted no compact, no further observation need be made in relation to it.

And 5. *That water rights are reserved to the respective States for the canal, both in the States of Maryland, Virginia, and the District of Columbia.* These reservations are so clearly restrictive of the general grant to the company, and a maintenance of the power of each State over the subject matter of the grant, that it is difficult to perceive how a compact is created; they are but conditions annexed to the grant, which run with it. Liberties reserved out of the grant, which the grantor could not defeat, nor could either State; for such attempted defeat would work a forfeiture of the grant, and neither State could do any act, or exercise any power, which would annul an actually vested grant. We have heretofore seen, that every judicial tribunal is impelled by the highest considerations, not to make a compact of acts which are entirely susceptible of accomplishment without, nor to call in the aid of a compact, unless there is (if I may be permitted to use the phrase,) a *"dignus vindice nodus."* The right of the States to tap this canal, any and every where, according to the charter, will forever exist without a compact, in virtue of the mere grant. For, let us suppose that one State attempts to interfere, to prevent the other from making a lateral canal, is not the whole charter forfeited in such other State? Certainly; for it is the condition of the grant, that this liberty shall exist, and the very fact that a forfeiture would thus

take place, secures the observance of this branch of the charter. But a State could not thus act, for it would be a violation of the grant to the company: she adopts and sanctions her grant, seeing and knowing all the conditions and reservations attached to it, and by thus sanctioning it, all the conditions are adopted, and the company could hold such State to a strict compliance with them.

Instead of there being any just foundation for the supposition of a compact, the inferences are all the other way.

These States were never known to leave their compacts, to inference from equivocal acts, but frame them with the precision which all governments do, when they enter into solemn treaties or compacts with each other. Is such the habit of the *United States?* Look at her compact with *Georgia* for the cession of her western lands. Look at all her compacts with the new States, when admitted into the Union, in relation to the public domain, within the limits of such new State. Every thing is framed with certainty and precision, and the only doubt which could possibly arise would be, not whether a contract existed, but perhaps on the construction of the contract. What has been the course of *Maryland* and *Virginia?* The only instance in which they ever framed a compact, we find that it was regularly negotiated by commissioners, and formally sanctioned by legislative enactments. It is not intended to be asserted, that these governments might not have made a pact, by a less solemn mode of proceeding; but their practice is resorted to, to rebut the inference of a contract in this case.

Their legislation too, in this particular instance, one would suppose, was guarded with some caution, for the very purpose of avoiding the possibility, that a compact should be supposed to exist. If *Virginia* had supposed she was about entering into a contract with *Maryland,* she would have contented herself with a simple, unqualified, demand of assent, which as the legislature of the nation, *Congress* was empowered by the constitution to give. But she evidently

never looked to this kind of assent. She says expressly, "*I only want your assent in virtue of your authority to legislate over the District.*" *Virginia* looked to the local and peculiar powers of *Congress*, as a mere territorial legislature, and not to her great constitutional powers, to overlook and guard agreements made by the sovereign States of the Union, with each other. If such was not the object of the provision, what was expected to be obtained by it? Why thus limit her assent? Her assent in the form in which it was asked, was indispensably necessary, as we have seen, not only to gratify her objects in granting the charter, but in the fulfilment of her obligations, and it was not necessary to go beyond this, as she contemplated no compact, to which her general constitutional power of assent was necessary, thereby leaving nothing to inference, but clearly demonstrating that she proposed nothing else, than separate legislation on the part of each government; making the offered grant dependent only on similar grants, by other powers. But it is said by the appellants' solicitors, *ex cathedra*, that this peculiar phraseology of the *Virginia* law, grew out of a desire on the part of that State, to exclude the conclusion, that by asking the consent of *Congress* in general terms, she would admit the powers of that body, constitutionally to legislate on subjects of internal improvement. If this were indeed her intention, there must have been an extraordinary portion of metaphysical subtlety engaged in the structure of her law; for who could ever dream, that a State in asking the assent of *Congress* to a compact between States, by the most distant implication, admitted the existence of power in *Congress*, to legislate over the subject matter of the compact? But the ascription of such intention to her, does not in the least degree, prove, it was the desire of *Virginia* to have the consent of *Congress* to a compact, but she asks it, that by virtue of legislation on the part of *Congress*, the canal might be extended through the *District*, by a similar grant to the same company, and that thereby the objects of her grant might be effectuated.

Again, is no inference to to be drawn against the idea of a compact, from the fact, that no visitorial power has been created over this corporation ? Is it to be conceived that sovereigns entering into a contract, to give birth to a perpetual corporation, would have provided no common tribunal to guard the sanctity of its grant; or who might be enabled, when the corporation was transcending its limits, or from mis-user or non-user, had failed to gratify the objects of those who gave it life, to restore to them the repossession of their imparted sovereignty ? Yet, here is a corporation without a visitor. They could not have left this matter to future stipulation; and it is unreasonable to suppose, that so grave and important a matter, had escaped the observation of the contracting parties. There being no provision on this subject, it is not unfair to conclude, that the States never thought of a compact, but looking solely to their acts, as separate grants of independent sovereignties, its legal supervision was supposed to be where that of every other corporation is, in the courts of the State creating it.

But who is it that complains of this violation of compact ? If there be a compact, it must be admitted that it is with parties always vigilant of their rights, and ever ready to maintain them. Has the history of the country furnished us with any evidence of remonstrances on the part of *Virginia*, or the *United States*, of an infraction of her contract by *Maryland?* Not a murmur has been heard; on the contrary, the *Rail Road Company* have grants, from both *Virginia*, and the *United States*. Is no deduction to be made from this, of what were the intentions of the governments ? Is not the inference satisfactory, that they never supposed any compact had been made to be violated, and that *Maryland* had done nothing, except what she had a right to do.

Having thus shown, that the *Chesapeake and Ohio Canal Company* had no derivative rights, which over-reached the *Ohio Rail Road Company*, acquired from the *Potomac*

*Company*, and that the *Rail Road Company* has in the adoption of her route, done nothing which could interfere with the rights of that company if it were yet in being, and consequently with the right of the *Chesapeake and Ohio Canal Company* derived by assignment from it.

Having shown, that the *Chesapeake and Ohio Canal Company* could only date its charter from the 23d May, 1828, when *Congress* complied with the provisions and conditions upon which the States had made their charter legislation to depend, and that it must date its incorporation from the day when the subscriptions of the corporations of the *District* were confirmed by *Congress*, both of which periods were subsequent to the charter of the rail road, and its adoption of a route.

Having shown, that the *Rail Road Company* could not be over-reached by any supposed relation or abeyance of the rights of the *Canal Company*, and that there existed nothing to prevent the State of *Maryland*, at any period anterior to the vesting of any rights under her offer of a grant to the *Canal Company*, from either repealing it in *toto*, or modifying it, whether its charter be considered either as the offering of *Maryland* law, or growing out of her concurrent legislation with other States.

Having shown, that the State of *Maryland* has restricted the *Canal Company* in, her choice of her route, and fixed the route of the *Rail Road Company* therein, that the law is constitutional, and gives the latter company a priority.

And finally, having shown that there exists no compact between *Maryland* and *Virginia*, in relation to the *Potomac Company*, or between the *United States*, *Virginia*, *Maryland*, and the *Potomac Company*, in the creation of the *Canal Company*, which could prevent the legislation of *Maryland*, or interfere with the rights of the *Rail Road Company*, acquired under such legislation.

I shall proceed in conclusion, to make some observations on the comparative equities of the respective parties.

It is objected against the equity of the complainants, that they hastily fastened themselves upon their route on the left bank of the *Potomac*, during a period of time when the *Canal Company* was unable, from a want of organization, to select that route, and their conduct in this respect, has been assimilated to one who takes advantage of the inability, or minority of a *feme covert* or infant, by seizing upon, and appropriating their property ; and it is emphatically asked, whether equity in such a case would not interfere ?

But it is not perceived, that this haste emanated from a desire to oust the canal of its rights or privileges, but to appropriate that which she believed she had a right to occupy; and if she had the right to occupy it, it would be difficult to impute to it, the want of equity in its proceedings, in endeavoring to gain possession of the right, whatever knowledge she might have of the movements of her antagonist. But let us trace the history of this matter a little farther, and its developments will show the futility of the argument. On the 7th December, 1826, *General Bernard* had reported to *Congress*, that the proposed canal would cost 22,000,000 of dollars. *Maryland*, at the session of its legislature of that year, had expressed her doubts, whether the canal would ever go into operation. *Maryland* had made her subscription to depend on the subscription by *Congress*, of a million of dollars, and it must be admitted that when the magnitude of its cost was taken into consideration, together with the uncertainty that *Congress* would ever give her aid, that the circumstances which surrounded the proposed corporation, were such as to make the most sanguine doubt of its success. In this state of things, the project of a rail road was started, as one the most likely to accomplish the object in view; and the history of all the legislation in relation to it, as well as all its proceedings from its organization, manifest that there was no tardiness or delay at any time. The same expedition existed in the commencement of the undertaking, as at the period when the conduct of the company is considered so objectionable. A brief

reference to these laws and proceedings, will show the activity of all concerned, and at a period too, when that company could have anticipated no collision with the *Canal Company*. On the 28th February, 1827, the rail road was incorporated by *Maryland*. On the 8th March, 1827, it was incorporated by *Virginia*. On the 31st March, 1827, the whole amount of stock was subscribed. On the 23d April, 1827, the company was organized. On the 20th June, 1827, engineers commenced their surveys to the *Ohio* from *Baltimore*. On the 5th April, 1828, the engineers report the route by the *Potomac*. On the 5th May, the board of engineers adopt the above report. On the 9th May, 1828, advice of counsel is asked, as to the mode of acquiring title to the adopted route. On the 12th May, 1828, the board of engineers were directed to proceed on the adopted route, preparatory to construction; and on the 14th May, 1828, agents were despatched to obtain title to the adopted route.

Thus, we perceive that this company moved with celerity from the very beginning. Even at a period of time when no one would have dreamed of any collision, only ten days was suffered to elapse after the passage of the *Maryland* charter, before one was also procured from *Virginia*, and in less than six weeks thereafter, notices had been given of the meetings of commissioners to take stock. The stock had been subscribed, and the company duly organised. No greater expedition was used afterwards than before. If there had been any alteration in the conduct of the company, if from being dilatory, it had become active and energetic, there would have been greater force in the argument. But where its character has been marked with energy and dispatch throughout, it would be difficult to impute that dispatch at any given period to inequitable motives, when, at one period at least, it would have been impossible to ascribe such considerations to the same actions.

But this conduct of the *Rail Road Company* is susceptible of other views, which make the course they pursued entirely justifiable, On the 3d of March, 1828, *Maryland*

had subscribed $500,000 to the company, on the condition that she would go to the *Potomac*—or in other words, the State, as we have seen, not only gave her liberty to take that course, but invited it by the strongest considerations, and having thus manifested her wishes, and conditionally fixed her route, could there be a want of equity in pursuing that course, and appropriating it to herself? Her creator, and that of the *Canal Company*, the fountain of law and justice within the territories of *Maryland*, its legislature, had invited it to this course, and in obeying so high a manifestation of the public will, the charge of inequity against her, would seem to be entirely destitute of any just foundation.

But let us look at the picture on the other side, and we shall find that imputations of a want of equity are made upon much more solid foundations. While the charter of the *Canal Company* was yet *in fieri*, its stock, as we have seen, not subscribed for within its charter, and of course its route not designated, the State of *Maryland*, by a supplement to the very law, subscribing $500,000 to the *Canal Company*, subscribed the same sum to the *Rail Road Company*, on condition that she went to the *Potomac* river, and through the counties of *Washington*, *Frederick and Alleghany*. Notwithstanding this appropriation of the *Potomac* route by the legislature of *Maryland* to the *Rail Road Company*, the *Canal Company* take the subscription of *Maryland*, and still insist upon having the very route, thus otherwise appropriated, under the supplement of the law, which gives her the money. Had the *Canal Company* acted with perfect good faith to the State of *Maryland*, after taking her money, she ought to have considered herself, whatever were her absolute rights, as having waived her right to take that course which *Maryland* had appropriated to the *Rail Road Company*. It is true, *Maryland* had in fact only assumed the character of a stockholder in both these companies; but it is impossible to lose sight of the idea, that she never looked to her own emoluments as a stockholder, in

making these subscriptions, but acted the part of a generous patron to those works, both of which she was, no doubt, anxious to see accomplished, and that for this purpose she generously and liberally advanced the public funds. Was it just and equitable therefore, in the *Canal Company* accepting this bounty, thus munificently bestowed, with full notice of the wishes and views of her creator and benefactor, to frustrate and defeat the only object the State had in view in extending her aid to the rival company, by declaring that she would have the very route, upon the selection of which alone the State had declared, she would bestow her bounty on the *Rail Road Company?* Her course was too plain to admit of hesitation. She ought either to have refunded the money, or have abandoned the route.

Before closing this opinion, I beg leave to subjoin a few remarks in relation to the derivative rights of this company, which were neglected to be made under the appropriate head.

If the *Canal Company,* as the assignee of the *Potomac Company,* still possesses the power of condemnation, it is not a power in aid of the *Chesapeake and Ohio Canal,* but in furtherance of the objects of the *Potomac Company.* If land is condemned under her powers, derived as assignee, these lands must be applied to the objects designed by the charter of the *Potomac Company,* and not to the objects designed by the *Canal Company.* In other words, she has no right to condemn under one charter, for the benefit of the other. Now the *Canal Company* have adopted the left margin of the *Potomac* for the canal, and can have authority to condemn for such a purpose, under that charter, and for that only. As long as she adheres to her route, her rights of condemnation, under her *Potomac* charter, are gone. So far from intimating a desire to abandon such route, she is insisting upon it here. It is clear, that all her condemnations must be made under her canal charter, or they cannot subserve her purposes; for she cannot use them for her canal, if they are condemned under the *Potomac Company's* char-

ter. She presents herself to the court in the attitude of an entire abandonment of the *Potomac* charter—Why? Because she has adopted the route of one continuous canal from tide to the mouth of *Savage* river, *under her new charter*, and so far at least as the left bank of the river is concerned, looks entirely to the new, and not to the old *Potomac* charter. If she means to exercise rights under the *Potomac* charter, they must now be in the bed of the river or on the *Virginia* shore. In this point of view, her rights from the assignment, would be of no consequence to her in this controversy.

From all these views, it appears to me, that in point of law and equity, the *Rail Road Company* is entitled to the route she has selected, and I am therefore for affirming the decree of the Chancellor.

DORSEY, J., also dissented, and delivered the following opinion :

In forming an opinion on the various questions presented for determination, by the argument in this case, I shall endeavor to divest my mind of every impression, which may have been made by the eloquent and forcible appeal, preferred to the patriotism and sympathies of this court, by the appellant, to induce them to urge on the argument of this case against the consent of the appellees, out of its regular order. And this, I am the more easily enabled to do, by finding, on a careful examination of the record, that the harsh and uncharitable remarks made on the conduct of the *President and Directors of the Baltimore and Ohio Rail Road Company*, according to my view of the subject, are wholly unwarranted by any unprejudiced consideration of the facts in the case ; and that the appeal made to stimulate the patriotic energies of the court, to an unwonted expedition, for the avowed purpose of removing the alleged "only obstacle" to the speedy completion of the greatest of national objects, the consolidation and perpetuation of the vital principles of the Union, and

the establishment of a connected navigation between the eastern and western waters, cannot be followed by the contemplated result; as the counsel for the *Canal Company,* in his concluding argument, has distinctly announced to us, that this company has not been chartered by *Pennsylvania;* not having agreed to accept the act of assembly of that State, by reason of the numerous conditions on which it was granted. That under present circumstances, more favorable terms could be obtained by them, is an event, in my estimation, not to be anticipated. So that this magnificent and stupendous enterprise is disrobed of its national character, and consequently, high prerogatives, and sinks into a mere "local" canal, whose extension is limited by the confines of *Maryland.* I shall also view this case, unprejudiced by the assertion, that the canal being a public highway, its charter should be most liberally and favorably construed; whereas, that of the rail road establishing "a close," "odious," and "enormous monopoly," should be visited with a most rigorous interpretation. Because, I regard a rail road, practically and beneficially, as great a convenience to the community, as any public highway ; and those features of monopoly, so much complained of, are the inseparable attributes of that mode of internal improvement, deprived of which, it would lose all its value, and could no longer be esteemed as of public utility.

The first inquiry, which I shall examine, is that, most elaborately and ably discussed on both sides : at what time did the rights of the *Chesapeake and Ohio Canal Company accrue?* Are they to relate to the date of their charter, or to the period at which, by the terms of that charter, they became a body corporate? As to the *Rail Road Company,* in this respect, there has been no controversy. Whether the accrual of their franchises be carried back to the time of the adoption of their charter, or to the time of their organization under it, is immaterial, as far as this first inquiry is concerned. The time, at which they assumed their corporate charter, were duly organized, and made the location

of their rail road, being conceded. With respect to the *Chesapeake and Ohio Canal Company,* a preliminary question is presented: at what time, agreeably to the provisions of their charter, was the amount of stock subscribed for, requisite to give them a corporate existence? By the 3d section of that law, it is enacted, "that whenever one-fourth, or a greater part of the said stock, shall have been subscribed, in the manner aforesaid, then the subscribers, their heirs and assigns, shall be, and are hereby declared to be, incorporated into a company, by the name of the *"Chesapeake and Ohio Canal Company."* The object of the legislature, in imposing this condition precedent, to my mind is most manifest; they designed that the powers and privileges created by their charter, never should vest, until the number of subscribers was such, as to afford a guaranty, or strong probability of the completion of the work, of which the company were to assume the execution. Nothing but a subscription by *bona fide,* competent subscribers, could gratify this postulate of the canal charter. If for a proposition, so undeniable, an authority were required, one, of the most conclusive character, may be found, in the case of the *Salem Mill Dam Corporation vs. Joseph Ropes,* 9 *Pickering,* 189.

One-fourth part of the capital stock of the *Chesapeake and Ohio Canal Company,* is $1,500,000. In November, 1827, the whole amount of subscription, for the canal stock, by competent subscribers, was $416,900. In January, 1828, it was $562,700. In these estimates are excluded the subscriptions of $100,000 by the corporation of the city of *Washington;* of $250,000 by the corporation of *Georgetown;* and the like sum by the corporation of *Alexandria;* because, by reference to the charters of those cities, it will be seen, that they were incompetent to make such subscriptions: their powers being all of a strictly limited, municipal character; and by no possibility of construction, could they be made to convey an authority to bind those cities for the amounts which had been subscribed. They

could levy money on the property within their respective jurisdictions, only to a very small amount; and such levies, they were enjoined, to apply to defraying the expenditures, incident to the execution of the specially enumerated powers with which they were invested by their charters.    The subscriptions of stock, by the corporations of *Georgetown*, *Washington* and *Alexandria*, as before stated, formed therefore, no part of that subscription, which was required by the charter of the *Chesapeake and Ohio Canal Company*, to give that company a legal entity. And, that such was the admitted fact, anterior to·the present controversy, is demonstrated by the act of the *Congress* of the *United States*, passed May 24th, 1828, entitled "An act to enlarge the powers of the several corporations of the *District of Coiumbia*, and for other purposes :" by which it is enacted "that the corporation of *Washington*, the corporation of *Georgetown*, and the corporation of *Alexandria*, within the *District of Columbia*, shall, severally, have full power and authority to subscribe and pay for shares of the stock of the *Chesapeake and Ohio Canal Company;* and all such subscriptions as shall have been already made, by either of the said corporations, shall, and the same are hereby declared to be valid, and binding on the said corporations respectively." If these corporations, anterior to May, 1828, possessed the power of subscribing for canal stock, why the necessity for an act of *Congress* expressly creating this power, and declaring valid and binding on the said corporations respectively, subscriptions, by them, antecedently made?

But it is contended, that conceding the invalidity of these subscriptions, prior to the passage of the act of *Congress*, to constitute the amount of stock, requisite to the existence of the contemplated corporation ; yet, that by the act of *Congress*, they were rendered valid, to all intents and purposes, in the same manner, as if this act of *Congress* had simultaneously passed.    There is nothing in the act of *Congress* itself, in the principles of justice or the analogies

of the law, to sustain this position. There are no words, in the act of *Congress* to favor such a construction. The terms used, are as precise, unequivocal, and comprehensive, for the purpose designed, as language could make them—the subscriptions were to be valid and binding, on the said corporations, respectively; and on them only. Not as is now insisted, to be "valid and binding" to the destruction of rights, legally and intermediately invested in third persons. Retrospective laws, upon every principle of sound interpretation, are to be construed strictly, and not extended beyond their obvious, natural import. Upon what grounds, then, can it be seriously urged, that the meaning of *Congress*, in this case, is, not only to be carried to the fullest extent, which the import of the terms used will bear; but that you are to add to the enacting clause, without one word or circumstance indicating such a legislative design, "that those subscriptions should be as valid and binding upon all persons whatsoever, as if those corporations, at the time of subscribing, possessed the power then given them by this act of *Congress*?" To have passed such a law, to operate in a contest like the present, was not within the powers of *Congress*, had they designed to exercise such a right. Even though it should be conceded that they could have made the subscriptions, from their date, valid and binding on the State of *Maryland*, which I deny; yet they could not have made them so, on the *Baltimore and Ohio Rail Road Company*, whose intermediate rights were lawfully acquired from the State of *Maryland*. Such an attempt would, not only have been inconsistent with the plainest dictates of justice, but subversive of the fundamental principles of civil government; and in spirit, a violation of that principle of the constitution, which forbids the passage of laws impairing the obligation of contracts. To impute to *Congress*, such an outrage, from an act of legislation, like that now before us, would be, to say the least of it, so uncourteous an extension of judicial

power, that no court of judicature entertaining a just respect for themselves, would ever sanction it.

That a statute, affecting a corporation *in esse*, is only operative thereon from the time of its acceptance, is abundantly shown, by the authorities cited on the part of the appellees; if authorities for such a proposition could be deemed necessary. It is an assumption which needs no authorities, that the organization of a company under such a law, as that constituting the *Chesapeake and Ohio Canal Company*, is *per se* its acceptance. If then the rights of this corporation accrue at the instant they accept their charter, or in other words become a corporate body, it follows that the accrual of their rights did not occur prior to the 24th of May, 1828, and that, as far as mere priority is concerned, they must yield precedence to the *Rail Road Company*. But to evade the force of this sound, natural, and common sense inference; it is contended that as soon as the *Chesapeake and Ohio Canal Company* springs into being, they are invested with all the rights and powers designed to be conferred on them, not from the date of their actual existence and investiture, but from the date of their charter. And this doctrine has been insisted on, upon two grounds; on one or the other of which it is said to be clearly sustainable. *First*, it is contended that from the nature of the franchises, about to be erected, they must be regarded from the date of the charter, as "rights *sui generis*, with a latent and indefeasible capacity of future attachment," &c. To sustain the legal recognition of this class of "rights," unintelligible, to minds not perverted by the most subtle refinements of legal technicalities, it was to have been expected, that at least some adjudication would have been adduced. In this expectation however, I have been disappointed. And being, in accordance with the spirit of the times, opposed to innovations on the common law not resting on reason and justice, but the offspring of abstruse refinement and incomprehensible subtilties, I cannot prevail on myself, without stronger reasons

than exist for it in the present case, to admit the existence of this novel species of rights.

The ground which was next relied on in support of the principle of relation, was, that from the date of the charter of the *Chesapeake and Ohio Canal Company*, all the rights with which it was intended to invest them, passed out of the States of *Maryland* and *Virginia*, and remained in abeyance, until the company was formed in whom they might legally vest: and that among these rights, passed that of eminent domain, over the whole section of country, watered by the *Potomac* and its tributaries, above tide water: comprehending perhaps a territory of two or three hundred thousand square miles. That the grant by *Maryland*, therefore, of any portion of this right to the *Rail Road Company*, was inoperative and void—she possessing no such power, could not communicate it to others. To support this doctrine, so astounding in its enunciation, nothing like an express adjudication has been produced; but it has been argued so much at length, and with so much earnestness on both sides, that it might from that circumstance, be well imagined to be a question of great difficulty and doubt, on the decision of which the whole merits of the controversy depended. It was attempted to be sustained upon principles of reason and justice, of policy, of intention in the legislature, of dedication to pious and public uses, and as being clearly within the principle of abeyance. This state of abeyance, it did appear to me when the idea was started, in the argument, and subsequent reflection has confirmed my first impressions, was so wholly irrelevant and inapplicable to the circumstances of this case, that I regarded the invocation of its aid, as the last effort of extreme ingenuity, contending with difficulties insurmountable, by which it was threatened to be overwhelmed. This "absurd and unintelligible fiction," as it is denominated by one of the most profoundly learned and able jurists, that has ever written upon the laws of *England*, is always odious and never tolerated, but from necessity. From necessity, because, without its ad-

mission the grant must fail to take effect; upon no other legal principles could it be sustained : without it, the intention of the grantor would be wholly defeated.   4 *Kent*. *Com*. 252.   Is this the condition of the grant made to the *Chesapeake and Ohio Canal Company*.   Can no company be organized, under the law, unless you adopt this wild notion of abeyance?   Might not every letter, word and object of the legislature have been gratified, and yet the right of eminent domain have remained in the State of *Maryland* until *the Chesapeake and Ohio Canal Company* were in being, and competent to exert it.   If so, and it is impossible to deny it, the essential ingredient, that which is inseparable from the doctrine of abeyance, the necessity of resorting to it, as the only means of effectuating the grant, is wanting; and the principle is therefore wholly inapplicable to the case.   This necessity does not depend on subsequent contingencies; it must exist at the instant the grant is made, or it can never exist at all.   If the States of *Maryland* and *Virginia* had, in express terms of present grant, given to the *Chesapeake and Ohio Canal Company* the power of eminent domain, as now claimed; thus evincing a determination immediately to divest themselves of that right, there might have been some apology, for resorting to this far-fetched absurdity called abeyance. Because, the States having in express terms, parted with this right, and the *Chesapeake and Ohio Canal Company*, not being competent to take it, there is some pretext for saying, according to the fictions of abeyance, that it passed into the clouds, there to remain until the *Chesapeake and Ohio Canal Company* should spring into life, when it would descend upon them.   But have *Maryland* and *Virginia* attempted the commission of such an act of rashness and folly, conceding to them the right to do so? which, however, I deny.   Nothing bearing to it the most remote resemblance is to be found in their law.   The 15th section, is the only one to be found on the subject.   That simply declares that, "whereas it is necessary for the making of the

said canal, locks, dams, ponds, feeders and other works, that provision should be made for condemning a quantity of land for the purpose; "be it enacted, that it shall and'may be lawful for the said president and directors, or a majority of them, *to agree with the owners of any land, through which the said canal is intended to pass,* for the purchase or use and occupation thereof; and in case of disagrement, or in case the owner thereof shall be a *feme-covert,* under age, *non compos,* or out of the State or county, on application to a justice of the peace of the county in which such land shall lie, &c. he shall issue his warrant to the sheriff, to summon a jury to value such lands, and upon payment of the valuation, the *Canal Company* are to be invested with the title thereto." It is the intention of the legislature, to be collected from what they have said, that must control the construction of their act; so far as they have disclosed an intention to bind themselves, or part with their privileges, and no farther, can we hold them bound. There is nothing in the language of the act of assembly; or the subject matter to which it applies; or the nature of the corporation or franchises, which it was designed to create, tending to give a momentary countenance to the intent imputed to the general assembly, or to the interpolation of this extraordinary principle of abeyance. On the contrary, every clause and sentence of this act of assembly is in accordance with the common sense, sound legal axiom of the law, that those rights which pass not to the grantees, remain in the grantors. What motive could have induced the legislature, in this case, to have acted in reference to a different rule? If their object were, as no doubt it was, to expedite the formation of the *Canal Company,* would it have been, with most certainty effected, by the measures imputed to them? Would any individual have more willingly subscribed for stock, because the rights, which he thereby acquired, passed to him, not by immediate transition from the State, but in a way, which none but minds strongly imbued with legal subtilties, not to say absurdities, could

comprehend? Would it not have had a tendency to delay the filling of the subscription list, when those who were peculiarly interested in the subject, saw there was no motive for haste, that they might await their own convenience; as all power of revoking or impairing the grant, or creating a rival enterprise, had passed from the hands of the State. There was then no motive for inconvenient dispatch ; they might with safety wait, and speculate on events. Had the legislature designed to seal up their powers, in this incompre hensible mysterious abeyance, would they not have limited some period, at the expiration of which, they should be restored to them, in case the contemplated corporation should never be in a capacity to exert them? It connot be said, that their omission to do so was the result of an entire confidence, that such a contingency could not occur. The reverse is the truth, as is demonstrated by their legislating for such an emergency, and declaring, that if the requisite amount of stock were not subscribed, the subscribers should be released from their engagements: thus sedulously providing for the protection of the interests of all parties concerned, but of themselves and their constituents. Is it fair to impute to our public functionaries such unpardonable negligence, or intentional violation of their duties? Should we not in candor presume, that the legislature never intended to divest themselves, to our injury, of those powers which were confided to them for our benefit, until that cor-- poration came into *esse*, by which they were to be beneficially exercised—that until then, their sovereign power of legislation remained unimpaired, and needed no statutory reservation to preserve it? If such were the conceptions and designs of the legislature, and the language they have used, as it is, be in accordance with them, is there any stern, unbending rule of law, by which, in a case like the present, the manifest intention is to be frustrated, and sovereignty disrobed of its characteristic and noblest attribute, by the seal of abeyance being stamped on its powers? If in the constitutional code of laws of any civilized nation, the ap-

plication of such a principle be tolerated, it should not find its way into the free and enlightened institutions of this country, by judicial legislation. From its introduction through any other source we have nothing to fear.

The right of eminent domain is only vested in the State, and can only be exercised by it, for the promotion of the public welfare. No transfer, or disposition can be made of it, for any other purpose. It is a power which is of the essence of sovereign government: and must always remain in a state, capable of being exerted for the public good. Such is the inherent, inviolable condition of its tenure. The State can pass no law, either utterly annulling the right, or suspending its exertion for an indefinite period, which could in anywise control subsequent legislation; until the right *vests* elsewhere, to be used for the public benefit, it always remains in the State. And even where the power to exercise it, is confided to others, they are not to be regarded in the character of its owners or possessors, but the instruments or agents, through whom its execution is effected by the State. Upon these grounds, the right depends, according to the fundamental principles of our government; and the interests of the community are deeply concerned in their inviolate preservation. In conformity thereto, should all legislative enactments on the subject, be presumed to have been made, unless such presumption be conclusively rebutted, by the terms of the laws themselves. The provisions of the charter of the *Canal Company* are in strict unison with such a construction; and are only made to violate it by an unnatural, wild, and strained interpretation; or rather by ingrafting on the act, an entirely new provision, unnecessary, impolitic, and improper in its operation, and which never entered into the imagination of the general assembly. And for what purpose are we urged to do this? That we may give to the *Canal Company* powers and priorities with which the law has not invested them; and convict a subsequent legislature of a breach of faith, and of duty, and of a violation of the constitution of the *United*

*States,* which they had sworn to support. The rail road charter does impair, or designs to impair, the rights secured to the *Canal Company,* if any of the positions of the appellants be sustained, except that which relates to the true construction of the rail road charter itself.   The rule is and should be, *omnia rite acta fuisse præsumuntur.*"   It applies, more strongly, to the acts of co-ordinate branches of the government, than to those of courts of judicature.   The power of courts of justice, of declaring an act of the legislature unconstitutional, in this State is drawn from necessity: and whilst I admit its existence, I am firm in the conviction, that it should never be exercised, but in a clear case, where the usurpation of authority stands free from doubt.  If this high and delicate power be lightly or wantonly exerted, or in any other than cases where the mind harbors no reasonable doubts, as to the infringement of constitutional principles, it will lead to consequences, more ruinous to the public interests, than would attend its non-existence.

But where the necessity of introducing into this case, the magical term "abeyance?"   Its introduction, in construing the act of the legislature relative to the *Canal Company,* serves but to perplex and confound what is otherwise simple and unambiguous.   The cases, referred to in support of it, are those of *present grant,* not where a mere mode of creating a franchise or right, is provided for by law.   They are cases where the grant must operate in *presenti* or never. Here there is no absolute, or immediate grant of a franchise, which must take effect *instanter* or never:  nor is it a grant on a condition precedent or subsequent, by which irrevocable rights instantly pass from the grantors.   But it is, as it were the mere offer of a bargain, a naked authority, which, until accepted in the mode prescribed, is revocable at the discretion of the party from whom it emanates.   This, surely, would be its condition, if this charter were the act of a private individual.   Can a reason be assigned, why a different construction should be placed upon it, when regarded as the act of a legislative body ?   What is a statute, or ac-

of assembly, but the mere expression of the will of the legislature ?

The adoption of the notion of abeyance makes the legislature to do, what is inconsistent with their duty, and irreconcileable with the attributes of sovereign legislative power: and imposes on them this absurdity, without motive or object; whereas their duty to their constituents, the interests of the community, and all sound legislative policy should have prompted them to a course of conduct, the reverse of that which is ascribed to them. They would be binding themselves for a period indefinite, when no equivalent obligation was imposed on the party with whom they designed ultimately to form a contract. No time was limited for the organization of the *Chesapeake and Ohio Canal Company;* none prescribed, when the important prerogative of legislating for the public good, according to the exigencies of the times, and the improved lights of science, might descend from the clouds, and light again on the sovereign legislature of the State. No human foresight could with certainty predict such a reinvestment of power. It could not be effected by limitations or length of time, until there be a party in *esse,* whose right might be impaired by such a positive or presumptive bar. If, therefore, a thousand years were to elapse, before any company were formed under the canal charter, the State, though enjoying none of the contemplated advantages, which formed the consideration for the cession of their rights, would still be hung up in this state of abeyance. It could not in any part of the territory, watered by the *Potomac* and its tributaries, open a public highway ; authorise the construction of a turnpike road ; condemn, as is usual, the site of a town, or sanction any other internal improvement; not even grant to the *United States* or to itself, the land necessary to erect a fort or arsenal, no matter how urgent a necessity therefor, may have been produced by a state of war. Can a court of justice, unless impelled by a force of language which leaves no alternative, which admits of no other ra-

tional construction, be induced for a moment to countenance such a theory.   According to my view of the subject, without violating the plainest principles of reason, justice, policy, the express words of the law, and the manifest intent of its framers, it is impossible to do so.   What motive could have prompted the legislature to such a suicidal act?   May not every rational design, which can be imputed to them, be as effectually accomplished by their retaining the power, till it vested elsewhere in a capacity to be exerted.

And this state of abeyance, if once endured, must be interminable, unless, per chance, a *Chesapeake and Ohio Canal Company* should spring into existence: and consequently presents this strange incongruity; if no body corporate comes into being, in whom, by the terms of the grant, they can vest, the rights of the State are irrecoverably gone; by no possibility can they be re-acquired; but, if those rights vest in the grantees, there is some hope for the State. It may be restored to its lost inheritance, which it sold for less than a pot of porridge, by purchase, by forfeiture, or by the *Chesapeake and Ohio Canal Company* ceasing to have further occasion for its use.   Such an absurdity has no analogy in the law to sustain it: no reason, resting on expediency or necessity.   It was suggested, that such a construction was necessary, in order to protect the *Canal Company* from the effects of conflicting, unjust, and inconsistent legislation. Has the constitution made any provision against such acts?   If not, can a court of justice do so?   Can they mould laws and constitutions as suits their pleasure?   And for what purpose are they now asked to do so?   To prevent the legislature from exercising their inherent rights, lest according to the court's notions on the subject, they may exert them unwisely, unnecessarily, or inconsistently.   Of their conduct, in this respect, they are themselves the sole, the exclusive judges.   The constitution has imposed on them no such interdict: it is neither our province, nor within our powers to prescribe it.   To interpret their acts, or adjudicate on such a presumption, would be an indignity

to the legislature, that this court could not permit themselves to offer. Were we to do so, it would be but a consistent extension of the same principle, to determine, that the general assembly having once legislated, their power of future legislation on the same subject, was in abeyance, lest they should act unwisely, unjustly, or inconsistently.

As respects the right of eminent domain, the same power has always been given to the turnpike road companies, that is conferred on the *Chesapeake and Ohio Canal Company.* Was it ever before suggested, that until the location of those roads were made, the right of eminent domain over the whole section of country in which their location was authorised, had passed out the State; and that no public highway could be laid out through it, until those turnpike roads were definitively located. On the contrary, have not the legistature, under such circumstances, been in the constant habit of opening public roads, as if no restriction had been laid on their powers: thus giving a legislative interpretation to their acts, and announcing their intention to be, the reverse of that which it is now insisted to have been.

According to this doctrine of abeyance too, if, immediately after the passage of the canal charter, and the assent to it by the *Potomac Company,* and before one share of stock had been subscribed, *Virginia, Maryland, Congress,* and the *Potomac Company,* had for reasons the most cogent, determined that the charter of the *Chesapeake and Ohio Canal Company* should be annulled; and in pursuance of such determination, the *Potomac Company* had revoked their assent, and *Maryland, Virginia,* and *Congress,* had repealed their laws, yet it was competent to have proceeded and organized the *Chesapeake and Ohio Canal Company;* and when organized, they would have been clothed with the same powers and immunities, as if those repeals and revocation had never taken place: and this without the aid of any constitutional provision. Does this appear to be either reasonable or just? is it such an intention as ought to be imputed to the parties to this charter? Unless restrain-

ed by some constitutional, or fundamental principle of civil government, what one legislature enacts, the same, or its succeeding legislature, may modify or repeal, either in whole or in part. Until the corporate franchise was acquired in the mode pointed out by the canal charter; *Congress* and the legislatures of *Maryland* and *Virginia*, or either of them, as far as their respective interests were concerned, might at discretion have exerted this power. The right appears to me incontrovertible : the only question could have been the expediency of its exercise ; and of this the legislature are the uncontrolled, exclusive judges. To restrain the legislative power, in the manner here attempted, is to fetter it with a restriction which no principle of constitutional law, of civil government, of reason, or of public policy, either authorises or requires. It is essential to our well being and prosperity, as a nation, that they who legislate for our benefit, should be left free to act, as their wisdom, prudence, and sense of justice, may dictate. And that in their sphere of action, in providing for the public weal, no restraints should be imposed on their powers, which are not to be found in our constitutional code, or in those fundamental principles which are the basis of all civil society. If, from misrepresentation, or ignorance of facts, or misconception of our rights or interests, they are led into error ; they should be permitted to retrace their steps, to correct their mistakes. The existence of such a privilege is of the essence of legislative power : to withhold it would be productive of ruinous consequences. What is there in the charter of the *Chesapeake and Ohio Canal Company* to make it an exception to this general rule ? Considered in its proper light, it is nothing more than the offer of a bargain, by three States, which, upon its acceptance, forms the contracting party on one side; the grantors. Until such acceptance, either of those States might revoke or alter its proposals at pleasure. It is in no wise distinguishable from a similar offer made by a private individual in reference to his own domain. And the same right of amendment, mod-

ification, or revocation of such offer would exist in the one case, as the other. With as much propriety may you apply this doctrine of abeyance, to the common cases of unaccepted contracts between individuals. As if A proposed to B to go to *Washington*, or pay me £10, and you shall have my horse, although B make no engagement to do either; yet A's right to his horse is put in abeyance, and he cannot be restored to his right of property, by withdrawing his proposition.

The argument is, "that when the corporation comes into life, the franchise which existed before *de jure*, then vests *de facto*, and relates back to the date of the charter, having the same operation as if the *Canal Company* had then been in existence." If this position can be sustained, there could be no such thing, as seniority in grants of land in *Maryland*, issued under the same order of the *Lord Proprietary*, or of the *Governor and Council*, or of the same act of the *General Assembly of Maryland*. And if by a subsequent order, a particular manor were granted, and afterwards a part thereof granted under a survey, authorised by the prior orders, the junior grant would have priority over the senior : contrary to the repeated decisions of all the courts in *Maryland* upon that subject. Indeed it would follow, that after the acts of assembly, or orders of the *executive council*, have, upon the terms and conditions therein specified, authorised the citizens of the *United States* to acquire title to all, or any of the vacant lands in the State, that those acts of assembly, or the orders of council, could not subsequently be changed or repealed ; the rights of the State having been thereby, put in abeyance. And yet such repeals and modifications have uniformly been made, and it never entered into the imagination of man, to question their legality, or to carry back a title, beyond the period at which the grantee acquired an equitable title, by locating his land warrant.

Under our act of assembly, entitled "an act to incorporate certain persons in every Christian church or congre-

gation in this State," every religious denomination may become incorporated, by complying with the prescribed requisitions. By this notion, of relation to the date of the law authorising an incorporation, all of those corporate bodies come into existence at the same instant of time : there is no such thing as seniority amongst them ; although, in point of fact, some of those Christian congregations had been duly incorporated, twenty years before others ever existed, or were known as a religious sect, or denomination of Christians. And if 500 years had intervened, it would not vary the principle. Should the State, for the encouragement of religion, direct its treasurer to divide $10,000 on the 1st January, 1833, amongst all the religious societies, incorporated under that act ; a christian congregation, conforming to the provisions of the law, fifty years afterwards, might, by this retrospective operation, claim its distribution of that, of which it was never designed to be a participant.

If the *Chesapeake and Ohio Canal Company*, by this doctrine of abeyance and relation, is, upon its being ushered into life, to be considered as clothed with the rights of the State from the date of its charter ; upon the same principle, the proposition is incontrovertible, that they are invested with all the rights and property of the *Potomac Company*, from the time of their assent to the canal charter : which assent was given, as it was designed to be, soon after the passage of the act of assembly under which it was made. They could no longer collect tolls, or do any other act authorised by their charter. Was such the design of the legislature ? Could they have intended, to prompt the *Potomac Company* to such an act of folly, and ruinous injustice to themselves ? That all their dearly bought rights and privileges should be suspended ; the public deprived of the enjoyment of the canals and locks constructed for their benefit, to gratify an absurd, unnecessary, technical fiction, which in truth, has no application to such a subject. If the States are to be held as having made this wanton, useless sacrifice of their rights, human ingenuity can-

not suggest a ground, on which, the *Potomac Company* can be rescued from a similar fate. Abeyance is equally applicable ; if it does not more strongly apply to acts of individuals and corporations, than to those of a sovereign State.

If, then, fifty or a hundred years had elapsed (as it well might and probably would, but for the subscription of $1,000,000 obtained from the *United States*, at a moment the most auspicious,) before the *Chesapeake and Ohio Canal Company* had been warmed into life, and during that interval, the profits received by the *Potomac Company*, if any they could receive, had been millions ; the whole of it would have vested in the *Chesapeake and Ohio Canal Company:* and no interest would be allowed the *Potomac Company* on their capital during this period. Would this be justice ? Could it have been the intention of the legislature, or the understanding of the *Potomac Company*, when their assent was given ? Had the *Canal Company* been immediately organized by the terms of their charter, the stockholders in the *Potomac Company*, at the par, or nominal value of their stock, were to be adopted as stockholders in the *Canal Company*. In this situation of the parties, the proposed substitution administered justice to both sides ; but can it be conceived, that either the legislature or *Potomac Company* intended, that if the organization of the *Canal Company* were delayed for a century, and during this period, the profits of the *Potomac Company* were four times the amount of its stock, yet it all became the property of the *Canal Company*. Such glaring injustice finds no support in the express words of the law, upon no principle of construction or implication does it receive the slightest sanction. Of the use and profits of their stock, the *Potomac Company* remained in the enjoyment, until they were substituted to an equivalent, by the organization of the *Canal Company*. So, upon the most extended idea of the transfer of the right of eminent domain, which can be insisted on with the the semblance of plausibility, to sup-

port it, the State continued in possession of it, until it vested in a being, in *esse*, competent to exert it for the purpose for which it exists. As was before remarked, the power of eminent domain is the inseparable attribute of sovereignty; and is held as a high and sacred trust, delegated exclusively, and to be exerted only for the public good. It is a right, in its nature unalienable, except to those, who, exercising it in consummation of the designs for which it was granted, are regarded, *pro hac vice*, as the agents or instruments of government. It cannot be granted to those who are *incompetent to exert it*: neither can the sovereign power disrobe itself of this, its noblest prerogative, nor place it in abeyance, or in any condition in which it is incapable of being exercised, where the interests of the public demand its exertion. These are implied conditions inherent in the nature of the power, and indissolubly attendant on its possession.

By the act of the general assembly of *Maryland*, passed in 1704, the vestry of every parish in the State, are empowered, upon the same principles that the *Canal Company* are authorised to exercise a similar right, to condemn two acres of land, for the building of a church or chapel of ease. And by an act passed in 1719, for the encouragement of iron manufacture, any person or persons were authorised, in like manner, to procure the condemnation of sites for forge mills, and iron works, each condemnation to embrace 100 acres of land. If the doctrines of the appellants be sustained, it follows, that, by these acts of assembly, the right of eminent domain over all the lands in the State was put in abeyance, until every suitable site for such a purpose should be improved, which will not be the case, in all probability, for centuries to come. The State, therefore, after the year 1719, had no more power to pass any right of eminent domain to the *Chesapeake and Ohio Canal Company*, than after the passage of the charter of that company, it could communicate it to the *Baltimore and Ohio Rail Road Company*. Their argument proves too

much; it annihilates their own rights, whilst it destroys those of the rail road; it involves both companies in one common ruin. The same remarks are applicable to the act of assembly passed in 1704, to encourage the building of water mills, by condemning ten acres of land for each site. And, notwithstanding these acts of assembly, that banished to the clouds or the moon, the right of eminent domain, which only returned to earth, as the exigencies under those laws demanded its re-appearance, yet, at every session of the general assembly, from the year 1704, to the present time, that power had been exerted in opening public highways, &c.; and such, the exercise of this power, had produced at various times before the legislature, in court and out of court, controversies of the most important and warmly contested character; yet, wonderful to tell, neither the legislature by whom the laws were enacted, nor the lawyers, nor the judges by whom they were scrutinized and sustained, until the present trial, ever dreamed of the discovery, now made: that all their proceedings were erroneous, being founded on the right of eminent domain, which did not exist in the State, having taken its flight from *Maryland* in 1704.

The appellants say, it is comparatively unimportant "when and how the company was organised as a body corporate, and acquired a capacity to be fully invested with their corporate franchises; whether in November, 1827, when the required *quota* of stock was subscribed; or in May, 1828, when the subscriptions of the district corporations were confirmed by *Congress;*" their rights take date not from that period, but from the day of the passage of the charter of incorporation; and are, to all intents and purposes, the same, as if the corporation had been brought into immediate existence, by the charter itself. This is extending the principle of "relation," in utter disregard of the reasons on which it is founded; and to an extent which is authorised by no previous adjudication. The cases to which it is applicable, as I have always understood the rule; are where

clear equitable rights are acquired, which cannot be defeated by him, in whom the legal title remains, but by an act of fraud or injustice; there a junior grant, in conformity to such prior equities, shall exclude or postpone a prior intermediate grant. To illustrate the principle, by the case of common occurrence in *Maryland:* A locates his warrant on *Black Acre;* returns his certificate; pays his composition money; but omits to consummate his title, by obtaining his patent. B afterwards executes his warrant on the same land; and, having complied with all the requisitions of the land office, receives his grant. A patent subsequently issues to A on his certificate. In contesting their rights, standing alone upon their patents, B has the prior and better title: but the court, looking to the anterior equities of A, regard his patent as coeval therewith; and to prevent fraud or injustice upon the principle of equitable "relation," the prior equity and junior grant have precedence of the junior equity and senior grant. But what equities had the appellants, simply on the passage of their charter? What fraud or injustice, would they have suffered by a repeal of the law, or any such modification of it, as the legislature might have seen fit to adopt? None. No rights, either legal or equitable, were conferred on the appellants, but by the requisite acts done in conformity to the act of assembly. Then their equities first arose; and to no more remote period, upon any principle of relation, can they possibly be carried. The appellants seek to apply a new doctrine of "relation," never heretofore recognized, which needs no prior equity to support it: thus dispensing with that which has always heretofore been of the very essence, the fundamental basis, of the rule. And what injustice, inconvenience, and confusion would result from such an innovation, may readily be imagined, by its application to the case before us, under a probable variation of its circumstances, which would not in any wise change the principle. Suppose the *Chesapeake and Ohio Canal Company* not to be in existence until ten years hence and

that during that period, under the faith of their charter, the *Rail Road Company* had completed their entire enterprise to the banks of the *Ohio*. What, upon this new and extraordinary doctrine of relation, would be their predicament? Why, the *Canal Company*, then, for the first moment, coming into being, might locate their works upon the identical ground occupied by the rail road, from *Parr's Spring Ridge* to the waters of the *Ohio*, and not allow the *Rail Road Company* one dollar, for the millions expended in the execution of their work. If such be the doctrine of relation, founded on equity, I am at a loss to conceive, what would be termed "relation," founded on iniquity.

But if "relation" be admitted into the case, to what period are the rights of the *Canal Company* to be translated? Is it to 1823, when *Virginia* passed the law, or to 1824, when *Maryland* adopted it, or to the date when *Congress* sanctioned it, or to the time when any of its supplements were passed? The difficulties and absurdities attending an affirmative answer to either of these questions, unequivocally show, that, to neither of those periods can it be carried: but, that you must go back to the common sense of the case, and fix the time of their acceptance of their charter, as the origin of their rights. The legal subscription of the requisite amount of stock being such acceptance.

It is contended, also, that this charter making the canal a public highway, forms an exception to the general rule applicable to such subjects; and must be regarded as a dedication to public uses: and therefore, effects the immediate transit of the powers of the State. The answer to this suggestion is the same, that was given to the alleged operation of the principle of abeyance. The doctrine of the dedication to public uses is founded on the same necessity, which must exist to support abeyance. It is only resorted to, where the thing granted was intended to pass immediately from the grantor; where its remaining in him, was utterly inconsistent with the grant. Is that the case before us? Was any thing more designed by the legislature, than

an eventual grant; a transfer of rights upon the formation of the corporation? Until that event occurred, nothing passed; neither the operation of the grant, in the fullest extent of its terms, and expressions, nor the intention of the grantors, nor any principle of law, require that it should. But would this discriminating feature, if admitted, be of service to the appellants? Concede, that so far as the public are concerned, the rights of the State vest in them. Does that exclude the power of future legislation on the subject? Nay, is it not the very circumstance that gives to the legislature full power and control over it? It is a *concessum* in all the cases of this character, where [the power of the legislature has been drawn in question, that over a grant affecting public rights and privileges, the right of future legislation is undeniable, and uncontrolled. The constitutional prohibition, as to impairing the obligation of contracts, has no application to such a grant. It is only to private, not rights in their nature public, that this salutary safeguard was designed as a protection. If then, for these public purposes, the rights of the State passed into immediate dedication, at the date of the act of assembly, there being no intervention of private vested rights to prevent it; the legislature might at any time resume its powers, or pass any law upon the subject, which its discretion might suggest. Until such private rights intervene, this dedication to public purposes, which is but the creature of the legislative will, exists but at its pleasure. Suppose, by act of assembly commissioners were appointed, to condemn and open a designated road, and hold the same for ever after, as a highway, for the use of the public. Could not the legislature, by any subsequent law, limit, change, or repeal their powers? It cannot be denied.

I have been insensibly drawn into unnecessary prolixity and detail, in the examination of this part of the case, because it appeared to me from the efforts made upon it by both parties, that it was considered the prominent point in

the cause. The other questions, I shall treat with more brevity.

Assuming, that I am right in the views I have thus far taken of this case; the pretensions of the appellant are attempted to be sustained on the ground, that *Maryland, Virginia,* and the *United States,* entered into a contract, and were bound to each other, that the *Chesapeake and Ohio Canal* might be made upon the terms stipulated in its charter ; and that any attempt, therefore, by either of those contracting parties, separately to repeal, change, or modify, any of its provisions, was unconstitutional and void, as impairing the obligation of a contract. If in truth, there be such a breach of faith on the part of *Maryland,* as is complained of, it might, with some show of reason, be said that it is *Virginia* only, which has a right to complain. The *Chesapeake and Ohio Canal Company* having accepted their charter, with a knowledge of its qualification, as made by *Maryland,* stands not with a good grace before a court of equity, as the voluntary asserter of *Virginia's* rights : who for ought that appears, acquiesces in those acts, which form the subject of complaint. Nay, she has actually assented to them, by passing the rail road charter. Having accepted the charter in the condition in which they found it, they have no equities, by which they can be subrogated to the rights of *Virginia,* if she had any. The *United States* not having complied with the conditions, on which alone *Maryland* consented to be bound, until after the alleged violation of the contract, there would be but little equity on their part, to which the *Canal Company* could fall heir.

But where is the evidence, that such a contract was ever made by these sovereign States? It is, say the learned counsel, the necessary inference to be drawn from their acts of legislation. This is not the mode in which independent governments make compacts. Their engagements with each other, are not entered into in the same loose, unauthentic manner, in which the ordinary transactions of mankind are conducted, where much rests on parol, and de-

pends on inference and conjecture. But all their contracts are matters of express stipulation, formally drawn up by learned and skilful agents, fully disclosing the character of their agreements; and for the most part, preserved in their public archives, as matters of record. Whether there be a contract between them, is never a question depending on remote inference, or vague implication; but is ever a subject of express declaration. Where then is the evidence, of the negotiation on which this alleged compact is founded? It is not even insinuated that it exists any where, unless it appears on the face of their acts of legislation. Does it so appear; let me ask? Is there a word or syllable in any of those laws, which intimates such an agreement? Does the preamble recite it? Do any of the enactments affirm it? Or is there, in their numerous statutes relating to this canal, a word or sentence, which does not receive its full and natural import upon the assumed fact, that there was no such compact? And are not all their enactments in relation to the canal, with their various forms and qualifications, consistent and natural, as the regular offspring or result of spontaneous, concurrent legislation, modified by the peculiar circumstances, and combination of interests, in which the parties were situated, independently of all compact on the subject? But stamp on their acts the character of contract, and how stand the legislatures of *Virginia* and *Maryland?* Convicted of a wanton and wilful violation of the constitution of the *United States*, which they had sworn to support. They not only, do not ask the assent of the *United States* to their compact, as it is now called, but expressly declared that *Congress* shall not assent to their act upon any other authority, than "as the legislature of the *District of Columbia.*" And the *Congress of the United States*, represented as one of the three sovereign parties to this unconstitutional compact, and consequently, alike cognizant of its nature and unconstitutionality, in violation of their duty and their oaths," as the legislature for the *District of Columbia,* sanction and affirm it. Can more conclusive evidence be

desired, that there never existed such a contract as is alleged, between the three governments, than the bare statement of the consequences, which would follow such an unnatural presumption? Could any thing short of the most irrefragable proof of the fact, induce any court of justice, much less this grave and reflecting tribunal, to cast such an imputation, not only on their own legislature, the high and predominating co-ordinate branch of their own government; but upon the legislature of the Union, and also upon that of one of the most enlightened States in it?

It has heretofore been a maxim, as well of ethics as of law, that presumptions are to be raised in favor of innocency of intention. But in this case, it does appear to me, that we are called on, in favor of the *Canal Company,* to invert the order of every thing which stands in the way of the accomplishment of their designs.

It is urged, that it must be the contract of the sovereign States, because each State legislates for the canal, through its whole extent: as well on subjects within its own limits and jurisdiction, as those in other States through which it passes. But is this conclusion warranted by the charter? Did *Maryland* intend, in virtue of her legislation, to give title to the *Chesapeake and Ohio Canal Company,* to lands or other property in *Virginia,* or *vice versa?* Where the necessity? What the object of the States in mutually delegating, or exercising such an anomalous, if not incommunicable power: even upon the supposition, of the canal charter, being a compact between them? None can be suggested. The common sense, the legal interpretation of their acts, is, that the legislation of each State should operate to the extent of its limits, and no farther, as regards the rights and powers transferred to the *Canal Company.* But that each State, as they well might do, (independently of all authority, interchangeably communicated,) did impose restrictions, by way of condition, extending beyond its territorial limits. As for example; that no higher toll should be exacted on any part of the canal, than that specified in the

law. With as much propriety, may it be said, that the rail
road charter is a compact between the States, through
which it must pass; the 4th section, enacting, "that the pre-
sident and directors of said company shall be, and are here-
by invested with all the rights and powers necessary to
the construction and repair of a road, from the city of *Bal-
timore* to some suitable point on the *Ohio* river, to be by
them determined;" the 15th section, authorising the acqui-
sition of title to the site, &c. of the road, by agreement or
condemnation, through the entire route; and the 18th sec-
tion, containing a similar restriction, as to tolls; and provid-
ing, that the capital stock of this company "shall be ex-
empt from the imposition of any tax or burden by the
States, assenting to this law." Thus continuing the simili-
tude by showing, that the assent to it, was to be given by
other States than *Maryland.* And *Virginia* did assent to
this law. Yet I believe the idea never entered the ima-
gination of man, that a compact was thus formed between
*Maryland* and *Virginia.*

So far from the restriction in the canal charter, as to tolls,
indicating a contract between the States, because each, in
passing the law, thus undertakes to establish a rate of
tolls, beyond its proper territorial jurisdiction, it shows the
reverse. If the charter was a compact between the States,
then the limitation in its 10th section, that the tariff of tolls
shall not exceed "an average of two cents per ton per mile;"
was all sufficient to prevent its ever exceeding that limit:
and bound, and protected all the parties. No further pro-
vision on the subject was necessary: because, it being the
contract of the three sovereigns, the assent of all was in-
dispensable to any change or modification of its terms. And
had it been attempted, under the legislative sanction of
either of the States, the article of the constitution of the
*United States,* forbidding the State to pass a law impair-
ing the obligation of the contracts, would at once have check-
ed such unconstitutional exercise of power. But not having
entered, nor designing to enter into any such compact; and

knowing, therefore, that without some further enactment, the company could by consent of any of the States, within their respective limits, raise or alter the tolls, in any way they pleased, they wisely added the following prohibition, to the 14th section; "and no other toll or tax whatsoever, for the use of the said canal, and the works thereon erected, shall at any time hereafter be imposed, but by consent of the said States, and of the *United States.*" Construe this a compact between the States, and this sage addition to their law becomes superfluous, unmeaning tautology. Can you, under circumstances like the present, upon any rule of construction ever heretofore adopted, cause it to be so regarded? The compact in this section, and throughout the charter, is not between the States themselves, but between the *Chesapeake and Ohio Canal Company,* when it shall spring into life, as the one contracting party, and the three several States or sovereignties, as the other. If a compact between the States themselves had been intended, the application for the assent of *Congress,* agreeably to the requisition of the constitution of the *United States,* would have followed as a matter of course. For the necessity of such assent, authorities need not be cited. If such assent be necessary to a cession of part of its territory, by one State to another, as has been adjudicated, and is admitted; it is equally necessary, when two States enter into a contract, by which they bind themselves to each other, to cede to a corporation, highly important streams of navigable water within their limits, and authorise the cutting of canals, &c. in either State: and for that purpose, to exercise the right of eminent domain in both States.

Suppose A, B, and C to be proprietors of three contiguous farms, through which D is about to construct a turnpike road, or any other improvement, that if completed throughout, would be highly beneficial to all; but, if not so completed, so far from being a benefit, it would be injurious to those through whose lands it might be made; and might be the means of defeating the accomplishment of some simi-

lar work, which would otherwise have been ultimately effected. D first applies to A, for permission to make the road, who grants it on condition, that no greater toll than one cent per mile be demanded: and further, that B and C assent to the making of the road through their farms on the same terms. B and C on being separately applied to, give such assent. Between A, B and C, no communication on the subject, of any nature or description ever passes. Before the work commenced, A by the consent of D, or under circumstances in which D's rights were not violated, withdraws his permission. Can he not lawfully do so? Has B or C any right to complain, that he has broken any contract, made with them? Unquestionably not. Can the human mind, aided by all the discriminating acumen and subtilty of the profession, draw a distinction in principle, between the case supposed, and that we are now called on to decide, except that the latter is much the stronger case? What A, B and C did, *Virginia, Maryland,* and the *United States* have done; and nothing more. The decision in both cases, must be the same. In confirmation of this idea of a contract between the three sovereigns, it may be asked; if after the completion of the said canal, *Congress* had repealed their law, assenting that a lateral canal be made by *Maryland* through the *District of Columbia,* could not *Maryland* have proceeded to make such lateral canal, in despite of such repealing law, on the ground that it was a nullity, being a law impairing the obligation of a contract? Unquestionably it might. But what contract did it impair? Not any contract between *Congress* and the State of *Maryland;* for none such existed; but the contract between *Congress* and the *Canal Company.* And the State of *Maryland* having the right to make such lateral canal, by their contract with the *Canal Company,* and *Congress* having been bound by their contract with the *Canal Company,* to permit *Maryland* to make such lateral canal, in contemplation of a court of equity, to prevent circuity of action, *Maryland* is subrogated to all the rights of the *Canal Com-*

*pany* on this subject, and standing in the stead thereof, may assert the unconstitutionality of the repealing law of *Congress.* Or may, in such character, to the extent of their injury, prosecute in a Court of Chancery, any other remedy for the breach of such contract, which the *Canal Company* could there maintain. This is so familiar a principle of a court of equity, that to sustain it by further illustration or authorities, cannot be necessary. But *Maryland* could be relieved against this repealing law, either in a court of law or equity, on the ground of fraud, (which would avoid it,) independently of any contract between *Congress* and *Maryland.* *Congress* had by contract with the *Canal Company,* agreed that *Maryland* should exercise the power. Upon this assent the conditional contract of *Maryland* with the *Canal Company* became absolute; the *Canal Company,* as they were authorised to do, finished the canal. A subsequent revocation of this power by *Congress,* independently of all idea of their contracting with *Maryland,* would be a rampant fraud, which no court of law or equity would tolerate. Let us imagine, that in the preceding hypothetical case of A, B, C and D, there was not only no contract between A, B and C, but they severally refused to hold any intercourse or contract in any shape, with each other: yet, after the road was finished through the farms of A and B, that C refused to permit D to progress with the road through his farm, to the great injury of A and B. Can it be doubted, that A and B, independently of contract between them and C, but upon the several contracts by A, B and C, with D, might obtain an injunction against C, to prevent his obstructing D in the completion of the road. It is a proposition that admits not of denial. So if, under the repealing law of *Congress,* any of their agents, or those who were bound by their legislation, prevented the opening of the lateral canal, in the mode prescribed by the repealed acts of *Congress,* a similar injunction would issue against them.

In confirmation of the remarks I have made, as to the clear and unambiguous language used by sovereign States,

in contracting with each other, or in consummating a contract by legislation, look to the act of assembly of *Maryland*, passed at November session, 1785, *ch.* 1; and, comparing it with the charter of the *Chesapeake and Ohio Canal Company*, see whether the evidence of compact, on the face of both laws, be in character the same. As to the canal charter, the inference of compact is reached by a forced unnatural construction, not deducible from the objects of the law, or the circumstances under which it passed, nor necessary to gratify one word or expression in it; and involving consequences, which every principle of courtesy, candor, and sound judicial interpretation, prompt us to avoid, by the rejection of such an inference. But turn to the former law, and the compact is so conclusively demonstrated by its title, its preamble, the terms and expressions of its enactments, that nothing is left for inference or conjecture. This is the mode in which sovereign States treat, or form compacts with each other. The title expressly announces "the compact;" the preamble most minutely recites it; and the enacting clause ratifies and confirms it, and declares that, "as soon as the said compact shall be approved, confirmed and ratified, by the general assembly of the commonwealth of *Virginia*, thereupon, and immediately thereafter, every article, clause, matter and thing, in the said compact contained, shall be obligatory on this State, and the citizens thereof, and shall be forever, faithfully and inviolably observed, and kept by this government and all its citizens, according to the true intent and meaning of the said compact; and the faith and honor of this State is hereby solemnly pledged and engaged to the general assembly of the commonwealth of *Virginia*, and the government and citizens thereof, that this law shall never be repealed or altered by the legislature of this government, without the consent of the government of *Virginia*." If the same inference of compact is drawn from these two acts of assembly, so utterly dissimilar, in that respect, in every feature and provision, the old legal axiom, "*et sic de*

*similibus*," should be changed, and it should now be "*et sic de insimilibus.*"

The appellants have also insisted, that their charter, upon the assent to be given, in the mode prescribed by the *Potomac Company*, was a contract between the *Potomac Company* and the States, of which the charter of the *Baltimore and Ohio Rail Road Company* was a violation. How many contracts, this charter, so prolific of contracts and litigation, may be alleged to contain, when passing through the ordeal of such professional ingenuity as has been applied to it, on the present trial, I am at a loss to conjecture. But, it appears to me, that the same arguments which have been urged against a compact between the States, for the most part, apply with equal force, against any such implication with the *Potomac Company*. The assent of that company, in reason and justice, can be regarded in no other light, than as an offer of a bargain to the *Chesapeake and Ohio Canal Company*, which, like all similar propositions, until accepted, was revocable, at the pleasure of the *Potomac Company*. To construe it otherwise, would be an act of unexampled, cruel injustice to that company. The *Chesapeake and Ohio Canal Company* could not be formed, until the *Potomac Company* had given their assent; they might not have been organized for a hundred years afterwards. Yet during all this period, the *Potomac Company* were to go on, expending their money in removing obstructions in the river, and improving its navigation by locks and canals; and, when, perhaps by dint of these expenditures to facilitate transportation, they are about to be re-imbursed, without the power of extricating themselves from their dilemma, they are to be divested of all the fruits of such their labors and disbursements, and for which no reimbursement or indemnity in any shape, is allowed. And what equivalent are they to receive for this? A mere possibility; remote and improbable, as to any beneficial result; the chance, that after all other stockholders receive ten per cent., there may be

something left for them. Some possible dividend may be made on their capital stock, but nothing on such their disbursements. It may be said, that they ought not (their assent being given) to have continued such expenditures. But what was their alternative? Why, to forfeit their charter, and all that had theretofore been expended. Draw from such their assent, the inference of contract, and they cannot escape the consequences I have mentioned. Should a court of equity, as we now are, be astute and technical, in seeking out a construction fraught with such injustice?

It has also been insisted, that, a subscription to the stock of the *Chesapeake and Ohio Canal Company* having been commenced, no matter to what amount such subscribers had acquired rights, which could not be impaired by any act of the legislature of *Maryland*, affecting the terms and conditions on which such subscription was made. This is true, so far as regards the coercion of the subscribers, to comply with the obligations assumed by subscription, but no further. There is no contract, under the charter of that company, between the State and the subscribers, *qua*, individual subscribers. The only contract that could arise, was between the State and the *Chesapeake and Ohio Canal Company*, when brought into being by the subscription of the requisite amount of stock. Before that took place, every thing was in *fieri*. Then, and not till then, are the legislative powers of the State suspended by the constitutional interdiction; then, and not before, does it impliedly contract, not to revoke, or impair the rights and privileges it has granted. To this extent, and no further, have the Supreme Court gone in the *Dartmouth College*, and other cases on the subject. The acts, done at the time of subscribing for stock, are, of themselves, nothing more than a compliance with the mode, by which the assent, to become members of the corporation, is given; and never were designed to create a contract between the State and the individual subscribers. With as much propriety, may it be said, that, if any article of pro-

perty were offered at public auction, and by the terms of sale, no bid were to be received, unless he who made it, in assurance of his punctuality, should deposit with the auctioneer, one dollar,—that upon such bid being made, and payment of the dollar, the owner could not decline proceeding with the sale, or offering it upon new, or different conditions.

It has been said, that "the charter of the *Chesapeake and Ohio Canal Company*, was granted upon individual application; that individuals had spent their time and money, in procuring the information, upon which the legislature acted, in granting it: and that this expenditure was a consideration, which was sufficient to make the contract binding on the State, from the date of the charter; that these individuals were, in fact, the parties interested, and not the persons who subsequently subscribed, and became corporators under the law." This argument is, I believe, at least entitled to the merit of novelty; but, it passes no encomium upon the strength of a cause, which, in a court of last resort, finds it necessary to invoke it to its aid. If the State be thus bound to these persons, then, have they, under the canal charter, rights above all others: and consequently, a prior right of subscription? Yet no such priority exists. Or if so entitled, the contract, I presume, is mutually obligatory, and they are bound to become members of the corporation. Can they be compelled to become so? And how? Is it possible, that this court, on grounds like these, would venture to declare an act of the general assembly of *Maryland*, unconstitutional?

But it has been alleged, that although the appellants should fail on all the other grounds, on which they have attempted to sustain their asserted priorities; yet, that they are clearly sustainable, under the powers long since granted to the *Potomac Company*, and to which they have been substituted. Before I enter on the examination of this question, let it be premised, that what I say on this subject, relates not to the rights of the *Potomac Company*, or

their successors; to the bed of the river, or to any canals or works which they have constructed. The location of the rail road, as I understand it, interfering with no such rights. The preliminary inquiry arises, what was the character and design of the *Potomac Company's* charter? What were the powers granted? And for what purpose given? On these heads a glance at the act of assembly would satisfy any reasonable mind: but to obtain demonstration on these subjects, all that is necessary, is to compare it with that of the charter of the *Chesapeake and Ohio Canal Company*. The preamble to the charter of the *Potomac Company* gives us the design of its authors, in the following words: "Whereas the extension of the navigation of the *Potomac* river, from tide water to the highest place practicable on the north branch, will be of great public utility: And whereas *it may be necessary to cut canals*, and erect locks and other works on both sides of the river," &c. That a continuous canal between the *termini* of this navigation, was not designed by the legislature: that a delegation of the powers necessary to its construction, was never intended, is to my mind a proposition so manifest, that I can hardly prevail on myself to believe, that arguments are necessary to throw light, as to this subject, on the mind of the most superficial interpreter of the law. The preamble declares, "*it may be necessary to cut canals.*" For what? "The extension of the navigation of the *Potomac* river." And in conformity herewith, the 4th section of the law transfers to the company the authority "to cut *such canals*, and erect such locks, and perform such other works, as they shall judge *necessary* for opening, improving, and extending the navigation of the *said river.*" The 10th section enacts, that the said *river*, and the works to be erected thereon, in virtue of this act, when *completed*, shall forever thereafter be esteemed and taken as a public highway, on payment of the tolls imposed by this act. The 17th section declares, "that the tolls herein before allowed to be demanded and received at the nearest convenient place below the mouth of the south branch, are grant-

ed, and shall be paid on condition only, that the said *Potomac Company* shall make the *river* well capable of being navigated in dry seasons, by vessels drawing one foot water, from the place on the north branch, at which a road shall set off to the *Cheat* river, agreeably to the determination of the general assemblies of *Virginia* and *Maryland*, to and through the place which may be fixed on, below the mouth of the south branch, for the receipt of the tolls aforesaid; but if the said *river* is only made navigable as aforesaid, from *Fort Cumberland*, to and through the said place below the mouth of the south branch, then only two-thirds of the said tolls shall be there received; that the tolls hereafter allowed to be demanded and received at or near *Payne's* falls, are granted, and shall be payable on condition only, that the said *Potomac Company* shall make the said *river* well capable of being navigated in dry seasons, by vessels drawing one foot water, from the said place of collection, near the mouth of the south branch, to and through *Payne's* falls aforesaid; that the tolls hereinafter allowed to be demanded and received, at the *Great Falls* are granted, and shall be payable on condition only, that the said *Potomac Company* shall make the *river* well capable of being navigated in dry seasons, from *Payne's* falls to the *Great Falls*, by vessels drawing one foot water, and from the *Great Falls* to tide water; and shall, at or near the *Great Falls*, make a cut or canal, twenty-five feet wide, and four deep, with sufficient locks, if necessary, each of eighty feet in length, sixteen feet in breadth, and capable of conveying vessels or rafts, drawing four feet water at the least; and shall make at or near the *Little Falls*, such canal and locks, if necessary, as will be sufficient and proper to let vessels and rafts aforesaid, into tide water, *or render the said river navigable in the natural course.*" And the 18th section provides, "that in case the said company shall not begin the said work, within one year after the company shall be formed, or if the navigation shall not be made and improved between he *Great Falls* and *Fort Cumberland*, in the manner here-

in before mentioned, within three years after the said company shall be formed, that then the said company shall not be entitled to any benefit, privilege or advantage under this act; and in case the said company shall not complete the navigation, through and from the *Great Falls* to tide water as aforesaid, within, ten years after the said company shall be formed, then shall all the interest of said company, and all preference in their favor, as to the navigation and tolls at, through, and from the *Great Falls* to tide water, be forever forfeited." . Adverting to the language of this charter, that the thing to be made navigable and a public highway forever, was the river of one foot depth: to the time within which the work was to be completed, viz: in three years, from the *Great Falls* to *Cumberland*; and ten years, from the *Great Falls* to tide water ; (thus giving where one or more canals were to be cut, more than thrice the time that was allowed to complete the residue of the work, where no cannalling of any moment was required or anticipated, but where the distance was ten times as great, and the labor and expence necessary to the completion of a continuous canal, tenfold greater,) and adverting to the power given to cut canals, which was of such only, as were *"necessary"* to render the *"river"* navigable; to the original subscription $220,000, (by which it was contemplated to accomplish the object, for which the company was organized,) an amount insufficient to construct the canal for three miles, at many of the difficult passes between the *Great Falls* and *Cumberland*. Can it be believed that the design of the legislature was, that a continuous canal should be made throughout the whole course of the navigation to be improved? Or that they gave such a power, when they authorised the cutting of *"such canals"* as were *"necessary"* to make the *"Potomac river,"* a navigable public highway. When such power is given, the language of the legislature discloses their intention. As in the preamble to the *Chesapeake and Ohio Canal Company's* charter, the first words of which are, "whereas a navigable canal, from the tide water of the river

*Potomac,* in *the District of Columbia,* to the mouth of *Savage* creek, on the north branch of said river," &c. "will be a work of great profit and advantage," &c. Not a word throughout the law, about the extension or improvement of the navigation of the *"river."* The cutting the continuous canal, and erecting its appertenant works, were objects for which the legislature designed to provide: and for their accomplishment, ample powers were given.

By the 13th section of the charter of the *Chesapeake and Ohio Canal Company,* that company are invested with all the property, rights and privileges of the *Potomac Company,* *"in the same manner and to the same effect as the said Potomac Company now hold, possess, and occupy the same by law."* In no other way, for no other *"effect,"* or purpose, can the *Canal Company* exercise the "rights and privileges" of the *Potomac Company,* but for the effects and purposes, contemplated by the charter of the *Potomac Company.* The same interests and powers, and nothing more, accrue to the *Canal Company,* exerting the "rights and privileges of the *Potomac Company"* in cutting an occasional canal, or making any improvement in the navigation of the river, as would, before the charter of the *Canal Company,* have accrued to the *Potomac Company,* performing the same work. Although the property of the *Potomac Company* passes to the *Canal Company,* to be used as they see fit, taking care that their rights are not forfeited under the provisions of the *Potomac* charter; yet they have no right under that charter to cut a canal, not necessary to improve the navigation of the river as there provided for, but with a view of using it as the canal authorised by the charter of the *Chesapeake and Ohio Canal Company.* Such a fraudulent device to over-reach the prior rights of the appellees; such deceitful trickery, would not for a moment be tolerated by a court of equity. If, after completion of the *Chesapeake and Ohio Canal,* or pending the execution of the work, the *Canal Company* keeping the *"river Potomac"* navigable, as required by the *Potomac* charter, were to

collect the tolls authorised thereby ; their right to do so could not be the subject of a doubt. If, to effectuate such navigability, it should be necessary to cut a canal at any difficult pass of the river, (putting out of view, the time limited for the completion of their work,) their power to do so could not be brought in question. But what tolls could be demanded for the use of such a canal? None other than those specified in the *Potomac* charter. Was it the intention of the *Chesapeake and Ohio Canal Company* to collect, for the use of that part of the canal they were locating, in collision with the location of the *Baltimore and Ohio Rail Road Company*, no other tolls than those sanctioned by the *Potomac* charter? Was it their design, merely to cut a canal, necessary to make navigable the "river," in the mode contemplated by the canal charter? If so, then, it may, in fairness be said, they were acting under the powers, possessed by the *Potomac Company*. But would the candor of their counsel permit them to throw out such an insinuation? Would the *Canal Company* for a moment, entertain the idea of making the canal from the *Point of Rocks* to *Cumberland*, (the battle ground) on such a condition? Nobody can believe it. Suppose the *Canal Company*, to draw the whole trade of the river into the canal, (after its completion) or for any other motive, were to suffer obstructions to accumulate in the river, until it ceased to be navigable, as provided for in the *Potomac* charter, and that charter, in consequence thereof, by judgment of a court of law, were forfeited; would the *Canal Company*, thereby, lose all title to that part of the canal, between the *Point of Rocks* and *Cumberland*. If it were made under the powers given by that charter, the consequence is inevitable; it must be conceded. Do the *Canal Company* admit it? They would hesitate long, before they did so. The undeniable fact is, that the *Canal Company* were locating that grand canal, provided for by the *Chesapeake and Ohio Canal* charter, and not any canal, contemplated by the charter of the *Potomac Company*.

How then can they be regarded as acting, under the powers delegated by the *Potomac Company's* charter? In my humble apprehension, it is impossible to sustain them, under this, their last expedient to defeat the well established rights of the *Baltimore and Ohio Rail Road Company.* To do so, would be to strain, beyond all reason, the letter of the statute, for the purpose of violating its spirit and obvious import : to give countenance, nay, encouragement, to fraudulent contrivances and ingenious deceits, which they have never yet received in any tribunal of equity.

The inquiry on this point, the answer to which, settles this question, is most simple. Were the acts of the *Canal Company,* against which the injunction issued in this case, done in execution of the enterprise contemplated by the *Potomac* charter? or in execution of the great work, provided for by the charter of the *Chesapeake and Ohio Canal Company?* If the former, then the *Potomac Company* being first legally constituted, it may be contended, that they are entitled to priority in the selection and appropriation of the route ; and the injunction granted to the *Rail Road Company* should be dissolved. But, on the other hand, if the acts of the *Chesapeake and Ohio Canal Company,* complained of, were done, not in completion of the works provided for by the charter of the *Potomac Canal,* but in execution of that stupendous canal, alone contemplated, and authorised by the charter of the *Chesapeake and Ohio Canal Company,* then the *Rail Road Company,* being the senior corporation, and having first made their location, are clearly entitled to all the priorities they claim ; and the injunction of the Chancellor should be made perpetual.

But, suppose the *Potomac Company* had, as insisted, originally, under their charter, a power either to have made a continuous canal, or to have improved the navigation of the river by occasional canals, or wholly by sluice navigation. Having once made their selection of the mode, and exercised, as they have done, the right of eminent do-

main, in cutting occasional canals, that power cannot be again exerted, in the making of a continuous canal. The desired improvement being made in one mode, this transcendent power cannot afterwards be exerted in affecting it in another; otherwise, a continuous, and an occasional canal, might both be cut through the lands of the same individual: an invasion of private rights, a wanton oppression, which the public exigencies at that time, did not require, and which, the framers of the *Potomac* charter never designed to give to that company.

Feeling entire confidence in this view of the subject, that no such power was derived from the *Potomac Company*, as that which brought the *Chesapeake and Ohio Canal and Baltimore and Ohio Rail Road Companies* in collision, I deem it unnecessary to examine the much vexed question, whether, if the *Potomac Company* originally possessed such a power, it could be exerted after the time limited by the 18th section of their charter, for the completion of the improvement of the navigation of the river.

On the part of the appellants, it has been further urged, that the acts of the general assembly of *Maryland*, in relation to the route of the rail road, conferring a general power of location, uncontrolled by localities, are to be so restricted, in their interpretation, as to exclude the right of interfering with the site of the canal; which, by its charter, is specifically located, on the eastern bank of the *Potomac*. But this position is untenable, because it is wholly unfounded, in fact. It is not true, that in the *Chesapeake and Ohio Canal* charter, there is any specific location given to the canal, confining it to the eastern or western bank of the *Potomac*, or to either of the banks of that river. The 19th section of the law, which alone defines the route and *termini* of the canal, declares, "that the first, or eastern section, shall begin at the *District of Columbia*, on tide water, and terminate at, or near the bank of *Savage* river or creek, which empties into the north branch of the *Potomac*, at the base of the *Alleghany* moun-

tain." Can human ingenuity torture this into any more definite location of this section of the canal, (which only, is involved in the present controversy,) than as fixing its *termini?* Can it be possible, judicially to determine, that the true import of these expressions, is, that the canal shall commence at tide water, in the *District of Columbia,* and thence follow the ravine of the *Potomac* to the bank of *Savage* creek? Is there any thing in the law, or the reason of the law, that could thus fetter its construction? Suppose it had been ascertained, by actual surveys and calculations, made by experienced engineers, aided by the superior and extended lights of science of the present day, as applied to the art of canalling; that, after receiving into the canal the waters of the *Potomac,* at the *Great Falls,* instead of following the sinuosities of that river, by means of its tributaries, and through the interior of the country, on its eastern shore, the canal could be conducted to the bank of *Savage* river, by one-half the distance—at one-third of the expense of labor and money—and in a way to give transportation to three times the quantity of produce, that it would otherwise have borne; could the power of the company, so to construct it, be the subject of a momentary doubt? Admit this power, as you must do, and all this notion of a specific location of the canal, by its charter, of which we have heard so much, vanishes in a moment. For, if the canal be located by its charter, the company possesses no discretion to depart from it. Nor does the preamble, as was supposed by the argument, sustain, in the slightest degree, this doctrine of specific location. Every letter of it is complied with, in exercising the discretion used in the suppositive case, I have suggested.

But it is alleged, that this specific location of the canal by its charter, is demonstrated, by reference to that mass of surveys, reports, dissertations, resolutions, &c. with which the record has been loaded. Or, in other words, that we are to collect the meaning of the legislature, not from the terms used by them, which are explicit, unambiguous, and

full in a pre-eminent degree; but by imputing to them a knowledge of facts, of which there is no evidence, (nor indeed could there be,) that they ever possessed, or if they did, upon what part of it they acted; we are to infer they meant the very reverse of what they have said. This would be stretching the power of judicial legislation, rather farther than the most zealous admirers of the maxim, "*est boni judicis ampliare jurisdictionem,*" has ever yet extended it. It would be enacting, not expounding the law. Conceding, however, that we possess the power to do so; and, that upon these voluminous documents, we are now about to declare, the legislature to have done, what, according to our opinion, they ought to have done ; and what is that? Why, to give to the *Canal Company* that discretion which they ought to possess, of locating the canal where the lights of improved science, expendiency, the great interests of the community, and the successful accomplishment of the enterprize, would dictate : and not tie them down to a location recommended by resolutions passed by conventions, less interested and enlightened, perhaps, than themselves: or recommended by surveys made ten, twenty, or fifty years before. This is the course, pursued by the legislature in this instance; and according to my view of it, is the only action on the subject, which an independent, and enlightened legislative body could have adopted. Indeed, from these documents, no certain, and specific location of the canal could well have been made, as scarcely any two of them agree in that respect. Some confining the canal, on one side of the river *Potomac;* some on another; some crossing the river often; some seldom; and perhaps some in one place, and some in another. Had a definite location been given to the canal, it would have been of a piece, with the practice so generally complained of, in locating turnpikes, and great public highways, with calls for all the little towns or villages, in the vicinity of which, they might probably pass. Had the legislature intended to make a peremptory location of the canal, they would have used apt words for

that purpose; as they did, in providing for the second or western section, (in the clause immediately following that before recited;) which say they, "shall commence at the said termination, and *extending along the valley* of *Savage* creek, so far as the same," &c. In not doing so as to the first, and doing so as to second, they distinctly announce the discrimination they designed to make, in the locations of the two sections. The utter silence of the law, as to any designated site, of the first section of the canal; its omission to select or adopt any of the numerous surveys, that had been made; is conclusive of the fact, that the *Canal Company* were left, as they should have been, to an unlimited freedom of choice. In which, they might be influenced by every circumstance, tending to control their choice : whether it related to the obstructions to be removed; the time and expense, necessary to be consumed in doing so; the length of the route; the commercial or transporting facilities to be afforded; their pecuniary ability to accomplish the object, or any like consideration.

But it is insisted, that, although, this court should be of opinion, there is by the charter of the *Canal Company*, no precise location of the canal, confining it to the margin of the river *Potomac*, yet that it is specifically located in the territory, watered by the *Potomac*, and attaches upon all the lands within such territory, and so continues, until the actual location of the canal. To recognize the principle of abeyance, as asserted, would be mercy to the landholders of that immense section of country; when we advert to their condition under the notion of this immense canal : whose location occupies the space for a sea, instead of a canal. The effect of abeyance of the power of eminent domain, would be to prevent the laying out of public highways, or the condemnation of land, for any improvement whatever : in the individual improvement and enjoyment of their lands, the owners were left unrestricted as heretofore. But, the effect of this sort of legislative location of a canal, which is to spread over a section of country of perhaps two hundred

miles in length, and more than one hundred in breadth, to the exclusion of all acquirements of intermediate rights, is to me a proposition so new and incomprehensible in its character; so appalling in its consequences, that I can with difficulty persuade myself, that it was "put forth in sober earnest." If it be sustainable, not only is the State bound by it, but no landholder within the sequestered district, could lawfully do any act by which this franchise of the *Canal Company* could be changed or impaired. To the whole extent of country then, watered by the *Potomac* and its tributaries, containing two or three hundred thousand square miles, this right of the *Canal Company* so attaches, that after the date of their charter, no proprietor of land can build a dwelling house, or mill, or erect any building or improvement upon his property, without incurring the risk of having his buildings and improvements razed to the ground, without any compensation or indemnity, other than what he would have been entitled to, had his property remained in the condition in which it was at the time the act of assembly passed. And where is he to look for indemnity for this suspension of his proprietary rights? The law does not provide it. The contemplated corporation might not have been formed for a hundred years, after the date of its charter, and although during all that time, his hands are tied, he is deprived of the beneficial use and enjoyment of his property; yet for this sacrifice no remuneration is allowed him. But even after the organization of the corporation, and the accomplishment of the object for which they were incorporated; who are compensated? All whose rights have been ruinously suspended? No. Not one in ten thousand. Perhaps the property of not one, in a still greater number, would be touched by the canal or its appendages; and for those only is any indemnity provided.

Have the legislature of *Maryland* a power to pass such a law, had they so designed? Certainly not. They can divest no man, agreeably to our constitutional safeguards, of

the beneficial enjoyment of his property; but upon making adequate compensation therefor.

If, however, it were shown that the canal, by its charter was specifically located, or in any way located, the rail road charter with the acts done thereunder, is a repeal of it, so far as their locations interfere, above the mouth of the *Monocacy;* the rights of the *Rail Road Company* having been conferred on them by the legislature of *Maryland,* whilst their powers over the canal charter, were unrestricted by any constitutional prohibition. The *Canal Company,* not being then in existence, could be invested with no rights, nor be a party to any contract, which the legislature of *Maryland* could impair, or violate. The selection of the route for the rail road, had been adopted before the *Canal Company* had been ushered into being.

Nor is it true, as has been assumed in the argument for the appellants, that there is no power given to the *Baltimore and Ohio Rail Road Company,* so to locate their road, as to interfere with the location, now claimed by the *Canal Company.* The charter of the *Rail Road Company,* passed at December session, 1826, gives to the company the power of locating the road, in terms as unlimited as could be devised. They are "invested with all the rights and powers necessary to the construction and repair of a rail road, from the city of *Baltimore* to some suitable point on the *Ohio* river, to be by them determined: and they, their agents, and those with whom they may contract for making any part of the same, or their agents may enter upon, use, and excavate any land, which may be wanted for the site of said road." If a power of location without restriction or exception of place, were designed to be given; expressions more comprehensive for that purpose, could not have been selected. But it is not alone upon these broad and general expressions, that the rights of the *Rail Road Company* rests. By the 2d section of the act of 1826, the State of *Maryland* reserved the privilege of taking stock in the *Rail Road Company,* to the amount of 10,000 shares.

By the 3d section of the act of 1827, passed the 3d March, 1828, the general assembly direct their treasurer to subscribe in their behalf, for 5000 shares of this reserved rail road stock, on condition, that the president and directors of the *Rail Road Company* "shall agree so to locate said road, that it shall go to, or strike the *Potomac* river, at some point between the mouth of the *Monocacy* river, and the town of *Cumberland* in *Alleghany;* and that it shall go into *Frederick, Washington* and *Alleghany* counties." To this condition, the president, directors and company of the rail road, assent: the stock is accordingly subscribed for, the money of the State received, and the rail road located accordingly. Yet, it is said under these circumstances, that the location of the rail road, "to go to, or strike" the *Potomac* in the manner aforesaid, was a power not designed to be given to the *Rail Road Company.* It is impossible to go to, or strike the river, without interfering with the route claimed by the *Canal Company.* Having reached the river, the continuing the rail road up the same, is the natural, practically speaking, the necessary consequence, in order to comply with the requisition of the act of assembly, that the rail road should pass through *Frederick, Washington,* and *Alleghany* counties. If there could be any doubt, as to the operation of the act of 1826, when construed alone ; it appears to me, that the legislative interpretation thereof, by the act of 1827, when no conflicting rights were in *esse*, to be affected by it, must forever remove such doubt. The act of 1827, acknowledges the power in question, to be in the *Rail Road Company*, by the act of 1826. These acts of the same legislature, in *pari materia*, are "to be construed together as one system." In this view of the subject, can there be a question as to their construction on this point? But let it be conceded for the moment, that there were no words in the act of 1826, by which this power could be transferred. I hold it a matter, too clear for argument or illustration, that this power is fully delegated by the act of 1827. At the time of its passage, the legislature were fully

authorised to have granted this power. They agree to pay $500,000, on condition of its exercise by the *Rail Road Company*. Is not the inference irresistible, the implication of necessity, that they authorised the *Rail Road Company* to exert it? To give to this act of assembly any other construction, would be to convict the legislature of *Maryland*, of an act of absurdity, prodigality and folly, which is without a parallel in the annals of rational men; they intended this, and could have intended nothing else. As well might it be said that if A pay to B $500, on condition that he would cut down, and haul off all the timber from fifty acres of A's wood-land, that A gave to B no powers under such contract, but that he could sue B as a tresspasser or wrong doer, and recover of him damages for every tree he should cut or haul off.

Having by the views already expressed, disposed of the material points in this case, so far as is necessary, to the final decision thereof, I forbear to express any opinion on the point so elaborately, I was about to say unanswerably, argued by the counsel for the appellees, that conceding to the *Canal Company*, seniority of corporate existence, that their charter *per se* gave to them no priority of right, in any particular route for their canal. That such superiority of right, rested entirely on priority of selection, and that therefore the rights of the *Rail Road Company* were paramount. I am therefore of opinion that the decree of the Chancellor, making the injunction perpetual, ought to be affirmed.

**DECREE REVERSED AND BILL DISMISSED.**